# Exhibit A: Executive Order GA-38



GOVERNOR GREG ABBOTT

July 29, 2021

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
3:15PM O'CLOCK

JUL 29 2021

Secretary of State

Mr. Joe A. Esparza
Deputy Secretary of State
State Capitol Room 1E.8
Austin, Texas 78701

Dear Deputy Secretary Esparza:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

> Executive Order No. GA-38 relating to the continued response to the COVID-19 disaster.

The original executive order is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

# 𝕰𝖝𝖊𝖈𝖚𝖙𝖎𝖛𝖊 𝕺𝖗𝖉𝖊𝖗

## BY THE
## GOVERNOR OF THE STATE OF TEXAS

**Executive Department**
**Austin, Texas**
**July 29, 2021**

### EXECUTIVE ORDER
### GA 38

*Relating to the continued response to the COVID-19 disaster.*

━━━━━━━━━━━━━━━━

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying under Section 418.014 of the Texas Government Code that the novel coronavirus (COVID-19) poses an imminent threat of disaster for all Texas counties; and

WHEREAS, in each subsequent month effective through today, I have renewed the COVID-19 disaster declaration for all Texas counties; and

WHEREAS, from March 2020 through May 2021, I issued a series of executive orders aimed at protecting the health and safety of Texans, ensuring uniformity throughout Texas, and achieving the least restrictive means of combatting the evolving threat to public health by adjusting social-distancing and other mitigation strategies; and

WHEREAS, combining into one executive order the requirements of several existing COVID-19 executive orders will further promote statewide uniformity and certainty; and

WHEREAS, as the COVID-19 pandemic continues, Texans are strongly encouraged as a matter of personal responsibility to consistently follow good hygiene, social-distancing, and other mitigation practices; and

WHEREAS, receiving a COVID-19 vaccine under an emergency use authorization is always voluntary in Texas and will never be mandated by the government, but it is strongly encouraged for those eligible to receive one; and

WHEREAS, state and local officials should continue to use every reasonable means to make the COVID-19 vaccine available for any eligible person who chooses to receive one; and

WHEREAS, in the Texas Disaster Act of 1975, the legislature charged the governor with the responsibility "for meeting ... the dangers to the state and people presented by disasters" under Section 418.011 of the Texas Government Code, and expressly granted the governor broad authority to fulfill that responsibility; and

WHEREAS, under Section 418.012, the "governor may issue executive orders ... hav[ing] the force and effect of law;" and

WHEREAS, under Section 418.016(a), the "governor may suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business ... if strict compliance with the provisions ... would in any way prevent, hinder, or delay necessary action in coping with a disaster;" and

WHEREAS, under Section 418.018(c), the "governor may control ingress and egress to

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
__3:15 PM__ O'CLOCK

JUL 2 9 2021

*Governor Greg Abbott*                                    *Executive Order GA-38*
July 29, 2021                                                           Page 2

and from a disaster area and the movement of persons and the occupancy of premises in
the area;" and

WHEREAS, under Section 418.173, the legislature authorized as "an offense,"
punishable by a fine up to $1,000, any "failure to comply with the [state emergency
management plan] or with a rule, order, or ordinance adopted under the plan;"

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and
authority vested in me by the Constitution and laws of the State of Texas, do hereby order
the following on a statewide basis effective immediately:

1. To ensure the continued availability of timely information about COVID-19 testing
   and hospital bed capacity that is crucial to efforts to cope with the COVID-19
   disaster, the following requirements apply:

   a. All hospitals licensed under Chapter 241 of the Texas Health and
      Safety Code, and all Texas state-run hospitals, except for psychiatric
      hospitals, shall submit to the Texas Department of State Health
      Services (DSHS) daily reports of hospital bed capacity, in the manner
      prescribed by DSHS. DSHS shall promptly share this information
      with the Centers for Disease Control and Prevention (CDC).
   b. Every public or private entity that is utilizing an FDA-approved test,
      including an emergency use authorization test, for human diagnostic
      purposes of COVID-19, shall submit to DSHS, as well as to the local
      health department, daily reports of all test results, both positive and
      negative. DSHS shall promptly share this information with the CDC.

2. To ensure that vaccines continue to be voluntary for all Texans and that Texans'
   private COVID-19-related health information continues to enjoy protection against
   compelled disclosure, in addition to new laws enacted by the legislature against so-
   called "vaccine passports," the following requirements apply:

   a. No governmental entity can compel any individual to receive a
      COVID-19 vaccine administered under an emergency use
      authorization. I hereby suspend Section 81.082(f)(1) of the Texas
      Health and Safety Code to the extent necessary to ensure that no
      governmental entity can compel any individual to receive a COVID-19
      vaccine administered under an emergency use authorization.
   b. State agencies and political subdivisions shall not adopt or enforce any
      order, ordinance, policy, regulation, rule, or similar measure that
      requires an individual to provide, as a condition of receiving any
      service or entering any place, documentation regarding the
      individual's vaccination status for any COVID-19 vaccine
      administered under an emergency use authorization. I hereby suspend
      Section 81.085(i) of the Texas Health and Safety Code to the extent
      necessary to enforce this prohibition. This paragraph does not apply to
      any documentation requirements necessary for the administration of a
      COVID-19 vaccine.
   c. Any public or private entity that is receiving or will receive public
      funds through any means, including grants, contracts, loans, or other
      disbursements of taxpayer money, shall not require a consumer to
      provide, as a condition of receiving any service or entering any place,
      documentation regarding the consumer's vaccination status for any
      COVID-19 vaccine administered under an emergency use
      authorization. No consumer may be denied entry to a facility financed

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
_3:15pm_ O'CLOCK

JUL 2 9 2021

in whole or in part by public funds for failure to provide documentation regarding the consumer's vaccination status for any COVID-19 vaccine administered under an emergency use authorization.

d.  Nothing in this executive order shall be construed to limit the ability of a nursing home, state supported living center, assisted living facility, or long-term care facility to require documentation of a resident's vaccination status for any COVID-19 vaccine.

e.  This paragraph number 2 shall supersede any conflicting order issued by local officials in response to the COVID-19 disaster. I hereby suspend Sections 418.1015(b) and 418.108 of the Texas Government Code, Chapter 81, Subchapter E of the Texas Health and Safety Code, and any other relevant statutes, to the extent necessary to ensure that local officials do not impose restrictions in response to the COVID-19 disaster that are inconsistent with this executive order.

3.  To ensure the ability of Texans to preserve livelihoods while protecting lives, the following requirements apply:

a.  There are no COVID-19-related operating limits for any business or other establishment.

b.  In areas where the COVID-19 transmission rate is high, individuals are encouraged to follow the safe practices they have already mastered, such as wearing face coverings over the nose and mouth wherever it is not feasible to maintain six feet of social distancing from another person not in the same household, but no person may be required by any jurisdiction to wear or to mandate the wearing of a face covering.

c.  In providing or obtaining services, every person (including individuals, businesses, and other legal entities) is strongly encouraged to use good-faith efforts and available resources to follow the Texas Department of State Health Services (DSHS) health recommendations, found at www.dshs.texas.gov/coronavirus.

d.  Nursing homes, state supported living centers, assisted living facilities, and long-term care facilities should follow guidance from the Texas Health and Human Services Commission (HHSC) regarding visitations, and should follow infection control policies and practices set forth by HHSC, including minimizing the movement of staff between facilities whenever possible.

e.  Public schools may operate as provided by, and under the minimum standard health protocols found in, guidance issued by the Texas Education Agency. Private schools and institutions of higher education are encouraged to establish similar standards.

f.  County and municipal jails should follow guidance from the Texas Commission on Jail Standards regarding visitations.

g.  As stated above, business activities and legal proceedings are free to proceed without COVID-19-related limitations imposed by local governmental entities or officials. This paragraph number 3 supersedes any conflicting local order in response to the COVID-19 disaster, and all relevant laws are suspended to the extent necessary to preclude any such inconsistent local orders. Pursuant to the legislature's command in Section 418.173 of the Texas Government Code and the State's emergency management plan, the imposition of any conflicting or inconsistent limitation by a local governmental entity or official constitutes a "failure to comply with" this executive order that is subject to a fine up to $1,000.

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
___3:15pm___ O'CLOCK

JUL 2 9 2021

4. To further ensure that no governmental entity can mandate masks, the following requirements shall continue to apply:

    a. No governmental entity, including a county, city, school district, and public health authority, and no governmental official may require any person to wear a face covering or to mandate that another person wear a face covering; *provided, however, that*:
        i. state supported living centers, government-owned hospitals, and government-operated hospitals may continue to use appropriate policies regarding the wearing of face coverings; and
        ii. the Texas Department of Criminal Justice, the Texas Juvenile Justice Department, and any county and municipal jails acting consistent with guidance by the Texas Commission on Jail Standards may continue to use appropriate policies regarding the wearing of face coverings.

    b. This paragraph number 4 shall supersede any face-covering requirement imposed by any local governmental entity or official, except as explicitly provided in subparagraph number 4.a. To the extent necessary to ensure that local governmental entities or officials do not impose any such face-covering requirements, I hereby suspend the following:

        i.    Sections 418.1015(b) and 418.108 of the Texas Government Code;

        ii.   Chapter 81, Subchapter E of the Texas Health and Safety Code;

        iii.  Chapters 121, 122, and 341 of the Texas Health and Safety Code;

        iv.   Chapter 54 of the Texas Local Government Code; and

        v.    Any other statute invoked by any local governmental entity or official in support of a face-covering requirement.

        Pursuant to the legislature's command in Section 418.173 of the Texas Government Code and the State's emergency management plan, the imposition of any such face-covering requirement by a local governmental entity or official constitutes a "failure to comply with" this executive order that is subject to a fine up to $1,000.

    c. Even though face coverings cannot be mandated by any governmental entity, that does not prevent individuals from wearing one if they choose.

5. To further ensure uniformity statewide:

    a. This executive order shall supersede any conflicting order issued by local officials in response to the COVID-19 disaster, but only to the extent that such a local order restricts services allowed by this executive order or allows gatherings restricted by this executive order. Pursuant to Section 418.016(a) of the Texas Government Code, I hereby suspend Sections 418.1015(b) and 418.108 of the Texas Government Code, Chapter 81, Subchapter E of the Texas Health and Safety Code, and any other relevant statutes, to the extent necessary to ensure that local officials do not impose restrictions in response to the

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
___3:15PM___ O'CLOCK

JUL 2 9 2021

       COVID-19 disaster that are inconsistent with this executive order, provided that local officials may enforce this executive order as well as local restrictions that are consistent with this executive order.

   b.  Confinement in jail is not an available penalty for violating this executive order. To the extent any order issued by local officials in response to the COVID-19 disaster would allow confinement in jail as an available penalty for violating a COVID-19-related order, that order allowing confinement in jail is superseded, and I hereby suspend all relevant laws to the extent necessary to ensure that local officials do not confine people in jail for violating any executive order or local order issued in response to the COVID-19 disaster.

This executive order supersedes all pre-existing COVID-19-related executive orders and rescinds them in their entirety, except that it does not supersede or rescind Executive Orders GA-13 or GA-37. This executive order shall remain in effect and in full force unless it is modified, amended, rescinded, or superseded by the governor. This executive order may also be amended by proclamation of the governor.

Given under my hand this the 29th day of July, 2021.

GREG ABBOTT
Governor

ATTESTED BY:

JOE A. ESPARZA
Deputy Secretary of State

Exhibit B: Second Amended Complaint

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| E.T., by and through her parents and next friends; J.R., by and through her parents and next friends; H.M., by and through her parents and next friends; E.S., by and through her parents and next friends; M.P., by and through her parents and next friends; S.P., by and through her parents and next friends; and A.M., by and through her parents and next friends. | ) ) ) ) ) ) ) ) ) | Civil Action No. 1:21-CV-00717-LY |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| MIKE MORATH, in his official capacity as the COMMISSIONER of the TEXAS EDUCATION AGENCY; the TEXAS EDUCATION AGENCY; and ATTORNEY GENERAL KENNETH PAXTON, in his official capacity as ATTORNEY GENERAL OF TEXAS, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## SECOND AMENDED COMPLAINT

Plaintiffs, by and through their parents and next friends, bring this action for declaratory and injunctive relief, and allege as follows:

### INTRODUCTION

1.     As COVID-19 infection rates rise in Texas, so do the enforcement actions of Defendant Attorney General Paxton and Defendant TEA Commissioner Morath to enforce Governor Texas Greg Abbott's Executive Order GA-38[1] prohibiting governmental entities from imposing a mask requirement, including lawsuits against school districts.  These enforcement

---

[1]     Governor Abbott's Executive Order is attached as Exhibit A.

actions are to prevent school districts from adopting universal masking requirements as a safety measure to address local spread of COVID-19 to ensure safe in-person education of students.

2.      Plaintiffs bring this suit because the Executive Order violates federal antidiscrimination law under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"), which prohibit the exclusion of students with disabilities from public educational programs and activities. Plaintiffs are students with disabilities and underlying medical conditions that carry an increased risk of serious complications or death in the event that they contract COVID-19.  These conditions include Down syndrome, moderate to severe asthma, chronic lung and heart conditions, cerebral palsy, and weakened immune systems and have been identified by the Centers for Disease Control ("CDC") as risk factors for severe COVID-19 infection.  Six plaintiffs are under the age of 12 years old, rendering them ineligible to receive the vaccine under current Food and Drug Administration ("FDA") regulations; one plaintiff is unlikely to benefit from the vaccine due to an immunosuppressed condition.  Under Executive Order GA-38 and Public Health Guidance issued by the Texas Education Agency ("TEA"),[2] school districts are prohibited from implementing basic COVID-19 prevention strategies based on individual needs, and thus have been unable to fulfill their obligations under the ADA and Section 504 to these students.

3.      GA-38 is thus preempted by the above federal laws. It is further preempted by federal law that specifically authorizes school districts to implement safety measures as classes begin for the 2021-2022 school year.  The American Rescue Plan Act of 2021 ("ARP Act") has allocated billions of dollars in emergency relief funding to school districts and explicitly authorizes using these funds for "developing strategies and implementing public health protocols including,

---

[2]      The Public Health Guidance issued by the TEA is attached as Exhibit B.

to the greatest extent practicable, policies in line with guidance from the Centers for Disease Control and Prevention." Pub. L. No. 117-2, 135 Stat. 4 § 2001(e)(2)(Q). As the Department of Education's Interim Final Requirement makes clear, this specifically includes the CDC's recommendation for universal indoor masking in K-12 schools. 86 Fed. Reg. 21195-01, 21200 (Apr. 22, 2021) (to be codified at 34 C.F.R. ch. II). Thus, Executive Order GA-38 is in irreconcilable conflict with federal law because it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress as set forth in the ARP Act and the Department of Education's Requirement.

4.    In response to rising infections caused by the hyper-contagious Delta variant, the CDC updated its "Guidance for COVID-19 Prevention in K-12 Schools" to recommend "universal indoor masking for all students, staff, teachers, and visitors to K-12 schools, regardless of vaccination status," noting that "protection against exposure remains essential in school settings." The Texas Medical Association, Texas Pediatric Society, and Texas Public Health Coalition have also called for universal masking in schools.

5.    Governor Abbott has indicated that he too recognizes the benefits of mask-wearing. Executive Order GA-38 exempts government-owned hospitals and correctional facilities from its reach by permitting these entities to "continue to use appropriate policies regarding the wearing of face coverings." And, in a previous Executive Order GA-29 issued in July 2020, Governor Abbott required Texans to wear masks inside commercial buildings or public spaces in counties that exceeded certain thresholds of positive cases.[3]

---

[3] Indeed, Governor Abbott emphasized at that time that wearing masks "is the best strategy you can use to make sure that you and others do not contract COVID-19," citing a Texas A&M study on face masks. SBG San Antonio, *Gov. Abbott: 'Masks are our best option' against COVID-19 spike*, June 24, 2020, https://news4sanantonio.com/news/local/gov-abbott-masks-are-our-best-option-against-COVID-19-spike; *see also* Keith Randall, Texas A&M Study: Face Masks Critical

6. Most Texas public schools began in-person classes in August.[4] But the excitement of the school year beginning—especially after a long, challenging period of virtual learning—has been clouded by national reports of increasing pediatric infections and hospitalizations, with child infections increasing from 12,000 cases nationwide in the first week of July, up to 96,000 in the first week of August, with the latest figure representing about 15% of all new infections, according to the American Academy of Pediatrics.[5] As noted by one publication, "child hospitalizations have now reached an all-time pandemic high."[6]

7. In spite of national and local guidance urging precaution, GA-38 prohibits local school districts from even considering whether to implement the most basic and effective COVID-19 prevention strategy in school settings. Following the Governor's order, the TEA which has legal authority to publish requirements for public schools, announced in its "Public Health

_____

In Preventing Spread Of COVID-19, Texas A&M Today, June 12, 2020 ("A study by a team of researchers led by a Texas A&M University professor has found that not wearing a face mask dramatically increases a person's chances of being infected by the COVID-19 virus."). https://today.tamu.edu/2020/06/12/texas-am-study-face-masks-critical-in-preventing-spread-of-COVID-19/.

[4] E.g., San Antonio ISD began classes on August 9, 2021 (https://www.saisd.net/upload/page/0456/docs/SAISD_2021-22_InstructionalCalendar.pdf); Fort Bend ISD began classes on August 11, 2021 (https://www.fortbendisd.com/calendar#calendar1/20210811/day); Dallas ISD and Fort Worth ISD began classes on August 16, 2021 (https://thehub.dallasisd.org/2021/04/20/see-the-dallas-isd-2021-2022-school-year-calendars/) (https://www.fwisd.org/calendar#calendar1/20210814/month); Austin ISD began on August 17, 2021 (https://www.austinisd.org/calendar). Houston ISD and Waco ISD began on August 23, 2021 (https://www.houstonisd.org/2021AcademicCalendar); (https://www.wacoisd.org/Page/2#calendar1/20210814/month).

[5] https://services.aap.org/en/pages/2019-novel-coronavirus-COVID-19-infections/children-and-COVID-19-state-level-data-report/

[6] Katherine J. Wu, *Delta Is Bad News for Kids*, The Atlantic, Aug. 10, 2021, https://www.theatlantic.com/health/archive/2021/08/delta-variant-COVID-children/619712/.

Guidance" that, "[p]er GA-38, school systems cannot require students or staff to wear a mask." Therefore, the Executive Order has the perverse effect of prohibiting local school district leaders from addressing this pandemic as they deem appropriate for their respective school districts.

8.     If school districts are unable to implement COVID-19 protocol as they each deem appropriate, parents of medically vulnerable students will have to decide whether to keep their children at home or risk placing them in an environment that presents a serious risk to their health and safety. In this regard, the Attorney General and TEA's active enforcement of GA-38 and TEA's Public Health Guidance unlawfully prevent school districts from complying with the ADA and Section 504's requirement to provide students with disabilities access to a public-school education.  They also conflict with and are preempted by the ARP Act because they frustrate the intention of Congress that local school districts be able to use emergency relief funding to develop public health policies, including universal masking, that are consistent to the greatest extent practicable with CDC guidance.

9.     Attorney General Paxton first threatened to enforce the mask provisions of GA-38 against specific school districts, and his filing of a lawsuit to enforce against San Antonio Independent School District the vaccine-related provisions of GA-38 shows that Attorney General Paxton is enforcing the mask-related provisions of GA-38 against school districts.   Indeed, Attorney General Paxton sent to certain school districts who wish to require masks for their students' safety letters threatening to file lawsuits to enforce GA-38's mask provision by enjoining such school districts from implementing mask requirements.[7]   Attorney General Paxton has also

---

[7] Ex. B.

published a list of school districts he views as out of compliance with GA-38's mask requirements[8] and has solicited parents to email his office information about school districts that attempt to implement mask requirements.[9]

10.     Attorney General Paxton also tweeted his willingness to sue to enforce GA-38:[10]



11.     Moreover, in Attorney General Paxton's lawsuit against San Antonio Independent School District, which Attorney General Paxton filed to enforce GA-38's vaccine-related

---

[8] Attorney General Paxton, COVID -19: List of Government Entities Unlawfully Imposing Mask Mandates, https://www.texasattorneygeneral.gov/covid-governmental-entity-compliance (last Updated: 8/31/2021, 9:22am CT).

[9] Ex. C.

[10] Ex. D., ¶ 27.

provisions by preventing San Antonio Independent School District from requiring its employees to be vaccinated against COVID 19, Attorney General Paxton purports to have the authority to enforce GA-38's provisions via civil lawsuit.  For example, the Attorney General's lawsuit posits that "[t]he State is the guardian and protector of all public rights and has authority to sue to redress any violations of those rights."[11]  The lawsuit states also that San Antonio Independent School District's challenged policy is "preempted and otherwise barred by GA-38,"[12] and the lawsuit requests prospective relief enjoining San Antonio Independent School District from implementing a vaccine requirement in violation of GA-38.[13]  In short, Attorney General Paxton purports to have the authority to enforce GA-38 via at least civil lawsuit and has demonstrated his willingness to do so.

12.     When not all districts caved to his threats, Defendant Paxton filed lawsuits against fifteen school districts (including two attended by plaintiffs): Richardson ISD, Round Rock ISD, Diboll ISD, Elgin ISD, Galveston ISD, Honey Grove ISD, La Vega ISD, Longview ISD, Lufkin ISD, McGregor ISD, Midway ISD, Paris ISD, Sherman ISD, Spring ISD, and Waco ISD to enforce GA-38.[14]

13.     Defendant Paxton's recent tweets also indicate his intent to continue his lawsuits seeking to enforce GA-38: "I filed suit against 9 more Texas schools in violation of GA-38. We will continue until we have law and order."[15]

---

[11] *Id.* ¶ 34.
[13] *Id.* "Prayer," ¶¶ A, B.
[13] *Id.* "Prayer," ¶¶ A, B.
[14] *E.g.*, Ex. E.
[15] https://twitter.com/KenPaxtonTX/status/1437822407700533250?s=20.

14.     In addition to publishing the Public Health Guidance, TEA is working with Defendant Paxton to enforce GA-38 by regularly providing his office with list of school districts that are reported to TEA as mandating masks.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. §§ 2201–2022.

16.     Venue is proper in the United States District Court for the Western District of Texas, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred and continue to occur in this district.

## PARTIES

### A.     Plaintiffs

17.     E.T.'s parents and next friends, A.T. and A.T., bring this action on her behalf.  E.T. is an eleven-year-old girl with Down syndrome, moderate to severe asthma, hypogammaglobulinemia, a CD19 deficiency, a severe B-cell lymphocyte deficiency, and a compromised immune system.  E.T. resides with her parents in Williamson County.  E.T. has been identified by her school as a student with a disability.

18.     Plaintiff A.M.'s parents and next friends, C.M. and B.M., bring this action on his behalf.  A.M. is an eight-year-old boy with cerebral palsy.  A.M. resides with his parents in Bexar County.  A.M. has been identified by his school as a student with a disability.

19.     E.S.'s parent and next friend, M.M., brings this action on her behalf.  E.S. is a seven-year-old girl with moderate to severe asthma.  E.S. resides with her parent in Bell County.

20.     J.R.'s parents and next friends, J.R. and J.R., bring this action on her behalf.  J.R. is an eight-year-old girl with moderate to severe asthma.  J.R. resides with her parents in Bexar County.  J.R. has been identified by her school as a student with a disability.

21.     H.M.'s parents and next friends, R.M. and S.M., bring this action on his behalf.  H.M. is an eight-year-old boy with Down syndrome, a heart defect, and a history of bronchomalacia.  H.M. resides with his parents in Travis County.  H.M. has been identified by his school as a student with a disability.

22.     M.P.'s parents and next friends, K.P. and J.P., bring this action on her behalf.  M.P. is an eleven-year-old girl with Down syndrome.  M.P. resides with her parents in Fort Bend County.  M.P. has been identified by her school as a student with a disability.

23.     S.P.'s parents and next friends, S.P. and M.P., bring this action on his behalf.  S.P. is a eight-year-old boy with bronchiectasis, spina bifida, attention deficit hyperactivity disorder, and epilepsy.  S.P. resides with his parents in Dallas County.  S.P. has been identified by his school as a student with a disability.

**B.     Defendants**

24.     Defendant Mike Morath is the Commissioner of the TEA, and as such is responsible for the acts and omissions of the TEA.  Defendant Morath is sued in his official capacity, and he may be served at 1701 North Congress Ave., Austin, Texas 78701.  The TEA is a public entity within the meaning of the Americans with Disabilities Act, 28 C.F.R. § 35.104, and a recipient of federal financial assistance within the meaning of the Rehabilitation Act, 29 U.S.C. § 794(a).

25.     Defendant Texas Education Agency is an agency of the state of Texas and is responsible for issuing requirements for the operation of public-school systems in Texas during the COVID-19 pandemic.  TEA will be served through its Commissioner, Mike Morath, at 1701 North Congress Avenue, Austin, Texas 78701.  TEA is a public entity within the meaning of the

Americans with Disabilities Act, 28 C.F.R. § 35.104, and a recipient of federal financial assistance within the meaning of the Rehabilitation Act, 29 U.S.C. § 794(a).

26.     Defendant Kenneth Paxton is the Attorney General of the state of Texas and is the head of the Office of the Attorney General.  As discussed in this Second Amended Complaint, Defendant Paxton has been enforcing the executive order at issue in this action, including by filing lawsuits against multiple school districts to enjoin violations of the order.  Defendant Paxton is sued in his official capacity as Attorney General of the state of Texas and as head of the Office of the Attorney General, and he may be served at 300 W 15th Street, Austin, Texas 78701.  The state of Texas and the Office of the Attorney General are public entities within the meaning of the Americans with Disabilities Act, 28 C.F.R. § 35.104, and recipients of federal financial assistance within the meaning of the Rehabilitation Act, 29 U.S.C. § 794(a).

## FACTS

27.     Governor Abbott's Executive Order GA-38 and TEA's Public Health Guidance prohibit local school districts and public health authorities from assessing the risks that students and children in their communities currently face from COVID-19.  By preventing local entities from adopting mask requirements for their students and staff in line with current CDC guidance, Defendant Paxton and TEA's enforcement of GA-38 and the Public Health Guidance will prevent and has prevented Plaintiffs and other students with disabilities from safely returning to school for in-person instruction without serious risk to their health and safety, in violation of the ADA and Section 504 and in irreconcilable conflict with the purposes and objectives of Congress as set forth in the American Rescue Plan Act of 2021.  As a result, Defendant Paxton and Commissioner Morath have erected an unlawful barrier, which will impact many students with disabilities and prevent local school districts and communities from providing a safe learning environment for their most vulnerable students.

A.     **The Current State of the COVID-19 Pandemic**

28.     The history of the COVID-19 pandemic is well-known,[16] and an extensive body of evidence shows that COVID-19 is a highly communicable respiratory virus that spreads through close contact.[17]

29.     Since the inception of the pandemic, more than three million positive cases of COVID-19 in Texas have been logged, and more than 50,000 Texans have died. COVID-19 hospitalizations peaked in Texas in January 2021 when almost 15,000 Texans were lying in hospital beds due to COVID-19 complications. The number of deaths, hospitalizations, and infections began declining in early 2021 once vaccines became available in Texas. And by June 2021, the number of COVID-19 hospitalizations had decreased to fewer than 1,500 Texans.

30.     The medical landscape drastically changed in late summer with the arrival of the highly contagious and virulent Delta variant of COVID-19.[18] The number of newly reported cases, hospitalizations, and deaths due to COVID-19 have all increased sharply.[19]

---

[16] The World Health Organization officially adopted the name COVID-19 for the novel coronavirus that causes Coronavirus Disease 2019 on February 11, 2020, WHO Twitter Post (Feb. 11, 2020), https://twitter.com/WHO/status/1227248333871173632?s=20.

[17] CDC, Scientific Brief: SARS-CoV-2 Transmission, May 7, 2021, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html ("The principal mode by which people are infected with [COVID-19] is through exposure to respiratory fluids carrying infectious virus. Exposure occurs in three principal ways: (1) inhalation of very fine respiratory droplets and aerosol particles, (2) deposition of respiratory droplets and particles on exposed mucous membranes in the mouth, nose, or eye by direct splashes and sprays, and (3) touching mucous membranes with hands that have been soiled either directly by virus-containing respiratory fluids or indirectly by touching surfaces with virus on them.").

[18] CDC, Delta Variant: What We Know About the Science, Aug. 6, 2021, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (noting that the Delta variant is "more than 2x as contagious as previous variants" and studies indicated that "patients infected with the Delta variant were more likely to be hospitalized").

[19] NY Times, Tracking Coronavirus in Texas: Latest Map and Case Count (Aug. 13, 2021), https://www.nytimes.com/interactive/2021/us/texas-COVID-cases.html (showing increases of

31.     The state's medical system is at an unprecedented and unfortunate tipping point. Multiple municipalities, including the Cities of San Antonio and Houston, have experienced extended intervals with no available EMS units to respond to emergency calls or prolonged wait times.[20]  The surging hospitalization rate has created an ICU bed shortage throughout the state of Texas with some cities having zero available beds and patients in critical condition having to wait hours for beds.[21]  Notably, a lack of pediatric ICU beds has forced young patients to be transported across the state or to out-of-state hospitals to receive medical care.[22]

32.     This data is particularly troubling for students and school districts because the Delta variant and the ongoing exponential growth in cases are threatening the fast-approaching school year.  Texas schoolchildren under the age of 12 cannot currently receive COVID-19 vaccinations, and 99.5% of the COVID-19 deaths since February 2021 were people who were unvaccinated.  At the same time, currently less than 50% of the Texas population is fully vaccinated against the virus.

---

72% of positive cases, 94% of hospitalizations, and 128% in deaths due to COVID-19 over the 14-day period prior to August 13, 2021).

[20] Kathleen Creedon, "For 26 Minutes Thursday, No EMS Units Were Available in San Antonio," Texas Public Radio, August 13, 2021, https://www.tpr.org/san-antonio/2021-08-13/for-26-minutes-thursday-no-ems-units-were-available-in-san-antonio; Travis Caldwell, "'I am frightened by what is coming': The struggle to keep Texas hospitals staffed as COVID-19 surges," CNN, August 12, 2021, https://www.wvtm13.com/article/i-am-frightened-by-what-is-coming-the-struggle-to-keep-texas-hospitals-staffed-as-COVID-19-surges/37291263#; Juan A. Lozano, "COVID cases pushing Houston hospitals to near breaking point," Associated Press, August 6, 2021, https://apnews.com/article/business-health-coronavirus-pandemic-houston-93ba953777111d602dced45dc1d7725b.

[21] "Dozens of Texas hospitals are out of ICU beds as COVID-19 cases again overwhelm the state's capacity," Reese Oxner, Aug. 10, 2021, Texas Tribune, https://www.texastribune.org/2021/08/10/coronavirus-texas-hospitals-icu-beds/.

[22] Id.  For example, as of August 10, 2021, only two pediatric beds were available for all of North Texas. Dallas Morning News, Aug. 10, 2021, https://www.dallasnews.com/news/public-health/2021/08/10/in-north-texas-intensive-care-bed-space-is-running-out-only-2-pediatric-icu-spots-remain-in-region/ ("In North Texas, intensive care bed space is running out[.]")

33.    Data also shows children are infected with the Delta variant at much higher rates than previous virus strains, especially those who are unvaccinated (including those 5 to 12 years old who are not yet eligible to receive a vaccine).[23]   According to the American Academy of Pediatrics, "the Delta variant has created a new and pressing risk to children and adolescents across this country."[24]   Pediatric cases of COVID-19 have been "skyrocketing alongside cases among unimmunized adults."[25]   For the week ending July 29, 2021, "nearly 72,000 new coronavirus cases were reported in kids—almost a fifth of all total known infections in the U.S., and a rough doubling of the previous week's stats."[26] The next week the number of new coronavirus cases in children jumped to almost 94,000.[27]   As the American Academy of Pediatrics explained: "The higher proportion of cases in this population means this age group could be contributing in driving continued spread of COVID-19.  Sadly, over 350 children have died of COVID since the start of pandemic and millions of children have been negatively impacted by missed schooling, social isolation, and in too many cases, the death of parents, family members, and other caregivers."[28]

---

[23] Yale Medicine, Five Things to Know About the Delta Variant, updated Aug. 9, 2021, *available at* https://www.yalemedicine.org/news/5-things-to-know-delta-variant-COVID (noting that a recent study "showed that children and adults under 50 were 2.5 times more likely to become infected with Delta").

[24] AAP President's Letter to Acting Commissioner of the FDA, August 5, 2021, https://downloads.aap.org/DOFA/AAP%20Letter%20to%20FDA%20on%20Timeline%20for%20Authorization%20of%20COVID-19%20Vaccine%20for%20Children_08_05_21.pdf.

[25] Katherine J. Wu, Delta Is Bad News for Kids, The Atlantic, Aug. 10, 2021, https://www.theatlantic.com/health/archive/2021/08/delta-variant-COVID-children/619712/.

[26] *Id.*

[27] *Id.*

[28] AAP President's Letter to Acting Commissioner of the FDA, August 5, 2021, https://downloads.aap.org/DOFA/AAP%20Letter%20to%20FDA%20on%20Timeline%20for%20Authorization%20of%20COVID-19%20Vaccine%20for%20Children_08_05_21.pdf ("[T]he Delta variant has created a new and pressing risk to children and adolescents across this country.").

**B.    COVID-19 Poses an Extreme Risk to a Large Number of Young Students with Disabilities**

34.    School-aged children with certain disabilities, including a range of underlying medical conditions, face a higher rate of severe illness from COVID-19 as compared to other children without those underlying medical conditions. According to the CDC, "children with medical complexity, with genetic, neurologic, metabolic conditions, or with congenital heart disease can be at increased risk for severe illness from COVID-19."[29]   And as with adults who face increased risks, "children with obesity, diabetes, asthma or chronic lung disease, sickle cell disease, or immunosuppression can also be at increased risk for severe illness from COVID-19."[30] Texas school districts regularly serve students with these exact disabilities—moderate to severe asthma, chronic lung and heart conditions, cerebral palsy, Down syndrome, obesity, and weakened immune systems are common.  Asthma alone impacts ten percent of school-age children.[31]

**C.    COVID-19 Prevention in K-12 Schools**

35.    The COVID-19 pandemic has dramatically affected students with disabilities, beginning with the closure of the public school system in the spring of 2020.  While school districts across Texas have been on the front lines this pandemic, many students lost critical instruction and services, which has persisted into the 2020-21 school year.

---

[29] Centers for Disease Control, *COVID-19: People with Certain Medical Conditions*, May 13, 2021, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[30] *Id*.

[31] *Percentage of ever having asthma for children under age 18 years, United States, 2019*, Nat'l Ctr. for Health Stat., Aug. 14, 2021, https://wwwn.cdc.gov/NHISDataQueryTool/SHS_child/index.html.

36.     The American Academy of Pediatrics has explained that "remote learning highlighted inequities in education, was detrimental to the educational attainment of students of all ages, and exacerbated the mental health crisis among children and adolescents."[32]

37.     The detrimental impact on education from the COVID-19 pandemic has been especially alarming for students with disabilities.[33] As detailed by the Department of Education, COVID-19 has significantly disrupted the education and related aids and services needed to support their academic progress and prevent regression."[34] Students with disabilities have not only lost critical in-class instruction, they have lost services such as speech and occupational therapy as well as behavioral support and counseling. Many parents have reported regression.[35] And there is evidence that the disruption in services and instruction "may be exacerbating longstanding disability-based disparities in academic achievement."[36]

---

[32] AAP, COVID-19 Guidance for Safe Schools, https://services.aap.org/en/pages/2019-novel-coronavirus-COVID-19-infections/clinical-guidance/COVID-19-planning-considerations-return-to-in-person-education-in-schools/ ("Opening schools generally does not significantly increase community transmission, particularly when guidance outlined by the World Health Organization (WHO), United Nations Children's Fund (UNICEF), and *Centers for Disease Control and Prevention (CDC) is followed*.") (emphasis added).

[33] "How America failed students with disabilities during the pandemic," The Washington Post, May 20, 2021, https://www.washingtonpost.com/education/2021/05/20/students-disabilities-virtual-learning-failure/ ("[O]fficials in school districts across the country concede they failed during the crisis to deliver the quality of education that students with disabilities are legally entitled to receive.")

[34] DOE Office of Civil Rights, Education in a Pandemic: The Disparate Impacts of COVID-19 on America's Students, https://www2.ed.gov/about/offices/list/ocr/docs/20210608-impacts-of-covid19.pdf.

[35] E.g., "How America failed students with disabilities during the pandemic," The Washington Post, May 20, 2021, https://www.washingtonpost.com/education/2021/05/20/students-disabilities-virtual-learning-failure//.

[36] DOE Office of Civil Rights, Education in a Pandemic: The Disparate Impacts of COVID-19 on America's Students, https://www2.ed.gov/about/offices/list/ocr/docs/20210608-impacts-of-COVID19.pdf.

38.    It is undisputed that "[s]tudents benefit from in-person learning, and safely returning to in-person instruction in the fall 2021 is a priority."[37]  And students with disabilities need in-person schooling more than other student groups, but they must be able to receive their instruction and services safely.[38]  Many of these students have underlying health conditions and are at high risk for illness and even death due to COVID-19.

39.    While full vaccination is the "leading public health prevention strategy to end the COVID-19 pandemic" and "promoting vaccination can help schools safely return to in-person learning," every school district in this state "serve[s] children under the age of 12 who are not eligible for vaccination at this time."[39] Based on current FDA estimates, a vaccine for students under 12 is not likely to be given emergency authorization until late into the coming school semester at the earliest.[40]

40.    Based on the unavailability of vaccines for a large portion of students and the currently "circulating and highly contagious Delta variant," the CDC currently "recommends universal indoor masking by all students (age 2 and older), staff, teachers, and visitors to K-12

---

[37] CDC, Guidance for COVID-19 Prevention in K-12 Schools, updated Aug. 5, 2021, https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html.

[38] GAO-21-43, Distance Learning: Challenges Providing Services to K-12 English Learners and Students With Disabilities During COVID-19, at 16 (Nov. 2020), https://www.gao.gov/products/gao-21-43 (reporting that "[s]chool officials told [GAO] that delivering related services—such as occupational therapy, physical therapy, or speech therapy— for students with complex needs was particularly difficult in a virtual setting," and that other officials "raised concerns about students not receiving services in the same manner as they did prior to distance learning, including occupational and physical therapy that involved hands-on instruction from therapists or required specialized equipment unavailable in students' homes").

[39] CDC, Guidance for COVID-19 Prevention in K-12 Schools, updated Aug. 5, 2021, https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html.

[40] Erika Edwards, COVID vaccines for kids under 12 expected midwinter, FDA official says, NBC News, https://www.nbcnews.com/health/health-news/vaccines-kids-under-age-12-expected-mid-winter-fda-official-n1274057.

schools, regardless of vaccination status."[41]  And while in general, people "do not need to wear masks in outdoor settings," the CDC also  "recommends that people who are not fully vaccinated wear a mask in crowded outdoor settings or during activities that involve sustained close contact with other people."[42]

41.     The Texas Medical Association, the Texas Pediatric Society, and the Texas Public Health Coalition have all called for universal masking in schools: "Let's face it; if we don't take action, the more infectious COVID-19 delta variant will spread among students when they gather together in schools.  We urge use of every tool in our toolkit to protect our children and their families from COVID-19."[43]  One hundred and twenty-five physicians from Cook Children's Medical Center in Fort Worth wrote to Fort Worth ISD asking for a mask requirement, noting the increase in COVID-19 infections and hospitalizations.[44]

42.     Masking works.  The ABC Science Collaborative, led by top physicians on the staff of Duke University, studied data from 100 school districts in North Carolina, and found that "[w]hen masking is in place, COVID-19 transmission in schools is low."[45]  And "when teachers,

---

[41] CDC, Guidance for COVID-19 Prevention in K-12 Schools, updated Aug. 5, 2021, https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html.

[42] *Id*.

[43] Physicians Encourage Masking and Vaccination of Students, July 28, 2021, https://txpeds.org/physicians-encourage-masking-and-vaccination-students.

[44] Anna Caplan, "Fort Worth ISD will require masks in schools," Dall. Morning News, Aug. 11, 2021, https://www.dallasnews.com/news/2021/08/11/letter-from-125-cook-childrens-physicians-prompts-fwisd-to-mandate-masks-for-school-year/.

[45] The ABC Science Collaborative, Press Conference, Aug. 5, release and recording https://abcsciencecollaborative.org/zimmerman-benjamin-urge-mask-wearing-in-press-conference/.

staff, and students consistently and correctly wear a mask, they protect others as well as themselves."[46]

### D. Defendant Paxton's Enforcement of Governor Abbott's Order and TEA's Guidance Prevent Local Schools from Adopting Protections Appropriate for Local Students

43. Since March 13, 2020, Governor Abbott has recognized by proclamation the "imminent threat" posed by the COVID-19 pandemic for all counties across the State of Texas. He has renewed that proclamation each month with successive executive orders, and each recognizes that the threat caused by the pandemic remains in place today.

44. Among his executive orders, Governor Abbott issued Executive Order GA-29 in July 2020, which required all Texans to "wear a face covering over the nose and mouth when inside a commercial entity or other building or space open to the public" in counties that exceeded certain thresholds of positive cases unless those counties affirmatively opted out of the mask requirement. Thus, Governor Abbott has previously recognized the importance of both using masks to help limit and control the spread of COVID-19 and the differences across Texas communities that may require a variety of different approaches with respect to masking.

45. Despite his prior endorsement of masking as a means of protection from the threat and despite the real threat of COVID-19 that Texans now face from the Delta variant, Governor Abbott issued Executive Order GA-38 on July 29, 2021, which prohibits any requirement by "any jurisdiction to wear or to mandate the wearing of a face covering" and further provides that "the

---

[46] *See also* CDC, Science Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking-science-sars-cov2.html ("Experimental and epidemiological data support community masking to reduce the spread of SARS-CoV-2. The prevention benefit of masking is derived from the combination of source control and wearer protection for the mask wearer.").

imposition of any such face-covering requirement by a local government entity or official constitutes a 'failure to comply with' this executive order that is subject to a fine up to $1,000."[47]

46.    Consistent with GA-38, the TEA, which has legal authority to publish requirements for public schools, announced in its August 5, 2021 guidance that, "[p]er GA-38, school systems cannot require students or staff to wear a mask." Then, following a number of lawsuits filed across the State challenging Governor Abbott's authority to issue Executive Order GA-38's prohibition on mask requirements, TEA published guidance on September 2, 2021 stating: "Please note, mask provisions of GA-38 are not being enforced as the result of ongoing litigation." On September 17, with litigation still pending, TEA again reversed course and announced: "Per GA-38, school systems cannot require students or staff to wear a mask. GA-38 addresses government-mandated face coverings in response to the COVID-19 pandemic."

47.    Enforcement of GA-38 and TEA's Public Health Guidance prohibit school districts from requiring the use of masks for students and staff, thereby preventing Plaintiffs and other students with disabilities from safely returning to school in-person, in violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

48.    By refusing to allow school districts or local public health authorities to even consider whether to implement mask requirements as needed to protect the health and safety of the children they serve, Defendants have placed an unlawful barrier for students with disabilities that is preventing our state's most vulnerable students from returning to public schools.

49.    Enforcement of Order GA-38 and TEA's corresponding Public Health Guidance, which forbid local school districts and public health authorities from having the freedom to

---

[47] Exec. Order GA 38, https://gov.texas.gov/uploads/files/press/EO-GA-38_continued_response_to_the_COVID-19_disaster_IMAGE_07-29-2021.pdf (July 29, 2021).

respond to the ongoing COVID-19 crisis and to require masks for their students and staff, has made it impossible for school districts to provide a safe learning environment for students with disabilities.

50. There are no viable alternatives for students with disabilities who cannot safely return to school in-person due to GA-38 and TEA's Guidance. Defendant Paxton and Commissioner Morath's enforcement of GA-38 puts parents in the impossible situation of having to choose between the health and life of their child and educating their child. Thus, Defendants' actions will have the perverse effect of either placing children with disabilities in imminent danger or unlawfully forcing those children out of the public school system.

**E.    Attorney General Paxton's Enforcement Campaign in Concert with TEA**

51. Attorney General Paxton is enforcing —and has indicated he will continue to enforce—GA-38's mask provisions.

52. Attorney General Paxton has sent to school districts that intended to implement mask requirements letters explicitly threatening such school districts with civil suits in which the Attorney General will seek to enjoin the school districts' alleged violations of GA-38's mask provision.[48]

53. Attorney General Paxton has published a "List of Government Entities Unlawfully Imposing Mask Mandates" that includes the school districts he views as out of compliance with GA-38's mask provisions.[49] Certain school districts on the Attorney General's list bear an asterisk,

---

[48] *E.g.*, Ex. F.

[49] Attorney General Paxton, COVID -19: List of Government Entities Unlawfully Imposing Mask Mandates, https://www.texasattorneygeneral.gov/covid-governmental-entity-compliance (last Updated: 8/31/2021, 9:22am CT).

which indicates that the Attorney General has sent a letter to such school districts.[50] The list also lists school districts that are "[n]ow in compliance," which indicates that these "[n]ow in compliance" school districts have abandoned their plans to implement mask requirements because of the Attorney General's enforcement activities.[51]

54.    Additionally, Attorney General Paxton has tweeted about his willingness to sue to enforce GA-38:[52]



---

[50] *See id.* ("* indicates currently not in compliance; letter sent by the Texas Attorney General's Office.").

[51] *Id.*

[52] https://twitter.com/KenPaxtonTX/status/1437822407700533250?s=20

 **Texas Attorney General** ✓
@TXAG

···

The #TXLege gave the governor, not a hodgepodge of local officials, the authority to guide #Texas through an emergency.

If government entities continue to blatantly disregard state law, I will sue every single one of them.



Paxton Sues San Antonio ISD and Superintendent Pedro Martinez for Employe...
Attorney General Ken Paxton filed a complaint asking for a temporary restraining order against San Antonio ISD after it refused to follow Executive Order GA-38.
🔗 texasattorneygeneral.gov



55.     The Attorney General has also instructed parents to inform his office via email of

school districts that attempt to implement mask requirements:[53]

---

[57] E.g., Ex. D, ¶65.



56.     Next, Attorney General Paxton has demonstrated his willingness to enforce GA-38 via a civil lawsuit in which the Attorney General sought to enjoin San Antonio ISD from violating GA-38's vaccine provisions. The Attorney General's lawsuit posits, for instance, that "[t]he State is the guardian and protector of all public rights and has authority to sue to redress any violations of those rights."[54] The lawsuit states also that San Antonio Independent School District's challenged policy is "preempted and otherwise barred by GA-38,"[55] the lawsuit requests prospective relief enjoining San Antonio Independent School District from implementing a

---

[57] E.g., Ex. D, ¶65.
[57] E.g., Ex. D, ¶65.

vaccine requirement in violation of GA-38.[56]  In short, Attorney General Paxton purports to have the authority to enforce GA-38 via civil lawsuit, has demonstrated his willingness to do so, and has threatened to do so in the future.

57.    Defendant Paxton followed through on his threats on Sept. 10, 2021, when he sued six school districts: Richardson ISD, Round Rock ISD, Galveston ISD, Elgin ISD, Spring ISD, and Sherman ISD.  Plaintiff E.T. attends Round Rock ISD, and Plaintiff S.P. attends Richardson ISD.

58.    In the complaints, Defendant Paxton, on behalf of the State of Texas, seeks an order declaring the district's mask mandates "invalid and unlawful" and injunctive relief for rescission of the mask mandates.[57]

59.    Defendant Paxton tweeted his intent to continue filing lawsuits: "Today, I filed suit against 6 Texas ISD's and this is just the beginning.  I will put an end to these unconstitutional mask mandates."[58]

60.    On Sept. 14, 2021, Defendant Paxton sued nine additional school districts: La Vega ISD, McGregor ISD, Midway ISD, Waco ISD, Diboll ISD, Lufkin ISD, Longview ISD, Paris ISD, and Honey Grove ISD.   The lawsuits have the same claims and seek the relief as the first six lawsuit filed on Sept. 10, 2021.

61.    Defendant Paxton again tweeted that he would continue to enforce GA-38 through lawsuits: "I filed suit against 9 more Texas schools in violation of GA-38. We will continue until we have law and order."[59]

---

[57] E.g., Ex. D, ¶65.
[57] E.g., Ex. D, ¶65.
[58] https://twitter.com/KenPaxtonTX/status/1436446560586539009?s=20

[59] https://twitter.com/KenPaxtonTX/status/1437822407700533250?s=20

62.     Due to Defendant Paxton's enforcement of GA-38, school districts are not enforcing or have rescinded mask mandates.  Defendant Paxton tweeted on Sept. 21, 2021: "Great news! @ShermanISD has decided to obey the rule of law and drop the mask mandate" and citing to an article that notes the decision came on the heels of the lawsuit brought by Paxton against the school district. [60]

63.     Districts threatened with lawsuits have also reacted to the filing of the lawsuits. Defendant Paxton tweeted on Sept. 21, 2021 that Denton ISD informed his office that the district ended its mandatory mask policy. [61]

64.     Defendant Morath and the TEA have worked in concert with Defendant Paxton.  In addition to publishing the Public Health Guidance to instruct district to comply with GA-38 and dissuade any mask requirement, TEA provides Defendant Paxton with the names of districts whom the agency learns are implementing mask mandates twice each week.

**F.     Harm to the Named Plaintiffs**

65.     The Governor's Order and TEA's Guidance have directly harmed each of the named Plaintiffs who now must risk their health and safety in order to obtain desperately needed in-person instruction and services.

66.     E.T. in the Round Rock Independent School District:

    a.     E.T. is eleven years old, and she has been diagnosed with Down syndrome, moderate to severe asthma, hypogammaglobulinemia, a CD19 deficiency, and a severe B-cell lymphocyte deficiency, which has resulted in a suppressed immune system.

---

[60] https://twitter.com/KenPaxtonTX/status/1440350480559788054?s=20.
[61] https://twitter.com/KenPaxtonTX/status/1440349159161090064?s=20.

    b.  E.T. attends a Williamson County public school, and the school has identified her as a child with a disability.

    c.  Children with Down syndrome, a weakened immune system, and asthma like E.T. are at a higher risk of hospitalization, severe illness, or death should they contract COVID-19.

    d.  Because Defendants are preventing Williamson County public schools from requiring masks for their students and staff—despite the surging number of infections, positivity rates, and hospitalizations due to the hyper-contagious Delta variant—it is simply too dangerous to E.T.'s health and safety for her to return to school without the protections deemed necessary by local and national authorities, which includes universal masking for all persons at K-12 schools.

    e.  Defendants' actions have forced E.T.'s parents to decide whether to return E.T. to school and risk her life or to leave the public school system.

67.  A.M. in the Edgewood Independent School District ("EISD").

    a.  A.M. is eight years old and was born with cerebral palsy, which is a neurological disorder.

    b.  A.M. attends a Bexar County public school, and the school has identified him as a child with a disability.

    c.  Children with neurological disorders, including cerebral palsy, like A.M., are at a higher risk of hospitalization, severe illness, or death should they contract COVID-19.

    d.  Because Defendants seek to prevent all Texas public schools from requiring masks for their students and staff—despite the surging number of infections, positivity rates, and hospitalizations due to the hyper-contagious Delta variant—it is simply too dangerous to A.M.'s health and safety for him to return to school without the protections deemed necessary by local and national authorities, which includes universal masking for all persons at K-12 schools. Notably, Governor Abbott has threatened to file litigation against any Texas school district which issues a mask mandate in its jurisdiction.[62]

    e.  Defendants' actions have forced A.M.'s parents to decide whether to return A.M. to school and risk his life or to leave the public school system.

68.    J.R. in the San Antonio Independent School District:

    a.  J.R. is eight years old and lives with attention deficit hyperactivity disorder, a growth hormone deficiency, and moderate to severe asthma.

    b.  J.R. attends a Bexar County public school, and the school has identified her as a child with a disability.

    c.  Children with severe or moderate asthma like J.R. are at a higher risk of hospitalization, severe illness, or death should they contract COVID-19.

    d.  Because Defendants seek to prevent Bexar County public schools from requiring masks for their students and staff—despite the surging number of

---

[62] "Governor Abbott threatens to sue school districts who enforce mask mandates," KVEO, Aug. 11, 2021, https://www.valleycentral.com/news/local-news/gov-abbott-threatens-to-sue-schools-who-enforce-mask-mandates/.

infections, positivity rates, and hospitalizations due to the hyper-contagious Delta variant—it is simply too dangerous to J.R.'s health and safety for her to return to school without the protections deemed necessary by local and national authorities, which includes universal masking for all persons at K-12 schools.

    e. Defendants' actions have forced J.R.'s parents to decide whether to return J.R. to school and risk her life or to leave the public school system.

69. E.S. is a student in the Killeen Independent School District:

    a. E.S. is seven years old and lives with moderate to severe asthma.

    b. E.S. attends a Bell County public school.

    c. Children with moderate to severe asthma like E.S. are at a higher risk of hospitalization, severe illness, or death should they contract COVID-19.

    d. Because Defendants are preventing Bell County public schools from requiring masks for their students and staff—despite the surging number of infections, positivity rates, and hospitalizations due to the hyper-contagious Delta variant—it is simply too dangerous to E.S.'s health and safety for her to return to school without the protections deemed necessary by local and national authorities, which includes universal masking for all persons at K-12 schools.

    e. Defendants' actions have forced E.S.'s parents to decide whether to return E.S. to school and risk her life or to leave the public school system.

70. H.M. in the Leander Independent School District:

a. H.M. is eight years old and has Down syndrome, a heart defect, and a history of bronchomalacia.

b. H.M. attends a Travis County public school, and the school has identified him as a child with a disability.

c. Children with Down syndrome, heart conditions, and chronic respiratory conditions like H.M. are at a higher risk of hospitalization, severe illness, or death should they contract COVID-19.

d. Because Defendants are preventing Travis County public schools from requiring masks for their students and staff—despite the surging number of infections, positivity rates, and hospitalizations due to the hyper-contagious Delta variant—it is simply too dangerous to H.M.'s health and safety for him to return to school without the protections deemed necessary by local and national authorities, which includes universal masking for all persons at K-12 schools.

e. Defendants' actions have forced H.M.'s parents to decide whether to return H.M. to school and risk his life or to leave the public school system.

71. M.P. in the Fort Bend Independent School District:

a. M.P. is eleven years old and was born with Down syndrome.

b. M.P. attends a Fort Bend County public school, and the school has identified her as a child with a disability.

c. Children with severe or moderate asthma like M.P. are at a higher risk of hospitalization, severe illness, or death should they contract COVID-19.

d.  Because Defendants are seeking to prevent Fort Bend County public schools from requiring masks for their students and staff—despite the surging number of infections, positivity rates, and hospitalizations due to the hyper-contagious Delta variant—it is simply too dangerous to M.P.'s health and safety for her to return to school without the protections deemed necessary by local and national authorities, which includes universal masking for all persons at K-12 schools.

e.  Defendants' actions have forced M.P.'s parents to decide whether to return M.P. to school and risk her life or to leave the public school system.

72.  S.P. in the Richardson Independent School District:

a.  S.P. is eight years old and has bronchiectasis, attention deficit hyperactivity disorder, spina bifida and epilepsy.

b.  S.P. attends a Dallas County public school, and the school has identified him as a child with a disability.

c.  Children with chronic lung and neurological conditions like S.P. are at a higher risk of hospitalization, severe illness, or death should they contract COVID-19.

d.  Because Defendants seek to prevent Dallas County public schools from requiring masks for their students and staff—despite the surging number of infections, positivity rates, and hospitalizations due to the hyper-contagious Delta variant—it is simply too dangerous to S.P.'s health and safety for him to return to school without the protections deemed necessary by local and

national authorities, which includes universal masking for all persons at K-12 schools.

e. Defendants' actions have forced S.P.'s parents to decide whether to return S.P. to school and risk his life or to leave the public school system.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
### AGAINST DEFENDANTS MORATH, AND PAXTON
### IN THEIR OFFICIAL CAPACITIES

73.     Plaintiffs repeat and re-allege the allegations in previous paragraphs of this Amended Complaint as if fully alleged herein.

74.     The ADA provides a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities. 42 U.S.C. §§ 12101(b)(1) & (2).

75.     Enactment of the ADA reflected deeply held American ideals that treasure the contributions that individuals can make when free from arbitrary, unjust, or outmoded societal attitudes and practices that prevent the realization of their full potential.

76.     The ADA embodies a public policy committed to the removal of a broad range of impediments to the integration of people with disabilities into society and strengthening the federal government's role in enforcing the standards established by Congress.

77.     The ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

78.     Defendants Paxton and Morath's enforcement of GA-38 38 and TEA's Public Health Guidance are denying local school districts and public health authorities the ability to

provide the children in the instant matter with the protections they need to attend school safely. In so doing, Defendants Paxton and Morath, acting in their official capacities, have violated the regulations and provisions of the ADA, and/or have caused Plaintiffs' School Districts to violate the regulations and provisions of the ADA, as follows:

    a. Defendants are failing to make a reasonable modification, and/or are preventing Plaintiffs' School Districts from making a reasonable modification, under circumstances where it is required, in violation of 28 C.F.R. § 35.130(b)(7);

    b. Defendants are excluding, and/or are causing Plaintiffs' School Districts to exclude, Plaintiffs from participation in public education, in violation of 42 U.S.C. § 12132 and 28 C.F.R. § 35.130;

    c. Defendants are failing to make, and/or causing Plaintiffs' School Districts to fail to make, their services, programs, and activities "readily accessible" to disabled individuals, in violation of 28 C.F.R. § 35.150;

    d. Defendants are administering a policy that has the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability and that has the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities, in violation of 28 C.F.R. § 35.130(b)(3).

79.    The ADA further prohibits any public entity from, either directly or through contractual or other arrangements, using any criteria or methods of administration that (a) have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of

disability and/or (b) perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.  28 C.F.R. §§ 35.130 (b)(3)(i) & (iii).

80.    Neither Defendants Morath nor Paxton have the authority to circumvent the ADA and its protections for students with disabilities through executive order or guidance requirements or the enforcement thereof.

81.    Excluding children from the public-school classroom because of a disability, including by Defendants enforcing of the executive order or guidance requirements at issue, is precisely the type of discrimination and segregation that the ADA and its amendments aim to prevent and specifically prohibit.

### SECOND CAUSE OF ACTION:
### VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973
### AGAINST ALL DEFENDANTS

82.    Plaintiffs repeat and re-allege the allegations in previous paragraphs of this Amended Complaint as if fully alleged herein.

83.    Plaintiffs are children with disabilities that substantially limit one or more major life activity, and therefore, are considered to be persons with a disability under Section 504 of the Rehabilitation Act, as amended. *See* 29 U.S.C. § 705(9)(B), as amended by the ADA Amendments Act, Pub. L. 110-325, Sec. 7, 122 Stat. 3553 (Sept. 25, 2008).

84.    Plaintiffs are otherwise qualified under Section 504 of the Rehabilitation Act because they meet the essential eligibility requirements for public education in the state of Texas.

85.    Defendant Morath, in his official capacity, the state of Texas, and the Defendant TEA are the recipients of federal financial assistance, to include funding from Title I of the Elementary and Secondary Education Act and from the Elementary and Secondary School Emergency Relief of the American Rescue Plan Act of 2021.

86.     Governor Abbott's Executive Order and TEA's Public Health Guidance, as well as Defendants Paxton and Morath's enforcement of the same, are denying local school districts and public health authorities the ability to provide these children with the accommodations they need to attend school safely.

87.     Defendants have violated the regulations and provisions of Section 504, and/or caused Plaintiffs' School Districts to violate the regulations and provisions of Section 504, as follows:

      a.   Defendants are excluding, and/or are causing Plaintiffs' School Districts to exclude, Plaintiffs from participation in public education, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(i);

      b.   Defendants are using methods of administration that have the effect of subjecting Plaintiffs to discrimination on the basis of disability, in violation of 34 C.F.R. § 104.4(b)(4);

      c.   Defendants are using methods of administration that have the effect or purpose of defeating or substantially impairing accomplishment of the objectives of the public education provided by Plaintiffs' School Districts, in violation of 34 C.F.R. § 104.4(b)(4).

88.     Defendants do not have the authority to circumvent Section 504 and its protections for students with disabilities through executive order or guidance requirements.

89.     The Office of the Attorney General is a department or agency that receives federal financial assistance, including but limited to funds for child-support enforcement, and to address Medicaid fraud, missing children, and drug trafficking.  The Attorney General does not have the

authority to circumvent Section 504 and its protections for students with disabilities through enforcement of the executive order or guidance requirements at issue.

90.     Excluding children from the public-school classroom because of a disability is precisely the type of discrimination and segregation that Section 504 aims to prevent and specifically prohibit.

## THIRD CAUSE OF ACTION:
## FEDERAL PREEMPTION UNDER AMERICAN RESCUE PLAN ACT OF 2021
## AGAINST ALL DEFENDANTS

91.     Plaintiffs repeat and re-allege the allegations in previous paragraphs of this Amended Complaint as if fully alleged herein.

92.     The Supremacy Clause of the United States Constitution renders federal law the "supreme Law of the Land." U.S. CONST. art. VI, cl. 2. The doctrine of federal preemption that arises out of the Supremacy Clause requires that "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Felder v. Casey*, 487 U.S. 131, 138, 108 S. Ct. 2302, 101 L. Ed. 2d 123 (1988) (quoting *Free v. Bland*, 369 U.S. 663, 666, 82 S. Ct. 1089, 8 L. Ed. 2d 180 (1962)). State law is preempted when, among other things, it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 204, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983).

93.     GA-38 and TEA's Public Health Guidance, as enforced by officials including Defendants Paxton and Morath, conflict with federal law because they frustrate Congress' purpose that local school districts have the authority to adopt public health policies, including mask requirements, to protect students and educators as they develop plans for safe return to in-person instruction. Under section 2001(i) of the American Rescue Plan Act of 2021 (ARP), local school districts in Texas – including the districts in which Plaintiffs attend school – have been allocated

over $11 billion in Elementary and Secondary School Emergency Relief (ESSER) funding so that they can adopt plans for a safe return to in-person instruction.[63] Pub. L. No. 117-2, § 2001(i). Section 2001(e)(2)(Q) of the ARP Act explicitly gives local school districts the authority to use these ARP ESSER funds for "developing strategies and implementing public health protocols *including, to the greatest extent practicable, policies in line with guidance from the Centers for Disease Control and Prevention* for the reopening and operation of school facilities to effectively maintain the health and safety of students, educators, and other staff." *Id.* § 2001(e)(2)(Q) (emphasis added). As discussed above, the CDC's guidance specifically recommends universal indoor masking in all K-12 schools.

94.     Furthermore, interim final requirements adopted by the U.S. Department of Education specifically require each local school district to adopt a plan for safe return to in-person instruction that describes "the extent to which it has adopted policies, and a description of any such policies, on each of the following safety recommendations established by the CDC…," specifically including "universal and correct wearing of masks." *See* American Rescue Plan Act Elementary and Secondary School Emergency Relief Fund, 86 Fed. Reg. 21195, 21200 (Apr. 22, 2021). To be clear, the requirement "does not mandate that [a local educational agency] adopt the CDC guidance, but only requires that [it] describe in its plan the extent to which it has adopted the key prevention and mitigation strategies identified in the guidance," which include both "[u]niversal and correct wearing of masks," and notably "appropriate accommodations for children with disabilities with respect to health and safety policies," among others. *Id.* The interim requirements

---

[63] *See* U.S. Dep't of Education, American Rescue Plan Elementary and Secondary School Emergency Relief Fund – Methodology for Calculating Allocations (Revised June 25, 2021) at 3, *available at* https://oese.ed.gov/files/2021/06/Revised-ARP-ESSER-Methodology-and-Allocation-Table_6.25.21_FINAL.pdf.

further provide that a local educational agency must ensure the interventions it implements will respond to the needs of all students, "and particularly those students disproportionately impacted by the COVID-19 pandemic, including … children with disabilities." *Id.*

95.     In other words, it is the legislative purpose and intention of Congress, both as set forth in the statute itself and as interpreted by the Department of Education, that local school districts – and not the state – have the authority to decide whether and to what extent they will adopt public health policies, including mask requirements, consistent with CDC guidance.  GA-38 and TEA's Public Health Guidance impermissibly conflict with and are preempted by this federal law.

**FOURTH CAUSE OF ACTION:**
**FEDERAL PREEMPTION UNDER AMERICANS WITH DISABILITIES ACT**
**AGAINST DEFENDANT PAXTON**

96.     Plaintiffs repeat and re-allege the allegations in previous paragraphs of this Amended Complaint as if fully alleged herein.

97.     Because Governor Abbott's order, as enforced by Defendant Paxton, violates the ADA and Section 504 of the Rehabilitation for the reasons described above, it conflicts with federal law and is therefore pre-empted.

**ATTORNEYS' FEES**

98.     Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to and seek an award of their reasonable attorneys' fees, costs, and expenses.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.     Assume jurisdiction of this action;

B.      Declare that Executive Order GA-38 and TEA's Public Health Guidance violate Plaintiffs' rights under the Americans with Disabilities Act and Section 504, and are preempted by the ADA, Section 504 and the American Rescue Plan Act;

D.      Issue preliminary and permanent injunctive relief enjoining Defendants from violating the Americans with Disabilities Act, Section 504, and the American Rescue Plan Act by prohibiting local school districts from requiring masks for their students and staff;

E.      Issue preliminary and permanent injunctive relief enjoining Defendants from violating the Americans with Disabilities Act, Section 504, and the American Rescue Plan Act by withholding state and federal educational funds from districts that elect to require students and staff to wear masks.

F.      Award Plaintiffs their reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and

G.      Grant such other and further relief as may be just, equitable and proper.

Dated: September 29, 2021

Respectfully submitted,

Thomas M. Melsheimer
Texas Bar No. 13922550
tmelsheimer@winston.com
Scott C. Thomas
Texas Bar No. 24046964
scthomas@winston.com
Alex Wolens
Texas Bar No. 24110546
John Michael Gaddis (*pro hac vice*)
Texas Bar No. 24069747
William G. Fox, Jr. (*application pending*)
Texas Bar No. 24101766
**WINSTON & STRAWN LLP**
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

Brandon W. Duke (*pro hac vice*)
Texas Bar No. 240994476
bduke@winston.com
**WINSTON & STRAWN LLP**
800 Capitol St., Suite 2400
Houston, TX 77002
(713) 651-2600
(713) 651-2700 (fax)

Dustin Rynders (*pro hac vice*)
Texas Bar No. 24048005
drynders@drtx.org
**DISABILITY RIGHTS TEXAS**
1500 McGowen, Suite 100
Houston, TX 77004
(713) 974-7691
(713) 974-7695 (fax)

L. Kym Davis Rogers
Texas Bar No. 00796442
krogers@drtx.org

**DISABILITY RIGHTS TEXAS**
1420 W. Mockingbird Lane, Suite 450
Dallas, TX 75247
(214) 845-4045
(214) 630-3472 (fax)

Robert Winterode (*pro hac vice*)
Texas Bar No. 24085664
rwinterode@drtx.org
**DISABILITY RIGHTS TEXAS**
2211 E. Missouri, Suite 243
El Paso, TX 79903
(210) 424-9652
(915) 542-2676 (fax)

Peter Hofer
Texas Bar No. 09777275
phofer@drtx.org
Brian East
Texas Bar No. 06360800
beast@disabilityrightstx.org
**DISABILITY RIGHTS TEXAS**
2222 West Braker Lane
Austin, TX 78758
(512) 407-2745
(512) 454-3999 (fax)

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned certifies that counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system on September 29, 2021.

*/s/Thomas Melsheimer*
Thomas Melsheimer

EXHIBIT C: FINDINGS OF FACT AND
CONCLUSIONS OF LAW

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

**FILED**

November 10, 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ **SO**
                                    DEPUTY

| | |
|---|---|
| E.T., BY AND THROUGH HER | § |
| PARENTS AND NEXT FRIENDS; D.D., | § |
| BY AND THROUGH HER PARENTS | § |
| AND NEXT FRIENDS; J.R., BY AND | § |
| THROUGH HER PARENTS AND NEXT | § |
| FRIENDS; H.M, BY AND THROUGH | § |
| HER PARENTS AND NEXT FRIENDS; | § |
| E.S., BY AND THROUGH HER | § |
| PARENTS AND NEXT FRIENDS; | § |
| M.P, BY AND THROUGH HER | § |
| PARENTS AND NEXT FRIENDS; S.P., | § |
| BY AND THROUGH HER PARENTS | § |
| AND NEXT FRIENDS; AND | § CAUSE NO. 1:21-CV-717-LY |
| A.M., BY AND THROUGH HER | § |
| PARENTS AND NEXT FRIENDS, | § |
| PLAINTIFFS, | § |
| | § |
| V. | § |
| | § |
| | § |
| MIKE MORATH, IN HIS OFFICIAL | § |
| CAPACITY AS THE COMMISSIONER | § |
| OF THE TEXAS EDUCATION | § |
| AGENCY; THE TEXAS EDUCATION | § |
| AGENCY; AND ATTORNEY GENERAL | § |
| KENNETH PAXTON, IN HIS OFFICIAL | § |
| CAPACITY AS ATTORNEY GENERAL | § |
| OF TEXAS, | § |
| DEFENDANTS. | § |

**MEMORANDUM OPINION INCORPORATING FINDINGS OF FACT AND
CONCLUSIONS OF LAW AND ORDER ON MOTION TO DISMISS**

On October 6, 2021, the court called the above-styled declaratory-judgment and injunctive

action for bench trial.[1]  Plaintiffs and Defendants appeared by counsel.  At issue is whether Texas

---

[1] Before and considered by the court are the Statement of Interest of the United States of America filed September 29, 2021 (Doc. #47); Defendants' Trial Brief filed September 29, 2021 (Doc. #48); Defendants' Exhibit List filed September 29, 2021 (Doc. #49); Defendants' Deposition Designations filed September 29, 2021 (Doc. #50); Plaintiffs' Witness List filed September 29, 2021 (Doc. #51); Plaintiffs' Designation of Deposition Testimony to Be Used at Trial filed September 29,

Governor Greg Abbott's Executive Order GA-38 ("GA-38") violates Title II of the Americans with Disabilities Act of 1990 ("ADA")[2] and Section 504 of the Rehabilitation Act of 1973 ("Section 504"),[3] and whether GA-38 is preempted by the ADA, Section 504, and the American Rescue Plan Act of 2021 ("ARP Act")[4]. Also before the court is Defendants' Motion to Dismiss filed September 13, 2021 (Doc. #34). Having carefully considered the evidence presented at trial, the pleadings, the motion to dismiss, and the applicable law, the court concludes that declaratory and injunctive relief is warranted. In so deciding, the court grants in part the motion to dismiss as to Defendants Mike Morath and the Texas Education Agency ("TEA") only and makes the following findings of fact and

---

2021 (Doc. #53); Plaintiffs' Trial Brief filed September 29, 2021 (Doc. #56); Stipulated Facts filed September 30, 2021 (Doc. #57); Brief of Amici Curiae Texas Pediatric Society and American Academy of Pediatrics in Support of Plaintiffs' Pretrial Filings and Opposition to Defendants' Motion to Dismiss filed September 30, 2021 (Doc. #60); Defendants' Response to Plaintiffs' Trial Brief filed October 4, 2021 (Doc. #62); Plaintiffs' Response to Defendants' Trial Brief filed October 4, 2021 (Doc. #63), along with Corrected Exhibit (Doc. #66); Defendants' Supplemental Exhibit List filed October 5, 2021 (Doc. #71); Defendants' Amended Proposed Findings of Fact and Conclusions of Law filed October 4, 2021 (Doc. #72); Amicus Curiae Brief of Counsel of Parents Attorneys & Advocates on the Subject of Administrative Exhaustion filed October 5, 2021 (Doc. #74); Plaintiffs' [Second] Amended Exhibit List filed October 5, 2021 (Doc. #75); Plaintiffs' Amended Proposed Findings of Fact and Conclusions of Law filed October 5, 2021 (Doc. #76); and Plaintiffs' Notice of Statutory and Regulatory Authority Relied Upon for Section 504/ADA Claims filed October 7, 2021 (Doc. #80).

    Also before the court is Plaintiffs' Emergency Motion for Preliminary Injunction filed August 18, 2021 (Doc. #7). Having considered and determined the merits of Plaintiffs' claims in this case, the court **DISMISSES** Plaintiffs' Emergency Motion for Preliminary Injunction filed August 18, 2021 (Doc. #7).

    [2] 42 U.S.C. §§ 12131  12134 (1990); 28 C.F.R. § 35.130 (2016 ); 28 C.F.R. § 35.150 (2012).

    [3] 29 U.S.C. § 794 (2016); 34 C.F.R. § 104.4 (2000).

    [4] Pub. L. No. 117-2, § 2001 (2021).

2

conclusions of law, ultimately concluding that GA-38 violates Plaintiffs' rights under the ADA and

Section 504 and is preempted by the ADA, Section 504, and the ARP Act.[5]

## I. Background

As of November 4, 2021, 6,503,629 total child COVID-19 cases have been reported in the

United States, representing more than 16.7% of the total cases in the United States.[6]  The prevalence

of pediatric COVID-19 cases has increased dramatically since the 2021-2022 school year began, with

23% of all child cases since the beginning of the pandemic diagnosed between August 13 and

September 23, 2021.[7]  This surge in child cases appears to be due to two principal factors: the

resumption of in-person schooling and the emergence of the Delta variant of COVID-19, which is

more than twice as contagious as previous variants.[8]  The Delta variant infects children at a higher

rate than previous variants and has caused higher infection rates among students than did the Alpha

variant during the previous school year.  The Delta variant also causes more serious illness and

increased fatality rates than prior COVID variants.

---

[5]  All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed.  Likewise, any conclusion of law more appropriately considered a finding of fact shall be so deemed.

[6]  *See Children and COVID-19: State-Level Data Report*, *Summary of Findings*, AAP, https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/children-and-covid-19-state-level-data-report/(data available as of 11/04/21).

[7]  *Children and COVID-19: State Data Report* at Fig. 6, Children's Hosp. Ass'n & Am. Acad. of Pediatrics (Sept. 23, 2021), https://downloads.aap.org/AAP/PDF/AAP%20and%20CHA%20-%20Children%20and%20COVID-19%20State%20Data%20Report%209.23%20FINAL.pdf.

[8]  *See Delta Variant: What We Know About the Science*, CDC (Aug. 26, 2021), https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html.

The spread of COVID-19 poses an even greater risk for children with special health needs. Children with certain underlying conditions who contract COVID-19 are more likely to experience severe acute biological effects and to require admission to a hospital and the hospital's intensive-care unit.[9] This includes children with conditions including, Down syndrome, organ transplants, lung conditions, heart conditions, and weakened immune systems.[10]

The majority of Texas public schools began in-person classes for the 2021-2022 school year between August 9 and 23, 2021. Since that time and up to October 31, 2021, 211,788 students have tested positive for COVID-19.[11] Since the start of the 2021-22 school year, at least 45 districts in Texas have temporarily shut down due to COVID-19 outbreaks among students and staff.[12] The United States Centers for Disease Control and Prevention's ("CDC") Guidance for COVID-19 Prevention in K-12 Schools, updated on November 5, 2021, recommends universal indoor masking for all teachers, staff, students, and visitors to K-12 schools, regardless of vaccination status.[13]

---

[9] *Caring for Children and Youth with Special Health Needs During the COVID-19 Pandemic*, AAP (last updated Sept. 20, 2021), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/caring-for-children-and-youth-with-special-health-care-needs-during-the-covid-19-pandemic/.

[10] *People with Certain Medical Conditions*, CDC, (last updated October 14, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

[11] The most recent statistics on Texas school campuses are available at https://dshs.texas.gov/coronavirus/schools/texas-education-agency/.

[12] THE TEXAS TRIBUNE, September 3, 2021, available at https://www.texastribune.org/2021/09/03/texas-covid-school-districts-shut-down/.

[13] The CDC Guidance for COVID-19 Prevention in K-12 Schools is available at https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html.

Plaintiffs are seven students enrolled in the Texas public-school system who have disabilities as defined under the ADA and Section 504. Plaintiffs' disabilities include Down syndrome, a heart defect, asthma, immune deficiency, underlying reactive airway disease, spina bifida, chronic respiratory failure, and cerebral palsy. Plaintiffs' medical conditions place them at increased risk of contracting COVID-19 and experiencing severe symptoms from the virus. In addition, six of the seven Plaintiffs were under the age of 12 at the time of trial and were not eligible to receive any of the currently authorized COVID-19 vaccines.[14]

During the 2020-21 school year, Texas independent school districts ("ISDs") were granted the discretion to choose whether to implement mask mandates for in-person instruction. However, with the issuance of GA-38 on July 29, 2021,[15] governmental entities, including public-school districts, are prohibited from imposing mask requirements and any local-government entity or official that imposes a mask mandate is subject to a fine of up to $1000.[16] On August 5, 2021, TEA, the state agency that oversees primary and secondary public education in Texas, issued an updated "Public Health Guidance," establishing requirements for school systems during the pandemic to reflect that "[p]er GA-38, school systems cannot require students or staff to wear a mask." TEA's Guidance has updated three times since August 5, 2021, most recently on September 17, 2021. All

---

[14] At the time Plaintiffs filed suit on August 17, 2021, the COVID-19 vaccine had not been approved for children under the age of 12. On October 29, 2021, the U.S. Food and Drug Administration ("FDA") formally approved the Pfizer COVID-19 vaccine for emergency use for children aged 5-11. The FDA's news release can be found at the following link: https://www.fda.gov/news-events/press-announcements/fda-authorizes-pfizer-biontech-covid-19-vaccine-emergency-use-children-5-through-11-years-age.

[15] Governor Abbott has issued subsequent Executive Orders since GA-38, none of which modify or amend the provisions of GA-38 at issue in this case.

[16] Executive Order No. GA-38, ¶ 4.

updates  including the September 17 update  reiterate GA-38's mandate that public schools are not permitted to require students, staff, or visitors to wear masks in their facilities.

Specifically, GA-38 provides, *inter alia*, that "[n]o governmental entity, including a . . . school district . . ., and no governmental official may require any person to wear a face covering or to mandate another person wear a face covering . . . ."  Texas Governor Greg Abbott's Executive Order GA-38, ¶ 4 (July 29, 2021).

School districts in Texas have not reacted uniformly to GA-38.  A number of school districts that had previously imposed mask requirements reversed course and made masking in school optional.  Others have implemented masking measures in schools despite the ban.  The latter school districts have been identified as potential or actual enforcement targets by Texas Attorney General Defendant Ken Paxton for their failure to comply with GA-38.   In recent weeks, Paxton has sent letters threatening school districts that have or have intended to implement mask requirements with civil suits in which he will seek to enjoin the school districts' alleged violations of GA-38's mask provision.  For example, on August 17, 2021, Paxton sent a letter to the Superintendent of Round Rock ISD stating that the district had "recently enacted a local policy mandating that students and faculty wear face masks at schools in your district" and stating that, unless the district rescinded its policy, it would "face legal action taken by [his] office to enforce the Governor's order and protect the rule of law."  On September 10, 2021, Paxton filed suit against six school districts: Richardson ISD, Round Rock ISD, Galveston ISD, Elgin ISD, Spring ISD, and Sherman ISD.  Plaintiff E.T. attends Round Rock ISD, and Plaintiff S.P. attends Richardson ISD.  On September 14, 2021, Paxton filed suit against nine additional school districts: La Vega ISD, McGregor ISD, Midway ISD, Waco ISD, Diboll ISD, Lufkin ISD, Longview ISD, Paris ISD, and Honey Grove ISD.

Paxton has also tweeted about his willingness to sue any public entity that does not comply with GA-38. On August 26, 2021, Paxton tweeted, "BIG WIN FOR LAW & LIBERTY! @GregAbbott_TX's ban on mask mandates is clear. Dem local govts didn't care. So I sued them. Dem judges sided with local D friends. SCOTX just ruled: The Gov's exec order stands. ALL public entities must comply    or be sued and lose over and over again." On September 14, 2021, right after Paxton increased his lawsuits against public school districts to 15, he tweeted, "I filed suit against 9 more Texas schools in violation of GA-38. We will continue until we have law and order."

In addition, the Office of the Attorney General of Texas's website maintains a "List of Government Entities Unlawfully Imposing Mask Mandates"[17] that states "Attorney General Ken Paxton is committed to protecting the rights and freedoms of all Texas. Executive Order GA-38 prohibits governmental entities and officials from mandating face coverings or vaccines. This order has the force and effect of state law and supersedes local rules and regulations." The list has been updated several times, the most recent update being on October 5, 2021. As of October 5, there are 102 school districts, schools, and counties listed as noncompliant, including but not limited to the following school districts in which some of the Plaintiffs are enrolled: Edgewood ISD, San Antonio ISD, Round Rock ISD, Leander ISD, and Richardson ISD. There are 40 school districts and counties listed as "previously not in compliance" but "now in compliance," including but not limited to the following school districts in which some of the Plaintiffs are enrolled: Killeen ISD and Fort Bend ISD. The list indicates which school district or county is both "currently not in compliance" and has been sent a letter by the Attorney General's Office.

---

[17] The List of Government Entities Unlawfully Imposing Mask Mandates is available at the following link: https://www.texasattorneygeneral.gov/covid-governmental-entity-compliance.

On August 17, 2021, Plaintiffs sued, alleging that GA-38 violates the ADA and Section 504 because GA-38 denies Plaintiffs equal access to in-person school and prohibits schools from considering mask mandates as a reasonable accommodation for students with disabilities who are at greater risk of contracting COVID-19 or suffering severe illness as a result of the virus, and that GA-38 is preempted by the ARP Act. The ARP Act has allocated over $11 billion dollars in funding to Texas public schools to implement safety protocols in an effort to promote in-person instruction for the 2021-2022 school year. Plaintiffs allege that GA-38 is preempted by the ADA and Section 504. Plaintiffs seek to enjoin Defendants from enforcing GA-38 insofar as it prohibits Plaintiffs' school districts from considering whether to implement mask requirements as part of their COVID-19 mitigation strategies. In response, Defendants assert that (1) Plaintiffs lack standing based on Plaintiffs' failure to show both imminent injury and Paxton's authority to enforce GA-38; (2) Defendants are entitled to sovereign immunity as to Plaintiffs' ARP Act and ADA claims; (3) Plaintiffs have failed to exhaust their administrative remedies; (4) Plaintiffs' ADA and Section 504 claims fail because Plaintiffs have not established that some exposure to COVID-19 constitutes exclusion; and (5) the ARP Act does not create an express or implied private cause of action.

## II. Jurisdiction

Plaintiffs assert that the court has subject-matter jurisdiction in this case. "[A]s the parties asserting federal subject-matter jurisdiction, [Plaintiffs] bear the burden of proving that its requirements are met." *Willoughby v. U.S. ex rel. U.S. Dep't of the Army*, 730 F.3d 476, 479 (5th Cir. 2013). "A plaintiff is also required to submit facts through some evidentiary method and has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Cell Science Sys. Corp. v. La. Health Serv.*, 804 F. App'x 260, 264 (5th Cir. 2020)

8

(quoting *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981)). Moreover, courts "have an independent obligation to determine whether subject-matter jurisdiction exists." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006). A plaintiff's failure to meet its burden, removes the court's "power to adjudicate the case." *Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

### *Sovereign Immunity–Enforcement*

A state's sovereign immunity can be overcome in three ways: (1) a clearly stated waiver or consent to suit by the state; (2) a valid abrogation by Congress; or (3) the *Ex parte Young* exception. *See Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990); *Ex parte Young*, 209 U.S. 123 (1908). Plaintiffs argue that Defendants' sovereign immunity has been waived for the Section 504 claim, an issue Defendants do not dispute at this stage. With regard to Plaintiffs' claims under the ADA and the ARP Act, Plaintiffs argue that the *Ex parte Young* exception applies. To be entitled to this exception, "the plaintiff at least must show the defendant has 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 1124 (2021) (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2004)).

### *Defendants Morath and TEA*

Defendants argue that Plaintiffs lack standing against TEA and Commissioner Mike Morath because Morath and TEA have never enforced or threatened to enforce GA-38 against any person or entity. The court agrees.

A motion to dismiss filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a party to challenge the subject-matter jurisdiction of the district court to hear a case. Fed. R. Civ. P. 12(b)(1). "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *Barrera Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir.1996)). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Id.* (citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex.1995)).

TEA is authorized to issue Public Health Guidance pursuant to GA-38. Germane to GA-38 is TEA's August 5, 2021 Guidance that provides in relevant part:

> Per GA-38, school systems cannot require students or staff to wear a mask. GA-38 addressed government-mandated face coverings in response to the COVID-19 pandemic. Other authority to require protective equipment, including masks, in an employment setting is not necessarily affected by GA-38.

> School systems must allow individuals to wear a mask if they choose to do so.

The August 5, 2021 Guidance does not specify how it will be enforced or who will enforce it. The Guidance and subsequent superseding versions have never been enforced against a school district or an individual student or staff member.

Moreover, the Guidance is not a rule promulgated by TEA pursuant to the Texas Administrative Code.[18] Thus, TEA's mechanisms for enforcing its rules do not apply to the

_____

[18] The Texas Administrative Code is a compilation of all Texas state-agency rules and is published by the Office of the Secretary of State. The Texas Administrative Code is divided into titles and parts to represent subject categories and related state agencies. The State Board of Education and Commissioner of Education rules are codified in the Texas Administrative Code. *See*

Guidance, and the Guidance's discussion of mask requirements is not subject to investigation or enforcement by TEA. Because Plaintiffs cannot show the threat of future enforcement from Morath or TEA, the court concludes that Plaintiffs lack standing to challenge GA-38 against Morath and TEA. Therefore, the court will dismiss Plaintiffs' claims against Morath and TEA for lack of subject-matter jurisdiction.

### Defendant Paxton

Defendants assert that a court order enjoining Paxton from enforcing GA-38 will not redress Plaintiffs' injuries "as he does not enforce GA-38 in the first place." Defendants argue that the GA-38 is akin to a criminal statute and therefore can only be enforced by other officials such as local district attorneys. Diverting the court to several Fifth Circuit and United States Supreme Court cases, Defendants argue that Plaintiffs have failed to show Paxton's "enforcement connection" to GA-38 because Paxton has not demonstrated a willingness to exercise a duty to enforce GA-38. *See Tex. Democratic Party*, 978 F.3d at 179. However, unlike this case, in the cases cited by Defendants, the officials involved were not or could not actively enforce the statute at issue.[19]

The Supreme Court in *Ex Parte Young* held that

---

19 Tex. Admin. Code, Part 2 (Tex. Edu. Agency Rules).

[19] *City of Austin*, 943 F.3d 993; *Mi Familia Vota v. Abbott*, 977 F.3d 461, 467 69 (5th Cir. 2020); *Morris v. Livingston*, 739 F.3d at 745 46; *Okpalobi v. Foster*, 244 F.3d 405, 414 16 (5th Cir. 2001). *See also Tex. Democratic Party v. Hughs*, 2021 WL 2310010, at *3 (5th Cir. June 4, 2021) (press release announcing a requirement contained no specific threat of enforcement); *Tex. Democratic Party*, 978 F.3d at 180 (Governor's suspension of primary election and extension of early voting period were not sufficient connection to enforcement of challenged election code provision regarding mail-in voting, and Attorney General Paxton's statements that distributing mail-in ballots was illegal were not specific threats of enforcement); *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020) (Attorney General's press release stating that challenged law would be enforced did not contain specific threats of enforcement), *cert. granted, judgment vacated sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261, (2021).

individuals, who, as officers of the State, are clothed with *some* duty in regard to the enforcement of the laws of the State, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action.

209 U.S. at 155  56 (emphasis added).  For the purpose of injunctive relief, the state officer "must have some connection with the enforcement of the act." *Id*. at 157.

The evidence presented to the court shows that Paxton has some authority to enforce GA-38, and that he has a willingness to enforce and has successfully enforced GA-38 against numerous school districts.  The record before the court contains sufficient evidence of Paxton's active enforcement as well as continued threat of enforcement  a willingness to exercise his duty to enforce GA-38.  Paxton has filed lawsuits against at least 15 school districts   including districts that some Plaintiffs attend   alleging that they have violated GA-38 by requiring masking and asking for injunctive relief compelling those school districts to discontinue their mask mandates.  He has also sent letters to at least 98 school districts   including districts that some Plaintiffs attend   accusing them of violating GA-38 by requiring masking, demanding that the school districts discontinue their mask mandates, and threatening them with litigation.

Additionally, Paxton has  made public threats that he will sue other school districts to enforce GA-38, has tweeted about his litigation campaign against school districts who seek to require masking, and has posted on his official website a list of school districts   including all school districts Plaintiffs attend   that he claims are in violation of GA-38.

"[T]he use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity."   Instead, [i]t is simply an illegal act upon the part of a state

12

official in attempting . . . to enforce," and "[t]he state has no power to impart to him any immunity from responsibility to the supreme authority of the United States." *Id*. at 159 60. By actively engaging in the enforcement of GA-38, Paxton not only has demonstrated that he believes that he has the power to enforce GA-38, but also "by virtue of his office" he is "sufficiently connected []with the duty of enforcement to make him a proper party." *Id*. at 161.

### *Standing–Imminent Injury*

Article III of the Constitution limits a federal court's jurisdiction to cases or controversies. In other words, a plaintiff must have standing for a district court to have jurisdiction over the case. There are three constitutional standing requirements identified by the Supreme Court: injury in fact, causation, and redressability. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 61 (1992).

Defendants challenge whether the injuries alleged by Plaintiffs are redressable. The Supreme Court has made clear that the redressability standing requirement must be satisfied prior to entering federal court. *See, e.g., Allen v. Wright*, 468 U.S. 737 (1984). The standard is not whether the proposed remedy is an absolute solution, but rather, whether it will "be 'likely,' as opposed to merely 'speculative,' " to redress the plaintiff's injury. *Lujan*, 504 U.S. at 561; *see also Uzuegunam v. Preczewski*, ____ U.S. ___, 141 S. Ct. 792, 797 (2021) (emphasizing ability to effectuate partial remedy satisfies redressability requirement).

The injury requirement "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). In addition to existing injuries, "imminent" injuries meet the injury requirement. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (stating that "an injury

13

must be 'concrete, particularized, and actual or imminent'") (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). An injury is sufficiently imminent to confer standing if there is a "'substantial risk' that the harm will occur." *Driehaus*, 573 U.S. at 158 (quoting *Clapper*, 368 U.S. at 414 n. 5).

Defendants argue that Plaintiffs' injury claims are speculative, characterizing them as follows: "(1) becoming infected with COVID-19 if they attend school in person or (2) being forced to stay home to avoid getting COVID-19," and Defendants list several contingencies that they assert demonstrate the speculative nature of these injuries. In response, Plaintiffs assert that their injury is the deprivation of reasonable access to in-person public schooling; that the evidence shows that some Plaintiffs are currently suffering that injury and that others will imminently face it; that the evidence shows that Paxton's conduct has deprived Plaintiffs of reasonable access to in-person public school; and that the evidence shows that the injunction Plaintiffs seek would redress their injuries. Thus, Plaintiffs argue, they do not have to show that Paxton's enforcement of GA-38 will actually cause any of them to contract COVID or that they would actually contract COVID in a mask-optional school environment. The court agrees.

The court concludes that Plaintiffs have standing to challenge GA-38 in this court because they allege a concrete and particularized injury that is redressable. During the 2020 2021 school year, several school districts around the state adopted, implemented, and enforced mask mandates for students, staff, and teachers. Paxton has a willingness to enforce and is actively enforcing GA-38 by both his words and his actions, and the court finds that Paxton's actions create an enforcement connection sufficiently connected with his duty to enforce. If GA-38 were not enforced, school districts would have the discretion to implement a mandatory mask policy on school grounds without

violating GA-38 and risking a lawsuit by Paxton. Therefore, it is not merely speculative that enjoining enforcement of GA-38 will redress Plaintiffs' alleged injuries.

### *Administrative Exhaustion*

The Individuals with Disabilities Education Act ("IDEA")[20] ensures that physically or intellectually disabled students receive necessary special education services by requiring states to provide a free appropriate public education ("FAPE"). "Under the IDEA, an 'individualized education program,' called an IEP for short, serves as the 'primary vehicle' for providing each child with the promised FAPE." *Fry v. Napoleon Cmty. Schs.*, ____ U.S. ____, 137 S. Ct. 743, 749 (2017). Congress permits a plaintiff to bring claims for the denial of a FAPE under the IDEA so long as the plaintiff first exhausts his or her administrative remedies under the IDEA. 20 U.S.C. § 1415(l).

However, when "the remedy sought is not for the denial of a FAPE, then exhaustion of the IDEA's procedures is not required." *Fry*, 137 S. Ct. at 754. To determine whether the relief sought falls under the IDEA, the court must look to the "gravamen" of the plaintiff's complaint. *Id.* at 755.

> That inquiry makes central the plaintiff's own claims, as § 1415(l) explicitly requires. The statutory language asks whether a lawsuit in fact "seeks" relief available under the IDEA   not, as a stricter exhaustion statute might, whether the suit "could have sought" relief available under the IDEA (or, what is much the same, whether any remedies "are" available under that law) . . . . A court deciding whether § 1415(l) applies must therefore examine whether a plaintiff's complaint   the principal instrument by which she describes her case   seeks relief for the denial of an appropriate education. But that examination should consider substance, not surface. The use or (non-use) of particular labels and terms is not what matters.

---

[20]  20 U.S.C. §§ 1400  1482 (2017).

15

*Id*.  In other words, Section 1415(l) "requires exhaustion when the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed in precisely that way." *Id*.

The court first asks whether "the plaintiff [could] have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school." *Id.* at 756.  Second, the court must ask "could an *adult* at the school . . . have pressed essentially the same grievance?" *Id.*  If the answer to both questions is "yes," the claim is not one for the denial of a FAPE under the IDEA and there is no exhaustion requirement.  *Id.*

Applying the *Fry* analysis, the court finds that the gravamen of Plaintiffs' claims seek relief for disability discrimination, not for denial of a FAPE.  Plaintiffs seek redress for GA-38's prohibiting school districts from mandating masks in public schools in Texas.  Plaintiffs contend that universal mask mandates should be required in their public schools to prevent them from physical injury, hospitalization, perhaps even death, all of which fall outside that IDEA.  Defendants assert that Plaintiffs' claims are grounded in relief that is available through the IDEA.  The court's review of Plaintiffs' live complaint, however, reveals that it does not allege what Defendants contend.

Defendants assert that Plaintiffs' claim that GA-38 effectively excludes them as disabled children from receiving an education necessarily alleges a denial of a FAPE.  Defendants' argument confuses quality of education with access to school.  As the Supreme Court recognized in *Fry*, "even when the suit arises directly from a school's treatment of a child with a disability    and so could be said to relate in some way to [the child's] education"    the "school's conduct toward [the] child . . . might injure [the child] in ways unrelated to a FAPE." 137 S. Ct. at 754.  Although Plaintiffs' claims relate to their education, Plaintiffs do not seek the type of special-education services that the

IDEA guarantees.  Rather, Plaintiffs seek to allow their public-school districts the discretion to impose mask mandates and provide children with "non-discriminatory access to public institutions" under the ADA and Section 504.  *Id.* at 756.  Plaintiffs allege they have been excluded from participating in or denied the benefits of the programs, services, or activities of a public entity based upon their disabilities.  Therefore, Plaintiffs' claims are properly brought under the ADA and Section 504, and there is no requirement for them to exhaust the IDEA's administrative process.

Additionally, Plaintiffs could bring their claims for the alleged discriminatory conduct at another public facility, such as a library.  An adult, including teachers or a staff members at a public school, could also bring the claims alleged by Plaintiffs.  Thus, the gravamen of Plaintiffs' claims is not for the denial of a FAPE, and the IDEA's exhaustion requirement is not applicable in this case.

### III.  Discussion and Analysis

Plaintiffs allege that they are students with disabilities whose medical conditions carry an increased risk of serious complications or death in the event that they contract COVID-19, and that because of these conditions GA-38 has or will prevent them from returning to in-person classes without serious risk to their health and safety.  Plaintiffs assert that there are no practicable education alternatives for students with disabilities who cannot safely return to school in person; thus, GA-38 has the effect of "placing children with disabilities in imminent danger or unlawfully forcing those children out of the public school system" in violation of the ADA and Section 504.  Plaintiffs further assert that GA-38 is preempted under the Supremacy Clause of the Constitution because GA-38 directly conflicts the with ADA and Section 504, and because it conflicts with the ARP Act by not following certain conditions imposed for the receipt of COVID-related funding under the terms of the act.

*Preemption*

The Supremacy Clause makes clear that a state statute is preempted to the extent it conflicts with federal law. *See* U.S. CONST. art. VI, cl. 2. State law conflicts with federal law either (1) when it is impossible to comply with both state and federal law or (2) "where 'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Crosby* v. *Nat'l Foreign Trade Council*, 530 U.S. 363, 372 73 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

These principles apply to state laws that interfere with the ability to comply with federal prohibitions on disability discrimination.[21] A state or local government cannot deny a modification for a person with a disability solely on the basis that it would violate state law. *See, e.g., Crowder* v. *Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996) (concluding Hawaii's animal quarantine law, as applied to guide dogs, interfered with state's compliance with ADA); *Barber* v. *Colo. Dep't of Revenue*, 562 F.3d 1222, 1232 33 (10th Cir. 2009) (emphasizing proposed accommodation under ADA not unreasonable simply because might require defendants to violate state law); *Astralis Condo. Ass'n v. HUD*, 620 F.3d 62, 69 70 (1st Cir. 2010) (defendant could not rely on Puerto Rico law to refuse accommodation required under Fair Housing Act for person with disability).

The court concludes that GA-38 conflicts with federal law to the extent that it interferes with local school districts' ability to satisfy their obligations under the ADA and Section 504 and their

---

[21] ADA and Section 504 claims are governed by the same legal standards. *Bennet-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) (citing *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287 88 (5th Cir. 2005)). "The remedies, procedures, and rights available under the Rehabilitation Act parallel those available under the ADA." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020*),* citing *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002). "Thus, '[j]urisprudence interpreting either section is applicable to both.'" *Id.* (quoting *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000)*).*

18

implementing regulations. Under these circumstances, Texas has an obligation to make "reasonable modifications" to its ban on school-masking requirements to avoid subjecting students with disabilities to unlawful discrimination. *See* 28 C.F.R. § 35.130(b)(7)(i). The clear intent of Congress is to place the authority with local school districts to decide by what means to comply with their obligations under the ADA and Section 504. GA-38 ignores that intent, removing that authority from local school districts and placing all authority state wide with the Governor.

Moreover, GA-38 conflicts with the ADA and Section 504 because it excludes disabled children from participating in and denies them the benefits of public schools' programs, services, and activities to which they are entitled, "stand[ing] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67. The Supremacy Clause requires that federal law prevail over a conflicting state law. The court concludes that to the extent that school districts cannot comply with GA-38's ban on mask requirements and at the same time meet their obligations under the ADA and Section 504, the ADA and Section 504 supersede any conflicting provisions of GA-38.

The ARP Act was enacted to address the impact of the COVID-19 pandemic and facilitate recovery from its health and economic effects. *See* Pub. L. No. 117-2. The act provides nearly $121 billion in Elementary and Secondary School Emergency Relief funding in order to "help schools return safely to in-person instruction maximize in-person instructional time, sustain the safe operation of schools, and address the academic, social, emotional, and mental health impacts of the COVID-19 pandemic on the Nation's students." American Rescue Plan Act Elementary and Secondary School Emergency Relief Fund, 86 Fed. Reg. 21195, 21196 (Apr. 22, 2021). Local school districts in Texas have been allocated over $11 billion in funding to address those needs. U.S.

19

Dep't of Education, American Rescue Plan Elementary and Secondary School Emergency Relief

Fund   Methodology for Calculating Allocations (Revised June 25, 2021) at 3.

A key purpose of the school funding is to assist schools in achieving a "safe return to in-person instruction." Pub. L. No. 117-2, § 2001(I). Thus, the ARP Act requires local school districts receiving funding to develop and make publicly available a "plan for the safe return to in-person instruction and continuity of services." *Id.* at § 2001(i)(1). Although the act does not require local school districts to adopt CDC guidance on universal masking, it does require that each school district's safe-return plan describe "the extent to which it has adopted policies, and a description of any such policies, on each of the following safety recommendations established by the CDC . . . ," specifically including "universal and correct wearing of masks." 86 Fed. Reg. 21195, 21200.

Plaintiffs argue that because the ARP Act requires school districts to create a plan and GA-38 inhibits the school districts'   who have been granted the authority alone under the act to create a plan   discretion to create that plan, GA-38 conflicts with federal law to the extent that it interferes with local school districts' ability to satisfy their obligations under the act. Defendants argue that the act does not create a private cause of action, nor does the Supremacy Clause create any federal rights. *See Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 626 (5th Cir. 2017).

The failure of the Supremacy Clause to confer a right of action does not diminish the significant role that courts play in assuring the supremacy of federal law. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). When a case or controversy is properly before the court, the court is bound by federal law. *Id.* Thus, "a court may not hold a civil defendant liable under state law for conduct federal law requires." *Id.* (internal citations omitted). "[I]f an individual

claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Id*. (citing *Ex parte Young*, 209 U.S. at 155  56).

When a federal-funding statute expressly gives local authorities discretion over how to spend federal money, any state law that purports to restrict that discretion is preempted. *See Lawrence County v. Lead-Deadwood School Dist.*, 469 U.S. 256, 260  61 (1984). Congress choice to vest that discretion with local school districts rather than state governments is a valid exercise of Congress' power under the Spending Clause of the Constitution[22] to impose conditions on the receipt of federal funds and thus does not raise federalism concerns. *Id*. at 269  70.

Plaintiffs assert that because GA-38 expressly prohibits local schools from implementing any mask requirements, GA-38 is in direct conflict with the ARP Act and is preempted as contrary to federal law because GA-38 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See Felder v. Casey*, 487 U.S. 131, 138 (1988). Thus, Plaintiffs' claim for preemption under the act is properly before this court not because of any private right of action under the act, but based on the equitable power of federal courts to enjoin unlawful actions by state officials. *See Armstrong*, 575 U.S. at 327 (2015) ("[W]e have long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law."); *Ex parte Young*, 209 U.S. at 150  51.

Plaintiffs' ARP Act preemption claim also falls within this court's jurisdiction under Section 1331 of Title 28 of the United States Code because the language of the act does not purport to remove that jurisdiction. *See Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 643 (2002) (holding that telecommunications carrier could assert preemption claim under court's

---

[22] *See* U.S. Const. art. I, § 8, cl. 1.2.

21

equitable power because nothing in federal Telecommunications Act purported to bar or restrict such claims). Plaintiffs may invoke this court's equitable jurisdiction because the act does not expressly or impliedly indicate that Congress intended to preclude enforcement by such means. *See Armstrong*, 575 U.S. at 327‑28.

It cannot be more clear that Congress intends that the local school district receiving ARP Act funds be the ultimate decider of the requirements of the safe return to in-person instruction of students within that district.

### *Violation of ADA and Section 504*

The Texas state constitution establishes that "it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." TEX. CONST. art. VII, § 1. The ADA ensures that state and local governments, in fulfilling this constitutional function, include children with disabilities equally within their ambit. Specifically, the ADA prohibits disability discrimination by state and local governments, including in "[a]ll programs, services, and regulatory activities relating to the operation of elementary and secondary education systems[.]" 28 C.F.R. § 35.190(b)(2). The focus of both the ADA and Section 504 is prohibiting discrimination for those with disabilities. 29 U.S.C. § 701(a)(3)(F) (Rehabilitation Act) (Congress found that individuals with disabilities should "enjoy full inclusion and integration in the economic, political, social, cultural, and educational mainstream of American Society."); 42 U.S.C. § 12101 (ADA) (Congress found that individuals with disabilities should be assured "equality of opportunity, full participation, independent living, and economic self-sufficiency."). Both the ADA and Section 504 also prohibit exclusion from participation, denial of benefits, or other kinds of discrimination. 42 U.S.C. § 12132; *Wilson v. City of Southlake,* 936 F. 3d

22

326, 330 (5th Cir. 2019). Therefore, the court's application of the ADA and its provisions in this case will apply equally to Plaintiffs' Section 504 claims.

On its face, GA-38 does not provide an exception even where a local school decides, based on an individualized assessment, that a mask mandate is necessary to comply with its ADA obligations; and Defendants did not indicate that Texas will interpret the GA-38 to allow for such an exception. Plaintiffs assert that there are no practicable education alternatives for students with disabilities who cannot safely return to school in person. Consequently, Plaintiffs allege, GA-38 has the effect of "placing children with disabilities in imminent danger or unlawfully forcing those children out of the public school system."

"The ADA is a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended 'to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.'" *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (citations omitted). Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a). An individual with a disability is "qualified" if, with or without reasonable modifications to rules, policies, or practices, the individual meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the public entity. 42 U.S.C. § 12131(2). Public education is a quintessential governmental service, program, or activity, and Plaintiffs, all of whom are enrolled or eligible for Texas's public education system, are qualified to participate in and receive the benefits of that service, program, or activity.

The Department of Justice has issued regulations to implement the ADA's mandate. *See* 42 U.S.C. § 12134 (charging Attorney General to issue implementing regulations). These regulations, codified at 28 C.F.R. Part 35, are entitled to deference. *See Frame*, 657 F.3d at 225. The regulations address the many different forms that disability discrimination can take, including discrimination that results from a public entity's implementation of facially neutral policies. *See generally* 28 C.F.R. § 35.130. Discrimination against individuals with disabilities results not just from intentional exclusion, but also from segregation; the failure to make modifications to existing practices; relegation to lesser services, programs, activities, benefits, or other opportunities; and exclusionary qualification standards and criteria. *See* 42 U.S.C. § 12101(a)(5).

The ADA regulations prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability or that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the public entity's program with respect to individuals with disabilities. 28 C.F.R. § 35.130(b)(3)(i) and (ii). In this context, "[t]he phrase 'criteria or methods of administration' refers to official written policies of the public entity and to the actual practices of the public entity." 28 C.F.R. pt. 35, app. B, § 35.130. Thus, GA-38 is an official policy of a public entity and is subject to the prohibitions of Section 35.130(b)(3)(i) and (ii).

The ADA prohibits denying students with disabilities the "opportunity to participate in or benefit from" a school's aid, benefits, or services that is "equal to that afforded others";[23] denying students with disabilities "the opportunity to participate in services, programs, or activities that are

---

[23] 28 C.F.R. § 35.130(b)(1)(i) and (ii).

24

not separate or different" from those provided to non-disabled students;[24] and denying students with disabilities the opportunity to receive a school's "services, programs, and activities in the most integrated setting appropriate to the needs" of students with disabilities.[25]  Public entities have an affirmative obligation to make reasonable modifications in their policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, unless they can show that so doing would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7)(i).

The evidence presented to the court establishes that GA-38 forbids and Paxton's enforcement of GA-38 forcefully prohibits school districts from adopting a mask mandate of any kind, even if a school district determines after an individual assessment that mask wearing is necessary to allow disabled students equal access to the benefits that in-person learning provides to other students. Denying students with disabilities the equal opportunity to participate in in-person learning with their non-disabled peers means that they are being "excluded from participation in or be[ing] denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).  Such a policy is unlawful because it "ha[s] the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3).   As Plaintiffs allege and the evidence proves, the "policy" in this case prevents local school districts from satisfying their ADA obligations to provide students with disabilities the "opportunity to participate in or benefit from" in-person instruction that is "equal to that afforded others," that is "not separate or different" from that provided to non-disabled students, and that is "in the most integrated setting appropriate." 28 C.F.R. § 35.130(b)(1), 35.130(b)(2), and 35.130(d).

---

[24]   28 C.F.R. § 35.130(b)(2).

[25]   28 C.F.R. § 35.130(d).

Moreover, the evidence further establishes that even if a school were to determine based on an individualized assessment that requiring masks is a reasonable modification necessary to enable a student with disabilities to have equal access to a safe, integrated, in-person learning environment, the school would be prohibited from providing that accommodation under GA-38. GA-38 expressly prohibits a school district from requiring "any person to wear a face covering," clearly forbidding such a reasonable modification no matter the scope of a local school's mask mandate. Thus, GA-38 not only prohibits school districts from implementing universal masking in schools in accordance with CDC guidelines, but also from imposing limited mask requirements, such as in one wing of a school building or in one classroom, or by requiring an individual aide to wear a mask while working one-on-one with a student who is at heightened risk of serious illness or death from COVID-19.

A public entity may avoid having to modify its program, service, or activity if it "can demonstrate that making the modifications would fundamentally alter the nature of the program, service, or activity." 28 C.F.R. § 35.130(b)(7)(i). However, Defendants have failed to present any evidence that would support a claim that mask requirements fundamentally alter the educational programs of local school districts.

Defendants also argue that GA-38 does not violate the ADA or Section 504 because GA-38 does not ban Plaintiffs from attending school in-person. Although GA-38 does not ban Plaintiffs from attending in-person instruction, the ADA requires more than mere access to programs, services, or activities; it prohibits denying individuals with disabilities the benefits of services, programs, or activities on the basis of their disability. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a). Even where an individual "is not wholly precluded from participating in [a] service, if he is at risk of incurring

serious injuries each time he attempts to take advantage of [the service], surely he is being denied the *benefits* of this service." *Allah v. Goord*, 405 F. Supp. 2d 265, 280-81 (S.D.N.Y. 2005).

In *Allah*, an inmate with partial paralysis brought an ADA claim against prison officials for allegedly providing unsafe transportation to and from medical appointments. *See id.* at 269-70. The district court denied the prison officials' motion to dismiss, holding that the plaintiff had pleaded sufficient allegations to establish a violation of the ADA where the plaintiff had alleged that prison officials "knew or should have known of the dangers" that inmates with disabilities are "exposed to when they are transported in an unsafe vehicle" but took no steps to make that environment safe. *Id.* at 279. *Allah* illustrates the proposition that an ADA violation can arise where a public entity provides a service or benefit to all participants but effectively excludes people with disabilities by failing to account for or take steps to remedy the ways in which that service may place participants with disabilities at increased risk of harm. *See also Gorman v. Bartch*, 152 F.3d 907, 913 (8th Cir. 1998) (arrestee stated claim where post-arrest transportation was provided but was unsafe for arrestee using wheelchair).

And the Fourth Circuit has instructed that the district court consider the increased risk of harm to a plaintiff from a defendant's actions. *J.D. v. Colonial Williamsburg Found.*, 925 F.3d 663, 673 74 (4th Cir. 2019). The plaintiff, who had a severe gluten allergy, was on a school trip with classmates and sought a reasonable modification to the restaurant's rule that patrons could not bring in their own food. The restaurant argued that, because the menu included a gluten-free option, the plaintiff could order from the menu like his peers and no accommodation was necessary or required. The circuit court reversed the district court's grant of summary judgment in favor ot the restaurant in part because the district court "incorrectly overlooked the testimony that J.D. repeatedly became

27

sick after eating purportedly gluten-free meals prepared by commercial kitchens." *Id.*  The circuit court  held that the district court erred in finding as a matter of law that J.D. could have an experience "equal to that of his classmates" if not accommodated. *Id.*  at 674.

Plaintiffs here have alleged that the use of masks by those around them is a measure that would lower their risk of contracting the virus and thus make it safer for them to return to and remain in an in-person learning environment.  The evidence here supports that the use of masks may decrease the risk of COVID infection in group settings.  Plaintiffs here are at higher risk of contracting COVID that their non-impaired peers.  But because GA-38 precludes mask requirements in schools,  Plaintiffs are either forced out of in-person learning altogether or must take on unnecessarily greater health and safety risks than their nondisabled peers.  The evidence presented by Plaintiffs establishes that Plaintiffs are being denied the benefits of in-person learning on an equal basis as their peers without disabilities.  The court concludes that GA-38 violates the ADA and Section 504.[26]

## IV.  Conclusion

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss filed September 13, 2021 (Doc. #34) is **GRANTED IN PART AND DENIED IN PART AS FOLLOWS**: Plaintiffs'

---

[26]  Several federal district courts have examined the actions of other states that have prohibitions similar to GA-38 and granted preliminary-injunctive relief based upon the ADA and Section 504, although no ruling on the merits has been rendered by any such court as of the date of this opinion. *See G.S. v. Lee*, ___ F. Supp.3d ___, 2021 WL 4942871 (W.D. Tenn. Sept. 3, 2021) (granting temporary restraining order); *Arc of Iowa v. Reynolds*, ___ F. Supp.3d ___, 2021 WL 4166728 (S.D. Iowa Sept. 13, 2021) (granting temporary restraining order); *Disability Rights South Carolina v. McMaster*, ___ F. Supp.3d ___, 2021 WL 4444841 (D.S.C. Sept. 28, 2021) (granting temporary restraining order and preliminary injunction); *Arc of Iowa v. Reynolds*, ___ F. Supp.3d ___, 2021 WL 4737902 (S.D. Iowa Oct. 8. 2021) (granting preliminary injunction); *R.K. v. Lee*, ___ F. Supp.3d ___, 2021 WL 4942871 (M.D. Tenn. Oct. 22, 2021) (granting preliminary injunction).

claims against Defendants Mike Morath and the Texas Education Agency are **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction.  In all other respects, the motion is **DENIED**.

Having concluded that GA-38 violates and is preempted by federal law, the court will permanently enjoin Paxton from enforcing or giving any effect to the provisions of GA-38 prohibiting school districts from requiring masks.

SIGNED this _10th_ day of November, 2021.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE

# Exhibit D: Trial Transcript

```
 1                   IN THE UNITED STATES DISTRICT COURT
                     FOR THE WESTERN DISTRICT OF TEXAS
 2                             AUSTIN DIVISION

 3   E.T., J.R., H.M., E.S., M.P., S.P., A.M.,   ) AU:21-CV-00717-LY
                                                 )
 4      Plaintiffs,                              )
                                                 )
 5   V.                                          ) AUSTIN, TEXAS
                                                 )
 6   MIKE MORATH, TEXAS EDUCATION AGENCY,        )
     KENNETH PAXTON,                             )
 7                                               )
        Defendants.                              ) OCTOBER 6, 2021

 8
                   **********************************************
 9                        TRANSCRIPT OF BENCH TRIAL
                       BEFORE THE HONORABLE LEE YEAKEL
10                 **********************************************

11   FOR THE PLAINTIFFS:   BRANDON W. DUKE
                           WINSTON & STRAWN LLP
12                         800 CAPITOL STREET, 24TH FLOOR
                           HOUSTON, TEXAS 77002-2925
13
                           TOM M. MELSHEIMER
14                         SCOTT C. THOMAS
                           WINSTON AND STRAWN LLP
15                         2121 N. PEARL STREET, SUITE 900
                           DALLAS, TEXAS 75201
16
                           LINDA T. COBERLY
17                         WINSTON AND STRAWN
                           35 WEST WACKER DRIVE
18                         CHICAGO, ILLINOIS 60601

19   FOR THE DEFENDANTS:   RYAN G. KERCHER
                           TAYLOR K. GIFFORD
20                         OFFICE OF THE ATTORNEY GENERAL
                           P.O. BOX 12548
21                         CAPITOL STATION
                           AUSTIN, TEXAS 78711-2548
22
     COURT REPORTER:       ARLINDA RODRIGUEZ, CSR
23                         501 WEST 5TH STREET, SUITE 4152
                           AUSTIN, TEXAS 78701
24
     Proceedings recorded by computerized stenography, transcript
25   produced by computer.
```

**EXHIBIT INDEX**

OFFD/ADM

Plaintiff
 1-369                                      4     4

Defendant
 1-42                                       5     5

```
09:02:32   1        (Open court)

09:02:32   2             THE COURT:  We're here today for a hearing on the

09:02:35   3   merits in Cause number 21-CV-717, E.T. and others v. Morath and

09:02:40   4   others.

09:02:41   5             Let me get announcements by the parties, beginning

09:02:44   6   with the plaintiffs.  Are you ready to proceed?

09:02:46   7             MR. MELSHEIMER:  May it please the, Court,

09:02:48   8   Your Honor:  Good morning.  The plaintiffs are ready to

09:02:50   9   proceed.  Tom Melsheimer here on behalf of the plaintiffs,

09:02:54  10   along with my partners Scott Thomas, who the Court knows, Linda

09:02:59  11   Coberly, who the Court has not met, Brandon Duke, who the Court

09:03:02  12   has met as well.  Thank you.

09:03:04  13             THE COURT:  And for the defendants?

09:03:08  14             MR. KERCHER:  Good morning, Your Honor.  Ryan Kercher

09:03:10  15   on behalf of the Office of the Attorney General for the State

09:03:12  16   of Texas, along with my co-counsel Taylor Gifford.

09:03:16  17             THE COURT:  All right.  And you-all are ready to

09:03:18  18   proceed?

09:03:18  19             MR. KERCHER:  We are, Your Honor.

09:03:19  20             THE COURT:  All right.  Initially let me deal with

09:03:22  21   some administrative matters before we get into your

09:03:28  22   presentations.

09:03:44  23             The Court notes that the parties have filed some

09:03:49  24   stipulated facts which is Document Number 57 on the docket.

09:03:53  25   The Court has reviewed those stipulated facts, accepts the
```

| | | |
|---|---|---|
| 09:03:58 | 1 | facts as stipulated to by the parties and will consider them as |
| 09:04:02 | 2 | if they had been presented and proved in court. |
| 09:04:07 | 3 | Further, my understanding from our earlier phone call |
| 09:04:11 | 4 | is that you -- the parties don't have objection to the |
| 09:04:17 | 5 | exhibits; is that correct? |
| 09:04:20 | 6 | Then let me start with the plaintiff, and if you want |
| 09:04:27 | 7 | to move the admission of your exhibits and give me the complete |
| 09:04:30 | 8 | number of them. |
| 09:04:31 | 9 | MR. THOMAS:  Yes, Your Honor.  Scott Thomas for the |
| 09:04:41 | 10 | plaintiffs.  We move to admit Exhibits 1 through 369.  And I'll |
| 09:04:45 | 11 | note, Your Honor, that pursuant to our phone call yesterday, |
| 09:04:51 | 12 | there's actually 174 exhibits.  We have intentionally skipped |
| 09:04:55 | 13 | some that we've removed, but we left the numbering as it was |
| 09:04:59 | 14 | because -- for ease of the court to refer to the trial brief |
| 09:05:02 | 15 | and other documents. |
| 09:05:03 | 16 | THE COURT:  All right.  So those are exhibits 1 |
| 09:05:05 | 17 | through 369; is that correct? |
| 09:05:07 | 18 | MR. THOMAS:  Yes, Your Honor. |
| 09:05:08 | 19 | THE COURT:  Objections? |
| 09:05:09 | 20 | MR. THOMAS:  No objection from Defendants, |
| 09:05:10 | 21 | Your Honor. |
| 09:05:10 | 22 | THE COURT:  All right.  Plaintiff's Exhibit Numbers 1 |
| 09:05:13 | 23 | through 369, inclusive, are admitted. |
| 09:05:18 | 24 | For the defendant? |
| 09:05:19 | 25 | MR. KERCHER:  Your Honor, the defendants offer |

| | | |
|---|---|---|
| 09:05:21 | 1 | Exhibits 1 through 42 for admission. |
| 09:05:28 | 2 | THE COURT:  Okay. |
| 09:05:29 | 3 | MR. THOMAS:  No objections, Your Honor. |
| 09:05:30 | 4 | THE COURT:  All right.  Defendant's Exhibits 1 |
| 09:05:32 | 5 | through 42 inclusive are admitted. |
| 09:05:39 | 6 | I think that handles the preliminary things that I |
| 09:05:43 | 7 | wanted to make sure that we got into the record.  As we |
| 09:05:46 | 8 | discussed yesterday, the motion to dismiss by the State |
| 09:05:53 | 9 | defendants is still on the table.  We have brought it forward |
| 09:05:57 | 10 | to this hearing, and it is subsumed into what we'll do in this |
| 09:06:01 | 11 | hearing.  But those issues are still before the Court and may |
| 09:06:03 | 12 | be urged by the State defendants. |
| 09:06:12 | 13 | So are the plaintiffs ready to proceed with their |
| 09:06:14 | 14 | case? |
| 09:06:15 | 15 | MR. MELSHEIMER:  We are, Your Honor. |
| 09:06:15 | 16 | THE COURT:  You may proceed. |
| 09:06:16 | 17 | MR. MELSHEIMER:  Your Honor, per the conversation we |
| 09:06:18 | 18 | had with the court at the pretrial yesterday, the beginnings of |
| 09:06:24 | 19 | our presentation will be Mr. Scott Thomas, who will be going |
| 09:06:27 | 20 | through the evidence and highlighting the exhibits and |
| 09:06:30 | 21 | arguments we make from those exhibits that the Court has |
| 09:06:34 | 22 | admitted. |
| 09:06:35 | 23 | THE COURT:  All right.  Mr. Thomas, you may proceed. |
| 09:06:38 | 24 | MR. THOMAS:  May it please the Court: |
| 09:06:47 | 25 | As my colleague said, I want to walk the Court |

09:06:51  1  through some of the key evidence in the case.  And following

09:06:55  2  Your Honor's instructions yesterday, the -- all of our exhibits

09:07:01  3  will be touched on in one way or another in this presentation

09:07:05  4  or they have been in our brief.  What I'm focusing on today is

09:07:09  5  the evidence in the exhibits that are -- we feel are key to the

09:07:13  6  significant issues in the case, whether they be our claims or

09:07:16  7  the defenses of the State.

09:07:20  8          Where I want to start, Your Honor is with our

09:07:23  9  plaintiffs.  We have seven child plaintiffs, all but one under

09:07:31  10  the age of 12.  And many of these facts are stipulated.  I'll

09:07:35  11  go through them hopefully not too quickly, but relatively

09:07:41  12  quickly, but they are important to some of the other issues in

09:07:44  13  the case and I want to focus on those.

09:07:46  14          Our first plaintiff is M.P.  She's 11 years old.  She

09:07:50  15  has Down syndrome.  She was currently at home instead of

09:07:53  16  in-person at school.  She attends Fort Settlement Middle School

09:07:59  17  in the Fort Bend Independent School District.  And the Fort

09:08:03  18  Bend Independent School District had a mask mandate but dropped

09:08:07  19  that mandate because of AG enforcement.  And that is

09:08:11  20  Exhibit 22, which is an affidavit from a Fort Bend board

09:08:15  21  trustee that we'll look at later.

09:08:17  22          Plaintiff E.T. is 12 years old.  She has Down

09:08:24  23  syndrome, asthma, an immune deficiency, and ADD.  She is

09:08:30  24  currently in-person at school at Pearson Ranch Middle School in

09:08:33  25  Round Rock Independent School District.  Round Rock has a mask

09:08:37  1  mandate but has been sued by the attorney general to remove

09:08:41  2  that mask mandate.

09:08:44  3        E.T. is the only one of our plaintiffs that has had

09:08:47  4  one dose of the COVID-19 vaccine, but doctors are concerned

09:08:53  5  that it may not be effective due to her immune deficiency.  And

09:09:00  6  that is in the stipulated facts as well, Your Honor.

09:09:03  7        The third plaintiff is S.P.  She is eight years old,

09:09:06  8  has spina bifida, ADD, chronic respiratory failure, growth

09:09:13  9  hormone deficiency.  She is in-person at Canyon Creek

09:09:17  10  Elementary in Richardson ISD.  Richardson ISD has a mask

09:09:20  11  mandate but has also been sued by the attorney general.

09:09:24  12       Plaintiff J.R. is eight years old.  She has moderate

09:09:28  13  to severe asthma, ADD, a growth hormone deficiency, and

09:09:34  14  anxiety.  She is currently in-person at Bonham Academy in the

09:09:39  15  San Antonio ISD.  San Antonio ISD currently has a mask mandate.

09:09:43  16  They've been sued by the governor for other aspects of

09:09:47  17  violating GA-38, but the governor -- excuse me -- the AG has

09:09:52  18  threatened to sue San Antonio for the mask portions of GA-38.

09:09:59  19       The next plaintiff is H.M.  Eight years old, has Down

09:10:03  20  syndrome, has a ventricular septal defect, and has

09:10:07  21  bronchomalacia.  H.M. is in-person at River Place Elementary in

09:10:12  22  Leander ISD.  Leander ISD has a mask mandate and has been

09:10:18  23  threatened by the attorney general with suit for having a mask

09:10:20  24  mandate.

09:10:22  25       Plaintiff A.M. is eight years old, has cerebral

09:10:27  1  palsy, is nonverbal, has ulcerative colitis, which requires

09:10:30  2  A.M. to receive immunosuppressive drugs.  A.M. Is in-person at

09:10:36  3  Roosevelt Elementary School in the Edgewood Independent School

09:10:39  4  District, which has a mask mandate and has also been threatened

09:10:44  5  with suit by the attorney general.

09:10:45  6           And our last plaintiff is E.S., who is seven years

09:10:48  7  old, has moderate to severe asthma, and attends Skipcha

09:10:51  8  Elementary in Killeen ISD.  Killeen ISD does not have a mask

09:10:58  9  mandate.

09:10:58  10          Importantly, as the Court noted, there are stipulated

09:11:02  11  facts, and the parties have stipulated that all of the

09:11:04  12  plaintiffs are individuals with disabilities, as defined under

09:11:08  13  the ADA and Section 504 of the Rehabilitation Act.

09:11:13  14          Also in the stipulated facts is evidence that doctors

09:11:18  15  who treat the plaintiffs have told those patients to avoid

09:11:25  16  places that do not have universal masking.

09:11:28  17          We have here E.T.'s doctor, Dr. Berhane, notes that

09:11:33  18  E.T. is at very high risk for COVID complications and should

09:11:37  19  avoid crowded indoor spacing where universal masking is not

09:11:42  20  practiced.  Similarly, S.P.'s doctor has told S.P.'s parents

09:11:47  21  that S.P. should not be in places without universal masking.

09:11:51  22  Likewise A.M.'s, doctor, Dr. Shah, has told A.M.'s parents the

09:11:56  23  same thing.

09:11:59  24          Your Honor, all of the evidence in the record about

09:12:04  25  these plaintiffs establishes that the plaintiffs' disabilities

09:12:07  1  put them at a higher risk than the general public and their

09:12:10  2  nondisabled peers in school for COVID complications.

09:12:14  3      Here -- and I won't read through all of it,

09:12:16  4  Your Honor, but the expert testimony of Dr. Yudovich talks

09:12:23  5  about each one of the plaintiffs in exhibit 15 and noticed that

09:12:28  6  their conditions put them at increased risk for severe illness

09:12:35  7  from COVID-19.

09:12:41  8      Also, Dr. Greenberg's expert testimony says the same

09:12:45  9  thing.  He says:  Children with significant disabilities like

09:12:48  10 the plaintiffs can have higher rates of morbidity and mortality

09:12:53  11 and are more likely to face severe, even life-threatening,

09:12:56  12 symptoms of COVID-19.

09:12:58  13      Your Honor, yesterday we talked about some of the

09:13:04  14 amicus briefs, and one of those that I'll be talking about

09:13:07  15 today is from the Texas Pediatric Society and the American

09:13:10  16 Academy of Pediatrics.  They too state that the risk of

09:13:17  17 children contracting COVID-19 is serious and the risk to

09:13:21  18 children with special health needs who contract COVID-19 is

09:13:24  19 even more severe.

09:13:25  20      Now, Your Honor, the State says numerous times in

09:13:28  21 their briefing that the plaintiffs just face a threat of

09:13:32  22 COVID-19, quote, that we all face.  That's just not accurate.

09:13:38  23 All the evidence in the record from the experts, the

09:13:43  24 professional organizations, and other treating physicians

09:13:47  25 establish that each of the plaintiffs are at a high risk.

09:13:50  1          The Pediatric Society of Texas and the American

09:13:55  2   Academy of Pediatrics specifically looked at the conditions

09:13:59  3   that the plaintiffs have and said that those are conditions

09:14:02  4   that put them at higher risk.

09:14:06  5          Now, how do we protect these plaintiffs so that they

09:14:09  6   can attend in person safely and equally to their nondisabled

09:14:14  7   peers?

09:14:15  8          First, we'll look at the CDC.  And this is

09:14:19  9   Exhibit 13.  The CDC recommends universal indoor masking in

09:14:25 10   schools.  And they say here:  The CDC recommends universal

09:14:29 11   indoor masking for all teachers, staff, students, and visitors

09:14:34 12   to K-12 schools regardless of vaccination status.

09:14:38 13          Children should return to full-time, in-person

09:14:40 14   learning in the fall with layered protection strategies in

09:14:45 15   place, and masking is one of those key layered prevention

09:14:49 16   strategies.  GA-38 and TEA's guidance take away that layer.

09:14:57 17          Again, all the evidence in the record -- there's no

09:15:01 18   evidence from the State that contradicts any of this -- is that

09:15:05 19   schools should have the ability to implement mask mandates to

09:15:10 20   protect vulnerable students against the spread of COVID-19,

09:15:15 21   which, as Your Honor well knows and is established in the -- in

09:15:19 22   the evidence, is spreading much more quickly and much more

09:15:24 23   widely because of the delta variant.

09:15:27 24          We look at Plaintiff's Exhibit 17, which is the

09:15:29 25   testimony of expert Dr. Septimus, and he notes that the delta

09:15:35  1  variant is impacting children at a higher rate than the alpha

09:15:39  2  variant did last school year.  And he says schools must have

09:15:43  3  the ability to implement mask mandates.  Dr. Septimus notes

09:15:48  4  that is particularly important in his testimony at Exhibit 17

09:15:55  5  because our plaintiffs are under 12 and cannot be vaccinated.

09:16:00  6  And for our one plaintiff who is vaccinated, her treating

09:16:03  7  physician is worried that the vaccine won't take because of her

09:16:07  8  immune deficiency.

09:16:09  9       Masks played an essential role before vaccines were

09:16:13  10  available and continue to be necessary today.

09:16:16  11       And why does CDC recommend mask wearing?  Because the

09:16:21  12  CDC, the experts, and the TEA itself acknowledge that in-person

09:16:27  13  learning is far superior to remote or virtual learning.  And

09:16:32  14  the CDC recommends that local school districts have the ability

09:16:36  15  to make decisions about implementing prevention layers, such as

09:16:41  16  masking, in classrooms, on campus, or district-wide.  Again,

09:16:47  17  the CDC guidance is Exhibit 13.

09:16:52  18       As I said, Your Honor, virtual instruction is not an

09:16:56  19  adequate alternative to our plaintiffs having equal access and

09:17:00  20  reasonable access to in-person learning.  We have, even from

09:17:05  21  the TEA itself, they recognize that testing results decreased

09:17:10  22  significantly because of virtual instruction.  That's

09:17:12  23  Exhibit 163.

09:17:13  24       And all the education experts agree -- that's

09:17:16  25  Dr. Sandbank and Dr. Sherwood with at Exhibits 20 and 21 --

09:17:21  1  that our specific plaintiffs need in-person instruction.  And

09:17:24  2  if they don't receive that, they're not getting the support and

09:17:27  3  the benefits of in-person learning that other students would be

09:17:31  4  getting.

09:17:37  5          Again, at Docket Number 60, which is the amicus brief

09:17:42  6  from the Texas Pediatric Society and the American Academy of

09:17:44  7  Pediatrics, they note that universal mask policies in schools

09:17:51  8  significantly reduce the spread of COVID-19 and that schools

09:17:54  9  that lack such policies experience significantly higher rates

09:17:58  10 of COVID-19 transmission.

09:18:00  11          Your Honor, there is nothing in the record from a

09:18:02  12 professional organization, a doctor, an expert witness, or any

09:18:06  13 witness that says anything contrary to this, that schools that

09:18:12  14 lack such policies experience significantly higher rates of

09:18:16  15 COVID-19 transmission.

09:18:17  16          We're going to talk about COVID-19 statistics and

09:18:20  17 some insinuations and inferences that the State is making

09:18:24  18 later.  But it's important to note again:  There is no evidence

09:18:28  19 from the State of any expert, any doctor, or anyone who says

09:18:34  20 that schools that lack masking policies -- universal mask

09:18:40  21 policies experience significantly higher rates of COVID-19

09:18:45  22 transmission.

09:18:46  23          Our experts also say that schools should be able to

09:18:49  24 implement mask requirements.  This is the expert testimony of

09:18:54  25 Dr. Septimus, which is at Exhibit 17 of the plaintiffs'

| | | |
|---|---|---|
| 09:19:01 | 1 | exhibits.  He says at the bottom here -- which we can't see on |
| 09:19:04 | 2 | the screen, but, Your Honor, it's on your slide, your |
| 09:19:06 | 3 | printout -- mask wearing is very effective.  Masks can be |
| 09:19:10 | 4 | implemented immediately, and there are essentially no costs |
| 09:19:13 | 5 | associated with them.  Thus, to best protect students, schools |
| 09:19:17 | 6 | or school districts must have the leeway to decide to require |
| 09:19:23 | 7 | masks universally to protect against the spread of the virus. |
| 09:19:31 | 8 | Likewise, Plaintiffs' expert Dr. Greenberg testified: |
| 09:19:34 | 9 | I believe that mask requirements of schools are necessary to |
| 09:19:37 | 10 | protect children like the plaintiffs from the virus.  Specific |
| 09:19:41 | 11 | to our plaintiffs -- not a general fear of COVID, not a general |
| 09:19:45 | 12 | rule, but specific to our plaintiffs, schools should be able to |
| 09:19:48 | 13 | implement mask requirements necessary to protect children like |
| 09:19:53 | 14 | the plaintiffs.  Again, there is no testimony or evidence from |
| 09:19:59 | 15 | the State contradicting that. |
| 09:20:02 | 16 | At the last hearing, Your Honor, the State said, |
| 09:20:06 | 17 | well, you know, the plaintiffs and their parents can just ask |
| 09:20:10 | 18 | the folks at their school to wear masks.  They can just ask |
| 09:20:13 | 19 | them to comply with this.  But, again, the uncontroverted |
| 09:20:20 | 20 | expert testimony in this case is that optional mask policies |
| 09:20:25 | 21 | are ineffective. |
| 09:20:26 | 22 | This is again Dr. Septimus at Exhibit 17:  Compliance |
| 09:20:33 | 23 | with optional mask policies is not great enough to reduce |
| 09:20:35 | 24 | transmission in communities.  Instead, universal mask |
| 09:20:39 | 25 | requirements are necessary for communities to reap the benefits |

| | | |
|---|---|---|
| 09:20:42 | 1 | of mask wearing as a COVID-19 precaution.  Masks are the |
| 09:20:47 | 2 | simplest precaution we can take immediately, and they are |
| 09:20:51 | 3 | effective. |
| 09:20:55 | 4 | Dr. Greenberg agrees Your Honor.  That's Exhibit 18: |
| 09:20:58 | 5 | Individuals' decisions not to wear a mask threaten the health |
| 09:21:03 | 6 | and safety of children like the plaintiffs.  No evidence from |
| 09:21:07 | 7 | the State contradicting that. |
| 09:21:10 | 8 | And, finally, as it relates to optional mask |
| 09:21:13 | 9 | policies, Your Honor, Dr. Greenberg at Exhibit 18 testified: |
| 09:21:21 | 10 | Whether to wear a mask in public is a public health decision, |
| 09:21:25 | 11 | not just a personal health decision.  And he likens mask |
| 09:21:31 | 12 | requirements to other socially accepted public health policies, |
| 09:21:35 | 13 | such as mandating that a certain classrooms cannot have |
| 09:21:38 | 14 | peanut-based snacks because one student has a peanut allergy. |
| 09:21:43 | 15 | So, Your Honor, now we've seen uncontroverted |
| 09:21:46 | 16 | evidence in the record that establishes that Plaintiffs are at |
| 09:21:49 | 17 | a higher risk for COVID-19 complications and/or death.  We've |
| 09:21:54 | 18 | also seen uncontroverted evidence in the record that |
| 09:21:57 | 19 | establishes that universal masking in a school, a classroom, or |
| 09:22:02 | 20 | district is effective and necessary when community transmission |
| 09:22:06 | 21 | is high and/or for the protection of higher-risk individuals, |
| 09:22:11 | 22 | such as plaintiffs.  That's the testimony of Dr. Greenberg and |
| 09:22:15 | 23 | Dr. Septimus. |
| 09:22:16 | 24 | And there's also uncontroverted testimony in the |
| 09:22:20 | 25 | record that virtual learning is substantially inferior to |

| | | |
|---|---|---|
| 09:22:25 | 1 | in-person learning. |
| 09:22:27 | 2 | Now, Your Honor, the State continues to misstate the |
| 09:22:29 | 3 | relief sought.  They did it back in September at the TRO |
| 09:22:32 | 4 | hearing; they did it again in their briefs.  They continue to |
| 09:22:38 | 5 | say, and I quote from page 30 of their initial trial brief: |
| 09:22:41 | 6 | Plaintiffs' requested accommodations, however, is that every |
| 09:22:44 | 7 | school must mandate the wearing of masks, overriding the |
| 09:22:48 | 8 | students' and their parents' choice, changing GA-38's no mask |
| 09:22:53 | 9 | mandate to a, quote, mask mandate. |
| 09:22:55 | 10 | That's not the relief sought, and I think Your Honor |
| 09:22:58 | 11 | knows that.  What we are saying is that schools should be able |
| 09:23:02 | 12 | to implement mask policies based on the needs of their |
| 09:23:08 | 13 | students, including students like our plaintiffs who are at |
| 09:23:12 | 14 | high risk, and also based off local data. |
| 09:23:17 | 15 | Here's an example, Your Honor, of a school doing just |
| 09:23:21 | 16 | that.  We've got -- this is from the Round Rock ISD.  This is |
| 09:23:26 | 17 | Exhibit 43.  And this is what we call -- they call it a mask |
| 09:23:30 | 18 | matrix that has different stages of when masks should be |
| 09:23:34 | 19 | required or masks should be optional.  And this is the exact |
| 09:23:38 | 20 | type of thing that we're asking our plaintiffs' districts to be |
| 09:23:42 | 21 | allowed to do that GA-38 and the TEA guidance and the attorney |
| 09:23:47 | 22 | general's enforcement prohibits or is seeking to prohibit: |
| 09:23:50 | 23 | Localized decision-making based off needs of the students, |
| 09:23:54 | 24 | including higher-risk students such as our plaintiffs, and also |
| 09:23:58 | 25 | based off of local data. |

09:24:02   1          Now, Your Honor, as we saw in one of the expert

09:24:05   2   reports and the expert testimony, the delta variant has caused

09:24:11   3   the spreading of COVID at a higher rate, particularly in

09:24:14   4   children that are school aged.  And the data shows the spread

09:24:18   5   of COVID is more prevalent in the schools this year than it was

09:24:24   6   last year.

09:24:24   7          And I want to start first statewide, and then we'll

09:24:27   8   work down into the specific schools.  Your Honor, this is from

09:24:34   9   Exhibit 8.  This is the Texas -- well, the data is pulled from

09:24:41  10   Exhibit 8, which is the Texas Department of State Health

09:24:45  11   Services website about COVID cases reported in public schools.

09:24:49  12          This shows that in the first eight weeks of school

09:24:55  13   this year, 2021 to 2022, starting August 8 -- starting the week

09:25:00  14   ending August 8, so that would be August 3rd, there have been

09:25:04  15   172,275 cases reported in Texas schools for students.  If you

09:25:13  16   add the teachers, the cases exceed 200,000.

09:25:19  17          Last year, where during the entire 2020-2021 school

09:25:27  18   district -- or school year, districts were able to implement

09:25:30  19   mask requirements or for some period of time were required to

09:25:35  20   have mask requirements, there was only 148,197 cases for all

09:25:41  21   52 weeks of the school year.

09:25:46  22          And, Your Honor, this is not on this slide, but it is

09:25:50  23   available by doing a simple calculation on Plaintiffs'

09:25:54  24   Exhibit 11, which is last year's Texas Health Department data.

09:25:59  25   The enrollment in Texas public schools last year was north of

09:26:02  1   3 million, so the infection rate for the entire year was less

09:26:09  2   than 5 percent.

09:26:12  3          Now, let's compare, Your Honor, this year to last

09:26:16  4   year.  This year, when GA-38 was issued a couple of days before

09:26:22  5   the '21-'22 school year and when the TEA guidance was issued on

09:26:28  6   August 5th that said schools must follow GA-38 and masks could

09:26:34  7   not be required, there already have been 172,275 cases, nearly

09:26:41  8   30,000 more cases than all of last year, in just eight weeks.

09:26:51  9          Compared -- and this is comparing Exhibits 8 to 11,

09:26:55  10  Your Honor, which are the -- Exhibit 8 is this year's Texas

09:26:58  11  Health Department data, and Exhibit 11 is last year's Texas

09:27:02  12  Department Health data.  At this time last year, there were

09:27:06  13  6,000 positive student cases.  Of course, last year masks were

09:27:11  14  required in schools.  This year there are nearly 30 times more

09:27:18  15  cases.

09:27:23  16         Your Honor, this slide is also from Exhibit 11, which

09:27:27  17  is last year's Texas Department Health data, and this is the

09:27:30  18  weekly case count.  And this is important to look at for some

09:27:35  19  comparison reasons we're going to do later in light of some

09:27:38  20  arguments made by the State.  So when masks were available to

09:27:42  21  schools the entire year, we see a bar chart here that shows

09:27:47  22  peaks, spikes, and dips several times throughout the year.

09:27:52  23         The most any -- the most cases in any week of last

09:27:59  24  year's school year was week 24, when there were 10,487 -- I'll

09:28:05  25  read that for you because the font is probably smaller than our

09:28:08   1   exhibit list, Your Honor.

09:28:09   2              THE COURT:  It is.

09:28:10   3              MR. THOMAS:  It's 10,487 cases.

09:28:14   4              Now, again, there is an insinuation by the

09:28:17   5   defendants -- and I think you're going to hear this based off

09:28:19   6   the exhibits they shared with us before the hearing today --

09:28:24   7   that COVID numbers are down throughout the state.  And so,

09:28:29   8   because there's been a decline in the last two weeks, we should

09:28:32   9   not worry about COVID.

09:28:34   10              But, again, it's very important to compare the data

09:28:38   11   to last year's data.  Again, last year we see four significant

09:28:44   12   dips throughout the year.  But, more importantly, Your Honor,

09:28:52   13   what we've done here is we've -- we've put in orange on the

09:28:57   14   left side the weekly case totals from this year's data --

09:29:04   15   that's Exhibit 8 -- and we put that next to the weekly totals

09:29:07   16   from Exhibit 11, which are the data from last school year.

09:29:14   17              As you can see, even though in the last two weeks

09:29:17   18   it's -- the number of cases reported each week in schools has

09:29:21   19   gone down, the most recent week more cases were reported than

09:29:26   20   even the highest week of 2020-'21 school year.

09:29:33   21              So any insinuation by the government -- by the State

09:29:37   22   that the COVID numbers are going down, that there's fewer

09:29:41   23   cases, that there's a low number of cases in school is wrong.

09:29:45   24   There are more cases this year than last year statewide.  And,

09:29:49   25   likewise, at the plaintiffs' school districts and their

09:29:53  1  schools, there are also, with the exception of one school and

09:29:56  2  one district, after just eight weeks, more COVID cases at each

09:30:02  3  of those schools.

09:30:05  4         Again, all but one of the plaintiffs' specific

09:30:07  5  schools that report cases -- some of the schools don't report

09:30:10  6  specific cases, but the districts do -- show that this year,

09:30:14  7  eight weeks in, there's been more cases than last year.  Same

09:30:17  8  with the districts, Your Honor.

09:30:22  9         And this is a graph we put together to show the

09:30:24  10  infection rate.  How quickly are we getting to these numbers?

09:30:28  11  The orange line is this year, Your Honor, the blue line last

09:30:31  12  year.  As you can see, in all but one of the school districts,

09:30:34  13  which is Richardson ISD which has masks in place right now and

09:30:39  14  is in a lawsuit with the State and the Attorney General's

09:30:42  15  Office, they have gotten to a higher number much more quickly.

09:30:46  16  And by reason of the plaintiff's disability, this puts them at

09:30:53  17  a much higher risk than their peers.

09:30:58  18         Your Honor, as I noted, the defendants have said

09:31:02  19  several times that the issue the plaintiffs have is a fear of

09:31:08  20  COVID, quote, like we all face.  And that just their fear of

09:31:13  21  COVID is what's keeping them out of the schools.  But that's

09:31:17  22  not true, Your Honor.  Both those propositions are not true.

09:31:21  23         The evidence shows that COVID is more prevalent than

09:31:24  24  all of last year in the state, in the plaintiffs' school

09:31:28  25  districts, and in this plaintiffs' specific schools.  And the

09:31:32  1  uncontroverted evidence shows that the plaintiffs are at higher

09:31:36  2  risk because of their disabilities.  And, of course, the higher

09:31:39  3  rate of infection puts them at even greater risk.

09:31:43  4          None of that evidence has changed from last year.

09:31:46  5  There's been no proclamation that COVID is not a serious issue.

09:31:52  6  There's no evidence that the plaintiffs are at a lower risk

09:31:54  7  than they are -- than they were last year -- this year.  All

09:31:58  8  the evidence of guidance from health agencies, pediatric

09:32:05  9  organizations, expert witnesses, plaintiffs' treating

09:32:07  10  physicians say universal masking is needed to protect these

09:32:13  11  plaintiffs.

09:32:14  12          And "universal masking" is not really defined

09:32:17  13  anywhere.  What the experts say is that the -- and the treating

09:32:20  14  physicians say is that the plaintiffs need to be in places that

09:32:24  15  have universal masking.  That could be their classrooms.  That

09:32:27  16  could be just the campus.  It could be the entire district.

09:32:31  17  The point is that the districts should be able to make that

09:32:33  18  decision based off those plaintiffs' needs and also the data

09:32:37  19  available to them in their locality.

09:32:41  20          Now, the defendants say that GA-38 and the TEA order

09:32:46  21  and the defendants' actions enforcing those orders are not

09:32:50  22  creating any barrier to in-person learning for the plaintiffs.

09:32:55  23  That's just not so.  The evidence we'll go through next shows

09:32:59  24  that GA-38, that TEA guidance, and defendants' enforcement of

09:33:03  25  those orders is the only reason that the plaintiffs' schools

09:33:08  1  are not, or at risk of not, having mask requirements in their

09:33:14  2  schools to protect the plaintiffs who are at higher risk.

09:33:28  3         Your Honor, Exhibit 1 for both parties, I believe, is

09:33:32  4  GA-38.  Your Honor is well familiar with that.  But GA-38

09:33:38  5  purports to remove the layer of protection of mask requirements

09:33:42  6  from school districts' arsenals to protect their students and

09:33:47  7  to protect high-risk students such as our plaintiffs.

09:33:51  8         The TEA guidance that was issued on August 5th --

09:33:55  9  that's the first set of guidance issued this school year by

09:33:58  10  TEA -- says that school systems cannot require students or

09:34:04  11  staff to wear a mask.  That changed for a little while, and

09:34:07  12  we'll go back and talk about that in a moment.  But, as we

09:34:10  13  stand here today, the active public health guidance, which is

09:34:14  14  Plaintiff's Exhibit 2, is very similar:  School systems cannot

09:34:20  15  require schools or staff to wear a mask.

09:34:28  16         Another key issue in this case, Your Honor, is the

09:34:31  17  enforcement by the defendants of GA-38.  And there is ample

09:34:34  18  evidence of enforcement by both the Attorney General's Office

09:34:40  19  and Texas Education Agency.

09:34:44  20         Now, in the presentation I've culled down hundreds of

09:34:49  21  pages of exhibits, of letters, lawsuits, Tweets, lists, memos.

09:34:52  22  We'll talk on some of that, but there is -- I'd say the large

09:34:55  23  bulk of our exhibits are various letters.  I'm going to touch

09:34:59  24  on some of those.  The letters by admission of the witnesses of

09:35:03  25  the Attorney General's Office, there's two versions of the

09:35:05  1   letters, but they're all basically the same, Your Honor.

09:35:12  2       Let's talk about the defendants' evolving enforcement

09:35:15  3   scheme, Your Honor.

09:35:16  4       What we learned in discovery in depositions in this

09:35:23  5   case, and then later in documents produced after the

09:35:26  6   deposition, is that the TEA sends memoranda to the attorney

09:35:30  7   general of school districts that, quote, have allegedly

09:35:32  8   violated the governor's order.  We'll see some of those memos

09:35:36  9   in a moment.

09:35:37  10      As the Court knows from prior hearings, the AG sent

09:35:40  11  letters, and sends letters, threatening to file, quote, legal

09:35:44  12  action to, quote, enforce the governor's orders.  And they sent

09:35:48  13  just under 100 of those lawsuits -- of those letters to school

09:35:53  14  districts in the state.

09:35:54  15      Additionally, that attorney general posts lists of

09:35:59  16  nearly 100, quote, noncompliant school districts on its

09:36:03  17  official website.  And we'll look at that in a moment,

09:36:05  18  Your Honor.  And, finally, as the Court knows, the attorney

09:36:09  19  general has followed up on its threat to enforce and has, to

09:36:13  20  date, sued 15 school districts, including two of our districts,

09:36:17  21  Richardson and Round Rock.

09:36:23  22      Here is a letter, Your Honor, sent on August 17th, to

09:36:26  23  the superintendent of the Richardson ISD, Dr. Jeannie Stone, by

09:36:32  24  Attorney General Paxton and his office.  And you'll note that

09:36:36  25  it references a recent enactment of a local policy mandate that

```
09:36:40   1  students and faculty wear face masks.  Your actions, according
09:36:45   2  to the attorney general, exceeded your authority as restricted
09:36:48   3  by Governor Abbott's Executive Order GA-38.
09:36:53   4          As he notes below, before August 17th, 2021, the
09:36:57   5  Attorney General's Office has taken legal action in multiple
09:37:00   6  cases, multiple cases, across the state to defend the rule of
09:37:05   7  law by ensuring the governor's valid and enforceable orders are
09:37:07   8  followed.
09:37:08   9          The next page of the letter goes on to say,
09:37:10  10  Your Honor:  My office will pursue further legal action,
09:37:14  11  including any available injunctive relief, costs and attorneys'
09:37:19  12  fees, penalties, and sanctions, including contempt of court,
09:37:22  13  available at law if -- against any local jurisdiction and its
09:37:29  14  employees that persist in enforcing local mask mandates in
09:37:32  15  violation of GA-38.
09:37:34  16          And the last line of this letter, Your Honor -- and,
09:37:37  17  again, this letter went out to nearly 100 school districts --
09:37:40  18  otherwise, you will face legal action taken by my office, the
09:37:44  19  Attorney General's Office, to enforce the governor's order.
09:37:48  20  The letter to Richardson ISD, Your Honor, is Plaintiffs'
09:37:51  21  Exhibit 28, again, sent on August 17th, '21.
09:37:55  22          I won't go through the entire letter, Your Honor.
09:37:57  23  But Exhibit 32, is a identical letter sent to Round Rock ISD's
09:38:04  24  superintendent on the same day, closing with the very same
09:38:09  25  threat, that the Round Rock ISD would face legal action taken
```

09:38:13  1   by my office to enforce the governor's order.

09:38:21  2          In a deposition Austin Kinghorn, who is in the Texas

09:38:25  3   Attorney General's Office, testified there was approximately

09:38:27  4   98 letters sent to school districts.  Mr. Kinghorn, whose

09:38:34  5   deposition excerpts are at Plaintiffs' Exhibit 161, testified

09:38:38  6   that he was the author of those letters.  And in the second set

09:38:41  7   of letters that went out in early September, he was the

09:38:45  8   signatory after a decision was made inside the Attorney

09:38:48  9   General's Office to change the signatory from Mr. Paxton to

09:38:52  10  Mr. Kinghorn.

09:38:56  11         And school districts throughout the state changed

09:38:59  12  their policy in response to the threats.  Again, I referenced

09:39:03  13  we have quite a few letters.  I have put just a few of these to

09:39:06  14  go over with the Court.  I will represent that many of them

09:39:10  15  say, in substance, the same thing.

09:39:12  16         This is from Trenton ISD in response to the attorney

09:39:15  17  general's letter, notifying families:  In abundance of caution,

09:39:20  18  I'm rescinding the ten-day mask requirement sent out on

09:39:23  19  September 1st, and citing that the letter had threatened

09:39:26  20  litigation against the district.

09:39:32  21         Likewise, Clavert ISD responded directly to

09:39:36  22  Mr. Kinghorn in this e-mail, which is Exhibit 102, that the

09:39:41  23  district has taken proper steps to rescind the mandate in

09:39:46  24  response to Mr. Kinhorn's letter.

09:39:51  25         And, finally, another example, the Salado ISD

09:39:54  1  likewise wrote to Mr. Kinghorn and the Office of the Attorney

09:39:57  2  General, upon receiving his letter, that Salado ISD is no

09:40:01  3  longer enforcing their local policy requiring masks.

09:40:05  4          Your Honor, I mentioned earlier that another

09:40:07  5  enforcement technique by the Attorney General's Office and the

09:40:11  6  TEA is that a list is maintained of noncompliant, so to speak,

09:40:17  7  school districts.  And that is at Exhibit 12.  This is the most

09:40:22  8  recent version -- or one of the most recent versions that was

09:40:25  9  updated on September 22nd of 2021.

09:40:29  10          And it says:  Attorney General Paxton is committed to

09:40:34  11  protecting the rights and freedoms of all Texans.  Executive

09:40:38  12  Order GA-38 prohibits governmental entities and officials from

09:40:42  13  mandating face coverings or vaccines.  This order has the force

09:40:46  14  and effect of state law and supercedes local rules and

09:40:49  15  regulations.

09:40:50  16          And then, as you see in the title, this is -- even

09:40:53  17  though it mentions vaccines, this list is about government

09:40:56  18  entities imposing mask mandates.  The first category of the

09:41:01  19  list is the following list of entities -- governmental entities

09:41:06  20  who have been reported as noncompliant with Executive Order

09:41:08  21  GA-38.  And you'll see our school districts are listed on this

09:41:16  22  letter.  And it's, again, small font, Your Honor.  I think the

09:41:19  23  actual exhibit, which is Exhibit 12, is easier to read.

09:41:22  24          There's an asterisk behind the governmental agency,

09:41:28  25  most of which are school districts, indicating that the letter

09:41:31  1  has been sent by the Attorney General's office to the district.

09:41:40  2        There is a second category on the list of

09:41:43  3  governmental entities, again, most of which most are school

09:41:46  4  districts, that says:  Now in Compliance (previously not in

09:41:49  5  compliance).

09:41:50  6        And, Your Honor, you will see in this list we have

09:41:54  7  two school districts that Plaintiffs attend in this case in the

09:42:00  8  "now in compliance (previously not in compliance)."  That is

09:42:02  9  the Fort Bend and the Killeen School Districts.

09:42:05  10        Mr. Kinghorn at the Attorney General's Office was

09:42:08  11  asked about that section of the website.  The question:  "Do

09:42:14  12  you know if that was because of the communication from the

09:42:16  13  Office of the Attorney General?"  And Mr. Kinghorn said, "In

09:42:20  14  some cases, yes, I know that."

09:42:25  15        And most significantly, the attorney general followed

09:42:28  16  up on his threats to enforce the governor's order by filing

09:42:32  17  15 suits, including suits against two of the plaintiffs' school

09:42:37  18  districts, Richardson and Round Rock.

09:42:42  19        Mr. Kinghorn admitted that 15 total actions was

09:42:50  20  approximately right and the number of cases that the AG filed

09:42:53  21  against school districts, all, in substance, the same type of

09:42:57  22  case and same type of allegations.

09:43:03  23        Now, Your Honor, one thing we didn't know when we

09:43:05  24  were here for the TRO that we've learned since through

09:43:08  25  discovery -- and this is -- we first learned it in Exhibit 160,

09:43:12  1   which is the deposition of the TEA's 30(b)(6) rep

09:43:17  2   Ashley Jernigan, is that the TEA was partnering with the

09:43:23  3   attorney general in keeping the list and aiding and abetting

09:43:27  4   the attorney general in its enforcement actions.

09:43:30  5           Now, what we learned was -- and we'll see some

09:43:35  6   examples in a moment -- the TEA sent, approximately twice a

09:43:40  7   week, a list of school districts for which it had received

09:43:44  8   complaints about violations of GA-38 to the Attorney General's

09:43:48  9   Office.  And when asked, "Why does the Texas Education Agency

09:43:57  10  provide the name of those local education agencies about which

09:44:00  11  people are complaining to the office of the attorney General?"

09:44:04  12  TEA testified, "It was on the request from the attorney general

09:44:07  13  that we provide that information to them."

09:44:08  14          And what we see here, Your Honor, at Exhibit 343 is

09:44:12  15  an example of one of those memorandum that was sent.  This is

09:44:18  16  on August 18th, 2021, and the title says:  "Alleged violation

09:44:27  17  of the governor's order.  It is sent to Ryan Fisher and

09:44:32  18  Christopher Hilton, counsel of record for the attorney general

09:44:35  19  and the defendants in this case, and Austin Kinghorn, who we

09:44:38  20  have mentioned was a witness in a deposition in this case.  And

09:44:42  21  you'll see that two of our school districts listed on the TEA

09:44:46  22  memo of August 18th.  That is the San Antonio School District

09:44:49  23  and the Leander School District.

09:44:53  24          Now, Your Honor in their initial trial brief, the TEA

09:44:57  25  said that it didn't know what the attorney general would do

09:45:01 1 with the list, and that they didn't -- all they did was, when

09:45:07 2 they would receive a complaint, tell the complainant to go to

09:45:11 3 the -- let me just quote exactly:  When TEA received complaints

09:45:16 4 that school districts are not in compliance with GA-38, it

09:45:20 5 responds that it does not have the authority to investigate

09:45:24 6 such complaints and refers the complainant to the local

09:45:27 7 grievance process.

09:45:28 8        That's Exhibit 6 -- excuse me -- page 6 of

09:45:31 9 Document 48 in the record, which is the defendants' initial

09:45:34 10 trial brief.

09:45:34 11        Your Honor, that's not according to the letter which

09:45:37 12 is Exhibit 358, exactly accurate.  Here, in response to a

09:45:43 13 complainant making a complaint about the Richardson ISD, the

09:45:48 14 TEA sent a letter on September 30th of 2021 saying that,

09:45:54 15 "Although TEA does not enforce the governor's order, we," being

09:45:58 16 TEA, "will coordinate the information provided with the Office

09:46:01 17 of the Attorney General so they can work to address the

09:46:04 18 identified concern about school districts not complying with

09:46:07 19 the governor's mask mandate."

09:46:09 20        They knew what the attorney general was doing with

09:46:11 21 this information.  In fact, Mr. Kinghorn and the TEA had

09:46:16 22 e-mails about the fact that he was sending letters to these

09:46:19 23 districts.

09:46:20 24        And, I will say that, despite what is said in the

09:46:24 25 brief about the TEA referring complainants to a local grievance

09:46:29  1  process and the letter that we obtained after the depositions,

09:46:33  2  Exhibit 358, there is no reference to anything other than the

09:46:37  3  fact that the TEA is going to coordinate with the attorney

09:46:40  4  general.

09:46:44  5       Now, the attorney general has -- the official

09:46:49  6  Attorney General's Office has Tweeted about its successful

09:46:53  7  enforcement strategies and efforts.  Here is Exhibit 143, a

09:46:57  8  Tweet from the attorney general about successfully getting the

09:47:05  9  Trenton, Calvert and Los Fresnos ISDs to pull down their mask

09:47:06  10  requirements.  And he says "Lawsuits are coming against them

09:47:10  11  this week" when he talks about over ISDs still having mask

09:47:14  12  mandates.

09:47:16  13       He followed up on that threat.  This is Exhibit 147,

09:47:20  14  a Tweet by the Texas Attorney General's Office and Mr. Paxton,

09:47:24  15  that "I have filed nine more lawsuits against the following

09:47:27  16  school districts for defying Executive Order 38."  And on

09:47:34  17  September 14th, he Tweeted that "A win:  Paris ISD has been

09:47:42  18  ordered to follow the law," which is referring to a temporary

09:47:44  19  restraining ordered issued against Paris ISD after the attorney

09:47:48  20  general filed suit against them.

09:48:00  21       Now, we also learned since we last met, Your Honor,

09:48:04  22  and discovery, the TEA revised its guidance in early September

09:48:10  23  to tell school districts the mask provisions of GA-38 are not

09:48:15  24  being enforced as a result of ongoing litigation.  Even though

09:48:18  25  they told that to school districts, they continued to send

09:48:23 1    their twice-a-week memo to the Attorney General's Office for

09:48:31 2    them to further their enforcement efforts.

09:48:34 3         The guidance I referred to was modified was

09:48:36 4    Exhibit 3, and here is one of several memos that occurred

09:48:41 5    between September 2nd and September 17th when the guidance was

09:48:46 6    changed, where TEA is sending lists of, quote, noncompliant

09:48:52 7    school districts to the attorney general.

09:48:57 8         Why did TEA send this guidance?  Because they wanted

09:49:01 9    to tell the school districts that there was a requirement that

09:49:05 10   the schools follow GA-38.  This again is Exhibit 160, the

09:49:10 11   testimony of TEA's 30(b)(6) witness Ashley Jernigan.  So,

09:49:17 12   according to this document, school districts cannot require

09:49:17 13   students or staff to wear a mask?  "Yes."  She also testified

09:49:22 14   that the purpose of this guidance was that TEA wanted to

09:49:29 15   dissuade school districts from requiring masks.

09:49:33 16        Your Honor, what I have here at slide 73 is a kind of

09:49:40 17   summary of what has happened since March 2020, when the world

09:49:46 18   was turned upside down by COVID-19, as it relates to schools,

09:49:51 19   mask mandates, and the governor's order and the defendants'

09:49:58 20   enforcement activities.

09:49:59 21        Of course, in March 2020, when COVID was declared a

09:50:04 22   disaster by Governor Abbott on March 13th of 2020 -- which, by

09:50:09 23   the way, Governor Abbott has not removed his declaration that

09:50:13 24   there is a COVID-19 disaster in this state -- schools were

09:50:16 25   closed pursuant to GA-8 on March 19 of '20.  Virtual education

09:50:22  1  was the only education really available for schools.  So really

09:50:26  2  no need to discuss a mask requirement in schools.  Although on

09:50:31  3  July 2nd, 2020, Governor Abbott in GA-29 required masks

09:50:36  4  statewide.

09:50:38  5          And then in the 2020-'21 school year, from August

09:50:43  6  through the early summer or the summer of '21, of course, mask

09:50:49  7  mandates were allowed during the fall and spring semesters.  On

09:50:54  8  March 25th, '21, towards the end of the '21 school year the --

09:51:00  9  I keep saying that -- the 2020-'21 school year, the TEA

09:51:06  10 guidance still required masks in schools.

09:51:08  11         Per Governor Abbott's Executive Order GA-36, the last

09:51:14  12 day schools could mandate masks was at 11:59 p.m. on Friday,

09:51:19  13 June 4th, which was, by all intents and purposes, the last day

09:51:23  14 of school for nearly every school district in the state.

09:51:26  15         And so then we get to the beginning of this school

09:51:31  16 year, Your Honor.  And on July 29th, '21 was when GA-38, which

09:51:37  17 is at issue in this case, was issued banning mask requirements,

09:51:41  18 including in schools.  The new school year started two days

09:51:44  19 later.  The TEA guidance that we've talked about saying no

09:51:47  20 masks can be required in schools for faculty or staff was

09:51:51  21 issued just a few days later, on August 5th.

09:51:54  22         And on August -- this is not in the timeline, but the

09:51:57  23 letters we've seen, Your Honor, were issued on August 17th, and

09:52:00  24 the lawsuits were filed roughly beginning September 10th

09:52:04  25 against the school districts.

09:52:10   1          And we see here, Your Honor -- and we talk about this

09:52:12   2   at the last hearing -- where there was a point in time that we

09:52:15   3   could point to that was kind of the last peaceful time, and

09:52:18   4   when we could point to a point in time where things changed.

09:52:22   5          And, Your Honor, I think this clearly shows, yes,

09:52:25   6   COVID was here and things were moving and there was a lot of

09:52:27   7   moving parts in March of 2020.  But for purposes of this case,

09:52:31   8   for purposes of the ability of school districts to implement a

09:52:34   9   layered protection plan to protect high-risk students such as

09:52:38   10   our school -- such as our plaintiffs so they could have equal

09:52:41   11   access to in-person learning, things changed right at the

09:52:45   12   beginning of this school year, in very late July, early August

09:52:49   13   of '21.

09:52:55   14          Now, Your Honor, again, the State has said several

09:53:02   15   times that GA-38 and their actions and the TEA guidance is not

09:53:06   16   a barrier to the students' access to school.  That is

09:53:10   17   incorrect.  The only thing -- the only thing in the record that

09:53:16   18   is cited as preventing schools from implementing mask

09:53:22   19   requirements as they deem fit is GA-38, the TEA guidance

09:53:28   20   relying on GA-38, and the defendants' enforcement of GA-38.

09:53:32   21          This is, again, the Texas Pediatric Society and

09:53:35   22   American Academy Of Pediatrics' amicus brief.  "This theory

09:53:39   23   overlooks the State's roll here:  The whole purpose of the

09:53:43   24   challenged orders," which are GA-38 and the TEA guidance, "is

09:53:47   25   to prevent school districts from imposing precisely the kind of

09:53:51  1   universal masking policy that would reduce the risks to

09:53:55  2   Plaintiffs so that they may safely obtain an in-person

09:53:58  3   education."

09:54:00  4          Your Honor, there's no evidence from the State at all

09:54:03  5   in this case contradicting the plaintiffs' evidence that the

09:54:07  6   plaintiffs are at high risk of COVID complications and death;

09:54:12  7   that masking universally on campus or in classrooms is an

09:54:20  8   effective preventive layer to protect our high-risk plaintiffs;

09:54:22  9   that virtual learning -- there's no evidence contradicting that

09:54:26  10  virtual learning is substantially inferior to in-person

09:54:31  11  learning; there is no evidence -- and we're going to see some

09:54:32  12  exhibits from them -- that contradicts the facts, the data that

09:54:36  13  we've looked at, that COVID-19 is more widespread today than it

09:54:39  14  was at any point in the '20-'21 school year.

09:54:42  15         Now, the governor's orders and the defendants' -- and

09:54:46  16  the TEA's order and the defendants' enforcement prevent the

09:54:50  17  school districts from making an individualized assessment that

09:54:54  18  a mask requirement at a campus or in a classroom or a district

09:54:58  19  is necessary to allow the plaintiffs to have equal access to

09:55:03  20  benefits of in-person learning, the same benefits that are

09:55:06  21  provided to other students.

09:55:11  22         And, again, there is no evidence of any reason other

09:55:14  23  than GA-38, the TEA guidance, and the defendants' enforcement

09:55:19  24  of those orders that prevents any of our schools or districts

09:55:23  25  from considering mask requirements.

09:55:27  1        Now, what does the evidence show the districts would

09:55:30  2  do?  This is a question Your Honor had at the last hearing.

09:55:34  3  What is the evidence of what school districts would do if GA-38

09:55:39  4  and the TEA guidance barriers to implementing necessary mask

09:55:45  5  requirements to protect the plaintiffs were removed?

09:55:48  6        Well, the evidence is found in two things: what the

09:55:51  7  school districts did before the enforcement actions and then

09:55:54  8  some affidavits from some school officials.

09:55:58  9        First let's look at the Round Rock ISD.  The Round

09:56:03  10 Rock ISD imposed mask requirements.  They received a letter

09:56:07  11 from the attorney general threatening a lawsuit.  The attorney

09:56:10  12 general followed up on that threat and filed a lawsuit, and the

09:56:14  13 district court granted a TRO, and the court of appeals stayed

09:56:17  14 the TRO.  But Round Rock is still at risk of the enforcement

09:56:22  15 efforts removing the ability to implement a mask requirement --

09:56:27  16 a universal mask requirement to protect the students in Round

09:56:30  17 Rock, including our plaintiff there.

09:56:34  18        Similarly, Richardson ISD wanted to impose a mask

09:56:39  19 mandate at the start of the school year, August 9th, for

09:56:43  20 Richardson, but refrained in the face of GA-38.  Then they

09:56:46  21 implemented a mask mandate after GA-38 was challenged in the

09:56:50  22 state courts and based on Richardson ISD's review of public

09:56:54  23 health data.

09:56:55  24        And that's at Exhibit 27, which is, I believe, the

09:57:00  25 affidavit of the superintendent of the school district, which

09:57:07   1   we'll get to.

09:57:08   2        Then the attorney general sent the threatening letter

09:57:10   3   that we looked at, filed a lawsuit, and of course the mask

09:57:14   4   mandate is still in effect, but is at risk of being removed

09:57:18   5   because of the attorney general's enforcement actions.

09:57:21   6        Fort Bend wanted to impose mask mandates at the start

09:57:25   7   of school but refrained in the face of GA-38.  And we'll see

09:57:29   8   this in a moment.  This is Exhibit 22, which is the testimony

09:57:32   9   of one of the Fort Bend trustees.

09:57:35   10        After 548 students were infected with COVID-19, Fort

09:57:39   11   Bend temporarily closed Pecan Grove Elementary on August 23rd

09:57:43   12   and implemented a mask mandate.  548 students, and that was the

09:57:48   13   second week of school.

09:57:50   14        Then Fort Bend stopped enforcing the mask mandate due

09:57:53   15   to the attorney general's enforcement actions on August 28th,

09:57:56   16   and the Fort Bend ISD is identified on the attorney general's

09:58:01   17   website as now in compliance but previously not in compliance.

09:58:06   18        The Leander School District instituted a mask

09:58:08   19   mandate, the OAG sent a threatening letter, and is still

09:58:13   20   identified on the attorney general's website as being not in

09:58:17   21   compliance and is still facing the threat of litigation.

09:58:21   22        San Antonio ISD has instituted a mask mandate as of

09:58:25   23   August 11th.  The Attorney General's Office sent a threatening

09:58:30   24   letter to San Antonio ISD about its mask mandate on

09:58:33   25   August 17th.  The attorney general has filed a lawsuit against

09:58:36   1  San Antonio on other aspects of GA-38, but they still face the

09:58:40   2  threat of a mask-related lawsuit.  And San Antonio is still

09:58:46   3  listed as not in compliance on the attorney general's website.

09:58:49   4          And, finally, the Killeen School District is

09:58:53   5  identified on the attorney's website as now in compliance but

09:58:57   6  previously not in compliance.  The parties stipulated that

09:59:01   7  Killeen ISD approved a mandate but later lifted it.

09:59:05   8          And Killeen ISD -- and this is Exhibit 369.  A

09:59:08   9  Killeen ISD representative has stated that "If there is a

09:59:11  10  change in the executive order, the district will call a special

09:59:14  11  board meeting to reconsider enforcing a mask mandate."

09:59:17  12          Your Honor, I referred to this a moment ago.  This is

09:59:20  13  the testimony of Fort Bend ISD Board Trustee Member Denetta

09:59:24  14  Williams.  This is Exhibit 22.

09:59:26  15          She said:  "The results of a mask option policy were

09:59:31  16  immediately catastrophic.  In that August 23rd, 2021 meeting, I

09:59:37  17  voted with the majority of the school board for a mask mandate

09:59:41  18  that took effect on August 26th."  The AG enforcement happened

09:59:47  19  thereafter.  The mask mandate was pulled down.  And she

09:59:50  20  testifies at paragraph 22 of her declaration, "If the attorney

09:59:56  21  general stopped enforcing GA-38, or there is an order barring

10:00:00  22  enforcement of GA-38, the Fort Bend mask mandate would

10:00:04  23  immediately go back into effect."

10:00:07  24          And in the testimony of Richardson Superintendent

10:00:11  25  Dr. Jeannie Stone, which is at Exhibit 27, she says that, in

| | | |
|---|---|---|
| 10:00:18 | 1 | implementing a mask mandate at Richardson ISD, "I made these |
| 10:00:23 | 2 | decisions with care and concern for all of our students, |
| 10:00:26 | 3 | including our students under twelve who could not be vaccinated |
| 10:00:30 | 4 | and," importantly here, "our students with health concerns who |
| 10:00:33 | 5 | may be at higher risk of serious illness from COVID-19." |
| 10:00:37 | 6 | Later on in her declaration she says that "Richardson |
| 10:00:40 | 7 | School District believes that the district has the right to |
| 10:00:43 | 8 | make decisions related to masks at the local level, but will |
| 10:00:46 | 9 | ultimately comply with any applicable court orders enforcing |
| 10:00:50 | 10 | GA-38." And importantly here for what would they do if GA-38 |
| 10:00:54 | 11 | and TEA guidance was removed, the superintendent the of |
| 10:00:59 | 12 | Richardson ISD says, "If the attorney general stopped enforcing |
| 10:01:02 | 13 | GEA-38, or there is an order barring enforcement of GA-38, |
| 10:01:06 | 14 | Richardson ISD will absolutely implement mask requirements as |
| 10:01:11 | 15 | long as student needs, local data, including the local COVID-19 |
| 10:01:16 | 16 | risk level, and expert guidance show it's necessary." |
| 10:01:20 | 17 | I want to shift at the end here, Your Honor, from the |
| 10:01:24 | 18 | districts back to the plaintiffs and their parents. |
| 10:01:31 | 19 | As the Texas Pediatric Society and the American |
| 10:01:34 | 20 | Academy of Pediatrics said in their amicus brief, "By barring |
| 10:01:37 | 21 | schools from imposing universal mask policies through orders |
| 10:01:41 | 22 | that both authorize and threaten enforcement actions against |
| 10:01:44 | 23 | public officials that impose such policies, the challenged |
| 10:01:47 | 24 | orders force upon parents an untenable choice:  They can either |
| 10:01:51 | 25 | send children, including especially medically vulnerable |

10:01:55  1  children such as Plaintiffs, to schools where they face grave

10:01:58  2  risk of contracting COVID-19 or keep children home, where they

10:02:01  3  will not have access to an in-person education.  For medically

10:02:06  4  vulnerable children who have an increased risk of severe

10:02:09  5  complications from COVID-19, barring schools from imposing the

10:02:12  6  precise kind of masking policy shown to reduce the risk of

10:02:17  7  contracting COVID-19 is a denial of safe access to in-person

10:02:20  8  school and a failure to provide these children reasonable

10:02:24  9  accommodations under the ADA and the Rehabilitation Act."

10:02:29  10      So we have in evidence, Your Honor, declarations from

10:02:32  11  all of our parents about the choice they face and what they

10:02:36  12  would do.

10:02:39  13      This is the testimony of S.P.'s mother at Plaintiffs'

10:02:44  14  Exhibit 220.  "S.P. is currently in-person at a mask-mandated

10:02:48  15  school."  And the mother says about her son, "Given his

10:02:51  16  learning and attention challenges, he suffered academically

10:02:54  17  during virtual instruction last year and, as a result, he is

10:02:57  18  significantly behind in core grade level skills such as reading

10:03:02  19  and math.  He cannot afford, academically or developmentally,

10:03:07  20  to do another year at virtual school."

10:03:11  21      "My husband and I feel like we have to chose between

10:03:13  22  S.P.'s education and his health.  No parent should be forced to

10:03:17  23  make a decision like this."

10:03:20  24      The testimony of A.M.'s mother, which is at

10:03:22  25  Plaintiffs' Exhibit 221 is:  "A.M. is currently in-person at a

| | | |
|---|---|---|
| 10:03:26 | 1 | mask-mandated school." |
| 10:03:27 | 2 | "A.M. is currently nonverbal but appears to be on the |
| 10:03:31 | 3 | cusp of verbalizing words.  I worry if A.M. does not receive |
| 10:03:36 | 4 | in-person instruction this school year, he will lose this |
| 10:03:39 | 5 | important emerging skill and may regress even further." |
| 10:03:42 | 6 | At paragraph 8 of the declaration:  "Without |
| 10:03:45 | 7 | universal masking, I do not know how I will be able to safely |
| 10:03:48 | 8 | educate my son and ensure his well-being." |
| 10:03:51 | 9 | "Under the homebound option, A.M. will likely |
| 10:03:54 | 10 | receive, at most, four hours of instruction per week, which is |
| 10:03:58 | 11 | not enough to ensure he attains adequate progress during this |
| 10:04:02 | 12 | important developmental period." |
| 10:04:04 | 13 | This is the testimony of ET's mother, Plaintiffs' |
| 10:04:08 | 14 | Exhibit 223:  "E.T. is currently in-person at a mask-mandated |
| 10:04:13 | 15 | school." |
| 10:04:13 | 16 | I'll hit some high points here:  "At the time I |
| 10:04:19 | 17 | signed the declaration on August 17th, 2021," which is a prior |
| 10:04:23 | 18 | declaration, "I do not know what to do with respect to E.T.'s |
| 10:04:27 | 19 | education this school year." |
| 10:04:28 | 20 | She will wear a mask, but the mother was concerned |
| 10:04:30 | 21 | that may not be enough to protect E.T. from COVID-19 if others |
| 10:04:34 | 22 | around her do not mask.  Her treating physician -- or her |
| 10:04:39 | 23 | treating psychiatrist has recommended that she attend in-person |
| 10:04:42 | 24 | classes provided it is safe -- is as safe as virtual learning. |
| 10:04:46 | 25 | She says at paragraph 12:  "I am very concerned that |

10:04:49  1  if the mandate is rolled back" -- the mask mandate at a her

10:04:53  2  school district -- "and our campus staff and students do not

10:04:55  3  choose to use masks, I will have no choice but to keep E.T.

10:04:58  4  home even though she needs in-person instruction."

10:05:01  5          "For my daughter's sake, I hope the court stops

10:05:04  6  enforcement of the executive order so Round Rock ISD has at

10:05:09  7  least the option to continue a mask requirement that allows my

10:05:11  8  daughter to safely attend school."

10:05:14  9          This is the testimony of J.R.'s mother, Plaintiffs'

10:05:17  10  Exhibit 225:  "J.R. is currently in-person at a mask-mandated

10:05:21  11  school."

10:05:21  12          "J.R. is doing very well in school this year, and it

10:05:23  13  would be devastating to have to remove her from in-person

10:05:26  14  schooling."

10:05:27  15          "At this time I have decided that, if San Antonio ISD

10:05:31  16  were not allowed to continue implementing a mask requirement, I

10:05:34  17  would have to keep J.R. home, even knowing she would lose out

10:05:38  18  on the in-person educational services she needs," those same

10:05:42  19  services that have caused J.R. to be doing very well in school

10:05:46  20  this year.

10:05:48  21          This is the testimony of M.P.'s mother, Plaintiffs'

10:05:51  22  Exhibit 226:  "M.P. is at home currently because the school has

10:05:57  23  a mask-optional policy."

10:06:00  24          M.P.'s mother said: "After receiving nearly daily

10:06:03  25  updates from Fort Bend ISD about the rising number of cases of

10:06:07  1  COVID-19 in schools and learning Fort Bend ISD was having to

10:06:11  2  close some campuses because of COVID-19 outbreaks, we made the

10:06:15  3  decision for M.P. to stop attending school in person until

10:06:19  4  there was a masking requirement in place.

10:06:20  5       "The virtual learning option only offers a portion of

10:06:23  6  her classes."

10:06:24  7       "This decision, while the right choice for M.P.'s

10:06:28  8  safety and health, has had a detrimental effect on her

10:06:31  9  emotional well-being, mental health, and education."

10:06:33  10       "M.P. is no longer receiving the social interaction

10:06:36  11  with her peers that in-person instruction offers or learning

10:06:40  12  nearly as much as she would in person.

10:06:43  13       "Because Fort Bend ISD is not allowed to implement

10:06:46  14  mask requirements, our daughter continues to be denied access

10:06:49  15  to in-person instruction she needs."

10:06:53  16       Two more, Your Honor.  Testimony of E.S.'s mother.

10:06:57  17       "E.S. is currently in-person at a school with a

10:07:00  18  mask-optional policy."

10:07:03  19       "E.S. struggled considerably during virtual

10:07:05  20  instruction because she missed being around her same-aged peers

10:07:09  21  and had significant difficulty remaining focused."  And,

10:07:13  22  therefore, E.S. parents have sent E.S. to school in person.

10:07:17  23       And, finally, the testimony of H.M.'s mother.

10:07:20  24       "H.M. Is currently in-person at a school with a mask

10:07:22  25  mandate that also has a broad opt-out."

| | | |
|---|---|---|
| 10:07:26 | 1 | At paragraph 10, H.M.'s mother says:  "With optional |
| 10:07:30 | 2 | masking, two students in H.M.'s class tested positive for |
| 10:07:33 | 3 | COVID-19, and we felt we had no option but to stop sending H.M. |
| 10:07:37 | 4 | to school for in-person learning he needs.  After three weeks |
| 10:07:40 | 5 | of being at home, he's returned to in-person learning today to |
| 10:07:43 | 6 | meet his social and educational needs; however, should another |
| 10:07:46 | 7 | student in H.M.'s class test positive for COVID-19, we |
| 10:07:51 | 8 | anticipate returning to at-home." |
| 10:07:52 | 9 | "As long as COVID-19 continues to spread at high |
| 10:07:55 | 10 | levels and H.M.'s district isn't allowed to accommodate his |
| 10:07:58 | 11 | needs by requiring masks of those near him, H.M. will be |
| 10:08:02 | 12 | excluded from needed in-person instruction." |
| 10:08:07 | 13 | Your Honor, each one of those declarations and all |
| 10:08:11 | 14 | the testimony says, if the school is allowed -- or if the |
| 10:08:15 | 15 | school is not allowed to have a mask mandate at that school, |
| 10:08:18 | 16 | their decisions are forced upon them by whether the school can |
| 10:08:22 | 17 | have a mask mandate or not have a mask mandate. |
| 10:08:26 | 18 | And, again, all the evidence in this case -- and |
| 10:08:28 | 19 | they're not going to stand up and point to anything else -- |
| 10:08:31 | 20 | that says those districts either don't have a mask mandate at |
| 10:08:36 | 21 | their school or are at risk of losing it is because of only |
| 10:08:40 | 22 | GA-38, TEA guidance, and the defendants' enforcement. |
| 10:08:46 | 23 | And each of these plaintiffs has been injured.  We |
| 10:08:49 | 24 | have two with ongoing injuries, Your Honor.  M.P., who is out |
| 10:08:52 | 25 | of school is denied reasonable and equal access to in-person |

| | |
|---|---|
| 10:08:57 | 1 |
| 10:09:02 | 2 |
| 10:09:08 | 3 |
| 10:09:13 | 4 |
| 10:09:18 | 5 |
| 10:09:24 | 6 |
| 10:09:27 | 7 |

learning.  We have E.S., who is in-person at a school without a
mask mandate.  So E.S. is at risk currently.  And we have five
other plaintiffs who are facing imminent injury if GA-38
successfully prohibits the school districts from continuing
their mask mandates.  We have four who are out of school: E.T.,
J.R., H.M., and A.M., and one ho would be in-person at risk in
Richardson.

Your Honor, all the evidence shows, and it's
stipulated, that the plaintiffs have disabilities that qualify
them for ADA.  They are at high risk for COVID.  Nothing has
changed since last school year.  COVID is more widely spread
statewide in schools, in the school districts, and in the
specific plaintiffs' schools.  There's no evidence that
contradicts that.  They're going to come up and point to what
they call low numbers, but we've got to compare that to last
year.  It's still higher now.

And so the plaintiffs, by reason of the enforcement
of GA-38 by the defendants, are being denied equal and
reasonable access to in-person public education because of
their disabilities and the higher risk of COVID, and they're
being denied the same benefits that their nondisabled peers are
facing.

So give me just one moment, Your Honor.

Your Honor, that's the end of or tour of Plaintiffs'
evidence, so to speak.  I'm happy to answer any questions.  But

10:10:39   1   pursuant to our discussion yesterday, I think Your Honor wanted

10:10:42   2   to kind of have a back-and-forth about facts and then have

10:10:45   3   legal argument at a subsequent time.

10:10:49   4            THE COURT:  Well, I think that is an appropriate way

10:10:53   5   to proceed.  Is that acceptable?

10:10:59   6            MR. KERCHER:  That works for the defendants,

10:11:01   7   Your Honor.

10:11:01   8            THE COURT:  All right.  Then why don't we do this,

10:11:03   9   because it's a convenient stopping point, let's take our

10:11:06  10   morning recess right now and be in recess for 15 minutes.

10:11:11  11        (Recess)

10:11:11  12        (Open court)

10:30:04  13            THE COURT:  Let me make just one observation that

10:30:07  14   nobody needs to do anything about here today.  Yesterday one of

10:30:13  15   things we talked about when we talked on the phone was that the

10:30:16  16   plaintiffs' exhibit list was really difficult to read because

10:30:19  17   the list had really small font on it.

10:30:25  18            I know that the plaintiff has attempted to remedy

10:30:29  19   that.  The problem is -- I thought I had made it clear

10:30:37  20   yesterday that the problem was not the number of exhibits that

10:30:41  21   were listed on the pages, but the font.  So, for future

10:30:48  22   reference, do not file anything in this court that has a

10:30:51  23   reduced font from what you would put in your brief.  Your new

10:30:56  24   amended exhibit list is just as hard to read as the old one

10:31:00  25   was.  I wanted the type back up to the regular-size type.

|          |    |                                                                  |
|----------|----|------------------------------------------------------------------|
| 10:31:05 | 1  | Now, it's gotten easier because you haven't                      |
| 10:31:08 | 2  | introduced all your exhibits.  Your slides give me exhibit       |
| 10:31:12 | 3  | references that make it easy to follow as to the ones that you   |
| 10:31:14 | 4  | want.  But for future trials and future things, try to listen a  |
| 10:31:21 | 5  | little more carefully to what the judge tells you the problem    |
| 10:31:24 | 6  | is.                                                              |
| 10:31:24 | 7  | And the problem is that I thought I had made it clear            |
| 10:31:31 | 8  | that I wanted exactly the same size font that you would use in   |
| 10:31:35 | 9  | a brief and in a pleading in your exhibit list.  So just         |
| 10:31:37 | 10 | remember for future working with the court.                      |
| 10:31:39 | 11 | MR. MELSHEIMER:  May it please the Court:                        |
| 10:31:41 | 12 | Your Honor, you made that perfectly clear.  There was nobody on  |
| 10:31:43 | 13 | our side that misunderstood that.  I know I didn't, and my       |
| 10:31:47 | 14 | direction was to make the font bigger.  If it didn't get         |
| 10:31:49 | 15 | bigger, that was a failure of execution, not a failure of        |
| 10:31:52 | 16 | listening.                                                       |
| 10:31:52 | 17 | THE COURT:  Well, at least what we ran out didn't get            |
| 10:31:55 | 18 | bigger.  It's just as hard to read as the others.                |
| 10:31:58 | 19 | MR. MELSHEIMER:  We will address that, Your Honor,               |
| 10:31:59 | 20 | because it was our intent to do so.  We're going to get that     |
| 10:32:02 | 21 | right.                                                           |
| 10:32:02 | 22 | THE COURT:  I just wanted to point that out.  I don't            |
| 10:32:04 | 23 | think I need the other list because you do a good job in your    |
| 10:32:09 | 24 | slides of highlighting the exhibits that has what you contend    |
| 10:32:13 | 25 | has the really outcome-determinative things in it, and that's    |

10:32:15  1  what I really want to look at, the exhibits of importance.  And

10:32:18  2  I will look at other exhibits, but I'm not going to back

10:32:22  3  through the list.  But I just wanted to point that out to you.

10:32:28  4          All right.  Is the State ready to proceed?

10:32:31  5          MR. KERCHER:  Defendants are ready, Your Honor.  May

10:32:33  6  it please the Court?

10:32:34  7          THE COURT:  You may.

10:32:35  8          MR. KERCHER:  Before I get into my prepared remarks,

10:32:38  9  Your Honor, I want to take a moment to appreciate the hard work

10:32:41  10  that I know the Court has put in administratively to getting

10:32:45  11  this difficult and complicated case to an opportunity to be

10:32:49  12  heard.  Likewise, to learned opposing counsel, as the Court has

10:32:52  13  recognized, this is an important case.  It is in some respects

10:32:56  14  an emotional case.  And despite the profound differences

10:32:59  15  between the parties, opposing counsel have been professional

10:33:05  16  and courteous to work with, and we appreciate that.

10:33:09  17          THE COURT:  Well, let me say something about that,

10:33:11  18  because, as I indicated -- or at least I hope I indicated -- on

10:33:15  19  the phone, I really appreciate all the effort that you-all have

10:33:17  20  put in this case to get it ready on the merits.

10:33:20  21          This case is yet another example as to why cases that

10:33:24  22  have statewide impact should be heard on the merits and not be

10:33:29  23  chopped up and heard on individual requests for emergency

10:33:34  24  relief.  I heard this morning from the plaintiffs' presentation

10:33:39  25  a whole lot that I would -- that I didn't hear when we had the

10:33:43 1  hearing on the temporary restraining order because discovery

10:33:47 2  has now been done.

10:33:48 3      We have big cases coming out of the legislature in

10:33:51 4  Texas that this group of people, as we mentioned early on, is

10:33:55 5  involved in a lot of them.  They have extreme importance.  Many

10:34:01 6  of them have nationwide impact.  They will go far beyond what

10:34:05 7  we're doing here in Texas.  And it is just better to get them

10:34:09 8  to the merits so the court can make a decision on a fully

10:34:12 9  developed record of whatever people want to produce and what's

10:34:17 10 out there than to try to do something on a half-baked emergency

10:34:21 11 basis.

10:34:22 12     I know the attorney general hears this talk all the

10:34:24 13 time because I get a lot of these cases, and I'm constantly

10:34:27 14 urging them to get to the point where we got to in this case,

10:34:31 15 that is, in a relatively short period of time, get the case

10:34:35 16 together where we can have a complete record, I can make a

10:34:39 17 decision on the merits, then the appellate courts can determine

10:34:45 18 this as a merits decision, and it gets over with and gets done.

10:34:50 19     So I greatly appreciate the efforts of both sides to

10:34:54 20 get this case to where we are today.

10:34:56 21     So now, Mr. Kercher.

10:34:58 22     MR. KERCHER:  Thank you, Your Honor.

10:35:03 23     The conversation, Your Honor, that we're having at

10:35:05 24 this trial is, once again, as it has been for the past 18 or

10:35:13 25 19 months, about the pandemic.  The pandemic has brought untold

10:35:20  1  harm, unprecedented harm, across all walks of life.  And the

10:35:24  2  fact that the pandemic has touched all walks of life does not

10:35:28  3  mean that it has not touched those walks of life in sometimes

10:35:31  4  particularized ways, which is to say that some of us are

10:35:34  5  suffering, some of us are challenged, some of us are facing

10:35:39  6  questions that others of us are not.

10:35:44  7       And while we may take hope from the fact that we have

10:35:47  8  learned new ways of helping one another through this pandemic,

10:35:51  9  that does not mean that all of the harms brought by the

10:35:55  10  pandemic can be fixed or ameliorated in a courtroom.

10:36:05  11       As the Court knows by now, much of what's going on in

10:36:07  12  this case turns on data, and I want to start by walking the

10:36:14  13  Court through not generalized ideas about what the data looks

10:36:18  14  like nationwide, what the data will look like according to

10:36:21  15  experts who are making prognostications, but about the actual

10:36:25  16  numbers in the schools and the school districts at issue.

10:36:28  17       Your Honor, slide number 2 is a chart that we put

10:36:33  18  together using data provided by the Department of State Health

10:36:36  19  Services that shows the relative COVID-positive rates among

10:36:41  20  students, both at the individual school level where the

10:36:44  21  individual plaintiffs attend or are enrolled, as well as in the

10:36:48  22  subject independent school districts.

10:36:53  23       This first chart is a chart that we put together

10:36:55  24  about a week ago.  When we were required to put together our

10:36:58  25  initial exhibits, we wanted to give plaintiffs' counsel notice

| | | |
|---|---|---|
| 10:37:01 | 1 | of the type of chart we were going to put together. And if you |
| 10:37:05 | 2 | look, Your Honor, at the information provided by the Department |
| 10:37:08 | 3 | of State Health Services in this far right-hand column, the |
| 10:37:13 | 4 | total rate of COVID-positive cases for the individual schools |
| 10:37:17 | 5 | that the plaintiffs in this case are enrolled in and, most |
| 10:37:20 | 6 | cases, attend in person, you can see that the positive COVID |
| 10:37:26 | 7 | rate varies from about .3 percent to 5.4 percent as of the data |
| 10:37:32 | 8 | available last week. |
| 10:37:34 | 9 | I would point out, Your Honor, that there are two |
| 10:37:37 | 10 | schools at issue in this case that do not currently have mask |
| 10:37:40 | 11 | mandates in place -- or two school districts, and that is the |
| 10:37:44 | 12 | Fort Bend ISD and the Killeen ISD. |
| 10:37:49 | 13 | For your reference, Your Honor, if you're looking at |
| 10:37:51 | 14 | the individual schools at the top portion of the chart, Fort |
| 10:37:54 | 15 | Settlement Middle School, which is the top individual school, |
| 10:37:57 | 16 | and Skipcha Elementary School, which is bottom individual |
| 10:38:03 | 17 | school, do not have mask mandates. |
| 10:38:05 | 18 | And if you scroll all the way to the right-hand side |
| 10:38:08 | 19 | of that chart, you can see that the relative positivity rates |
| 10:38:08 | 20 | are 1.8 percent at Fort Settlement Middle School, which does |
| 10:38:13 | 21 | not have a mask mandate, and 2.6 percent at Skipcha Elementary, |
| 10:38:19 | 22 | which does not have a mask mandate. |
| 10:38:21 | 23 | And you can see, Your Honor, that those are well |
| 10:38:23 | 24 | within the range, and certainly not the highest, of |
| 10:38:27 | 25 | COVID-positive rates among the schools at issue in this case. |

10:38:31  1          Likewise, if you go down to the second part of the

10:38:34  2   chart, you can see the same data but at an independent school

10:38:38  3   district level.  Fort Bend ISD, scrolling all the way to the

10:38:43  4   right-hand side of slide number 2, has a 3.7 positive rate.

10:38:49  5   Killeen ISD has a 2.5 positive rate.  And you can see that

10:38:53  6   those are well within the norm for what schools, both with and

10:38:57  7   without mask mandates in this case, are experiencing.

10:39:05  8          If we go to the next slide, Your Honor, it's a little

10:39:08  9   bit harder to read because it is one column longer.  It has one

10:39:12  10  additional week's worth of data.  And you can see that while

10:39:15  11  all the numbers move up with that extra week's worth of data

10:39:19  12  about new COVID-positive cases coming in, they all move up in

10:39:22  13  roughly the same range.

10:39:24  14          Again Fort Settlement Middle School, the top

10:39:27  15  individual school listed, had a positive rate of 1.9 percent,

10:39:30  16  which is well within the range of the schools that do have mask

10:39:33  17  mandates in place.  Likewise, Fort Bend ISD has a 3.9 percent

10:39:41  18  rate, and Killeen ISD has a 3 percent rate, which are well

10:39:45  19  within the range for schools at the school districts at issue

10:39:48  20  in this case, with and without mask mandates.

10:39:56  21          Slide number 4, Your Honor, is a portion of

10:39:58  22  Exhibit 19.  And, likewise, there are additional exhibits that

10:40:01  23  look like this.  I think it's Exhibits 11 through 19 and

10:40:06  24  Exhibit 41 for the defendants.

10:40:10  25          And what we've done is we've taken the Department of

10:40:11  1  State Health Services data that is compiled week after week and

10:40:16  2  put up on a website, and we have provided the Court with all of

10:40:19  3  that data for the school districts and the individual schools

10:40:23  4  at issues so that the Court doesn't have to take our word for

10:40:27  5  it in the charts we provided in slides 2 and 3, but the Court

10:40:31  6  can, at its convenience, should it want to, scroll through that

10:40:35  7  data and see what the actual numbers look like at a finer grain

10:40:39  8  level.

10:40:42  9          In addition, Your Honor, to the Department of State

10:40:44  10  Health Services keeping statewide data and counting on schools

10:40:49  11  and school districts to report their COVID positivity rates,

10:40:53  12  individual school districts are doing the same thing and

10:40:55  13  they're making that data, for the most part, available online.

10:41:00  14          Let's start with Fort Bend ISD.  This is

10:41:04  15  Plaintiffs' -- Defendants' Exhibit Number 11 on slide number 5.

10:41:11  16  You can see, Your Honor, that we have highlighted the

10:41:13  17  individual school at issue from Fort Bend ISD.  That's Fort

10:41:16  18  Settlement Middle School.

10:41:18  19          And, as of last week, if you scroll over to the

10:41:20  20  right-hand side of the chart -- if you're looking at the

10:41:23  21  screen, Your Honor, I'll circle it for you -- you can see last

10:41:25  22  week there were four COVID-positive cases at Fort Settlement

10:41:30  23  Middle School, where a COVID-positive rate of .27 percent.  To

10:41:40  24  be clear, that's not 27 percent, it is .27 percent, or about

10:41:45  25  one quarter of 1 percent.  You can see in the upper left-hand

1  corner of the same exhibit that the active positive cases for

2  the entire district was at 206.

3       At the bottom, Your Honor, of slide number 5 and

4  Exhibit Number 11 is a chart that tracks the COVID rate across

5  the weeks and Fort Bend ISD, which, as we all agree, has

6  essentially not had a mask mandate in place for the entire

7  year.

8       And you can see, Your Honor, that the chart goes up

9  and up until the first part or the end of August, and it

10  reaches around 1,000 total positive COVID cases.  If we go to

11  Exhibit 12, Your Honor, this again is Fort Bend ISD.  You can

12  see, following that same chart after the first -- the end of

13  August into the first part of September and to where we are

14  now, those COVID-positive rates have fallen dramatically.

15       If you review the data on the Department of State

16  Health Services, data that we provided in Exhibits 11 through

17  19 and Number 41, you can see that this is a trend that is

18  common to all schools or all of the schools at issue in this

19  case, both with and without mask mandates.  There is an initial

20  rise in COVID-positive levels, and then it trails off.

21       It's also worth noting, Your Honor, because I know

22  that during Plaintiffs' opening presentation, they focused on

23  how much context matters.  And context does matter.  So if you

24  look at the numbers as they rise to nearly 1,000 positive COVID

25  cases in Fort Bend County at the end of August, it looks like

10:43:39  1  an overwhelming amount.  And 1,000 cases is a lot of cases.

10:43:43  2      But, in the context of Fort Bend ISD, which I believe

10:43:47  3  is the largest ISD at issue in this case, it's 1,000 out of

10:43:52  4  over 77,000 students.

10:43:57  5      THE COURT:  Let me ask you a question.

10:43:59  6      MR. KERCHER:  Yes, Your Honor.

10:44:00  7      THE COURT:  For purposes of this case, why are

10:44:03  8  numbers important at all in a nutshell?  Why is it important

10:44:12  9  that we're seeing more cases in this school year perhaps than

10:44:18 10  last school year?  Why is not what government ought to be

10:44:21 11  looking about are any cases and protecting students based on

10:44:27 12  the best scientific information available from any cases?

10:44:31 13      The numbers only mean something in the big picture.

10:44:38 14  There could be 10,000-to-1 odds against something, but it

10:44:45 15  doesn't mean anything if you're the one.  So why are we

10:44:48 16  concerned about how numbers go up and down instead of being

10:44:51 17  concerned with what is the best policy and what does the law

10:44:57 18  allow to protect anyone from this?

10:45:02 19      MR. KERCHER:  I think there are a number of

10:45:03 20  subquestions wrapped up in that, and I'll try to take them one

10:45:09 21  by one.

10:45:12 22      First, Your Honor, when this case began -- and I

10:45:15 23  believe it was in their original complaint -- Plaintiffs drew

10:45:20 24  an analogy to stacking layers of Swiss cheese.  And one of

10:45:24 25  their experts -- I believe it's Yudovich -- makes that same

1  analogy.

2          What's nice about that analogy is that it captures

3  the complexity of the pandemic, because if you imagine layers

4  of Swiss cheese that have different patterns of holes in them

5  and you start stacking those on top, the idea is you get enough

6  layers, then you'll have fewer holes that go all the way

7  through from the top of the stack to the bottom of the stack.

8          That's not an inaccurate way to think about the

9  pandemic, because the pandemic is complicated.  There is not a

10  straight line from one piece of information to another piece of

11  information in something as complicated and as little

12  understood as the pandemic.

13          So when the Court asks why do the numbers matter, the

14  numbers matter in this case for the same reason that they would

15  matter in any study where you have a control group, right?

16  Where you want to adjust variables against a control group and

17  evaluate whether there is a delta.

18          The issue in this case about the pandemic turns on

19  masks, but that does not mean that it's the only variable at

20  issue in a pandemic.  And if you control for masks, what

21  happens to the relative positivity rate?  And what we see when

22  we look at the numbers at the schools and school districts at

23  issue in this case, is that masking is not making an

24  appreciable statistically significant difference between the

25  level of infection in the schools at issue in this case that do

10:46:46  1  have mask mandates and the schools at issue that do not have

10:46:50  2  mask mandates, which draws us to ask questions about other

10:46:54  3  variables that are not at issue in this case.

10:46:57  4          And opposing counsel, Mr. Thomas, in his opening

10:47:00  5  remarks on behalf of the plaintiffs repeatedly emphasized the

10:47:03  6  danger of the delta variant.  That's true.  The delta variant

10:47:07  7  does spread more quickly than other variants do.  Does that

10:47:10  8  mean that the delta variant is perhaps at issue when we are

10:47:13  9  talking about different rates of COVID positivity levels as

10:47:16  10  between last year and this year?

10:47:18  11          Another variable at issue, Your Honor, in the

10:47:20  12  pandemic but not brought up in this case is the number of

10:47:24  13  students who stayed home and worked remotely from school all

10:47:27  14  year long versus the relative avalanche of students who have

10:47:32  15  returned to school this year.  What role does that play in that

10:47:35  16  initial spike?  We cannot evaluate whether or not it's the mask

10:47:40  17  mandate or lack of mask mandate that is at issue or that is

10:47:44  18  allegedly causing the plaintiffs' injury.

10:47:47  19          The other thing to consider, Your Honor, is one of

10:47:50  20  things that the plaintiffs are asking for -- and Ms. Gifford

10:47:53  21  will get into this when we get into the legal argument -- but

10:47:56  22  they're asking for reasonable accommodations.

10:47:58  23          If a school like Fort Settlement Middle School, which

10:48:04  24  has over 1500 students and staff, is a multistory, large middle

10:48:10  25  school building has four cases, is the scope of the relief that

10:48:15   1   Plaintiffs are asking, which is statewide, a reasonable

10:48:18   2   accommodation?

10:48:20   3          Also, Your Honor, you asked the question about --

10:48:22   4          THE COURT:  Well, I didn't get the impression that

10:48:24   5   was their argument.  I got the impression that the plaintiffs'

10:48:28   6   argument is that you look at what is a reasonable accommodation

10:48:36   7   on the lowest common denominator, whether it's a classroom,

10:48:43   8   whether it's a campus, whether it's a school district, and that

10:48:49   9   that is the thrust of the ADA and the other acts that are

10:48:53   10  decided.

10:48:54   11         Because that's all I decide on.  I don't decide on

10:48:56   12  the basis of what's good policy or bad policy under the facts

10:49:00   13  of this case.  I look at the current status of the law and what

10:49:07   14  GA-38 says and compare it to the federal statutes, because

10:49:11   15  that's what's in this court.  But I don't get the idea when

10:49:16   16  I've read those statutes that it talks about percentages or

10:49:22   17  numbers or what have you.

10:49:24   18         MR. KERCHER:  Well, that's not necessarily true.  It

10:49:27   19  may be the case that in certain kinds of ADA causes of action,

10:49:30   20  an individual plaintiff may need to prove those.  It is

10:49:33   21  certainly the case when a plaintiff, for purposes of standing,

10:49:36   22  brings a generalized injury or a generalized grievance, that

10:49:40   23  they have to prove that injury with specificity and they have

10:49:43   24  to bring statistics showing what kind of, or the degree to

10:49:47   25  which, a future injury is more likely or in which an increased

10:49:53  1  risk of injury -- in which a factor that effects an increased

10:49:58  2  risk of injury will increase it by a certain amount.

10:50:00  3      I'll also say, Your Honor, referring to your remark

10:50:02  4  about why don't we just find what the safest policy is and do

10:50:04  5  that.  Well, for two reasons:

10:50:06  6      First, the pandemic is complicated.  There are lots

10:50:11  7  of interests at issue in this case.  And, in fairness, the

10:50:15  8  speed limit is not five miles an hour anywhere, right?  And we

10:50:19  9  also have to be careful when we're asking about what is the

10:50:22  10  best policy.  Because, as you point out, we're not setting the

10:50:26  11  policy here.

10:50:27  12      And so when we're asking whether or not Plaintiffs

10:50:29  13  are actually injured by a mask mandate, and they cannot show

10:50:32  14  that the absence or presence of a mask mandate in the schools

10:50:36  15  at issue makes a significant difference in the number of

10:50:42  16  COVID-positive rates, then that bears on whether or not GA-38,

10:50:45  17  which prohibits mask mandates, is really excluding these

10:50:48  18  plaintiffs from their schools.  That's why we have to look at

10:50:52  19  the numbers.

10:50:52  20      Because if they can't show the mask mandates or not

10:50:55  21  mask mandates are changing the numbers of positivity rates in

10:50:59  22  the schools at issue right now, then they cannot say that GA-38

10:51:03  23  is the thing that is keeping them out of the schools.

10:51:16  24      To that point, Your Honor slide number 7 is

10:51:18  25  Defendants' Exhibit Number 30, which is updated information

10:51:21  1  from Fort Bend County.  And you can see, in Fort Bend Middle

10:51:25  2  School, the COVID positivity rate is .13 percent.  Two people

10:51:33  3  out of over 1500 are COVID positive in that school.

10:51:44  4          And as we scroll through the next several slides,

10:51:48  5  Your Honor, slide 8 is Exhibit Number 20.  This shows Pearson

10:51:53  6  Middle School -- Pearson Ranch Middle School in Round Rock ISD.

10:51:57  7  And you can see there are currently no positive cases.  And

10:52:03  8  that's true even when we update with another week's worth of

10:52:06  9  data.

10:52:09  10          If we look at the ISD level, total cumulative

10:52:14  11  positive cases in Round Rock ISD are at 11 out of tens of

10:52:19  12  thousands of children.

10:52:20  13          Richardson ISD, as of last week -- this is

10:52:27  14  Defendants' Exhibit 21 -- the COVID-positive levels, if you

10:52:33  15  look at the chart in the top left-hand corner, is for

10:52:37  16  employees, one quarter of 1 percent and for students, just over

10:52:40  17  a quarter of a percent.

10:52:45  18          Richardson ISD has a mask mandate in place, and its

10:52:48  19  COVID positivity rate is higher than the maskless Fort

10:52:53  20  Settlement Middle School in Fort Bend.

10:53:00  21          If we go to slide number 11, we look specifically at

10:53:03  22  Canyon Creek Middle School which is at issue in this case.

10:53:06  23  There is currently one student out of 351 who is COVID positive

10:53:10  24  out of 16 for the whole year.  Again, a positivity rate of just

10:53:14  25  over one quarter of a percent.  Higher than Fort Bend Middle

10:53:18  1  School -- Fort Bend ISD, which does not have a mask mandate.

10:53:26  2  The updated information on slide number 12 shows that Canyon

10:53:29  3  Creek Middle School even this week only has one current

10:53:33  4  positive case.

10:53:34  5          San Antonio ISD tells a similar story.  Positivity

10:53:38  6  rate for the week of September the 11th through September 17th

10:53:41  7  of 2021 is .7 percent.  Again, that's not 7 percent.  It's less

10:53:47  8  than 1 percent and, at .7 percent, is many times higher than

10:53:52  9  the Fort Bend ISD which does not have a mask mandate.

10:53:57  10  San Antonio ISD for the time being does.

10:53:59  11          Bonham Academy in San Antonio ISD, the individual

10:54:03  12  San Antonio ISD school at issue in this case, currently has one

10:54:07  13  positive case out of 647 students.  If we update that

10:54:12  14  information to last week, it's three positive cases.

10:54:18  15          Leander ISD on slide number 16, Defendants' Exhibit

10:54:21  16  Number 25, current total positive cases this week is just 50

10:54:28  17  out of tens of thousands of students.

10:54:32  18          If we look at the by campus on slide number 17,

10:54:35  19  Your Honor, is Plaintiffs' exhibit -- is Defendants' Exhibit

10:54:37  20  Number 26, there is an error on here.  We have circled the

10:54:42  21  wrong school.  The school at issue is not River Ridge, but the

10:54:46  22  one immediately above it, River Place ISD.  And you can see

10:54:49  23  total positive cases at the beginning of October were just two.

10:54:57  24          Leander ISD updated information, total positive cases

10:55:00  25  for the ISD is 14, and the total at the relevant elementary

| | |
|---|---|
| 10:55:03 | 1 |
| 10:55:09 | 2 |

school in Leander ISD was zero.  There are no people with

positive COVID cases at the relevant Leander school.

        Killeen ISD also -- Killeen ISD does not have a mask

mandate, and the total student cases for the year is 138, or

just over a third of a percent.  And if we update -- if we look

at the individual campus implicated in this case, Skipcha

Elementary School as of last week had three positive cases.

        And if we update that to this week, Your Honor, we

can see that Skipcha Elementary, the Killeen ISD school at

issue in this case, has zero positive cases.  And the total

positivity rate for Killeen ISD is again just under one quarter

of 1 percent.

        Our last slide, Your Honor, is again from the

Department of State Health Services website.  And you make

recognize this number, the 172,275 cases.  You can see this

chart looks a little bit different, though.  When the

plaintiffs present this information, they present is it as

cumulative information, and they show their chart continuing to

go up and up because, of course, as more people get sick their

line graph goes up.

        But if you look at the number of cases week after

week, you can see there has been a dramatic and steep decline

across the entire state, including both ISDs that have mask

mandates in place and ISDs that do not have mask mandates in

place.

10:56:58  1         Another important aspect of about slide number 22,

10:57:03  2  Your Honor, is that it shows the number of students enrolled in

10:57:06  3  public schools.  I think Mr. Thomas mistakenly said that it was

10:57:11  4  about 3 million.  That's not what the Department of State

10:57:13  5  Health Services said.  They say it's 5,340,108, which changes

10:57:21  6  the math pretty significantly.

10:57:30  7         If you look, Your Honor, at slide number 31 for the

10:57:33  8  Plaintiffs' presentation this morning which is Plaintiffs'

10:57:36  9  Exhibit Number 8, I'll just hold it up for your reference.

10:57:46  10  This is the way they present the COVID-positive cases.  And

10:57:50  11  this is not, of course, inaccurate, but it tells one side of

10:57:52  12  the story.  This is the cumulative number of cases.

10:57:54  13         And I agree with plaintiff inasmuch as context does

10:57:57  14  matter, because look what happens when you put 172,000 on a

10:58:02  15  graph this size.  But if we were to draw a graph, Your Honor,

10:58:15  16  that went all the up to the more than 5 million students,

10:58:24  17  context matters.  That line doesn't go off the charts.  It

10:58:32  18  doesn't even reach 5 percent.

10:58:49  19         The same is true, Your Honor, for slide number 34 of

10:58:53  20  the Plaintiffs' Exhibit, which is Plaintiffs' Exhibit 8 and 11

10:58:56  21  superimposed.  It makes it look like the COVID-19 numbers are

10:59:00  22  off the charts this year.  That's not the case when you

10:59:03  23  consider that there are more than 5,340,000 students.

10:59:11  24         The percentages matter because it has everything to

10:59:14  25  do with the amount of danger that may or may not be faced by

10:59:19   1  people who are concerned about catching COVID, even if their

10:59:22   2  risk once they get COVID may be elevated.

10:59:34   3          Slide number 35 from the plaintiffs' exhibits this

10:59:37   4  morning, Plaintiffs' Exhibit Numbers 8 and 11 again.  Well,

10:59:41   5  they compare the relative numbers from last year to this year,

10:59:45   6  and they have this handy graphic that shows a mask.  But, as we

10:59:51   7  discussed earlier, Your Honor, masks are not the only variable.

10:59:54   8  They don't tell the Court how many students stayed home last

10:59:58   9  year who are back in school this year.  They don't tell the

11:00:02  10  difference between the level of spreadability of the Delta

11:00:05  11  variant and what role that plays.

11:00:31  12          Since we're talking a little bit, Your Honor, about

11:00:34  13  the role of students being back in school this year who may

11:00:37  14  have stayed at home last year, it's also important to note that

11:00:41  15  there is something uniform among each of the plaintiffs in this

11:00:44  16  case.  Last year there were mask mandates in place in schools

11:00:49  17  across Texas.  All seven of the plaintiffs stayed home.  They

11:00:59  18  got their education remotely even when there was a mask mandate

11:01:05  19  in place, which again shows the complexity of this case.

11:01:10  20          The plaintiffs want for the Court to believe that

11:01:12  21  there is simply a straight line; that masks help and if we

11:01:18  22  institute masks, then the problems will be solved and the

11:01:20  23  behavior of the plaintiffs will change.  That's not a complete

11:01:28  24  picture.

11:01:28  25          We know that masks do help some.  We can't show that

11:01:31  1  they would help in the cases of the individual students'

11:01:34  2  choices in this case because, when their schools required

11:01:37  3  masks, the children did not go to school in person.

11:01:40  4       We cannot show that the masks will make a difference

11:01:44  5  in this case because we cannot show that there is a difference

11:01:47  6  between the level of COVID-positive rates and the ISDs and

11:01:52  7  individual schools that do and do not have mask mandates in

11:01:55  8  place this year.

11:02:11  9       Your Honor, if we walk through the stipulated facts

11:02:16  10  in Exhibit A, there are two -- it's a pretty helpful chart that

11:02:20  11  Plaintiffs' counsel is mostly responsible for putting together.

11:02:27  12  If we look at Plaintiff M.P. in this center column, Your Honor,

11:02:31  13  if you follow that center column for -- in Exhibit A to the

11:02:35  14  plaintiffs' stipulations all the way down -- and this chart

11:02:38  15  begins at page 5 -- you can see that item 1 for each of the

11:02:45  16  students stipulates that the students attended virtual

11:02:49  17  instruction last year.  In a couple of cases they went back in

11:02:55  18  person for a brief period, but the individual plaintiffs spent

11:03:02  19  a vast majority of their school last year despite universal

11:03:07  20  mask mandates in schools, learning remotely.

11:03:12  21       Right now there is one plaintiff who is not attending

11:03:15  22  in person.  That is Plaintiff M.P. in Fort Bend ISD.  M.P. Is

11:03:26  23  enrolled at Fort Settlement Middle School, which currently has

11:03:30  24  two positive COVID cases out of over 1500 combined students and

11:03:35  25  staff.  The losses of which she complains are difficulty with

11:03:45  1  school instruction.  She's lost reading support, she says, and

11:03:51  2  she has seen a drop in fluency both in reading fluency as well

11:03:56  3  as social skills.

11:04:01  4        This mirrors, Your Honor, the impacts stipulated in

11:04:04  5  this far right-hand column of the stipulated facts in Exhibit A

11:04:08  6  there, too, and the plaintiffs are quite universally

11:04:14  7  complaining about or alleging injuries that entail a loss of

11:04:18  8  education and education-related services.  Free, appropriate

11:04:21  9  public education is the type of injury that Plaintiffs are

11:04:24  10  alleging they're suffering.  Plaintiffs are unable to go to

11:04:28  11  their preferred classes.  That they are suffering in terms of

11:04:32  12  reading and -- a loss of both in terms of reading and math.

11:04:37  13        When we look at types of impacts they are alleging,

11:04:40  14  it's important to note that the plaintiffs are alleging a loss

11:04:42  15  of free, appropriate public education injuries.

11:04:52  16        I want to draw your attention also in this chart,

11:04:55  17  Your Honor, to page 9, Plaintiff J.R.  In the far right-hand

11:05:00  18  column, J.R. notes that it's not just J.R.'s disabilities that

11:05:07  19  are affecting the decision whether to go to school or not, but

11:05:10  20  there are a number of autoimmune disorders in J.R.'s home which

11:05:15  21  will affect the analysis for purposes of the ADA and Rehab Act

11:05:21  22  in terms of whether or not solely the plaintiff's disabilities

11:05:24  23  are the cause of their alleged injuries.

11:05:35  24        If we scroll down to page 11 of this chart,

11:05:38  25  Your Honor, for plaintiff A.M., again, in the far right-hand

| | | |
|---|---|---|
| 11:05:43 | 1 | column, item number 2, even with the district-wide mask |
| 11:05:48 | 2 | mandate, however, some activities remain mask optional, such as |
| 11:05:54 | 3 | PE and field trips, which he has been unable to participate in. |
| 11:05:58 | 4 | This goes to the Court's question earlier about why |
| 11:06:01 | 5 | don't we just find the safest thing to do and do that?  That's |
| 11:06:04 | 6 | not the choice that anybody gets.  It's not the choice that |
| 11:06:07 | 7 | anyone is making.  It would also require us to identify what is |
| 11:06:11 | 8 | the safest and/or best policy choice, which, as you point out, |
| 11:06:16 | 9 | is not at issue in this case. |
| 11:06:18 | 10 | Over and over again, Your Honor, these plaintiffs who |
| 11:06:21 | 11 | are enrolled in schools talk about the choice they will have to |
| 11:06:24 | 12 | make, the threshold that they have, for wanting or needing to |
| 11:06:29 | 13 | leave in-person instruction.  You will note as you scroll |
| 11:06:32 | 14 | through the far right-hand column that for each of those |
| 11:06:35 | 15 | plaintiffs, that threshold is different. |
| 11:06:40 | 16 | One of the plaintiffs was in school, and then people |
| 11:06:43 | 17 | in her classroom got sick and so she went remote and then came |
| 11:06:47 | 18 | back.  Despite knowing that there are COVID-positive cases, |
| 11:06:52 | 19 | that there were COVID-positive cases in her classroom, the |
| 11:06:57 | 20 | reasonable course of action, the choice that the plaintiff made |
| 11:06:59 | 21 | in that case, was to leave and to come back. |
| 11:07:01 | 22 | There are also other options at the disposal of the |
| 11:07:05 | 23 | plaintiffs, at least some of them.  One of the plaintiff's |
| 11:07:08 | 24 | parents has purchased HEPA filter for the child's classroom in |
| 11:07:12 | 25 | order to improve air circulation and in order to hopefully |

| | | |
|---|---|---|
| 11:07:17 | 1 | clean up the air that the children in that classroom are |
| 11:07:25 | 2 | breathing. |
| 11:07:26 | 3 | Let's talk a moment now about the defendants and the |
| 11:07:29 | 4 | plaintiffs' efforts to show that they are either enforcing or |
| 11:07:33 | 5 | that such enforcement is the cause of their alleged injuries. |
| 11:07:38 | 6 | The case against TEA and Commissioner Morath -- and |
| 11:07:42 | 7 | it's important to mention that we have both a state official in |
| 11:07:45 | 8 | his official capacity and a state agency, not an individual, |
| 11:07:48 | 9 | and so not subject to the *Ex parte Young* analysis for purposes |
| 11:07:53 | 10 | of sovereign immunity.  Plaintiffs' primary argument for |
| 11:08:01 | 11 | enforcement there is that the TEA is sharing publicly available |
| 11:08:06 | 12 | information with a fellow state agency. |
| 11:08:10 | 13 | If this court enjoins that enforcement activity, the |
| 11:08:14 | 14 | plaintiffs are asking a federal court to tell one state agency |
| 11:08:19 | 15 | not to share publicly available information with another state |
| 11:08:23 | 16 | agency, which should put in context (a) the nature of the |
| 11:08:32 | 17 | relief they're asking for and (b) whether or not the actions of |
| 11:08:36 | 18 | either TEA or Commissioner Morath constitute enforcement in any |
| 11:08:41 | 19 | meaningful sense of the word, particularly where TEA and |
| 11:08:46 | 20 | Commissioner Morath have affirmatively stated that they are not |
| 11:08:51 | 21 | enforcing GA-38. |
| 11:08:59 | 22 | You may see in the deposition excerpts that are |
| 11:09:01 | 23 | provided both by Plaintiffs' counsel and also by Defendants' |
| 11:09:04 | 24 | counsel by Ms. Jernigan who testified as a 30(b)(6) witness on |
| 11:09:08 | 25 | behalf of TEA regarding its enforcement abilities and what |

11:09:11  1  enforcement, if any, it has engaged in for purposes of its

11:09:14  2  public health guidance.  And the plaintiffs very capably walked

11:09:19  3  Ms. Jernigan through the types of authority that the TEA may

11:09:22  4  have to create rules and what authority it may have in order to

11:09:27  5  enforce those rules.

11:09:28  6       But Ms. Jernigan testified unequivocally that the

11:09:33  7  public health guidance issued by the TEA is not a rule created

11:09:37  8  by the TEA.  Rules created by the TEA have to go through the

11:09:41  9  Texas administrative procedures process.  There's a notice and

11:09:45  10  comment period that the public health guidance is that kind of

11:09:52  11  rule.

11:09:52  12       THE COURT:  So is your argument that TEA and the

11:09:55  13  commissioner are not enforcing, or is your argument the TEA and

11:10:03  14  the commissioner cannot enforce?

11:10:04  15       MR. KERCHER:  The argument is both, Your Honor, that

11:10:10  16  when it comes to the public health guidance, the TEA is not and

11:10:13  17  cannot enforce it.  Ms. Jernigan testifies that the enforcement

11:10:19  18  mechanisms available to the TEA to enforce rules that it makes

11:10:21  19  under the Administrative Procedures Act that show up in the

11:10:23  20  Texas Code, the Texas Administrative Code, are that the public

11:10:28  21  health guidance is not that kind of rule and that the ability

11:10:31  22  of the TEA to enforce those kinds of rules does not apply to

11:10:34  23  the public health guidance.

11:10:36  24       THE COURT:  So if we remove the attorney general from

11:10:39  25  the equation right now and not even talk about the attorney

| | | |
|---|---|---|
| 11:10:46 | 1 | general, if this suit was only against the TEA and the |
| 11:10:49 | 2 | commissioner, is your position that there is no law in effect |
| 11:10:57 | 3 | at this time, or regulation -- I'm reading the law broadly |
| 11:11:00 | 4 | here -- that would allow the commissioner or the TEA to do |
| 11:11:03 | 5 | anything with regard to GA-38 with regard to individual |
| 11:11:09 | 6 | independent school districts? |
| 11:11:11 | 7 | MR. KERCHER:  In the way of enforcing is your |
| 11:11:18 | 8 | question? |
| 11:11:19 | 9 | THE COURT:  All right.  Pick a school district. |
| 11:11:20 | 10 | School District A looks at GA-38 and says we don't like it, |
| 11:11:24 | 11 | we're not going to do it, and they come down with mandatory |
| 11:11:27 | 12 | mask instructions for students, teachers, and staff.  The |
| 11:11:34 | 13 | attorney general's never heard from.  The attorney general is |
| 11:11:36 | 14 | off doing something else and not interested in this. |
| 11:11:40 | 15 | Do they have any concern that there is going to be |
| 11:11:47 | 16 | any enforcement activity engaged by the Texas Education Agency |
| 11:11:53 | 17 | or the commissioner? |
| 11:11:55 | 18 | MR. KERCHER:  I think the answer to that question has |
| 11:11:57 | 19 | to be no, Your Honor.  The Texas Education Agency has |
| 11:12:00 | 20 | enforcement authority pursuant to the rules that it creates |
| 11:12:03 | 21 | that wind up as a part of the Texas Administration Code.  But |
| 11:12:06 | 22 | that's not what GA-38 is.  And, importantly, GA-38 does not say |
| 11:12:11 | 23 | that the Texas Education Agency has some kind of special |
| 11:12:14 | 24 | enforcement power. |
| 11:12:15 | 25 | So it's not -- so Ms. Jernigan also testified that |

| | | |
|---|---|---|
| 11:12:19 | 1 | sometimes the Texas Legislature will pass a law, and that law |
| 11:12:22 | 2 | will empower the TEA to create rules under that law.  That's |
| 11:12:26 | 3 | not what -- that's not what GA-38 does or has been interpreted |
| 11:12:30 | 4 | to do, and that's not what the TEA is doing. |
| 11:12:32 | 5 | THE COURT:  Well, even if it did, your statement |
| 11:12:35 | 6 | would be that the TEA has not promulgated any rules -- |
| 11:12:38 | 7 | MR. KERCHER:  That's correct. |
| 11:12:39 | 8 | THE COURT:  -- under that law. |
| 11:12:40 | 9 | MR. KERCHER:  That's correct. |
| 11:12:41 | 10 | THE COURT:  So, therefore, there is no school |
| 11:12:43 | 11 | district that is at risk from the TEA until such time as the |
| 11:12:48 | 12 | TEA goes through the rule-making process and comes up with |
| 11:12:51 | 13 | rules that are then capable of enforcement. |
| 11:12:53 | 14 | MR. KERCHER:  I believe that's correct, Your Honor. |
| 11:12:55 | 15 | I think that's right. |
| 11:12:56 | 16 | THE COURT:  Okay. |
| 11:13:09 | 17 | MR. KERCHER:  With regard, Your Honor, to the alleged |
| 11:13:10 | 18 | enforcement actions by the attorney general -- and we'll get |
| 11:13:12 | 19 | into this I think in more substance as part of the legal |
| 11:13:14 | 20 | argument -- it's important to know that the case law is very |
| 11:13:16 | 21 | clear that things like lists kept by the attorney general or |
| 11:13:20 | 22 | Tweets from the attorney general's Twitter account do not |
| 11:13:24 | 23 | constitute enforcement. |
| 11:13:28 | 24 | Mr. Thomas in his opening remarks made several |
| 11:13:32 | 25 | reference to the deposition testimony of Austin Kinghorn. |

```
11:13:35   1   Austin Kinghorn is general counsel --
11:13:37   2           THE COURT:  Let me stop you right there.  I just want
11:13:38   3   to make sure I understand the atmosphere in which we're living.
11:13:43   4           Is your statement that the attorney general can bully
11:13:46   5   and threaten and say whatever he wants to, however flippantly
11:13:54   6   or seriously, about "see you in court" and "you're going to
11:13:57   7   have to pay court costs and attorneys' fees" and "you're going
11:14:00   8   to be subject to an injunction," but that's not enforcement,
11:14:04   9   that's just bullying, and that's all right?
11:14:12  10           MR. KERCHER:  I don't know that I would follow the
11:14:15  11   Court's characterization as bullying.
11:14:16  12           THE COURT:  I wouldn't expect you to.  That's mine.
11:14:18  13   I don't work for the attorney general.
11:14:19  14           MR. KERCHER:  I think the attorney general sets out
11:14:21  15   policy not through Tweets.  And whether there is a credible
11:14:27  16   threat of enforcement ought not be evaluated based on social
11:14:30  17   media.  I think that we all agree that the better evidence to
11:14:35  18   evaluate is what the attorney general has done by way of
11:14:40  19   letters that he's sent and lawsuits that it has filed.
11:14:43  20           Let's talk about those letters and those lawsuits.
11:14:47  21   Mr. Kinghorn, as we were discussing, holds the general counsel
11:14:51  22   role at the Attorney General's Office.  He testified in that
11:14:53  23   capacity, not in his capacity -- not as 30(b)(6) witness on
11:14:59  24   behalf of the Office of the Attorney General.  But he talked --
11:15:02  25   he was asked pretty direct questions about, well, "What do you
```

11:15:05  1  mean in your letters when you say that the attorney general is

11:15:09  2  going to enforce GA-38?"

11:15:10  3          And Mr. Kinghorn said at page 22 of his deposition,

11:15:16  4  which is Exhibit 9 for the defendants, "With the understanding

11:15:21  5  we might proceed forward with legal action in order to assert

11:15:24  6  the supremacy of state law over local ordinances or policies

11:15:32  7  that are adopted by local government in contravention of state

11:15:35  8  law."

11:15:35  9          We'll get into the weeds on this later on, I'm sure.

11:15:38 10  It's my understanding that plaintiffs' counsel have brought in

11:15:41 11  a lawyer specifically to argue this who has a lot of experience

11:15:44 12  arguing standing.

11:15:50 13          Why --

11:15:50 14          THE COURT:  You have brought your lawyer with you,

11:15:52 15  too, though.

11:15:53 16          MR. KERCHER:  I've got an outstanding team, and I

11:15:54 17  would not trade them, Your Honor.  I can tell you that.  We

11:15:58 18  have been in the trenches for the past few weeks, as you can

11:16:01 19  well imagine.

11:16:02 20          What matters is not somebody's use of the word force

11:16:04 21  or enforcement, but whence the enforcement, whether that

11:16:07 22  enforcement bears as *Fitts v. McGhee*, which precedes even

11:16:13 23  *Ex parte Young*, has a special relation to the statute at a

11:16:18 24  issue or whether, as in this case, a public official is

11:16:23 25  bringing a lawsuit for *ultra vires* conduct that private

| 11:16:30 | 1 | citizens are equally able to bring and are in fact bringing. |
| 11:16:35 | 2 | I believe our response to Plaintiffs' trial brief |
| 11:16:38 | 3 | cites to at least three cases that we know about filed by |
| 11:16:41 | 4 | private citizens, *ultra vires* lawsuits against ISDs and their |
| 11:16:47 | 5 | officials, to enforce GA-38.  And the question that we'll have |
| 11:16:53 | 6 | to talk about a little bit later on is whether or not the |
| 11:16:56 | 7 | attorney general, exercising identical abilities to citizens |
| 11:17:00 | 8 | all around the state, constitutes that type of special |
| 11:17:04 | 9 | relation, that particular -- particularized relation to the |
| 11:17:10 | 10 | challenged statutes. |
| 11:17:28 | 11 | Bearing in mind, Your Honor, the comments at the end |
| 11:17:30 | 12 | of the TRO hearing, that "lawyers abhor a vacuum," I will not |
| 11:17:36 | 13 | push my factual argument further.  There may be some additional |
| 11:17:40 | 14 | factual issues we may need to address as we get into the meat |
| 11:17:45 | 15 | of the legal arguments, but this concludes my opening |
| 11:17:48 | 16 | statement. |
| 11:17:48 | 17 | THE COURT:  All right.  I presume at this stage we're |
| 11:17:52 | 18 | in agreement we're going to get into the legal stages? |
| 11:17:55 | 19 | MR. MELSHEIMER:  Yes, Your Honor.  May it please the |
| 11:17:57 | 20 | Court:  I wonder if the court would -- would permit about ten |
| 11:18:01 | 21 | minutes of a response to that before we get into the legal |
| 11:18:05 | 22 | argument? |
| 11:18:07 | 23 | THE COURT:  You think -- |
| 11:18:08 | 24 | MR. MELSHEIMER:  Remember, I'm happy to be on a |
| 11:18:11 | 25 | clock, Your Honor.  We offered to be on the clock. |

11:18:14  1          THE COURT:  You think you can do it in ten minutes?

11:18:16  2          MR. MELSHEIMER:  Well, I know I cannot, but I'm

11:18:18  3  confident Mr. Thomas can.

11:18:20  4          THE COURT:  All right.  Mr. Thomas can have ten

11:18:22  5  minutes or close to it.

11:18:25  6          MR. THOMAS:  Thank, Your Honor.  I've never known

11:18:27  7  Mr. Melsheimer to speak for less than ten anyways.

11:18:30  8          Your Honor, I may be less than ten minutes.  I just

11:18:33  9  want to touch on a few points that counsel mentioned.  First,

11:18:42 10  with respect to data, Your Honor, you asked about the data and

11:18:46 11  if it's just one student at the school who is infected are we

11:18:50 12  protecting.

11:18:51 13          When Mr. Kercher talked about control groups, he

11:18:54 14  talked about a lot of data, that was Mr. Kercher talking.  We

11:19:00 15  have in the record experts, treating physicians, infectious

11:19:08 16  disease doctors.  We have the CDC guidance.  We have the amicus

11:19:15 17  brief from the Texas Pediatric Association and the American

11:19:20 18  Association of Pediatrics.

11:19:22 19          THE COURT:  All right.  I understand that.

11:19:25 20          MR. THOMAS:  Yes.

11:19:26 21          THE COURT:  You have -- because I want to get down to

11:19:28 22  the basics here, because this is what I've got to rule on.

11:19:33 23  you've got a lot of broad-ranging information that is

11:19:37 24  impressive about what COVID-19 has been doing and is doing at

11:19:42 25  this time.  The State defendants come in, and they come with a

| | | |
|---|---|---|
| 11:19:51 | 1 | much more focused set of statistics which apply, according to |
| 11:19:55 | 2 | Mr. Kercher, to the particular schools and particular situation |
| 11:20:03 | 3 | that we have here. |
| 11:20:05 | 4 | So tell me what data the Court should pay the most |
| 11:20:13 | 5 | attention to and why, because I can tell you, when I make my |
| 11:20:22 | 6 | ruling, I'm not going to make any more broad than I need to |
| 11:20:25 | 7 | make it. So I think it's important -- and I was going to get |
| 11:20:28 | 8 | into this had you not wanted to speak now -- to point out why |
| 11:20:35 | 9 | his data is more important and more persuasive to the Court |
| 11:20:40 | 10 | regarding what the result you ultimately get is than the data |
| 11:20:46 | 11 | you are presenting to the Court. |
| 11:20:48 | 12 | MR. THOMAS: Well, Your Honor, I presented that same |
| 11:20:50 | 13 | data in slide 39, which is a comparison of Exhibits 8 and 11, |
| 11:20:58 | 14 | and on the left-hand side we have the current data which I |
| 11:21:02 | 15 | believe would line up with the defendants' exhibits that they |
| 11:21:06 | 16 | went through as to the school districts. And to the right is |
| 11:21:12 | 17 | the entirety of the '20-'21 school year data. |
| 11:21:18 | 18 | So we didn't avoid the specific schools. In eight |
| 11:21:23 | 19 | weeks, with all but one district and all but one school, we |
| 11:21:29 | 20 | have already surpassed the number of cases. |
| 11:21:32 | 21 | THE COURT: Well, then what is the difference between |
| 11:21:34 | 22 | what you show and what Mr. Kercher shows? |
| 11:21:38 | 23 | MR. THOMAS: Well, Your Honor, there's -- the only |
| 11:21:40 | 24 | difference is I have compared it to -- the data is the same for |
| 11:21:45 | 25 | this year. The number of cases at these schools and districts |

11:21:48   1   as the last reported date, which is the week ended September

11:21:52   2   26th.  What Mr. Kercher didn't compare to, and I think we

11:21:54   3   talked about context being important, is what those school

11:21:57   4   districts looked like last year when mask mandates were

11:22:02   5   uniformly applied everywhere and in all these schools and the

11:22:06   6   delta variant wasn't around.  Your Honor, again, put it in

11:22:10   7   context.  There is more cases at all of these schools except

11:22:14   8   for one than there were for the 52 weeks of last year.

11:22:19   9         And what I was getting to is the data is not -- the

11:22:25   10  data is helpful to us.  It tells us -- it gives us context.

11:22:29   11  But the State did not go out and get an expert, an

11:22:35   12  immunologist, an infectious disease expert, to come in and say,

11:22:37   13  Okay, things are so much better now.  Two is not enough.  One

11:22:42   14  is not enough.  We need to have 28.  We don't have that.

11:22:45   15        What we have is us looking at the data, but we have

11:22:48   16  our experts, we have the CDC guidance for this school year that

11:22:53   17  the school districts -- Your Honor, the school districts are

11:22:56   18  the ones, not -- frankly, not Mr. Kercher and not me, who

11:22:59   19  should look at this data and make the decisions to implement

11:23:02   20  the various layers of Swiss cheese.

11:23:05   21        THE COURT:  No, no.  Yes.  Perhaps that's correct.

11:23:09   22  But isn't that a policy decision as to whether the school

11:23:13   23  districts are better equipped than the governor is?  And how

11:23:21   24  does that then get you to what you seek to achieve here, which

11:23:26   25  is that GA-38 violates the ADA and certain other federal

| | | |
|---|---|---|
| 11:23:35 | 1 | statutes, because that's all this Court has in front of it to |
| 11:23:38 | 2 | rule on. |
| 11:23:39 | 3 | MR. THOMAS:  And I agree, Your Honor.  And, as we've |
| 11:23:44 | 4 | seen with the expert reports that schools should be able to |
| 11:23:46 | 5 | implement mask requirements if the local data and their needs |
| 11:23:50 | 6 | arise to protect -- and we have the expert reports and |
| 11:23:54 | 7 | testimony we went through to protect Plaintiffs.  The experts |
| 11:23:57 | 8 | say, to protect Plaintiffs, they need to have these things. |
| 11:24:00 | 9 | And what GA-38 and the TEA guidance and their |
| 11:24:04 | 10 | enforcement has done is, when we talk about the school's |
| 11:24:07 | 11 | decision to use a layered Swiss Cheese approach, they've taken |
| 11:24:10 | 12 | one of the two biggest pieces of Swiss cheese and all the |
| 11:24:15 | 13 | prevention, which is masks, out of the equation, vaccines for |
| 11:24:19 | 14 | all but one of our plaintiffs cannot be put into the equation, |
| 11:24:22 | 15 | so the two biggest pieces of Swiss cheese have been taken out, |
| 11:24:27 | 16 | one not because of their actions but the other, masks, |
| 11:24:30 | 17 | definitely because of their actions. |
| 11:24:31 | 18 | And, because of that, they are preventing -- the AG |
| 11:24:35 | 19 | and the TEA and their enforcement efforts are preventing the |
| 11:24:39 | 20 | schools from implementing plans that protect our plaintiffs who |
| 11:24:45 | 21 | are ADA qualified and restricting their equal access to |
| 11:24:50 | 22 | in-person learning the same as other non -- nondisabled or |
| 11:24:57 | 23 | non-high-risk students.  That's how that plays into our case, |
| 11:25:01 | 24 | Your Honor. |
| 11:25:06 | 25 | Did I answer your question?  I want to make sure I |

| | | |
|---|---|---|
| 11:25:08 | 1 | answered your question. |
| 11:25:09 | 2 | THE COURT:  No.  Keep going. |
| 11:25:11 | 3 | MR. THOMAS:  Okay.  Your Honor, I want to correct a |
| 11:25:17 | 4 | couple of things, if we can go to slide 37, please.  It's 38. |
| 11:25:28 | 5 | Sorry. |
| 11:25:30 | 6 | Your Honor, Mr. Kercher said we didn't display data |
| 11:25:33 | 7 | that shows, you know, that there has been a decline the last |
| 11:25:38 | 8 | couple of weeks.  We obviously did in Exhibit 38.  But, again, |
| 11:25:41 | 9 | to use Mr. Kercher's language, context is key, even though the |
| 11:25:45 | 10 | state numbers have declined in the last week, they are still |
| 11:25:48 | 11 | higher than the very highest week during all of last year. |
| 11:25:57 | 12 | Mr. Kercher also talked about the fact that last year |
| 11:26:00 | 13 | all of our plaintiffs engaged in remote learning.  And, |
| 11:26:05 | 14 | Your Honor, we can go through the stipulation, and I don't want |
| 11:26:08 | 15 | to go through everything, but we saw in the testimony from the |
| 11:26:10 | 16 | parents -- and it's also in the stipulated facts -- that the |
| 11:26:16 | 17 | plaintiffs who went or I guess who engaged in virtual school |
| 11:26:21 | 18 | last year, their education suffered, their experience suffered, |
| 11:26:25 | 19 | their interactions suffered.  And that gets back to the |
| 11:26:28 | 20 | untenable choice that we talked about, that the AGs and GA-38 |
| 11:26:35 | 21 | actions have put the parents into. |
| 11:26:41 | 22 | And finally on enforcement, I want to talk first |
| 11:26:46 | 23 | about the easiest, and that's the AG.  We talked about Tweets, |
| 11:26:49 | 24 | we talked about a list.  But what we have is letters, not |
| 11:26:53 | 25 | saying supremacy of the land, not saying those things, saying: |

11:26:58  1  "District, you will face legal action taken by my office to

11:27:01  2  enforce the governor's order."  That could not be clearer.

11:27:06  3  They followed up on that threat at the AG's Office.

11:27:09  4          As for the TEA, they're -- we are not asking -- it

11:27:14  5  was posed that we are asking you to enter an order that

11:27:19  6  prohibits the TEA from sending public information.  That's not

11:27:23  7  what we're asking.  What we're asking the Court is to stop TEA

11:27:28  8  from aiding and abetting or being connected with the

11:27:31  9  enforcement of GA-38 and the TEA guidance.

11:27:36  10         THE COURT:  What's the difference between what you

11:27:37  11 just said and what Mr. Kercher said about all the TEA is doing

11:27:41  12 is providing information that's requested by the attorney

11:27:44  13 general?

11:27:45  14         MR. THOMAS:  Your Honor, the TEA said in the letter

11:27:47  15 that they're coordinating with the AG's Office, they're

11:27:49  16 providing that information, they're sending a report.  There's

11:27:52  17 an exhibit -- and I don't have it in front of me; I'll get it

11:27:56  18 for you, Your Honor -- where Mr. Kinghorn at the AG's Office,

11:27:58  19 who was not a 30(b)(6) rep but is the author of all the

11:28:03  20 letters, says to the TEA:  "Hey, I'm about to send these

11:28:08  21 letters to the school districts.  Tell me who's not complying."

11:28:10  22 They're using them and working together to enforce.

11:28:12  23         So that's -- the TEA is just not just -- I mean,

11:28:15  24 they're working together.  They admit in their letters that

11:28:17  25 they're coordinating and acting upon each other's requests.  So

11:28:21   1   that is a connection with the enforcement that the AG's Office

11:28:25   2   is engaging with as at it relates to GA-38.

11:28:29   3            THE COURT:  Well, then why shouldn't the governor

11:28:35   4   still be in the lawsuit?  Because, clearly, the governor is

11:28:42   5   interested in getting information from the attorney general,

11:28:45   6   and perhaps the attorney general gets information from the

11:28:48   7   governor.  Or perhaps it comes from the Texas Association of

11:28:53   8   School Boards.

11:28:54   9            I'm having a hard time getting to the fact that, just

11:29:01  10   because they're communicating, that that's anything I can

11:29:04  11   enjoin the commissioner or the TEA from doing.

11:29:08  12            MR. THOMAS:  Well, Your Honor, the -- the reason the

11:29:11  13   governor is not in the case is we didn't have the evidence that

11:29:13  14   we had against TEA.  The defendants produced their

11:29:17  15   communications related to enforcement efforts, and it was the

11:29:20  16   TEA and the attorney general, not the --

11:29:22  17            THE COURT:  All right.  Well, you don't need to spend

11:29:24  18   a lot of time on that because I don't think that's your

11:29:27  19   strongest argument.

11:29:28  20            MR. THOMAS:  Well, Your Honor, I think what we have,

11:29:30  21   again, is we have a concerted effort of two parties, and the

11:29:33  22   TEA's action is connected with the enforcement, which my

11:29:35  23   colleagues will talk about the importance of that later.

11:29:38  24            Your Honor, the last thing I'll say about the data,

11:29:40  25   you asked about why the data was important.  We presented the

| | | |
|---|---|---|
| 11:29:44 | 1 | data to show context, to show why GA-38 and the TEA guidance |
| 11:29:51 | 2 | and their enforcement activities are impeding the school |
| 11:29:54 | 3 | districts from plaintiffs -- from complying with the ADA and |
| 11:29:58 | 4 | Section 504 and all of the expert recommendations, all of the |
| 11:30:02 | 5 | treating physician recommendations, all of the professional |
| 11:30:06 | 6 | organization recommendations.  And there was nothing -- |
| 11:30:11 | 7 | regardless of whether the data has gone up or down, there is no |
| 11:30:14 | 8 | evidence in the record that those recommendations have changed |
| 11:30:18 | 9 | because there is either more or lower cases. |
| 11:30:20 | 10 | Our students -- or our plaintiffs and our students |
| 11:30:23 | 11 | and their parents are considering the guidance.  They're |
| 11:30:26 | 12 | considering what their doctors tell them to do.  And GA-38 the |
| 11:30:30 | 13 | and enforcement activities of the attorney general and TEA are |
| 11:30:33 | 14 | preventing school districts from complying with their |
| 11:30:36 | 15 | obligations under ADA and 504. |
| 11:30:39 | 16 | If you have no further questions, I'm done, |
| 11:30:42 | 17 | Your Honor. |
| 11:30:42 | 18 | THE COURT:  That's fine.  Mr. Kercher, do you want to |
| 11:30:45 | 19 | respond to that, briefly, because we are having a |
| 11:30:47 | 20 | back-and-forth.  You're not required to respond to it; I just |
| 11:30:51 | 21 | give you that opportunity. |
| 11:30:52 | 22 | MR. KERCHER:  The only point that I'll make, |
| 11:30:54 | 23 | Your Honor, you were asking earlier about the data as presented |
| 11:30:57 | 24 | by the plaintiffs and data as presented by the defendants, and |
| 11:31:01 | 25 | Mr. Thomas reiterates that the total numbers this year are so |

11:31:06  1  much higher than the total numbers last year.  True.  Why, that

11:31:11  2  is, they can't tell you with any certainty.

11:31:15  3          At least part of what we know, Your Honor, is that it

11:31:19  4  has to do with the total in-person attendance last year.

11:31:25  5  Plaintiffs' Exhibit 169 shows that about 51 percent of the

11:31:29  6  student population last year stayed home.  The only difference,

11:31:34  7  though, that we know of as between the schools and school

11:31:39  8  districts at issue in this case this year is whether they have

11:31:45  9  a mask mandate in place or not.

11:31:47  10         There are fewer variables for which we have to

11:31:50  11  control.  And you don't have to be a scientist to see that

11:31:53  12  Fort Bend ISD has an infection rate that is right on par and,

11:31:57  13  on a school-by-school level, lower than most of the other

11:32:00  14  schools at issue.

11:32:02  15         So if we're talking about Swiss cheese and how

11:32:05  16  complicated the pandemic is, comparing last year to this year

11:32:10  17  is apples and oranges, as opposed to comparing school district

11:32:14  18  to school district this year.

11:32:17  19         THE COURT:  Okay.  Mr. Thomas?

11:32:20  20         MR. THOMAS:  Nothing further, Your Honor.

11:32:21  21         THE COURT:  All right.  So, how do you want to

11:32:24  22  proceed at this point on the law?

11:32:30  23         MR. MELSHEIMER:  May it please the Court, Your Honor,

11:32:32  24  we are prepared to engage on the law however the Court desires.

11:32:37  25  We are -- we were thinking we would talk about the merits of

11:32:42   1  the ADA and 504 claims first and then deal with sovereign

11:32:49   2  immunity and standing, although we could flip that if the Court

11:32:52   3  preferred.

11:32:52   4       THE COURT:  I don't have a preference one way or the

11:32:55   5  other.  What I do want both of you to do is, in your briefing

11:32:58   6  and what have you, we consistently talk about the

11:33:01   7  Rehabilitation Act, Sections 504 and 505.  The problem I have

11:33:07   8  is I've got to write an opinion on this.  So it's pretty

11:33:14   9  difficult to deal with a situation where we have the

11:33:18   10  United States Code that doesn't refer to Section 504 or Section

11:33:24   11  505, it refers to code sections.

11:33:27   12       So what I would like each of you to do -- because

11:33:31   13  your briefs refer to the more general section, but that's not

11:33:35   14  where I have to get to with my citations and I hate to sit down

11:33:39   15  and look that up -- is just give us -- and it doesn't have to

11:33:46   16  be right now because I'm not going to rule from the bench; I'll

11:33:50   17  just tell you I'm going to write a written opinion on this --

11:33:53   18  just a little cheat sheet as to what the U.S. Code sections are

11:33:59   19  and code provisions to what you generally refer to in order

11:34:02   20  that, when I draft my opinion in this case, I can make that

11:34:06   21  comparison so whoever reads what I do in the future will know

11:34:11   22  what we're talking about.

11:34:15   23       So if your preference, because you have the burden on

11:34:18   24  the whole case, is to go to the merits first, we'll do that.

11:34:24   25  Because what I've done is hold the motion to dismiss issues, as

| | | |
|---|---|---|
| 11:34:29 | 1 | I said earlier, and I will take them up, too.  But I'm going to |
| 11:34:34 | 2 | let you, because you're the plaintiff, kind of drive the truck |
| 11:34:37 | 3 | here on your issues.  And then I'll let -- because the State |
| 11:34:41 | 4 | defendants have the burden on the motion to dismiss, I will let |
| 11:34:44 | 5 | them drive the truck on that. |
| 11:34:48 | 6 | MR. MELSHEIMER:  May it please the Court? |
| 11:34:50 | 7 | THE COURT:  Yes. |
| 11:34:50 | 8 | MR. MELSHEIMER:  Your Honor, this would be tab 2 of |
| 11:34:52 | 9 | the Court's binder of the PowerPoint slides. |
| 11:34:59 | 10 | Your Honor, as the Court has seen from our briefing, |
| 11:35:02 | 11 | the Americans with Disabilities Act and Section 504 of the |
| 11:35:07 | 12 | Rehabilitation Act is basically the same legal analysis.  And |
| 11:35:12 | 13 | it is the same legal analysis that has been undertaken by five |
| 11:35:16 | 14 | other federal district courts that have either granted a TRO or |
| 11:35:21 | 15 | preliminary injunction in similar cases addressing these kinds |
| 11:35:24 | 16 | of claims, challenging statewide bans or limitations on the use |
| 11:35:31 | 17 | of masks. |
| 11:35:32 | 18 | At the time we were last together, Your Honor, there |
| 11:35:35 | 19 | had been TROs entered in two cases, but there are now five, and |
| 11:35:41 | 20 | I'll be referring to those cases throughout my discussion of |
| 11:35:44 | 21 | the merits. |
| 11:35:45 | 22 | Now, the Court know noted last time, correctly, that |
| 11:35:52 | 23 | these are not cases from the Fifth Circuit.  And I took the |
| 11:35:55 | 24 | Court primarily to be referring to the sovereign immunity and |
| 11:36:00 | 25 | standing issues that had been raised by State that, at least as |

11:36:04 1  of the hearing last month, seemed to be unique to the Fifth

11:36:08 2  Circuit.  Now, we don't think those standing or sovereign

11:36:13 3  immunity issues are unique to the Fifth Circuit, Your Honor.

11:36:16 4  We think that *Ex parte Young* and the Supreme Court cases govern

11:36:21 5  all the circuits and govern this Court's decision as well.

11:36:24 6         But there's no difference that's been pointed out,

11:36:26 7  and I'm not aware of one, between the circuits in which these

11:36:30 8  other district courts sit on the merits of the ADA or

11:36:36 9  Section 504 claims.  In other words, there's not some peculiar

11:36:41 10 rule or approach that the Fifth Circuit takes to an ADA or 504

11:36:45 11 claim that the Fourth Circuit or the Sixth Circuit doesn't

11:36:49 12 take.

11:36:50 13        So I'm going to be referring to those, and I

11:36:52 14 commend those to the Court, that those cases are reasoned

11:36:58 15 opinions, they are not simply a one-liner two-liner.  They go

11:37:06 16 through a detailed analysis of really all the issues raised by

11:37:09 17 the defendants to counter our argument on the merits.

11:37:12 18        So the first element of a 504 claim is that the

11:37:20 19 plaintiffs must be qualified under the ADA or Section 504.  We

11:37:24 20 don't have to spend any time on that, Your Honor, because the

11:37:26 21 parties have stipulated in Exhibit 14 that all of the

11:37:30 22 plaintiffs are individuals with disabilities as defined under

11:37:34 23 the ADA and Section 504.

11:37:40 24        The second element, Your Honor, is why we're here,

11:37:42 25 and that is whether or not the Executive Order GA-38

11:37:47   1   discriminates against Plaintiffs in a way that is unlawful.

11:37:52   2   And we believe that it does, and we believe the evidence is

11:37:55   3   plain that it does.  In our briefing on this we make those

11:38:00   4   points.

11:38:01   5          The ADA, Your Honor, guarantees that students with

11:38:06   6   disabilities are able to participate in the public school

11:38:09   7   system and they receive the full benefits of a public

11:38:13   8   education.

11:38:14   9          And the ADA in Section 504 prohibits denial of those

11:38:19   10  opportunities, but also prohibits disabled -- from providing

11:38:26   11  disabled students with an unequal opportunity to participate in

11:38:32   12  or benefit from educational services.

11:38:34   13         Both statutes further prohibit the failure to make

11:38:38   14  reasonable modifications, sometimes called "accommodations" --

11:38:43   15  reasonable accommodations in order to guarantee meaningful

11:38:46   16  access to these programs.

11:38:47   17         And, as the terms of the statute say, the public

11:38:51   18  entity -- in this case the school districts -- shall operate

11:38:55   19  each service, program, or activity so that the service,

11:38:59   20  program, or activity, when viewed in its entirety, is readily

11:39:03   21  accessible to and useable by individuals with disabilities.

11:39:13   22         Your Honor, the evidence shows that two students have

11:39:15   23  been excluded from in-person learning in one degree or another.

11:39:22   24  The plaintiff M.P. from the Fort Bend School District is

11:39:25   25  currently at home.  You know that Fort Bend does not have a

11:39:28  1  mask mandate due to the attorney general's enforcement

11:39:34  2  activities in connection also with the TEA's efforts.

11:39:37  3        And, in fact, you see from the declaration that

11:39:41  4  Mr. Thomas referred to in the opening presentation, the board

11:39:46  5  of directors, Ms. Williams, a trustee, why they don't have that

11:39:53  6  mask mandate and what they would do if GA-38 was not in

11:39:57  7  existence or was somehow voided.

11:39:59  8        M.P. attended virtual instruction last year and

11:40:02  9  experienced significant overall regression in their social

11:40:07  10  skills and focus and reading fluency.  She's not received other

11:40:12  11  services because she stayed at home.

11:40:14  12       H.M. has missed three weeks of school but recently

11:40:19  13  returned to in-person classes at Leander.  Leander has a mask

11:40:26  14  mandate with a broad opt-out provision.  And the evidence is

11:40:32  15  uncontroverted that if there is an outbreak or if the district

11:40:34  16  rescinds that loose mask mandate, the parents will pull H.M.

11:40:39  17  out of school again.

11:40:40  18       That's in the stipulated facts as well as in

11:40:43  19  Exhibits 229 and Exhibits 230, which are the plaintiffs'

11:40:47  20  declarations.

11:40:48  21       THE COURT:  Is your argument that the barring of a

11:40:54  22  mask mandate in GA-38 is what causes the mischief here under

11:41:04  23  Section 504 and the ADA?  Or is it your argument that GA-38

11:41:14  24  prevents the school districts from fashioning specific plans

11:41:22  25  within their district or specific rules to provide for this

11:41:29  1 | accommodation?

11:41:30  2 |         MR. MELSHEIMER:  The way we've pled and argued it,

11:41:32  3 | Your Honor, is that GA-38, being a mask mandate ban with no

11:41:39  4 | exceptions at all, prohibits the school districts from doing

11:41:43  5 | what the ADA would otherwise require them to do, which is to

11:41:47  6 | take a look at the experience of a disabled students, students

11:41:51  7 | with disabilities, and make reasonable modifications or

11:41:55  8 | accommodations to their school experience.

11:41:58  9 |         THE COURT:  All right.

11:42:00 10 |         MR. MELSHEIMER:  Your Honor, we'll go to the next

11:42:03 11 | plaintiffs, E.T., J.R., and A.M.  These are plaintiffs who the

11:42:10 12 | evidence is uncontradicted from their parents that they will be

11:42:14 13 | withdrawn from in-person learning if the schools were to lift

11:42:18 14 | their mask policies.  All the schools involved here are of

11:42:23 15 | E.T., J.R., and A.M. have mask mandates, but they've either

11:42:27 16 | been sued or threatened with a lawsuit by the Attorney

11:42:31 17 | General's Office.  And, again, that is in the stipulated facts,

11:42:34 18 | Exhibit 14, as well as the plaintiffs' declarations.

11:42:38 19 |         And then, finally, two plaintiffs, E.S. and E.P.,

11:42:54 20 | will remain in school even if their schools do not have mask

11:42:57 21 | mandates.  But the evidence in the record is that attending

11:43:01 22 | school without a mask mandate is creating a significant risk of

11:43:05 23 | severe illness, and that is not the same educational

11:43:08 24 | opportunity that is provided to the other children.

11:43:14 25 |         So I want to talk about this notion that -- that was

11:43:21  1  raised in the TRO hearing.  Let me just read what the argument

11:43:29  2  was, and it was made in the briefing.

11:43:32  3         Defendants have argued that the decision by the

11:43:37  4  plaintiffs to keep them at home rather than risk their health

11:43:40  5  by attending school is some sort of a self-inflected harm or

11:43:45  6  revealed preference.  This is what they said.

11:43:48  7         "There are seven plaintiffs who are right now in

11:43:51  8  in-person schooling.  You'll forgive me.  That's not actually a

11:43:56  9  Hobsion choice" -- it actually should be "Hobson's choice," but

11:43:59  10  I think he said "Hobsion choice" -- "that's a revealed

11:44:03  11  preference.  It's where parents have made the balancing

11:44:05  12  analysis that all parents are having to make under these

11:44:08  13  difficult circumstances and determine that the opportunities

11:44:10  14  provided by in-person schooling outweigh the dangers."

11:44:13  15         That's just not right, Your Honor, based on the

11:44:15  16  evidence in the record.  It's not some sort of a -- of a choice

11:44:20  17  that these parents are making independently.  These students,

11:44:25  18  it's uncontradicted, are at a heightened risk in a school

11:44:32  19  environment of COVID-19.  And, if they get COVID-19, they're at

11:44:36  20  higher risk of getting seriously ill or even dying.

11:44:40  21         So they're injured if they go to school with -- and

11:44:43  22  they're unable to even to advocate for a mask mandate.  They're

11:44:49  23  injured if they stay at home because, again, the stipulated

11:44:52  24  evidence is that virtual learning is not the same as in-person

11:44:56  25  learning.  And no one has really questioned that.

| | | |
|---|---|---|
| 11:45:07 | 1 | THE COURT:  So the argument is:  Take away GA-38.  We |
| 11:45:13 | 2 | are in a pandemic.  It is dangerous to congregate in groups. |
| 11:45:23 | 3 | It is dangerous to go to school.  Okay.  If that's where we |
| 11:45:30 | 4 | stand, then various school districts, or perhaps individual |
| 11:45:40 | 5 | schools, will determine how they're going to run and how |
| 11:45:46 | 6 | they're going to attempt to conduct school in a situation that |
| 11:45:50 | 7 | we now know is inherently dangerous. |
| 11:45:53 | 8 | MR. MELSHEIMER:  Correct. |
| 11:45:54 | 9 | THE COURT:  All right.  So within that group of |
| 11:45:57 | 10 | students in a particular school or in a particular school |
| 11:46:01 | 11 | district are students that have conditions, such as the ones |
| 11:46:06 | 12 | that are the plaintiffs in this case, that make them either |
| 11:46:10 | 13 | more vulnerable to catching COVID or more vulnerable to very |
| 11:46:20 | 14 | harsh results from it or both, if they catch it. |
| 11:46:25 | 15 | So the school districts have to figure out how to |
| 11:46:30 | 16 | balance this, and one of the things they have to look at are |
| 11:46:34 | 17 | the mandates from the federal government in Section 504 and the |
| 11:46:38 | 18 | ADA. |
| 11:46:40 | 19 | All right.  So then, as they attempt to deal with |
| 11:46:45 | 20 | that, we interject GA-38 into the situation and it says:  One |
| 11:46:54 | 21 | of the tools that you might have had that you can't use is |
| 11:47:00 | 22 | masking, because we're banning that.  And, therefore, your |
| 11:47:08 | 23 | argument is that when the schools are deprived of a tool they |
| 11:47:13 | 24 | could use to attempt to make reasonable adjustments or |
| 11:47:18 | 25 | accommodations, that's the violation of 504 and the ADA? |

| | |
|---|---|
| 11:47:23 | 1 |

11:47:23  1        Is that it --

11:47:24  2        MR. MELSHEIMER:  That's it in a nutshell, Your Honor.

11:47:27  3  It is, yes.  And that's in fact what the other courts that have

11:47:31  4  considered this have also concluded.  I'll refer the court to

11:47:37  5  the *Arc of Iowa* case, where the court said this:  "Plaintiffs

11:47:42  6  have demonstrated that school programs, services, and

11:47:45  7  activities are not readily accessible" -- that's the language

11:47:50  8  from the ADA -- "to the disabled minor children involved here,

11:47:53  9  because these children cannot attend in-person learning at

11:47:57 10  their schools without the very real threat to their lives

11:48:00 11  because of their medical vulnerabilities.

11:48:04 12        The court in *R.K. v. Lee* -- that's the Texas case,

11:48:09 13  Your Honor -- concluded similarly.  The plaintiffs are entitled

11:48:12 14  to anti-discrimination protections in the ADA in Section 504

11:48:17 15  because they were forced to face a prevalent threat of

11:48:20 16  infection every time they accessed public educational programs

11:48:25 17  and services.

11:48:26 18        And, finally, Your Honor, on this point I'll refer

11:48:29 19  the Court to statement of interest of the United States which

11:48:32 20  is at Docket 47, where the United States says that the ADA

11:48:39 21  requires more than mere access to programs or services and

11:48:43 22  activities.  Even where an individual is not wholly precluded

11:48:48 23  from participating in a service, if he or she is at risk of

11:48:52 24  incurring serious injuries each time he attempts to take

11:48:55 25  advantage of the service, surely, he is being denied the

11:48:58  1   benefits of the service.

11:48:59  2        So I think that this notion of -- of masking is being

11:49:14  3   prevented by GA-38.  We know that mask requirements may be a

11:49:19  4   type of reasonable accommodation for students with underlying

11:49:21  5   medical conditions.  That's what the Court held in the

11:49:25  6   *Disability Rights South Carolina* case.  Let me just read from

11:49:30  7   it, Your Honor, where that judge said:  Years ago ramps were

11:49:34  8   added to school to accommodate those with mobility-related

11:49:38  9   disabilities so they could access a free public education.

11:49:41 10   Today a mask mandate works as sort of a ramp to allow children

11:49:45 11   with disabilities to access their schools.  Thus, the same

11:49:49 12   legal authority requiring people to have ramps requires that

11:49:52 13   school districts have the option -- have the option -- to

11:49:56 14   compel people to wear a mask.

11:49:59 15        Now, we have provided a significant amount of

11:50:02 16   testimony showing that masking is effective, Your Honor.  And I

11:50:05 17   know the Court -- I sympathize with the Court on why are we

11:50:10 18   talking about this data, if we've got one kid with a peanut

11:50:15 19   allergy, we may have to make all the kids not have peanut

11:50:19 20   butter sandwiches.  So in one sense --

11:50:22 21        THE COURT:  That's what Southwest Airlines did.

11:50:24 22        MR. MELSHEIMER:  Exactly.  That's why they have

11:50:27 23   pretzels.

11:50:27 24        THE COURT:  Yeah.

11:50:28 25        MR. MELSHEIMER:  But, Your Honor, it's important to

11:50:31   1  note, though, that the reason why we put so much time into the

11:50:35   2  evidence on this is that there is no evidence that's been

11:50:40   3  adduced by the State that masks are not effective at slowing

11:50:44   4  the spread of COVID.

11:50:45   5       THE COURT:  But let's suppose they aren't effective.

11:50:49   6  Is it a violation of the statute for the State to remove

11:50:57   7  something that a school district could consider in making

11:51:01   8  adjustments or accommodations?

11:51:03   9       MR. MELSHEIMER:  I think it is, Your Honor.

11:51:04  10       THE COURT:  And that's what -- why I question how

11:51:09  11  important the data really is.  Because, if the school districts

11:51:20  12  are bound to come up with adjustments and accommodations -- and

11:51:26  13  the way I read the law is that it really does come down to a

11:51:32  14  particular school on a case-by-case basis --

11:51:35  15       MR. MELSHEIMER:  Or even classroom, Your Honor.

11:51:37  16       THE COURT:  Yes.  And I've had many of those cases in

11:51:39  17  my court.  There's no lack of litigation over what's generally

11:51:44  18  referred to as "reasonable accommodation," but it's the same

11:51:47  19  thing we're talking about.  But does it really matter what the

11:51:50  20  data shows about number of cases or the efficacy of masks

11:52:01  21  outside the context of can the State, through whatever method,

11:52:08  22  eliminate tools that the local people could use to comply with

11:52:14  23  ADA?

11:52:15  24       It's possible that a school district could determine

11:52:18  25  in our -- we have 254 counties in Texas, and the last time I

11:52:24  1  looked, I think we have 1579 independent school districts.  I

11:52:29  2  mean, don't ever think Texas doesn't have a love affair with

11:52:31  3  government, for all our rugged individualism we like to talk

11:52:36  4  about.  But it's possible one of those school districts would

11:52:39  5  determine that, based on what we have going on in our area, we

11:52:43  6  don't want to use a mask.

11:52:45  7           So that's why I try to boil it down to:  Is the

11:52:48  8  problem removing the tool from the school district regardless

11:52:52  9  of how effective or ineffective it may be?

11:52:56  10           MR. MELSHEIMER:  I think that is the problem,

11:52:57  11  Your Honor.  The reason I think why the data is relevant is, of

11:53:01  12  course, you could have -- which we don't have -- but you could

11:53:04  13  have a debate about, you know, they could have brought an

11:53:08  14  expert to talk about, hey, masks are more harmful or helpful or

11:53:14  15  masks don't work.  They didn't do that.

11:53:15  16           So that's why we brought that up, because I think

11:53:17  17  that the other courts that have looked at this said, look,

11:53:22  18  you're prohibiting from the get-go, from a statewide -- the top

11:53:31  19  executive officials the state is saying, no matter what your

11:53:34  20  situation is, you can't ever mandate masks.  And that -- we

11:53:41  21  don't need to talk about whether or not that's good policy or

11:53:44  22  not, Your Honor.  I want to make this clear.  We're not talking

11:53:48  23  about what the policy should or shouldn't be or what the

11:53:51  24  motivation for that is.

11:53:51  25           THE COURT:  And that's not for this Court to decide.

| | | |
|---|---|---|
| 11:53:52 | 1 | MR. MELSHEIMER:  That's not before you, and that's |
| 11:53:54 | 2 | not -- we're not arguing the policy.  We're arguing, whether |
| 11:53:56 | 3 | it's a good idea or bad idea, it's an illegal idea.  It's an |
| 11:54:00 | 4 | idea that violates the ADA, and it puts the schools and the |
| 11:54:04 | 5 | children with disabilities in a position that the ADA is |
| 11:54:07 | 6 | designed to prevent, which is it's designed to prevent them |
| 11:54:10 | 7 | from being in a position where they can't get reasonable |
| 11:54:13 | 8 | accommodations to be mainstreamed and integrated into our |
| 11:54:19 | 9 | public schools.  And that is a bar to the school's district |
| 11:54:22 | 10 | doing that. |
| 11:54:22 | 11 | And it may be that there may be a school district in |
| 11:54:26 | 12 | South Texas that does one thing and there may be a school |
| 11:54:29 | 13 | district in East Texas that does something else.  And that's |
| 11:54:32 | 14 | going to be up to them, based on their assessment of the data |
| 11:54:35 | 15 | and the children and the issues in their schools, not a ban |
| 11:54:41 | 16 | from Austin that says you can't do it no matter what. |
| 11:54:45 | 17 | I refer the Court also to the other briefing from the |
| 11:54:56 | 18 | Texas Pediatric Society and American Academy of Pediatrics, |
| 11:55:00 | 19 | which is Docket 60, which, again, endorses masking as one of |
| 11:55:04 | 20 | these tools.  And it's important, Your Honor, there was a |
| 11:55:08 | 21 | suggestion last hearing that this masking could become like a |
| 11:55:12 | 22 | book club where we just agree to mask.  That doesn't work.  We |
| 11:55:17 | 23 | have evidence on that in Exhibit 17, that optional or voluntary |
| 11:55:22 | 24 | mask policies don't work, they're ineffective, and they |
| 11:55:26 | 25 | actually can contribute to school-based outbreaks. |

| | | |
|---|---|---|
| 11:55:32 | 1 | As I've said, Your Honor, we're not suggesting that |
| 11:55:35 | 2 | schools must adopt mask requirements as a reasonable |
| 11:55:37 | 3 | accommodation regardless of circumstance.  And under the ADA |
| 11:55:44 | 4 | what constitutes such a modification is of course a |
| 11:55:47 | 5 | fact-specific inquiry.  What we're saying is a school must be |
| 11:55:51 | 6 | able to consider masking in determining what type of reasonable |
| 11:55:56 | 7 | accommodation is necessary. |
| 11:55:57 | 8 | So you might consider -- the schools might consider a |
| 11:56:01 | 9 | variety of factors, Your Honor: vaccination rates among the |
| 11:56:05 | 10 | community, positive test rates, or they might decide to tailor |
| 11:56:10 | 11 | the scope of a mask policy to a particular classroom like the |
| 11:56:15 | 12 | Round Rock School District has done, which has that mask matrix |
| 11:56:19 | 13 | that Mr. Thomas pointed out which sets requirements based on |
| 11:56:23 | 14 | color-coded stages of risk just up the road in Williamson |
| 11:56:30 | 15 | County. |
| 11:56:30 | 16 | Your Honor, as we said in our briefing, it's not |
| 11:56:33 | 17 | uncommon -- and the Court has pointed this out in one of its |
| 11:56:37 | 18 | questions -- that a reasonable accommodation for one person may |
| 11:56:40 | 19 | involve compliance by others.  So courts have held, and I |
| 11:56:44 | 20 | suspect this Court has held, that policies impacting others, |
| 11:56:48 | 21 | like a smoking ban, peanut ban, a latex ban, that they may be |
| 11:56:55 | 22 | required as a reasonable accommodation. |
| 11:57:01 | 23 | And, in fact, mask requirements there's no evidence, |
| 11:57:05 | 24 | frankly, that they adversely affect other students.  The |
| 11:57:09 | 25 | United States pointed out in its statement of interest that |

| | | |
|---|---|---|
| 11:57:11 | 1 | schools across the country, including in the great state of |
| 11:57:14 | 2 | Texas, have successfully used mask requirements while |
| 11:57:18 | 3 | requiring -- had in-person school and universal masking in |
| 11:57:22 | 4 | accordance with the CDC guidelines. |
| 11:57:33 | 5 | So element number 3, Your Honor, -- and I know we're |
| 11:57:36 | 6 | approaching noon, and the Court had mentioned we would break |
| 11:57:40 | 7 | for lunch at noon.  I'm happy to continue for as long as the |
| 11:57:43 | 8 | court wishes.  I'm happy to stop at 12:00. |
| 11:57:45 | 9 | THE COURT:  No.  Let's break right now, because I'm |
| 11:57:50 | 10 | not fixed to a calendar, but I have other things that come up |
| 11:57:53 | 11 | on my other cases.  As you may or may not have guessed, I have |
| 11:57:58 | 12 | more than this case that I'm dealing with.  So I need to devote |
| 11:58:05 | 13 | some time to other things while we try to fit this in. |
| 11:58:08 | 14 | So let's go ahead and be in recess until 1:30, and |
| 11:58:12 | 15 | then we'll come back and proceed from there. |
| 11:58:16 | 16 | So the court's in recess. |
| 11:58:18 | 17 | (Recess) |
| 13:30:21 | 18 | (Open court) |
| 13:30:21 | 19 | THE COURT:  Mr. Melsheimer, I think you were getting |
| 13:30:24 | 20 | ready to walk into element 3. |
| 13:30:26 | 21 | MR. MELSHEIMER:  Yes, sir, Your Honor.  May it please |
| 13:30:33 | 22 | the Court? |
| 13:30:33 | 23 | THE COURT:  You may proceed. |
| 13:30:34 | 24 | MR. MELSHEIMER:  Element 3 in an ADA violation, |
| 13:30:37 | 25 | Your Honor, is that discrimination is by reason of Plaintiffs' |

13:30:40  1  disabilities.  An it's important to note a couple of things

13:30:48  2  about this.  First of all, the ADA does not have sole cause

13:30:53  3  requirement.  There can be contributing causes, and you prove

13:30:58  4  discrimination under the ADA in two ways:  You can prove that

13:30:58  5  it's intentional discrimination, or you can prove that it's

13:31:03  6  failure to accommodate.  And Executive Order 38 here precludes

13:31:09  7  the school districts' abilities to implement mitigation or

13:31:15  8  accommodation strategies to address the heightened risk created

13:31:20  9  by the plaintiffs' disabilities.

13:31:21  10         Two of the courts that have considered this have some

13:31:25  11  pretty plain language about this element.  The *Lee* case out of

13:31:30  12  the Western District of Tennessee concluded that plaintiffs

13:31:33  13  attending school in person have established that their

13:31:36  14  exclusion is due to the threat plaintiffs face from COVID-19

13:31:41  15  exposure because of their extreme medical vulnerabilities, in

13:31:46  16  other words, due to their disabilities.

13:31:48  17         The *McMaster* court out of South Carolina concluded

13:31:49  18  that this is not a close call.  The General Assembly's COVID

13:31:53  19  measures disallowing school districts from mandating masks

13:31:57  20  discriminate against children with disabilities.

13:31:59  21         And, finally, in the *Lee* case, which is also one of

13:32:02  22  the five cases that it has found an ADA violation out of a

13:32:06  23  similar exclusionary order, concluded that the refusal to

13:32:11  24  provide accommodations is discrimination on the basis of

13:32:15  25  disability.

13:32:16  1        The defendants offer a defense of exhaustion,

13:32:23  2   Your Honor.  I want to deal with that.

13:32:27  3        THE COURT:  Let me first ask you about these other

13:32:31  4   cases.  They use strong language that the -- particularly the

13:32:39  5   *McMaster* case, that the General Assembly's COVID measures

13:32:42  6   disallowing school districts from mandating masks discriminates

13:32:48  7   against children with disabilities.

13:32:50  8        You know, I wonder as I look at GA-38, even though it

13:32:58  9   disallows school districts from mandating masks, if that

13:33:04  10  discriminates against children with disabilities or does that

13:33:08  11  put in motion a progression that would discriminate.

13:33:15  12       For instance, it's not a foregone conclusion that an

13:33:22  13  individual school district would allow masks or disallow masks.

13:33:30  14  And it's clear to me that if the plaintiffs prevail here and

13:33:36  15  the court in some way restricts GA-38, that we won't know

13:33:45  16  whether there's discrimination until potentially the second

13:33:50  17  lawsuit, because a school district might not compel masking

13:33:59  18  even though it could.

13:34:00  19       So are these cases -- is this language really the

13:34:05  20  appropriate language, or is it a little strong here?

13:34:08  21       MR. MELSHEIMER:  Well, Your Honor, it may be -- it

13:34:10  22  may be a little strong.  But I think under the -- under the

13:34:13  23  law, though, again, it doesn't have to be -- the challenged

13:34:19  24  regulation or activity doesn't have to be the sole cause of

13:34:23  25  discrimination.  So whether it's putting in process something

13:34:26  1  that's going to lead to discrimination or not --

13:34:28  2      Obviously, you're exactly right, what this -- what

13:34:31  3  enjoining GA-38 would allow, it would allow the individual

13:34:36  4  school districts to do what we believe the law requires, which

13:34:41  5  is to make an individualized assessment of what is an

13:34:46  6  appropriate accommodation for children with disabilities in

13:34:49  7  their schools.

13:34:50  8      Now, we have evidence in this record that there are

13:34:53  9  school districts that want to do that, they want to have mask

13:34:56  10  mandates but for the governor's order.  But what's going to

13:34:59  11  happen on a statewide basis, you're right, we don't know that.

13:35:03  12      The remedy we're seeking, though, and we cite a

13:35:07  13  case -- sort of an unpronounceable case about the effectiveness

13:35:11  14  of the remedy from I believe last year's Supreme Court term.  I

13:35:15  15  believe it's a Clarence Thomas opinion that says, you know, a

13:35:17  16  remedy can be an appropriate remedy for a federal judge to

13:35:21  17  enter even if it doesn't solve every problem, even if it

13:35:25  18  doesn't deal with every potential permutation of the problem.

13:35:29  19      And that's really what we have in this case.  We have

13:35:31  20  an order that we believe violates the ADA.  We also think it's

13:35:35  21  preempted by the ADA, Your Honor, and I'm going to get to that

13:35:39  22  in a minute.  But it may be the language from South Carolina is

13:35:43  23  a tad strong, but I think the fundamental premise is the same,

13:35:51  24  which is you're taking away an ability to provide an

13:35:52  25  accommodation which the ADA requires you to at least be able to

13:35:56  1  consider.

13:36:02  2        THE COURT:  Yes.  I just am always concerned when I

13:36:04  3  see a language as strong as "discriminates."  It worries me a

13:36:10  4  little bit, because I think that GA-38 does a lot of things,

13:36:14  5  and the end result may be under the terms of the statute that

13:36:19  6  there's discrimination.  But I don't think the governor's

13:36:27  7  executive order set out to discriminate against anybody.  I

13:36:32  8  believe the ADA may have been overlooked, perhaps, in

13:36:36  9  determining this.

13:36:37  10        MR. MELSHEIMER:  And, Your Honor, we don't have to

13:36:40  11  prove any kind of malicious intent by the governor, and we're

13:36:43  12  not alleging that, by the way.

13:36:44  13        THE COURT:  I know you don't.  I just am always

13:36:45  14  concerned when I see courts using the strongest language that

13:36:49  15  could be used as opposed to some perhaps better language.

13:36:53  16        But go ahead.

13:36:53  17        MR. MELSHEIMER:  Thank you, Your Honor.  The

13:36:55  18  defendants offer the defense of exhaustion and it's our --

13:37:00  19  couple of things about this, Your Honor.  First of all, they

13:37:03  20  raise this for the first time in their trial brief of

13:37:08  21  September 29th.  It wasn't previously raised.  I'm not saying

13:37:11  22  it's not properly before the Court.  I'm just saying that it

13:37:14  23  hasn't been previously raised.

13:37:16  24        This is an issue, though, that is out of place in

13:37:19  25  this lawsuit, because the exhaustion issue comes up when a

13:37:24  1  plaintiff asserts a claim under the Individuals with

13:37:27  2  Disabilities and Education Act, not under the ADA or

13:37:30  3  Section 504.  And the IDEA, as the Court knows, is a federal

13:37:36  4  law that guarantees that students with disabilities receive

13:37:39  5  individually-tailored educational services that address their

13:37:43  6  special education needs.

13:37:45  7         And those kind of claims are about the school

13:37:48  8  properly evaluating the academic and behavior goals for a

13:37:52  9  student, the adequacy of the teaching, the amount of speech

13:37:56  10 therapy, counseling, physical therapy, and related services.

13:38:00  11        This is not such a case.  This is not an IDEA case.

13:38:05  12 This is a case about access to education.  It's not a case

13:38:09  13 about -- well, exhaustion is not required if a Plaintiffs'

13:38:14  14 claim is about the equality of access to public facilities, not

13:38:18  15 adequacy of special education.

13:38:20  16        The test to determine whether you have an exhaustion

13:38:23  17 issue is the Supreme Court case in *Fry*.  And in *Fry* the case

13:38:33  18 was about the quality of the education, not the access to it.

13:38:36  19 And you ask two questions under *Fry*.  Exhaustion doesn't apply,

13:38:42  20 or put another way, the claims do not concern the quality of

13:38:47  21 instruction if first the plaintiff could have brought

13:38:51  22 essentially the same claim if the alleged conduct had occurred

13:38:54  23 at a public school like a library.  And the answer to that here

13:38:57  24 is yes.  And, two, that an adult at the school could have posed

13:39:01  25 essentially the same grievance if they were in the same

13:39:04  1  position.  So the answer to that is yes as well.

13:39:07  2      So this is not a case under *Fry* where you can have

13:39:12  3  exhaustion.  I'll point the Court to the four federal courts

13:39:15  4  that have previously considered this issue and exhaustion was

13:39:20  5  raised: the *Arc of Iowa* case, the *G.S.* case, the *R.K.* case, and

13:39:26  6  the *S.B.* case.  All of those cases found that no exhaustion of

13:39:30  7  administrative remedies, that is to say, going through an

13:39:34  8  administrative agency to get claims of additional remedies or

13:39:38  9  relief, was not required because the issue was access to the

13:39:44  10  school, not quality of the education.  We haven't pled anything

13:39:48  11  about the quality of the education.  We haven't pled this free,

13:39:53  12  appropriate public education, this so-called FAPE.

13:39:59  13      The only court that has found exhaustion, Your Honor,

13:40:02  14  is the Florida case of *Hayes v. DeSantis*.  And that case was

13:40:05  15  based on a finding or a conclusion that, in that case, the

13:40:11  16  plaintiffs' pleadings -- and, remember, the plaintiffs are

13:40:14  17  master of their pleadings -- the plaintiffs' pleadings in that

13:40:17  18  case were replete with explicit references to special education

13:40:22  19  rights, FAPE.  And the relief requested was, quote, a free and

13:40:28  20  appropriate education.  That is not the case in our pleadings.

13:40:32  21  We make no references to the IDEA or any of those related

13:40:36  22  terms.

13:40:37  23      So, the *DeSantis* case noted, to contrast itself with

13:40:44  24  the *Arc of Iowa* case and *G.S.*, that those cases did not contain

13:40:49  25  a single reference to free, appropriate public education or

13:40:54  1  FAPE, and the exact same is true here.  We don't have a single

13:40:59  2  reference to that concept in our pleadings.

13:41:03  3       So, Your Honor, this is not an exhaustion case, and

13:41:06  4  the two cases they cite about exhaustion out of the Fifth

13:41:11  5  Circuit are very distinguishable.  The *McMillen* case, there the

13:41:15  6  court focused on the complaint as it should, the substance and

13:41:19  7  language of the complaint, and it concluded it that was focused

13:41:22  8  on the denial of special education services and the denial of

13:41:27  9  FAPE.  That's not our case.

13:41:29  10       And then the *Logan* case, Your Honor, the court found

13:41:32  11  that the complaint focused on the products of the Individuals

13:41:37  12  with Disabilities Education Act and, thus, was a denial of

13:41:40  13  F-A-P-E or FAPE.  In our case, our pleadings which we've

13:41:46  14  amended, have never been focused and are not focused on the ill

13:41:49  15  failure of the students' special education services or denial

13:41:52  16  of FAPE.  Instead, they're focused on this idea of access.

13:41:58  17       What are some other indications that this isn't an

13:42:02  18  exhaustion case, Your Honor?  Well, we haven't sued any school

13:42:06  19  districts.  That's an IDEA claim.  You have to sue a school to

13:42:10  20  make an IDEA claim.  Our pleadings contain no references to

13:42:17  21  other IDEA terminology, like the "IPE team" or "MDR" or "ADR

13:42:23  22  committee."  Those are issues that come up in the special

13:42:25  23  education context.

13:42:26  24       We're not requesting a change to any so-called IEPs,

13:42:31  25  individualized education programs, and the defendants are not

13:42:34 1  subject to -- the defendants in this case are not subject to

13:42:38 2  the due process procedures laid out in the IDEA.  So we don't

13:42:42 3  think that this is fairly at all characterized as a case where

13:42:47 4  exhaustion is appropriate.

13:42:50 5       Your Honor, we have one other set of claims which I'd

13:42:53 6  like to address on the merits, and then I thought I would yield

13:42:57 7  to the other side to respond, if that's appropriate.

13:42:59 8       THE COURT:  That's appropriate.  Keep going.

13:43:01 9       MR. MELSHEIMER:  So, Your Honor, we make a couple of

13:43:03 10  claims of preemption.  And, as the Court is aware, that arises

13:43:12 11  from the supremacy clause of the Constitution that says the

13:43:15 12  federal law is the supreme law of the land.  And any state law

13:43:19 13  or regulation is preempted when, among other things, it stands

13:43:24 14  in the way or is an obstacle to the accomplishment and

13:43:29 15  execution of the full purposes and objectives of congress.  And

13:43:32 16  state law must give way to the extent it conflicts with federal

13:43:35 17  law.

13:43:36 18       It is our position that the GA-38 is preempted in

13:43:41 19  multiple ways.  First it's preempted by the ADA in Section 504.

13:43:47 20  And, Your Honor, this sort of aligns with the question you were

13:43:50 21  raising before lunch, sort of, what are we really saying here?

13:43:55 22  Are we saying -- how are we characterizing the order exactly?

13:43:58 23       We're characterizing the order in one sense as

13:44:01 24  something that conflicts and violates federal law, i.e., the

13:44:07 25  ADA and Section 504.

13:44:09  1            Now, I didn't see in their briefing -- and they may

13:44:13  2   point this out differently.  I don't believe they address

13:44:16  3   preemption on those grounds.  Maybe they do.  I read them as

13:44:22  4   addressing preemption under the American Recovery Act.

13:44:26  5            But it is our position that the enforcement of GA-38

13:44:32  6   by the attorney general and by the Texas Education Agency, in

13:44:39  7   concert, conflicts with what the ADA the Section 504 require,

13:44:44  8   because it deprives -- it excludes children with disabilities

13:44:47  9   with benefits that they're entitled to.  In other words, it's

13:44:51  10  an obstacle to the accomplishment and execution of the ADA,

13:44:57  11  which is to provide access and, where appropriate,

13:45:01  12  accommodations to students with disabilities.

13:45:03  13           The Court in the *Arc of Iowa* case, Your Honor, found

13:45:08  14  this precisely.  The court there said:  The court concludes

13:45:13  15  that Iowa Code Section 28.31 seems to conflict with the ADA and

13:45:22  16  Section 504 of the Rehabilitation Act because it excludes

13:45:26  17  disabled children from participating in, and denies them the

13:45:28  18  benefits of, public schools' programs, services, and activities

13:45:31  19  to which they are entitled.

13:45:33  20           Thus the Iowa code prohibiting masks appears to stand

13:45:39  21  as an obstacle to the accomplishment and execution of the full

13:45:43  22  purposes and objectives of congress.

13:45:46  23           So really right there, Your Honor, now, Ms. -- my

13:45:50  24  partner Ms. Coberly is going to deal with the standing -- the

13:45:54  25  standing we have to bring this claim and the fact that there's

13:45:58   1  no immunity from a claim like this.

13:46:00   2          But right there you've got enough to enjoin or void

13:46:04   3  enforcement of this order, because it does prohibit school

13:46:08   4  districts from doing what the ADA is set up to do, which is to

13:46:13   5  accommodate, integrate, and give access to school, to the full

13:46:18   6  benefits of public education, to disabled children.

13:46:26   7          We also have pled separately, Your Honor, that the

13:46:28   8  Executive Order GA-38 is preempted by the American Rescue Plan

13:46:32   9  Act.  Now, you talked about this with us, Your Honor, at the

13:46:39  10  first hearing, and you rightly suggested that you needed more

13:46:41  11  detail and more study of this, which we've tried to do in our

13:46:49  12  briefing.  We know that congress enacted the American Rescue

13:46:53  13  Plan to provide billions in funding to state and local

13:46:58  14  governments to address COVID-19's impact on the economy and

13:47:01  15  public health.

13:47:02  16          There's $11 billion -- 11 billion -- allocated to

13:47:06  17  school districts in Texas to develop what the access is, a plan

13:47:11  18  for the safe return to in-person instruction that, to the

13:47:17  19  greatest extent practical, is consistent with CDC guidelines.

13:47:22  20  I refer the Court to Exhibit 166, which is the evidence of the

13:47:26  21  funding allocation to the State of Texas of $11 billion.

13:47:31  22          On August 5th the CDC updated its guidance to

13:47:36  23  recommend universal masking in all K through 12 schools.  The

13:47:41  24  Department of Education's interim final requirements provide

13:47:44  25  that each school district's safe return plan, which is part of

13:47:49  1  the ARP, must describe the extent to which it has adopted

13:47:53  2  policies established by the CDC, including CDC guidelines

13:47:58  3  providing for universal masking and appropriate accommodations

13:48:04  4  for children with disabilities with respect to safety and

13:48:07  5  health policies.

13:48:08  6          Your Honor, Exhibit 165 is a letter that

13:48:14  7  Michael [sic] Cardona, the secretary of education, sent to the

13:48:17  8  governor and to the education commissioner, stating that GA-38

13:48:23  9  might interfere with the school district's, quote, ability

13:48:26 10  under the ARP Act to adopt a plan for the safe return to

13:48:31 11  in-person instruction and continuity of services that the local

13:48:37 12  educational agency determines adequately protects students and

13:48:42 13  educators by following CDK guidance.

13:48:45 14          It is well settled, Your Honor, that when a federal

13:48:47 15  funding statute expressly gives local authorities discretion on

13:48:51 16  how to spend their money, a state law that seeks to restrict

13:48:56 17  that discretion is preempted.  It was congress's choice here to

13:49:01 18  vest discretion with the local school districts, not the State,

13:49:05 19  to adopt the COVID-19 mitigation strategies for this

13:49:09 20  $11 billion dollars in Texas.  That's a valid exercise of

13:49:13 21  congress's power under the spending clause, to impose

13:49:17 22  conditions on the receipt of federal funds.  And no one has

13:49:20 23  suggested that raises any federalism concerns.

13:49:23 24          Now, there are different categories of preemption,

13:49:27 25  Your Honor.  There's express preemption, implied preemption

13:49:31   1  because the federal law occupies the field; implied preemption

13:49:36   2  because it's impossible for a private party to comply with both

13:49:39   3  state and federal law; or implied preemption because the State

13:49:42   4  action conflicts with the federal law, and here's that language

13:49:46   5  again, by standing as an obstacle to the accomplishment and

13:49:51   6  execution of the full purposes and objectives of congress.

13:49:55   7          We're arguing that kind of preemption, that this

13:49:58   8  regulation, this executive order from the governor, conflicts

13:50:03   9  by standing as an obstacle to the accomplishment and execution

13:50:06  10  of congress's objectives.

13:50:09  11          Now, we're not asserting -- and I think they wrongly

13:50:13  12  argue in their briefing that we're arguing some other kind of

13:50:16  13  preemption.  We're not.  We're not arguing, for example, that

13:50:19  14  this American Rescue Plan is a federal regulatory scheme like

13:50:24  15  in the *Armstrong* case, like Medicaid, that's intended to

13:50:29  16  display state regulation of schools.  Nor that ARP and GA-38

13:50:35  17  impose conflicting mandates such that you can't comply with

13:50:39  18  both.

13:50:39  19          We're arguing that it stands as an obstacle that

13:50:46  20  prevents the school districts from exercising the discretion on

13:50:50  21  what to do that this act, the ARP Act, explicitly and expressly

13:50:57  22  gives them.  So this case, Your Honor, is like *Lawrence County*,

13:51:02  23  a 1984 Supreme Court case, that held that where a federal

13:51:06  24  statute expressly gives local authorities discretion on how to

13:51:13  25  use federal funding, a state law that purports to limit that is

13:51:18  1  preempted.

13:51:19  2          *Lawrence* is still the law, and the ARPA is like the

13:51:24  3  statute in *Lawrence* in that it expressly gives school districts

13:51:29  4  discretion to spend the so-called ESSER funds, elementary and

13:51:34  5  secondary school emergency relief funds, on a variety of

13:51:39  6  enumerated purposes, for example, looking at Section

13:51:45  7  2001(e)(2), and does not suggest that the State has any role

13:51:50  8  other than distributing the money according to a formula.

13:51:57  9          Now, the defendants argue in their briefing that,

13:52:01  10  while there's no real conflict here because the State of Texas

13:52:04  11  is allowed to impose restrictions on how local school districts

13:52:09  12  use this ESSER funding, and they suggest that -- I believe they

13:52:14  13  suggest that because the funding is distributed though the

13:52:17  14  State Education Agency and that local school districts have to

13:52:21  15  submit their plans to the State Education Agency, that somehow

13:52:26  16  that means that the State's allowed to impose additional

13:52:31  17  restrictions.

13:52:32  18          Your Honor, it's clear to us that, when you look at

13:52:36  19  the DOE's explanation of the requirements of ARP, ARP did not

13:52:41  20  intend to permit the State's discretion in controlling how the

13:52:45  21  funds are spent.  First, there's nothing in the statute that

13:52:48  22  suggests a state can prohibit local school districts from using

13:52:54  23  the ESSER funding for a purpose that the ARPA especially

13:52:59  24  allows, like developing health policies consistent with CDC

13:53:04  25  guidance.

13:53:04 1        If congress intended to do that, they could have said

13:53:08 2   states may limit school districts' discretion to the extent not

13:53:12 3   inconsistent with state law.  They didn't say that.

13:53:15 4        Now, ARPA does use state education agencies as a

13:53:21 5   conduit for distributing the money, but nothing in the statute

13:53:24 6   gives the State any discretion in how to spend the money or any

13:53:28 7   authority to withhold it.  ARP Section 2001(d)(1) provides that

13:53:32 8   the State Education Agency keeps 10 percent of the funding and,

13:53:37 9   quote, shall distribute the remaining 90 percent to local

13:53:41 10  education authorities, LEAs, according to same allocation under

13:53:46 11  which they receive federal funding in the most recent fiscal

13:53:49 12  year.

13:53:49 13       And, as explained by the Department of Education, the

13:53:52 14  purpose of requiring the school agencies to submit these plans

13:53:57 15  to the State Education Agency is to provide transparency to

13:54:03 16  make sure that the local school districts are using the funding

13:54:05 17  consistent with ARPA's requirements.  But it makes it very

13:54:09 18  clear that the local education agencies are supposed to make

13:54:14 19  their own decisions as to whether and to what extent it will

13:54:17 20  adopt policies consistent with CDC guidance.

13:54:20 21       It is our view, Your Honor, that ARPA and the

13:54:28 22  Department of Education effectively require local school

13:54:31 23  districts to make their own informed decisions on masking,

13:54:34 24  after taking into account local conditions and the views of

13:54:38 25  local stakeholders, a process which is quite plainly

13:54:42  1  short-circuited by GA-38, which is basically saying "we're

13:54:46  2  taking this off the table."  And that short-circuiting impedes

13:54:57  3  or serves as on obstacle to ARPA.

13:55:01  4       So in that sense, Your Honor, we believe that ARPA

13:55:07  5  preempts the governor's order here attempting to ban mask

13:55:11  6  mandates in all circumstances.

13:55:17  7       The *Armstrong* case does not preclude equitable relief

13:55:21  8  under the ARP Act.  So, Your Honor, unless -- we read the law,

13:55:25  9  unless the federal statute expressly or impliedly precludes

13:55:30  10  private enforcement, a claim that a state law is preempted by a

13:55:33  11  federal statute gives rise to federal question jurisdiction,

13:55:36  12  and we can argue the ability to obtain an injunction.

13:55:41  13       Again, this isn't like *Armstrong*.  ARP is not like

13:55:47  14  the Medicaid system.  First of all, the ARP Act is silent on

13:55:51  15  enforcement.  The Medicaid statute has a whole bunch of

13:55:56  16  language on enforcement and who is supposed to enforce it.

13:55:59  17       The Medicaid scheme, as the Court is well aware, is

13:56:01  18  very complicated and basically has all kinds of rules and

13:56:05  19  regulations about how the money is supposed to be spent and who

13:56:08  20  it can go to.  We are simply seeking a very simple injunction

13:56:14  21  to prevent state officials from violating federal law.

13:56:21  22       This case is more like the *Verizon* case cited in our

13:56:26  23  brief which concluded that in that case that the

13:56:28  24  telecommunications carrier *Verizon* could assert a preemption

13:56:33  25  claim where nothing in the Federal Telecommunications Act

13:56:37  1  Purported to bar and restrict such claims.

13:56:39  2         The defendants do not address *Verizon* Your Honor, and

13:56:42  3  I think the *Verizon* case is right on point.  We don't have --

13:56:46  4  just like the Telecommunications Act, ARPA does not have

13:56:52  5  anything in it suggesting there is an intent by congress to

13:56:56  6  restrict the kind of claim for injunctive relief that we are

13:57:00  7  seeking.  We are just seeking a traditional and straightforward

13:57:03  8  remedy of enjoining federal officials from violating state law

13:57:08  9  unlike *Armstrong*, where they were asking the court to basically

13:57:12  10  impose a reimbursement formula on the state.  And the court

13:57:19  11  their rightly concluded that was a complex task best left to

13:57:23  12  the administrative expertise of the secretary of HHS.  All

13:57:27  13  we're asking here is that the Court enjoin state officers from

13:57:30  14  violating or undermining federal law.

13:57:37  15         They argue, Your Honor -- Defendants argue that,

13:57:39  16  well, this ARPA is complex and judicially unadministrable.  But

13:57:43  17  that's just not true, Your Honor.  It's relatively

13:57:46  18  straightforward compared to the Medicaid statute.  And, again,

13:57:49  19  we're not asking the Court to do anything with respect to the

13:57:52  20  ARPA money.  We're not asking you to administer it or impose

13:57:54  21  some sort of scheme or anything like that.  All we're asking is

13:57:58  22  that you enjoin the defendants from interfering with specific

13:58:02  23  provisions of ARPA that allow the local schools, the LEAs, to

13:58:12  24  develop appropriate health care protocols in their district

13:58:16  25  consistent with CDC guidance on masking.

13:58:21    1            Now, you might rightly ask:  Can they do that in

13:58:24    2    light of GA-38?  The answer is they cannot, because they're

13:58:24    3    prohibited from the get-go from considering what all the

13:58:28    4    evidence in the record says is the most effective means of

13:58:33    5    mitigating the spread of COVID in an unvaccinated population,

13:58:36    6    which children 12 and under most assuredly are.

13:58:40    7            So the issue here, Your Honor, is straightforward,

13:58:46    8    and the remedy is straightforward.  It is not like the

13:58:49    9    *Armstrong* case where the plaintiffs in that case were asking a

13:58:52   10    federal judge to basically take over and administrate the

13:58:55   11    Medicaid system, in effect.  That's not what we're asking you

13:58:58   12    to do.

13:59:04   13            Your Honor, that concludes the presentation that I

13:59:06   14    would make on our claims.  So just to remind the Court, our

13:59:08   15    claims are the ADA claim, the Section 504 claim on the merits,

13:59:13   16    as well as these two preemption claims, preemption on the basis

13:59:18   17    of the ADA and 504, which, again, at least two other courts

13:59:22   18    have found preempted, as well as preemption on the basis of the

13:59:29   19    American Rescue Plan Act, which we believe is very consistent

13:59:32   20    with the Supreme Court's decision in *Verizon* and very

13:59:36   21    distinguishable from the Supreme Court's decision in *Armstrong.*

13:59:40   22            If the Court has no questions, I will turn it over to

13:59:43   23    the other side.

13:59:44   24            THE COURT:  I have no questions at this time.

13:59:50   25            The State defendants may proceed at this point to

13:59:55  1  answer what the plaintiffs have presented, and then we'll flip

14:00:00  2  over and you can begin with your motion to dismiss arguments.

14:00:09  3         I understand these may overlap, so don't worry about

14:00:13  4  getting into something out of order.

14:00:14  5         MR. MELSHEIMER:  Might I make one suggestion on that,

14:00:16  6  Your Honor, with respect to the order?

14:00:18  7         So we have carved out the standing and sovereign

14:00:22  8  immunity issues as a separate issue.  In terms of driving the

14:00:27  9  truck, as the Court said, that is part of our proof that we

14:00:32  10  need to establish, that we have standing to sue.  So I thought

14:00:35  11  it might make sense for us to go first on that issue, but I

14:00:38  12  certainly defer to the Court.

14:00:40  13         THE COURT:  Well, we'll see.  Let me hear the State

14:00:42  14  defendants' response to what you've done so far, and then we'll

14:00:45  15  decide where we're going with the rest of it.

14:00:47  16         Ms. Gifford?

14:00:50  17         MS. GIFFORD:  Your Honor, may it please the Court:

14:00:58  18         Under the ADA and section 504, there are two basic

14:01:01  19  forms of discrimination.  It states that no otherwise qualified

14:01:04  20  individual with a disability can be excluded from participation

14:01:12  21  in and be denied the benefits of or be subjected to

14:01:16  22  discrimination under any program or activity receiving federal

14:01:18  23  financial assistance.

14:01:20  24         Discrimination due to -- so there are two types.

14:01:27  25  There's discrimination due to disability, and there's a failure

14:01:29  1  to accommodate.  Disability discrimination, the individual has

14:01:33  2  to be a qualified -- has to have a qualified disability, the

14:01:38  3  individual has to be excluded or denied benefits, and the

14:01:41  4  discrimination must be because of the disability.

14:01:49  5       Now, this is an important distinction between the ADA

14:01:51  6  and Section 504 because the causation standard is different.

14:01:54  7  So under the ADA the causation standard is a motivating factor.

14:02:01  8  So these plaintiffs' disabilities, were they a motivating

14:02:05  9  factor in enacting GA-38 and, presumably in this case, the

14:02:11  10  alleged enforcement by the attorney general and TEA.

14:02:13  11       Under Section 504 the causation standard is sole

14:02:18  12  cause.  So were the plaintiffs' disabilities the sole cause of

14:02:21  13  the defendants' actions and the governor's enactment of GA-38?

14:02:28  14  There's absolutely no evidence in this case of the governor or

14:02:31  15  the defendants being motivated by the Plaintiffs' disabilities.

14:02:37  16       The plaintiffs in fact stated in response to one of

14:02:42  17  your questions before our lunch break that GA-38 prohibits

14:02:45  18  ISD's independent schools from complying with the ADA.  That

14:02:50  19  clearly eliminates any causation with regard to those

14:02:53  20  individual plaintiffs.

14:02:57  21       So really this case comes down to one of reasonable

14:03:00  22  accommodations and whether the defendants in this case have

14:03:04  23  failed to accommodate these plaintiffs.

14:03:10  24       For a failure to accommodate cause of action, the

14:03:14  25  plaintiffs -- the plaintiffs identify a disability and

14:03:17   1   limitations, they're required to identify what their

14:03:21   2   disabilities and their limitations are, and they're required to

14:03:24   3   request specific accommodations.  This explicitly requires an

14:03:31   4   interactive process.

14:03:32   5          There is zero evidence in this case that the

14:03:35   6   plaintiffs have engaged in any interactive process whatsoever

14:03:40   7   with regard to their limitations, their disabilities, and the

14:03:46   8   accommodations that they want so that they feel comfortable

14:03:50   9   going to school in person.  In fact, the plaintiffs argued

14:03:53   10  earlier that GA-38 is causing individual schools to violate the

14:03:58   11  ADA and Section 504 and that schools must be able to consider

14:04:04   12  masking.

14:04:07   13         Plaintiffs cannot engage in this interactive process

14:04:11   14  with the defendants that are here in this courtroom.  They

14:04:13   15  cannot engage with the Office of the Attorney General or with

14:04:16   16  the TEA on establishing or coming up with any possible

14:04:23   17  reasonable accommodations for their disabilities.

14:04:25   18         The other way to establish a failure to accommodate

14:04:34   19  is that the plaintiffs' disability and limitation must be so

14:04:34   20  open, obvious, and apparent, and the accommodation required has

14:04:41   21  to be equally open, obvious, and apparent to the program

14:04:43   22  administrator.  This is the only way to allow the plaintiffs to

14:04:47   23  skip the interactive process.  The plaintiffs -- the defendants

14:04:54   24  here cannot evaluate reasonable accommodations in the abstract,

14:04:59   25  nor can they evaluate the accommodations for these particular

14:05:06  1  plaintiffs.

14:05:06  2          In the case of equal, obvious, and apparent -- or

14:05:11  3  open, obvious, and apparent, you think of the case where the

14:05:18  4  individual was deaf and was pulled over by a police officer,

14:05:22  5  and the police officer read the individual Miranda rights and

14:05:25  6  the individual didn't understand, couldn't hear.  That is open,

14:05:30  7  obvious, and apparent.  That's not the case here.

14:05:33  8          For the plaintiffs to request a reasonable

14:05:41  9  accommodation, it needs to be something, an interactive

14:05:43  10  process, with the school district.  The school districts are

14:05:46  11  not here in this courtroom.

14:05:47  12          THE COURT:  Well, with whom do the parents interact?

14:05:49  13  The school district?

14:05:53  14          MS. GIFFORD:  Yes.

14:05:53  15          THE COURT:  How can they interact with the school

14:05:55  16  district if the school district is barred from interacting with

14:05:58  17  them because interaction would be to no avail because the

14:06:05  18  school districts cannot consider masks?

14:06:07  19          MS. GIFFORD:  Your Honor, they wouldn't be barred

14:06:09  20  from interacting with them.  I guess the issue would be, would

14:06:12  21  they be able to get a reasonable accommodation?  Would the

14:06:16  22  interaction result in a reasonable accommodation?

14:06:18  23          THE COURT:  Well, I've always heard that the law will

14:06:20  24  not compel a futile act.  And it sounds like it's a futile act

14:06:24  25  to attempt to interact with the school district with GA-38 in

14:06:28    1  effect.

14:06:29    2              MS. GIFFORD:  And, Your Honor, I think that question

14:06:32    3  right there precisely raises the standing issue and the issue

14:06:37    4  of proper parties.  And the --

14:06:40    5              THE COURT:  Well, who would be the proper party?

14:06:46    6              MS. GIFFORD:  In this situation, where the plaintiffs

14:06:48    7  have to go to their particular schools to request an

14:06:52    8  accommodation, it seems that -- and I'll jump ahead to the

14:06:59    9  cases that have been argued in the other jurisdictions

14:07:04   10  regarding masks and the ADA.  In all of those cases the

14:07:07   11  individual school districts were sued, along with the governor

14:07:12   12  and, in some cases, the attorney general or the equivalent of

14:07:16   13  the TEA for those states.

14:07:24   14              So, for example, in *G.S.*, one of the Tennessee cases,

14:07:26   15  the case was brought against the governor and the local county.

14:07:33   16  The other Tennessee cases were brought against the governor,

14:07:36   17  the local county board of education, and the local school

14:07:39   18  districts.

14:07:47   19              THE COURT:  All right.  Let's say that the plaintiffs

14:07:48   20  had sued all those people.  The only one they could possibly

14:07:51   21  interact with and obtained any relief could be the governor.

14:07:55   22  And your position would be that, well, you can't interact with

14:07:59   23  the governor because he doesn't enforce.

14:08:01   24              How can any interaction with any school or school

14:08:06   25  district or the commissioner of education or the attorney

14:08:10  1  general result in a change in GA-38?

14:08:16  2          MS. GIFFORD:  Well, I think it's -- those are

14:08:18  3  actually, I think, two different questions.  One is the -- the

14:08:23  4  interactive process in terms of coming up with the specific

14:08:26  5  accommodation for the specific plaintiff, and that does have to

14:08:31  6  happen at the local level.  Now, if the school district is

14:08:36  7  prohibited from masking, even though they're not prohibited

14:08:42  8  from any other tools in their toolbox, any other slices of

14:08:46  9  their Swiss cheese, then that seems to be an issue between the

14:08:51  10  school district itself and either the governor or the attorney

14:08:55  11  general or TEA.  It's not -- it's not between the individual

14:09:02  12  plaintiff and the State defendants.

14:09:09  13          THE COURT:  So your position is, then, if the school

14:09:13  14  district chooses not to contest the executive order, then no

14:09:23  15  one else can.  See, we keep running around in a circle here as

14:09:32  16  to who can sue and who are you supposed to sue.  So tell me who

14:09:36  17  could sue whom to get relief from GA-38 if it were appropriate,

14:09:45  18  if they prove their case in the educational context.  I'm not

14:09:52  19  worried about any of the other things that are in GA-38.

14:09:55  20          MS. GIFFORD:  So I think we will get into this more

14:09:56  21  deeper --

14:09:56  22          THE COURT:  Why don't you just tell me this right

14:09:59  23  now, and we'll get into it deeper later.

14:10:01  24          MS. GIFFORD:  I think that the Tennessee cases are

14:10:03  25  instructive, Your Honor.  I think that in those cases the

14:10:06  1  individual plaintiffs sued the state entities, but they also

14:10:13  2  sued their local school districts.  I think that if I were

14:10:20  3  sitting on the other side of this courtroom, I could imagine

14:10:23  4  suing the school district and possibly then the state

14:10:27  5  defendants be brought in as -- be joined as other parties.

14:10:34  6          THE COURT:  And what relief would you ask of the

14:10:36  7  school districts?

14:10:37  8          MS. GIFFORD:  The relief, I imagine, Plaintiffs would

14:10:42  9  ask of school districts would be to -- the complaint would be

14:10:47  10 that they were failing to provide a reasonable accommodation,

14:10:52  11 and that Plaintiffs I imagine would argue that the reasonable

14:10:55  12 accommodation must require masking.  And if the school

14:11:01  13 districts are prohibited from enforcing masking, then that

14:11:07  14 would be an issue between the school district and the State

14:11:11  15 entities.

14:11:14  16          THE COURT:  All right.  I understand your argument.

14:11:17  17          MS. GIFFORD:  So with regard to reasonable

14:11:30  18 accommodations, in *Campbell v. Lamar*, which is from the Fifth

14:11:33  19 Circuit from 2016, a disabled student does not have the right

14:11:38  20 to his accommodation of preference.  An institution is not duty

14:11:43  21 bound to acquiesce in and implement every accommodation a

14:11:48  22 disabled student demands.  The accommodation does not have to

14:11:52  23 be the best accommodation so long as it is sufficient to meet

14:11:55  24 the needs of the individuals.

14:11:57  25          I think this is very important in this case because

14:12:01  1  we talked about "tools in the toolbox," or "arrows in the

14:12:09  2  quiver," the "Swiss cheese effect" of this case.  Masking is

14:12:14  3  not the only -- is not the only way to prevent the spread of

14:12:20  4  this virus.

14:12:21  5        THE COURT:  How many slices of the cheese can the

14:12:23  6  governor take out of the stack?  Could the governor in GA-38

14:12:30  7  also say that no school can use a wheelchair to assist a

14:12:38  8  student?

14:12:42  9        MS. GIFFORD:  I think those are very -- they're are

14:12:47 10  different issues.  They're not --

14:12:49 11        THE COURT:  Bear with me.  I don't think they're

14:12:51 12  different issues because I have not heard the plaintiffs tell

14:12:55 13  me the remedy the plaintiffs want on an individual,

14:12:59 14  case-by-case basis.

14:13:01 15        What the plaintiffs are saying is that the school

14:13:05 16  district should be allowed to consider masking, along with all

14:13:11 17  of the other things they can consider, to come up with what is

14:13:15 18  a safe plan on a case-by-case basis, whether that case by case

14:13:20 19  is a classroom by classroom or campus by campus, as they put

14:13:26 20  it, or school district by school district.

14:13:29 21        If one slice of the stack of cheese can be removed,

14:13:33 22  how many can be removed before you can seek relief?

14:13:39 23        MS. GIFFORD:  Well, I think it's a defect in their

14:13:42 24  case that they are demanding that the accommodation of their

14:13:47 25  choice, their preference --

14:13:49  1        THE COURT:  No, they're not.  They're just saying

14:13:52  2  that the school districts be allowed to consider everything

14:13:57  3  that's out there suggested by the CDC and others in determining

14:14:01  4  what is appropriate with regard to that classroom or that

14:14:06  5  school or that school district.  I have not heard any argument

14:14:13  6  about what the result of that ought to be.

14:14:18  7        I've heard a lot of argument that it is wrong to not

14:14:21  8  be able -- for a school district to not be able to consider

14:14:24  9  that and that that's what comes afoul of the federal statutes,

14:14:29 10  because the federal statutes appear to say that the school

14:14:33 11  district is to consider everything available to them and GA-38

14:14:43 12  says you can consider everything that's available to you but

14:14:47 13  this one thing and you can't even consider it:  "We're taking

14:14:51 14  it off the table.  I'm the governor.  I can do that.  Doesn't

14:14:54 15  matter what the federal law is.  Doesn't matter what we have

14:14:56 16  out there.  You're not going to consider mandatory masking as

14:15:01 17  one of the things you can consider in determining these things

14:15:04 18  on a case-by-case basis."

14:15:07 19        MS. GIFFORD:  So I would say in that case he's

14:15:09 20  removed one slice of cheese.

14:15:13 21        THE COURT:  All right.  What can he do next?

14:15:16 22        MS. GIFFORD:  But that's not an issue in this case,

14:15:19 23  what he can do next.

14:15:20 24        THE COURT:  No.  But it's -- it's how many things do

14:15:23 25  you take out before you have flipped the whole calculus that

14:15:28  1  the federal government has set up to consider the educational

14:15:32  2  context here.

14:15:34  3         MS. GIFFORD:  I understand your question, and I -- I

14:15:38  4  wish I had a better answer than it's what GA-38 does is remove

14:15:44  5  one tool --

14:15:46  6         THE COURT:  Yeah.

14:15:47  7         MS. GIFFORD:  -- one arrow, one piece of cheese.

14:15:50  8         As the Fifth circuit held in *Campbell v. Lamar*, the

14:15:54  9  disabled student again does not have a right to his

14:15:57 10  accommodation of preference.  It would be the same with the

14:16:01 11  school districts, that they have -- the plaintiffs have

14:16:05 12  presented no evidence that the mitigating -- the mitigation

14:16:12 13  efforts that these school districts are taking right now are

14:16:15 14  not working.

14:16:17 15         THE COURT:  I don't think it is the same when you're

14:16:21 16  dealing with a school district.  I don't think it's the same --

14:16:24 17  I don't think it's a valid analogy that the students can't

14:16:28 18  demand a particular type of solution.  It's too big a jump to

14:16:36 19  this Court to then say a school district can't consider

14:16:40 20  everything that the government intends for them to consider in

14:16:47 21  determining what's best for the students.

14:16:55 22         MS. GIFFORD:  And the plaintiffs rely on *Sturz v.*

14:16:58 23  *Wisconsin Department of Corrections*.  In this case, again,

14:17:04 24  neither the employee -- the court held that neither the

14:17:08 25  employee nor the employer my unilaterally determine what

14:17:13   1   constitutes the reasonable accommodation.  Rather, an employer

14:17:15   2   has to engage in the interactive process with the employee to

14:17:20   3   determine what an appropriate accommodation would be.

14:17:24   4        And, again, the employer has -- in this case the

14:17:27   5   court held that an employer had the duty to consult with the

14:17:30   6   employee to determine precisely what the plaintiff's

14:17:34   7   job-related limitations were that were imposed by his

14:17:40   8   disability.  So, in other words, just as an employee may not

14:17:45   9   impose a wish list of accommodations on an employer, an

14:17:49   10  employer -- a defendant in this case -- was not entitled to

14:17:55   11  deny out-of-hand requests by the plaintiffs.

14:18:01   12       And, again, in *Smith v. Harris County*, another Fifth

14:18:10   13  Circuit case decided last year, the court held that plaintiffs

14:18:13   14  ordinarily satisfy the knowledge element by showing that they

14:18:20   15  identified their disabilities as well as resulting limitations

14:18:24   16  to a public entity or its employees and requested an

14:18:28   17  accommodation in direct and specific terms.  Again, in this

14:18:33   18  case there is no evidence that the plaintiffs have requested

14:18:36   19  any accommodations in direct and specific terms.

14:18:41   20       When a plaintiff fails to request an accommodation in

14:18:44   21  this manner, the Fifth Circuit held he can prevail only by

14:18:47   22  showing that the disabilities and the resulting limitations and

14:18:53   23  necessary reasonable accommodations were open, obvious, and

14:18:56   24  apparent to the entity's relevant agents.

14:18:59   25       THE COURT:  Well, I go back, and I guess we just have

14:19:02  1  a basic disagreement.  I don't see the plaintiffs here seeking

14:19:08  2  an accommodation at this point.  I see that to be the next

14:19:14  3  step.  I see the plaintiffs here objecting to the fact that the

14:19:19  4  school district, by state law, is barred from considering

14:19:26  5  something that the school district would otherwise consider in

14:19:31  6  determining what an appropriate accommodation would be.

14:19:35  7       I have not heard an argument -- perhaps I will get

14:19:39  8  enlightened on it later, but nobody has argued to me that there

14:19:43  9  is a particular accommodation demanded here.

14:19:50  10       MS. GIFFORD:  So, in response to that, it would be

14:19:52  11  discrimination -- the claim would be discrimination based on

14:19:56  12  their disability.  There has been no evidence of motivating

14:20:00  13  factor or sole -- or sole cause under either the ADA or

14:20:07  14  Section 504.  And so the plaintiffs' claim does not succeed on

14:20:14  15  causation under the discrimination -- under disability

14:20:19  16  discrimination.

14:20:22  17       THE COURT:  All right.  Proceed.

14:20:45  18       MS. GIFFORD:  Risk of exposure is not exclusion.  The

14:20:49  19  plaintiffs rely on the case of *Helling v. McKinney*.  This was a

14:20:54  20  case of a prisoner who had a cell mate smoking five packs of

14:21:01  21  cigarettes a day.  And I think it highlights a very important

14:21:04  22  distinction between eliminating the risk and reducing a risk.

14:21:11  23       In *Helling*, while, the court held that, while the

14:21:16  24  prisoner did not have a constitutional right to a smoke-free

14:21:19  25  environment, the appellate court held that he had stated a

14:21:23  1  valid claim under the Eighth Amendment by alleging he had been

14:21:27  2  involuntarily exposed to excessive levels of secondhand smoke

14:21:31  3  that posed an unreasonable risk.

14:21:35  4          And in this case and in the other cases -- well, in

14:21:39  5  *Helling* and the other Title I cases cited by plaintiffs, it

14:21:43  6  doesn't stand for the proposition that the risk must be

14:21:47  7  eliminated completely.

14:21:50  8          As defendants highlighted in their -- in the

14:21:57  9  response trial brief -- in the response to the trial brief,

14:22:02  10 specifically, Plaintiff M.P. has attended school -- attends

14:22:07  11 school in Fort Bend ISD.  They began school on August 11th

14:22:11  12 without a mask mandate in place.  A mask mandate was issued and

14:22:16  13 in place briefly, for a couple of days, and M.P.'s parents

14:22:28  14 decided to pull their child from school because of the rising

14:22:31  15 number of cases.

14:22:32  16         According to the data reported and the evidence we

14:22:34  17 walked through earlier this morning, M.P.'s school has two

14:22:40  18 cases of COVID at the moment, for a total infection rate of

14:22:49  19 1.8 of the student population.

14:22:56  20         At one of the other schools Plaintiff A.M.'s school,

14:23:01  21 which does have a mask mandate in place, 5.4 percent of the

14:23:06  22 student population has tested positive for COVID since school

14:23:09  23 started on August 9th.

14:23:18  24         And Your Honor had asked earlier, why is the data

14:23:21  25 important?  And, again, what these statistics demonstrate is

14:23:22  1  that COVID is complicated and there's no cognizable connection

14:23:28  2  between the Office of the Attorney General and the TEA and

14:23:32  3  Commissioner Morath's actions and Plaintiffs' purported

14:23:36  4  exclusion from in-person learning.

14:23:38  5      It's also important to point out, Your Honor, that

14:23:42  6  all seven of these children were remote learners last year,

14:23:51  7  when there was a mask mandate in place in all of their schools,

14:23:54  8  where the capacity of their schools was significantly reduced,

14:23:58  9  and they chose to remain home.

14:24:00  10      And the question is brought up of at what point does

14:24:05  11  the risk become acceptable to the parents to feel comfortable

14:24:09  12  sending their children to school?  And for some, for M.P.'s

14:24:16  13  parents, an infection rate of under 2 percent is not worth the

14:24:20  14  risk.  Yet, for A.M.'s parents, an infection rate of

14:24:23  15  5 1/2 percent with a mask in place is worth the risk.  And so

14:24:32  16  it's a complicated issue and one that -- and so it's not about

14:24:40  17  elimination of the risk.  And masking -- the evidence does not

14:24:45  18  show that masking eliminates the risk.

14:24:48  19      With regard to the ADA cases from other

14:24:56  20  jurisdictions, I think just from the outset it's important to

14:25:00  21  point out that all of those cases were -- the court was

14:25:07  22  granting injunctive relief, and so the standard was lower.  It

14:25:12  23  was likelihood of success as opposed to what's required here

14:25:17  24  today in a trial on the merits.

14:25:19  25      It is also important to point out that the evidence

| | | |
|---|---|---|
| 14:25:28 | 1 | presented in those cases was very specific to the individual |
| 14:25:35 | 2 | schools, the individual school districts.  For example, in G.S. |
| 14:25:49 | 3 | in the preliminary injunction -- or permanent injunction |
| 14:25:51 | 4 | hearing and the opinion the Court issued on September 17th, the |
| 14:26:02 | 5 | court noted that Shelby County alone, where the plaintiff |
| 14:26:05 | 6 | resided and was going to school, had an infection rate of |
| 14:26:08 | 7 | 34 percent of the county -- I'm sorry -- 34 percent of the |
| 14:26:15 | 8 | county's total infections were pediatric cases. |
| 14:26:22 | 9 | There were statistics regarding the number of |
| 14:26:26 | 10 | students opting out of wearing masks in certain schools that |
| 14:26:29 | 11 | hasn't been presented here.  The plaintiffs have not presented |
| 14:26:32 | 12 | that kind of evidence in this case. |
| 14:26:33 | 13 | In the case of *R.K.*, another Tennessee case, the |
| 14:26:43 | 14 | record reflected that in August 33 percent of the students were |
| 14:26:46 | 15 | absent from Williamson County Middle School.  The statistics |
| 14:26:51 | 16 | provided in that opinion were specific -- specific to |
| 14:26:55 | 17 | individual schools. |
| 14:27:06 | 18 | And, again, in the -- *McMaster* case, a South Carolina |
| 14:27:10 | 19 | case, another distinguishing fact there is that the governor |
| 14:27:16 | 20 | and the attorney general argued that the plaintiffs had no |
| 14:27:20 | 21 | private right of action for failure to accommodate under |
| 14:27:24 | 22 | Title II or Section 504.  And that's not one of the issues here |
| 14:27:28 | 23 | that's been raised in this case. |
| 14:27:34 | 24 | So this is not a case where a child in a wheelchair |
| 14:27:37 | 25 | is denied access to school by stairs because no one will build |

14:27:43  1   the child a ramp.  This is an issue of being fearful of going

14:27:52  2   to school.  And I appreciate and I hear the plaintiffs'

14:27:54  3   argument that that's not how they characterize it.  But at the

14:27:59  4   end of the day, that's what it does come down to.  It comes

14:28:02  5   down to choice.

14:28:03  6        And the plaintiffs can be on the fence about making

14:28:06  7   choice.  The fact that they can be I think draws even into

14:28:14  8   sharper focus that the relief is fundamentally a question of

14:28:21  9   choice, of what is acceptable risk to these parents.

14:28:29  10       THE COURT:  Well, but doesn't that presume that the

14:28:32  11  parents determine in all instances all of the factors involving

14:28:39  12  the risk?

14:28:44  13       Here, because we are dealing with a pandemic and we

14:28:47  14  are dealing with various elements that come from medical

14:28:52  15  doctors, whether we take the broad view of the statistics or

14:28:59  16  the short view of the statistics, to me this comes back down it

14:29:05  17  appears -- for this issue it appears that the federal

14:29:07  18  government desires -- and it's for sure under the Rescue Act --

14:29:16  19  independent school districts who receive money under the Rescue

14:29:24  20  Plan consider everything that is produced by the CDC -- all the

14:29:30  21  information produced by the CDC and made available to consider.

14:29:35  22  And it's all in play and the governor has taken out of play one

14:29:40  23  element, which is masks, and that that's the argument here

14:29:49  24  about what the problem is.

14:29:50  25       It's not about a particular plan for any of these

14:29:53  1  students.  It may be that after the school district produces a

14:29:56  2  plan and the school district says, well, you know, in our local

14:30:03  3  area, we don't have a big problem and we don't see masking as

14:30:08  4  being important, so we're going to bar the use of masks.  Then

14:30:12  5  at that point it becomes the choice of the parents.

14:30:14  6         But I don't see how it's the choice of the parents

14:30:17  7  now, when we're looking to see whether GA-38 violates federal

14:30:24  8  law by, as we've talked about, taking out one of the slices of

14:30:29  9  cheese.

14:30:34  10         MS. GIFFORD:  Your Honor, I have not seen any case

14:30:35  11  law that is on point with -- with how you frame this issue.

14:30:43  12         THE COURT:  Well, I'll help you.  I don't believe

14:30:45  13  there is any.  I think that's what this case is going to do one

14:30:48  14  way or the other.

14:30:51  15         MS. GIFFORD:  At least with regard to the ADA and

14:30:53  16  Section 504.  And I don't think that the case law is

14:30:59  17  instructive that it stands for the proposition that, if the

14:31:06  18  government removes one arrow from the quiver, that it is --

14:31:11  19  under the ADA or Section 504, that it is violating those

14:31:17  20  particular statutes.

14:31:20  21         THE COURT:  Well, I agree there's not a case to that.

14:31:22  22  But it just seems to me, use whatever metaphor you want to

14:31:28  23  use -- "camel's nose under the tent flap," what have you --

14:31:32  24  that once you allow a change by the State in the way the

14:31:38  25  federal statute functions and that they can say that school

14:31:41  1  districts cannot consider everything that is out there, where

14:31:47  2  do you stop restricting what independent school districts can

14:31:50  3  consider?  Where does it stop?

14:31:53  4          We're just dealing with one thing here.  We're

14:31:55  5  dealing with it at the beginning.  And I have a strong

14:31:59  6  suspicion that this case and perhaps the other cases out of

14:32:03  7  South Carolina and -- I mean, yeah, Tennessee and Iowa that

14:32:08  8  we've discussed may -- in this case may be the start of that.

14:32:11  9  I don't think there's any hard and fast law out there.

14:32:17  10         MS. GIFFORD:  I think the closest analogy to that

14:32:19  11 would be the issue of reasonable accommodation and the case law

14:32:24  12 that says that a plaintiff is not entitled to their

14:32:27  13 accommodation of choice, just as the defendant wouldn't be

14:32:36  14 entitled to its accommodation of choice, right?  It's not a --

14:32:40  15 and so to remove one element from the plaintiff -- from the

14:32:48  16 plaintiffs' preferences does not get to --

14:32:50  17         THE COURT:  Well, but it's not just a preference.

14:32:57  18 It is virtually every respected medical authority that has

14:33:00  19 looked at this since March of 2020 says masks are a good idea,

14:33:07  20 okay?  I recognize there are other people outside the

14:33:11  21 scientific community that feel otherwise.

14:33:15  22         So it's not just like the parents dreamed up this

14:33:19  23 idea about a mask.  And if the closest thing we can come --

14:33:22  24 come to is the idea of you can't choose your accommodation,

14:33:27  25 then it's pretty clear we don't have anything that's even

14:33:30  1  closely analogous to this because I don't believe that's very

14:33:34  2  analogous to it.

14:33:37  3       I think it's a whole new thing, which is why I have

14:33:40  4  consistently asked the questions of all of you about this

14:33:46  5  particular situation and the particular statutes that are

14:33:49  6  alleged to have been violated by GA-38.  And so at the end of

14:33:56  7  the day, I'll just have to write something on it and we'll see

14:34:03  8  how it plays in Peoria.

14:34:08  9       MS. GIFFORD:  So Your Honor, I would just say that

14:34:10  10  the plaintiffs have not -- what they presented today and in

14:34:13  11  this case, they've not stated a claim for discrimination,

14:34:18  12  Because there is no -- they've not established the causation

14:34:20  13  standard for either the ADA or for Section 504.

14:34:28  14       Even if this court -- even if this case is not about

14:34:32  15  a failure to accommodate and it -- and it relies on disability

14:34:40  16  discrimination, they have not met that standard.

14:34:49  17       THE COURT:  Thank you.

14:34:49  18       MS. GIFFORD:  Yes.

14:34:50  19       THE COURT:  All right, Mr. Melsheimer?

14:34:53  20       MR. MELSHEIMER:  Your Honor, I think they were going

14:34:55  21  to handle the preemption, Your Honor, maybe?

14:34:56  22       MS. GIFFORD:  Yes.

14:34:56  23       MR. KERCHER:  With the Court's permission, I'll take

14:34:58  24  up the response to their arguments about preemption.

14:35:01  25       THE COURT:  I want to ask him some questions about

| | | |
|---|---|---|
| 14:35:03 | 1 | this right now. |
| 14:35:07 | 2 | Address Ms. Gifford's argument under 504 and the ADA. |
| 14:35:17 | 3 | I'm not so concerned about different causation standards but |
| 14:35:24 | 4 | motivating factor, because is motivating factor important under |
| 14:35:28 | 5 | both 504 and ADA?  And, if so, tell me where I find that |
| 14:35:36 | 6 | discrimination was a motivating factor in GA-38. |
| 14:35:40 | 7 | MR. MELSHEIMER:  We're not saying -- we're not |
| 14:35:44 | 8 | alleging it is, Your Honor. |
| 14:35:45 | 9 | THE COURT:  No.  But they seem to say you have to |
| 14:35:48 | 10 | allege it is and you have to prove it.  So you can't duck that |
| 14:35:51 | 11 | by just saying, well, we're not going to talk about it. |
| 14:35:53 | 12 | MR. MELSHEIMER:  Well, Your Honor, I don't think |
| 14:35:55 | 13 | that's the law.  I don't think to state -- |
| 14:35:56 | 14 | THE COURT:  All right.  Tell me what is the law. |
| 14:35:58 | 15 | MR. MELSHEIMER:  To state the claim that we are |
| 14:36:00 | 16 | making here, we do not have to -- so there's -- there's two |
| 14:36:05 | 17 | aspects of the kind of discrimination that you can have.  One |
| 14:36:09 | 18 | is intentional discrimination, which we are not seeking, we |
| 14:36:13 | 19 | have not pled or proven.  The other is failure to accommodate |
| 14:36:18 | 20 | and -- or modify or reasonably accommodate.  There's different |
| 14:36:23 | 21 | language used. |
| 14:36:24 | 22 | And here we've argued and we've produced evidence |
| 14:36:28 | 23 | that GA-38 is an obstacle to that.  It's an obstacle to any |
| 14:36:33 | 24 | effort for anyone to make any -- to make a reasonable |
| 14:36:37 | 25 | accommodation based on masking. |

14:36:39    1        The evidence is that masking is effective, that it's

14:36:42    2   the most effective.  They haven't challenged that.  And our

14:36:46    3   position is that, under both the ADA and under 504 of the

14:36:52    4   Rehabilitation Act, that -- that states the claim for the kind

14:36:55    5   of discrimination recognized in the failure to accommodate.

14:36:58    6        So if you look at what happened in, for example, the

14:37:02    7   case of *Lee* which is one of the two or three Tennessee cases

14:37:08    8   here, the court concluded there that the school systems at

14:37:14    9   issue are being suppressed by Executive Order Number 38 from

14:37:19   10   giving plaintiffs the effective accommodation of a temporary

14:37:23   11   universal mask mandate for all students and teachers.

14:37:26   12        That's what it found to be the violation, that they

14:37:29   13   weren't able to -- they were barred from the making that

14:37:30   14   accommodation by the suppression of an order which purported

14:37:33   15   and did in fact bar mask mandates.  This notion that we have to

14:37:37   16   ask for accommodations, which was sort of the lead point that

14:37:41   17   she made, is -- is not apt here for reasons the Court alluded

14:37:49   18   to.  And this also came up in the *Lee* case where the court

14:37:52   19   there said, Why would a board of education bother acting to

14:37:56   20   adopt a mask mandate when Governor Lee's executive order allows

14:38:01   21   students not to comply with it?  Governor Lee's executive order

14:38:03   22   reduces any board of education's mask mandate to a mere paper

14:38:07   23   tiger.

14:38:07   24        So our position is that the restriction, *ab initio*,

14:38:14   25   from the ability for any school district anywhere in Texas to

14:38:18   1   impose a mask mandate in a classroom, in a school, in a school

14:38:23   2   district for certain activities, anything like that, that is

14:38:26   3   what is the violation that -- of either the ADA and 504.

14:38:31   4          And we -- the evidence, Your Honor, to support that

14:38:35   5   is that the school districts that had adopted mask mandates

14:38:39   6   backed off them in response to the governor's order, and the

14:38:42   7   testimony from other school districts said, hey, if the

14:38:46   8   governor's order is voided or rescinded, we would move to adopt

14:38:50   9   mask mandates.

14:38:52  10          So I think the causation is clear in this case.  Now,

14:38:54  11   does that mean every school district in the state of Texas will

14:38:57  12   or has to adopt mask requirements?  No.  And the Court has made

14:39:02  13   that -- is right about that.  We're not arguing that.  We're

14:39:05  14   simply saying that when you take --

14:39:08  15          And that's why we had all this evidence, Your Honor,

14:39:10  16   about the efficacy of masks and the science.  Because this

14:39:16  17   isn't like the governor has taken off the table some kind of

14:39:19  18   crazy thing like, you know, injecting bleach or something like

14:39:24  19   that, right?  It's not like he's said you can't take horse

14:39:27  20   medicine for COVID.

14:39:28  21          He's taken off something that the science and the

14:39:32  22   doctors and the educators and the epidemiologists all say is an

14:39:36  23   effective tool for combating COVID spread in schools,

14:39:40  24   especially in an unvaccinated population.

14:39:44  25          And our plaintiffs are children with disabilities who

14:39:47  1  are especially vulnerable to COVID, and that's why they are

14:39:51  2  here arguing that the prevention of that accommodation is a

14:39:56  3  violation of their civil rights under the ADA and 504.

14:40:00  4          THE COURT:  All right.  Thank you.  Now.

14:40:07  5          MR. KERCHER:  Let's talk a little bit about the

14:40:14  6  American Rescue Plan Act, Your Honor.  We talked a little bit

14:40:17  7  at the last hearing about how there's not a cause of action

14:40:21  8  that the plaintiffs can bring in order to challenge that

14:40:24  9  action, in order to challenge that statute.

14:40:27  10          It's true for a couple of reasons.  One, preemption

14:40:32  11  is not by itself a cause of action.  Two, the ARP, or the

14:40:40  12  American Rescue Plan Act, does not itself provide a private

14:40:45  13  right of action.  Some of the cases that the plaintiffs have

14:40:48  14  cited in their response to those arguments are jurisdictional

14:40:55  15  cases about whether or not the court can hear that kind of

14:40:59  16  thing.  But, as the Court knows, just because it has

14:40:59  17  jurisdiction to hear, for example, a constitutional claim

14:41:01  18  doesn't mean an individual plaintiff automatically has a

14:41:04  19  Section 1983 cause of action or right of action.

14:41:08  20          *Armstrong* is instructive, and you heard

14:41:11  21  Mr. Melsheimer sort of backing away from *Armstrong*, saying this

14:41:15  22  is a really different case.  I read *Armstrong* because it's

14:41:18  23  cited in their brief.  In *Armstrong* the court explicitly said

14:41:23  24  preemption is not a cause of action all by itself.  It did say

14:41:27  25  that courts can, in equity, here challenges to statutes

14:41:32  1  sometimes.  But just a couple of paragraphs later, the court

14:41:35  2  said, But those challenges are not free from all statutory

14:41:41  3  requirements, and we have to look at the statute and see

14:41:44  4  whether or not it provides a private right of action.

14:41:47  5        In the *Armstrong* case they're looking at not just the

14:41:52  6  whole Medicaid Act, but a particular provision of the Medicaid

14:41:55  7  Act that provided that certain kinds of health care providers

14:41:59  8  would be paid at certain rates.  And the plaintiffs had sued a

14:42:02  9  couple of Idaho state officials that Idaho was underpaying

14:42:07  10  under Medicaid.

14:42:08  11        The court said, well, preemption is not a cause of

14:42:11  12  action.  Let's look and see if there is a cause of action under

14:42:13  13  this provision in Medicaid and determined there's not one, one,

14:42:17  14  because there was only -- the only available remedy

14:42:21  15  contemplated by the statute was the administrative withholding

14:42:24  16  of funds, and, two, because it was judicially unadministrable.

14:42:32  17  It was too complicated, involved a number of individual

14:42:35  18  decision-making steps between the start and the end of the

14:42:38  19  process in that statute.  And, finally, because the statute

14:42:46  20  itself, Medicaid, did not contemplate a private right of

14:42:49  21  action.

14:42:49  22        That's all true here, Your Honor.  The American

14:42:51  23  Rescue Plan Act, if you take a look at it, really provides for

14:42:54  24  federal funding to siphon into a variety of different walks of

14:42:59  25  American life, among them, public school districts in the

14:43:01  1   States.  There is no remedy contemplated at all under the

14:43:07  2   provisions we're talking about here.  The only thing that could

14:43:09  3   possibly happen if somebody were not complying with its

14:43:13  4   strictures would be that money could possibly be withheld,

14:43:17  5   which is similar to the Medicaid provision which contemplated

14:43:21  6   only an administrative remedy of withholding funds.

14:43:25  7         Secondly it is judicially unadministrable because the

14:43:28  8   plaintiffs can't have it both ways.  They really focused on how

14:43:34  9   important discretion is under the ARPA but at the same time

14:43:37  10  want to say that it could be judicially administrable.

14:43:42  11        The American Rescue Plan Act provides for discretion

14:43:45  12  not just by local education agencies or school districts but

14:43:48  13  also specifically by the State.  In fact, the reporting

14:43:53  14  requirements on which Plaintiffs' trial brief relied so heavily

14:43:58  15  to demonstrate that the full -- the obstacle and full purpose

14:44:02  16  and objective of congress were for LEAs to consider

14:44:08  17  specifically masking requirements, those reports go to the

14:44:11  18  State.

14:44:12  19        And, in fact, *Armstrong* closes by saying, State

14:44:21  20  government -- excuse me -- the Department of Education, in

14:44:23  21  putting together requirements -- I think they're final interim

14:44:27  22  requirements for the administration of the ARPA -- says

14:44:31  23  expressly:  State government is, quote, best situated to

14:44:34  24  determine what additional requirements to include in the LEA,

14:44:39  25  ARP ESSER plan.

14:44:42  1        That does not -- that's the type of (a) judicially

14:44:47  2  unadministrable plan, and (b) that does not suggest that the

14:44:50  3  central purpose of the provision is necessarily that masks have

14:44:55  4  to be considered, much less imposed, particularly when looking

14:44:58  5  at the entirety of the American Rescue Plan Act.  In its

14:45:02  6  105,508 words the word "mask" shows up only four times.

14:45:08  7        So ARPA does not provide a private right of action.

14:45:14  8  Even if it did, Your Honor, the plaintiffs have failed to show

14:45:16  9  that they could recover under such a private cause of action.

14:45:19  10        We talked a little bit -- Mr. Melsheimer did a good

14:45:22  11  job walking through the different kinds of preemption there

14:45:25  12  are, and we understand now that they're not asking for --

14:45:28  13  they're not arguing that it expressly preempts or that there is

14:45:32  14  a pervasive scheme of federal regulation but, rather, that

14:45:36  15  there is a direct conflict.

14:45:43  16        The thing is, the provisions to which the plaintiffs

14:45:45  17  cite in order to meet their burden of proof for an alleged

14:45:50  18  preemption cause of action under the American Rescue Plan Act

14:45:53  19  do not require masks and do not require that local school

14:45:56  20  districts implement masks.  Rather, what they do is suggest

14:46:01  21  that those things be a part of a report submitted by the LEAs

14:46:07  22  to a state agency about what they considered, what they have,

14:46:12  23  and have not done.

14:46:13  24        That does not make the full purpose and objectives of

14:46:18  25  congress the institution or even the consideration of masks if

14:46:23  1  the only requirement is that schools report about whether or

14:46:26  2  not they have instituted or considered them.

14:46:31  3       The plaintiffs -- the plaintiffs will tell you,

14:46:33  4  Your Honor, that it is well settled.

14:46:37  5       THE COURT:  So the report would be sufficient if the

14:46:40  6  school said:  We didn't consider masks because it had been

14:46:43  7  barred by a proclamation of our governor?

14:46:48  8       MR. KERCHER:  I don't think that there's anything in

14:46:50  9  the statute that says that's not sufficient.  I think that the

14:46:53  10 school districts could perhaps frame it another way:  We

14:46:56  11 considered it and ultimately rejected it because of GA-38, and

14:47:00  12 GA-38 says we may not impose mask mandates right now.  They may

14:47:05  13 also report things like:  We considered whether we could

14:47:08  14 mandate them, decided that we would not and decided instead

14:47:11  15 that we would encourage our students to wear mask; that we

14:47:15  16 would adopt policies that handed out masks to students who want

14:47:19  17 them.

14:47:19  18      There are a variety of things that school districts

14:47:22  19 could consider and report on under the American Rescue Plan Act

14:47:25  20 that would meet its very limited strictures when it comes to

14:47:28  21 what role, if any, masks are to play in those funds.

14:47:33  22      When the plaintiffs tell you, Your Honor, that it's

14:47:35  23 well settled that when federal funds go to a local governmental

14:47:39  24 entity, that -- that the State does not get to decide how those

14:47:44  25 funds are spent, they cite one case.  It's a Lawrence County --

14:47:48   1   it's called *Lawrence County*, and that case is different from

14:47:51   2   this case.

14:47:51   3          First of all, in *Lawrence County* the money went

14:47:54   4   straight from the federal government to the local government.

14:47:58   5   It was a payment in lieu of taxes because, as you know, for

14:48:01   6   example, a county where there is federal land, the county might

14:48:05   7   otherwise be entitled to tax that land.  But, because it's

14:48:08   8   owned by the federal government, the county loses out on that

14:48:11   9   money.  So instead of getting that money as tax, the federal

14:48:14   10  government was paying it by way of payment in lieu of that tax.

14:48:18   11  Those funds went directly from the federal government to the

14:48:21   12  local government.

14:48:22   13         The state government in that case -- and in this case

14:48:26   14  it was South Dakota -- passed a statute that required that

14:48:30   15  local governments receiving such payment in lieu of moneys from

14:48:34   16  the federal government must allocate those moneys exactly as

14:48:38   17  they would have had they been collected as taxes, which is to

14:48:42   18  say that -- you were asking earlier in a different context how

14:48:45   19  many arrows could the state government remove, right?  How many

14:48:49   20  slices of cheese could it remove?

14:48:51   21         In this case -- in the *Lawrence County* case the state

14:48:53   22  government removed all of the arrows.  It wasn't an ADA case,

14:48:57   23  but it removed all of the discretion and said you cannot do

14:49:00   24  anything with this money other than what you would have done if

14:49:03   25  you had collected it as taxes.

14:49:06  1          That's fundamentally distinguishable from this case,

14:49:08  2    Your Honor, where, first of all, the money goes through the

14:49:11  3    State.  And although the State is required to turn over an

14:49:14  4    amount of that money to local governments, the State does

14:49:16  5    retain some authority to institute additional requirements

14:49:22  6    under the Act.  That's not preemption.  That's leaving

14:49:25  7    discretion in the hands of the State to interact with local

14:49:29  8    governmental agencies where, on receipt of these funds, to

14:49:31  9    determine what additional requirements might make sense.

14:49:34  10   That's not preemption.

14:49:38  11         To the degree they bring a preemption claim under the

14:49:41  12   ADA, my understanding of that is -- and if you read the brief

14:49:47  13   from the DOJ, their argument turns on whether or not Plaintiffs

14:49:52  14   can prove the facts they allege, which really sort of says

14:49:58  15   that, if the plaintiffs can prove that there has been an ADA

14:50:01  16   violation, then they can recover under the ADA.

14:50:03  17         I'm not sure that that's really at issue here.  If

14:50:07  18   they can prove that there has been an ADA violation, then I

14:50:11  19   think the defendants are in trouble.  Our position in this case

14:50:15  20   is that GA-38 and the public health guidance sent out by the

14:50:20  21   TEA do not violate the ADA.  And so I don't think we reached

14:50:25  22   the issue of whether the ADA preempts GA-38.

14:50:29  23         With that, Your Honor, I'll conclude -- unless you

14:50:32  24   have additional questions, I'll conclude my remarks and speak

14:50:35  25   to what my opposing counsel said about who gets to go first on

14:50:39   1   the standing issue.

14:50:40   2          THE COURT:  Do you argue that there -- that

14:50:42   3   Plaintiffs have not made out an ADA violation, or do you argue

14:50:47   4   they don't get the opportunity to because they don't have

14:50:52   5   standing?

14:50:53   6          MR. KERCHER:  I think we argue both in the

14:50:55   7   alternative.

14:50:57   8          THE COURT:  All right.  Now, Mr. Melsheimer, how

14:50:59   9   would you suggest we proceed at this point?

14:51:01  10          MR. MELSHEIMER:  May I get two minutes on preemption,

14:51:03  11   Your Honor.

14:51:04  12          THE COURT:  We've gone down from ten to two.  Yes,

14:51:08  13   you can have two.

14:51:09  14          MR. MELSHEIMER:  I'll be giving you time back at this

14:51:11  15   rate, Your Honor.

14:51:13  16          Our position on preemption is pretty simple,

14:51:16  17   Your Honor, in that GA-38 stands as an obstacle to the

14:51:21  18   accomplishment of the objectives of congress in the ADA and 504

14:51:26  19   and in the ARPA.  With respect to the ARPA, it requires the

14:51:30  20   local school districts to develop -- to use this money to

14:51:34  21   develop plans consistent with CDC guidelines, and the

14:51:38  22   governor's order says you cannot do that.  You cannot do that.

14:51:42  23   You have to leave out one of the key components of CDC

14:51:47  24   guidelines.  That is the essence of preemption.

14:51:51  25          With respect to the standing argument, Your Honor,

```
14:51:54   1   here's what I suggest:  I think standing is part of the
14:52:00   2   plaintiffs' burden in the case, and I think we should go first
14:52:03   3   on that.  I think sovereign immunity is a defense.  They should
14:52:08   4   probably go first on that.
14:52:10   5        Now, I'll just say here -- and this is no -- I'm not
14:52:14   6   casting any aspersions -- they've sort of conflated those
14:52:18   7   issues in their briefing, so you have to sort of unpack it.
14:52:21   8   But I would suggest that we go first primarily on standing.  To
14:52:25   9   the extent we have to mention sovereign immunity, we can.  And
14:52:29  10   then that they go and give their full-throated sovereign
14:52:33  11   immunity defense and then respond on standing.
14:52:38  12        THE COURT:  Mr. Kercher, how do you feel about that?
14:52:40  13        MR. KERCHER:  I agree that standing is a part of
14:52:41  14   their burden, Your Honor, and, as a result, I do think it's
14:52:44  15   appropriate that they go first.
14:52:45  16        Before we dive into that, because I do think that
14:52:48  17   will probably be what wraps up the argument, I would ask for a
14:52:50  18   short recess.
14:52:51  19        THE COURT:  All right.  Well, I would normally recess
14:52:53  20   about 3:30, but there's no problem with recessing now.  We'll
14:52:58  21   be recess for 15 minutes.  And then we'll come in and we won't
14:53:00  22   have another recess.  We'll go straight through and finish up.
14:53:03  23      (Recess)
15:14:25  24      (Open court)
15:14:25  25        MS. COBERLY:  Good afternoon, Your Honor, and may it
```

15:14:27  1  please the court:  I want to thank the Court for having me and

15:14:31  2  allowing me to appear here today.  It's a pleasure to be with

15:14:35  3  you.

15:14:35  4        THE COURT:  Oh, we don't necessarily allow people or

15:14:37  5  not allow people to appear.  If you show up, we generally let

15:14:40  6  you do whatever you want to do.

15:14:42  7        MS. COBERLY:  Well, thank you.  I appreciate it.

15:14:44  8  It's good to be here.

15:14:44  9        THE COURT:  So you may proceed.

15:14:44  10        MS. COBERLY:  Thank you.  So standing is a practical

15:14:49  11  inquiry.  It really is about -- it boils down to a pretty

15:14:54  12  simple ideas, and just that whether these defendants --

15:14:58  13        THE COURT:  For the record, go ahead and give us your

15:14:59  14  name before you get into that.

15:15:01  15        MS. COBERLY:  Oh, of course, sir.  Linda Coberly for

15:15:04  16  the plaintiffs.

15:15:08  17        THE COURT:  Okay.

15:15:08  18        MS. COBERLY:  So standing boils down to whether these

15:15:10  19  defendants are doing something that is causing harm to the

15:15:14  20  plaintiffs or a substantial risk of harm to the plaintiffs.

15:15:20  21  You evaluate that based on the facts, and here the facts

15:15:24  22  support standing.

15:15:25  23        We have a concrete and particularized injury, a

15:15:29  24  deprivation of a legally protected interest.  And that is the

15:15:35  25  interest in reasonable and equal access to school.  That's an

15:15:39  1  interest that we know is legally protected because of the Texas

15:15:43  2  Constitution which imposes an obligation on the State to

15:15:48  3  maintain public, free schools.  We know it's a legally

15:15:53  4  protected interest because of the Supreme Court, the U.S.

15:15:57  5  Supreme Court, which has said that a student's legitimate

15:16:02  6  entitlement to a public education is a property interest that's

15:16:06  7  protected by the due process clause.

15:16:08  8          And we know it's a legally protected interest because

15:16:14  9  congress in the Americans with Disabilities Act and under

15:16:18  10  Section 504 has recognized an interest in ensuring that the

15:16:24  11  access provided to students with disabilities is equal, is on a

15:16:29  12  par, with the access provided to nondisabled children.

15:16:34  13          So access -- reasonable and equal access to school is

15:16:39  14  a legally protected interest, and we have alleged, and have

15:16:43  15  proven now with evidence, that the defendants' actions are

15:16:47  16  depriving the plaintiffs of that interest.

15:16:51  17          Some plaintiffs face existing depravation.  They have

15:16:56  18  already suffered this injury.  And that includes M.P., who is a

15:17:02  19  student in the Fort Bend district who is at home currently

15:17:06  20  being deprived of access to public school, and E.S., who is a

15:17:12  21  student in the Killeen School District who is at school but is

15:17:16  22  facing an unequal experience and unequal access because of the

15:17:23  23  heightened risk of COVID-19.

15:17:25  24          THE COURT:  Well, let me ask you this:  Looking at

15:17:28  25  your slide there -- and it's accurate -- but I find this a

15:17:36  1  little tricky, because each of your points on each of your

15:17:43  2  plaintiffs does kind of play back into what the State

15:17:55  3  defendants have argued, is that you're asking for a specific

15:17:58  4  accommodation, which is masking.

15:18:00  5        So I don't think we're there yet.  I don't think they

15:18:09  6  say they're unable to attend school because there is no

15:18:14  7  masking, but we still have, or at least in my mind, this gap

15:18:18  8  between there is no guarantee that the school districts are

15:18:22  9  going to mandate masking.  And if we're looking at this as

15:18:29  10  black and white as you argue it is, then it comes back to a

15:18:35  11  degree to the State's argument that you're asking for a

15:18:39  12  specific accommodation, which I do not believe that you were

15:18:43  13  asking for.

15:18:44  14        So straighten me out on that.

15:18:48  15        MS. COBERLY:  You're right, Your Honor, that we are

15:18:50  16  not asking for a specific accommodation.

15:18:52  17        THE COURT:  But stop right there.

15:18:54  18        MS. COBERLY:  Yes.

15:18:55  19        THE COURT:  If the concrete injury is being unable to

15:18:59  20  attend school because there is no masking or attending school

15:19:05  21  without masking or attending school with -- everything you say

15:19:11  22  up to there, that smacks of a belt-and-suspenders argument of

15:19:20  23  saying we're really not asking for a mask mandate, but it's our

15:19:26  24  concrete injury because we don't have one.

15:19:30  25        MS. COBERLY:  So I'm going to change slides because I

15:19:33  1  think the next one is clearer.  And this is slide number 93

15:19:37  2  that you saw this morning that just describes the kinds of

15:19:41  3  injury that each of the plaintiffs is experiencing.

15:19:43  4       So I think when it comes to standing, Your Honor, the

15:19:49  5  question is:  Are they being deprived?  And what they're being

15:19:55  6  deprived of is the ability to go into school.  Now, whether the

15:19:59  7  accommodation is --

15:20:00  8       THE COURT:  No, no.  How are they deprived of being

15:20:03  9  able to go into school?  How are they being deprived of that

15:20:08  10  that will be remedied by this court in some way restraining

15:20:16  11  GA-38?

15:20:19  12       MS. COBERLY:  So I think if -- first of all, I'm

15:20:23  13  going to talk about what a reasonable -- set of reasonable

15:20:25  14  accommodations might be, just to reflect on --

15:20:27  15       THE COURT:  Well, I would rather just hear you answer

15:20:31  16  my question.

15:20:32  17       MS. COBERLY:  Okay.  So the remedy we're talking

15:20:36  18  about is separate from the injury.  The injury is an injury

15:20:40  19  that reflects the actual facts on the ground -- the facts and

15:20:42  20  the evidence in the record.  And the evidence we have presented

15:20:47  21  is that these districts regardless of what GA-38 -- what

15:20:53  22  removing GA-38 would require or what the ADA requires, we know

15:20:58  23  factually what those districts would do.

15:21:02  24       Two of these districts had universal mask mandates.

15:21:07  25  Now, whether that's necessary for a reasonable accommodation is

15:21:11  1  something that would be -- that would be resolved between the

15:21:13  2  school district that was really able to consider all the

15:21:16  3  options and a particular plaintiff.  But we happen to know

15:21:20  4  that, in fact, two of the five -- of the seven districts at

15:21:24  5  issue had universal mask mandates but no longer have them

15:21:30  6  because of GA-38.  And five of these districts do have mask

15:21:38  7  mandates today, but the attorney general has sued or has

15:21:43  8  threatened to sue them.

15:21:45  9          So the -- I think the tension that you're referring

15:21:49  10  to, Your Honor, which is we're not asking for a -- you know,

15:21:54  11  we're not saying that there would have to be a universal mask

15:21:58  12  mandate in the entire school in order to be a reasonable

15:22:01  13  accommodation for these plaintiffs.  That's something that

15:22:04  14  would be worked out later between the school district and the

15:22:07  15  plaintiff.

15:22:08  16          What we know today is that all seven of the school

15:22:12  17  districts of our plaintiffs would impose a universal mask

15:22:18  18  mandate if GA-38 were not in effect and were not being

15:22:23  19  enforced.  So we kind of don't get to the question of what

15:22:28  20  would be a reasonable accommodation for a specific student.  If

15:22:32  21  GA-38 were not in place, there would be masking, and it

15:22:37  22  wouldn't be an issue.  These students would be able to go to

15:22:41  23  school as a factual matter.  Does that help, Your Honor?

15:22:45  24          THE COURT:  Well, I still think there's a hole there.

15:22:49  25  And what I'm trying to get around is, so let's say that I'm

15:23:00 1  trying to get -- well, I'm trying to get the bridge from, all

15:23:03 2  right, if we didn't have GA-38, these seven school districts

15:23:08 3  would have mask mandates and, therefore, those children would

15:23:21 4  go to school because their parents are only going to send them

15:23:25 5  to school if there is a mask mandate in place.  I think that's

15:23:34 6  different from saying can go to school or can't go to school.

15:23:37 7          MS. COBERLY:  So I'm not sure that that

15:23:39 8  characterization of the evidence is exactly right.  The

15:23:42 9  doctors -- we know why these children -- why M.P. is not in

15:23:48 10 school, for example.  We know that because there is no required

15:23:53 11 masking at all in the school.  And the doctor, the treating

15:23:59 12 physician, has said that that is too high risk an environment

15:24:03 13 for this child because this child is at enhanced risk.  And

15:24:09 14 based on the advice of the medical professionals, the parents

15:24:12 15 have kept the child home.

15:24:14 16         And, similarly, we have presented evidence that for

15:24:18 17 the other children, the ones in schools that do today have mask

15:24:22 18 mandates but have been threatened by the attorney general, the

15:24:27 19 medical professionals have said that is a situation that is too

15:24:33 20 dangerous for this child, and, therefore, the child is being

15:24:37 21 kept at home.

15:24:38 22         So we don't need -- at the moment the schools would

15:24:44 23 not -- I mean, we don't even have an issue yet about whether

15:24:48 24 the school would adopt just a classroom mask mandate, for

15:24:52 25 example.  I mean, we're talking about children who are -- many

15:24:55  1  of whom are in a special education setting.  There might be

15:24:59  2  more than one of these -- one child in need of accommodation

15:25:03  3  who are actually in the same classroom.

15:25:06  4          And so perhaps the reasonable accommodation under the

15:25:11  5  ADA would end up being a mask mandate for that particular

15:25:15  6  classroom if that is what the school believed was appropriate.

15:25:20  7          So that is something that is allowed and would be

15:25:22  8  allowed by -- you know, by an injunction.  That kind of

15:25:26  9  analysis would be allowed by an injunction entered by this

15:25:30  10  court.

15:25:31  11          But in terms of standing, we look at what are the

15:25:34  12  facts on the ground today.  And the facts on the ground today

15:25:36  13  are that these seven schools would have not just a mandate in

15:25:41  14  classrooms, but universal masking, but for GA-38.  And that's

15:25:48  15  enough for standing.  That gets us into court, and then we

15:25:53  16  debate about what is a violation of the ADA and what's a

15:25:58  17  violation of 504.

15:26:00  18          But the evidence we have that gets us into court to

15:26:04  19  make those arguments shows that these are children who are

15:26:08  20  either being kept from school or face a substantial risk of

15:26:14  21  being kept from school because GA-38 has gotten in the way of

15:26:19  22  mask mandates at that school.

15:26:21  23          THE COURT:  All right.

15:26:22  24          MS. COBERLY:  And the reason we're talking about what

15:26:27  25  evidence is there of what the districts would do but for GA-38

15:26:32   1   is in response to an argument that the plaintiffs -- or the

15:26:36   2   defendants, I'm sorry, are making.

15:26:41   3          In their brief -- in their trial brief, the defendant

15:26:46   4   said we don't know what the school districts would do but for

15:26:49   5   GA-38.  And that's a contingency, that's an uncertainty that

15:26:55   6   the plaintiffs have to show in order to satisfy standing.

15:26:59   7          My response to that is we know exactly what they

15:27:02   8   would do, because the evidence tells us.  And the evidence

15:27:06   9   tells us that, but for GA-38, these seven schools would have a

15:27:10   10  universal mask mandate.  And that's enough for standing and

15:27:14   11  gets us into court.

15:27:19   12         The plaintiffs have pointed to the *Glass v. Paxton*

15:27:23   13  case as a case that they think is important on the issue of

15:27:27   14  imminent injury.  And I want to talk about that for a second

15:27:30   15  because I think it -- it illustrates the -- the kind of error

15:27:35   16  in their approach to this issue.

15:27:37   17         *Glass v. Paxton* was a challenge to the enforcement of

15:27:42   18  statute that allowed concealed carry on college campuses.  And

15:27:47   19  a professor sued the attorney general and said that that

15:27:53   20  statute violated her First Amendment rights because she was

15:27:58   21  going to have to censor her own speech out of a fear that she

15:28:04   22  might say something that would incite a student to brandish a

15:28:09   23  gun and engage in violence in the classroom.  And so she was

15:28:13   24  suing over that infringement of her speech rights.  And the

15:28:17   25  court said there was no imminent injury.  That was just too

15:28:22  1  speculative.

15:28:22  2          And there's a pretty profound difference, I think,

15:28:26  3  between that case and ours.  There you were talking about a

15:28:29  4  plaintiff who was censoring herself out of a fear of illegal

15:28:33  5  activity by third parties.  Our plaintiffs are staying home out

15:28:42  6  of a fear of a real, tangible, medically proven enhanced risk

15:28:48  7  of COVID-19 that we have proven with evidence.

15:28:51  8          So the kind of uncertainty that was present in a case

15:28:55  9  like *Glass v. Paxton* or in a case like *Amnesty International* is

15:29:01  10  just not present here.  We have evidence and we have presented

15:29:04  11  evidence, medical evidence, that demonstrate a real risk to

15:29:08  12  these students, and that risk is why they are staying out of

15:29:14  13  school.  It's a risk on advice of their doctors, based on their

15:29:19  14  own specific enhanced risk of COVID-19.

15:29:22  15          It doesn't matter for these families.  They're not --

15:29:26  16  they're not making their decision just by looking at what the

15:29:28  17  State officials say on a given day about the positivity rate

15:29:34  18  that impacts the general population of students.  And that's

15:29:39  19  why the data from the defendants this morning is really beside

15:29:43  20  the point.  What's keeping these children out of school is a

15:29:48  21  choice their parents are making on the advice of their doctors,

15:29:52  22  based on their specific enhanced risk and the inability of the

15:29:56  23  school to require masks at all, even in the classrooms.

15:30:03  24          Now, what you -- what you see in the defendants'

15:30:08  25  briefs really kind of distorts what the injury is in our case.

15:30:14   1  The defendants have said that the plaintiffs need to prove that

15:30:17   2  there's a substantial risk that they will contract COVID-19.

15:30:23   3  And there are a whole series of contingencies that make that

15:30:27   4  speculative, according to the defendants.

15:30:29   5        But that's not the injury that underlies the claim in

15:30:32   6  our case.  We're not basing our claim of injury on the risk of

15:30:37   7  contracting COVID-19.  The injury in our case is the

15:30:42   8  deprivation of the legally-protected right to reasonable and

15:30:47   9  equal access to public education.  And that depravation is not

15:30:53  10  at all speculative.  We've proven it up with evidence, as

15:30:57  11  demonstrated by the exhibits you see on this slide and the one

15:31:01  12  I showed a moment ago.

15:31:02  13        It's also not the case that there's any problem about

15:31:12  14  redressability.  You heard evidence this morning from a

15:31:18  15  Fort Bend board member who put in a declaration who said, and I

15:31:22  16  quote:  If the attorney general stopped enforcing GA-38, or

15:31:28  17  there is an order barring enforcement of GA-38, the mask

15:31:33  18  requirement would immediately go back into effect.

15:31:36  19        So Fort Bend actually has a mask requirement today

15:31:41  20  but stopped enforcing it specifically because of the efforts of

15:31:45  21  the attorney general.  And, if those efforts changed, if the

15:31:49  22  attorney general stopped enforcing GA-38, the mask requirement

15:31:53  23  would go back into effect.  It's hard to imagine clearer

15:31:58  24  evidence of redressability.

15:32:00  25        There are also, as I noted, districts that have been

15:32:06  1  sued or that are being threatened with suit who are currently

15:32:13  2  facing the prospect of having to lift their mask mandates.  And

15:32:20  3  if this court were to enter an order enjoining attorney

15:32:24  4  general, those suits would end.  The attorney general would not

15:32:30  5  be able to pursue them, and the defendants would be able to

15:32:33  6  point to this Court's order in those cases.  And the risk that

15:32:41  7  those districts might have to lift their mask mandates would go

15:32:45  8  away.  That too shows redressability.

15:32:47  9        You heard this morning a reference to the idea that

15:32:58  10  there are other potential enforcers of this GA-38, that there

15:33:04  11  are other suits, including by parents.  And that is certainly

15:33:09  12  true.  But there's no requirements that the defendants are the

15:33:16  13  only potential enforcer of GA-38.

15:33:19  14        In fact, the evidence shows that it's the attorney

15:33:22  15  general's enforcement, the attorney general's specifically,

15:33:25  16  that matters most to these school districts.  Just looking at

15:33:29  17  the Fort Bend declaration itself shows that.

15:33:33  18        The attorney general also is the one that monitors

15:33:37  19  compliance on his website.  The attorney general has of course

15:33:41  20  statutory authority as the -- as the chief law officer of the

15:33:46  21  State to take action to enforce laws in the state.  And so --

15:33:54  22  and of course, as we know, the attorney general is actively

15:33:57  23  enforcing GA-38.

15:34:00  24        So the question isn't whether this suit would provide

15:34:03  25  complete relief, as Mr. Melsheimer noted this morning.  Even a

15:34:08  1  remedy that provides partial redress of the injuries would be

15:34:14  2  sufficient to meet the requirement in Article III of

15:34:17  3  redressability.  We have that.  We have enough to be in court.

15:34:21  4        Now, most of the defendants' arguments on standing

15:34:24  5  really turn on a number of rules -- formalistic rules that

15:34:29  6  would require this Court to ignore what is actually going on,

15:34:34  7  the facts that we've presented.  But there's no authority for

15:34:39  8  these kinds of rules.  Standing is a practical inquiry.  It

15:34:43  9  turns on the facts and whether the defendants are doing

15:34:46  10  something that is harming these plaintiffs.  And we've shown

15:34:50  11  that they are.

15:34:52  12        For example, the defendants have said that we need to

15:34:56  13  show a risk of enforcement against the plaintiffs personally.

15:35:01  14  They point out that none of the enforcement actions taken by

15:35:05  15  the attorney general or the commissioner at this point are

15:35:10  16  enforcement against those plaintiffs personally.  And that's

15:35:14  17  true, of course, because that's not our theory.

15:35:17  18        In the *Driehaus* case involving the Susan B. Anthony

15:35:21  19  List, the court looked for whether those plaintiffs would be

15:35:25  20  the subject of enforcement because that was their theory of

15:35:29  21  injury.  Their theory of injury was we might be the subject of

15:35:34  22  enforcement actions, and court looked at whether that was

15:35:38  23  sufficiently alleged.

15:35:39  24        But our theory is not that someone is going to sue

15:35:43  25  the student M.P. under GA-38.  Our theory is that the

15:35:48  1  enforcement of GA-38 against school districts has made it

15:35:53  2  impossible for M.P. to go to school and get the benefit of

15:36:03  3  public education.

15:36:04  4        There's also no requirement that the enforcement

15:36:06  5  power that the attorney general is exercising be found in the

15:36:09  6  four corners of GA-38 itself.  And this is where the defendants

15:36:14  7  are blurring some *Ex parte Young* cases with standing cases.

15:36:21  8        They claim that enforcement -- we're not suing the

15:36:28  9  right party unless we sue a party who is charged with

15:36:31  10  enforcement in the four corners of GA-38 itself.  But even in

15:36:38  11  the *Ex parte Young* cases, the Fifth Circuit has not imposed

15:36:40  12  that kind of a requirement when there is already active

15:36:43  13  enforcement going on.

15:36:48  14        The defendants are enforcing GA-38, and the question

15:36:51  15  is just whether that enforcement is causing injury.  It doesn't

15:36:54  16  matter where the defendants got the power they are using to

15:36:58  17  bring those enforcement actions.

15:37:01  18        There's also no requirement that the enforcement be

15:37:04  19  criminal as opposed to civil.  The defendants made that

15:37:07  20  argument because the Supreme Court noted it and declined to

15:37:13  21  decide it in the *Susan B. Anthony List* case, but that case

15:37:17  22  doesn't say that a threat of a civil suit can't confer

15:37:23  23  standing.  It just so happened that in that case there was a

15:37:27  24  criminal statute at issue.

15:37:28  25        And, anyway, again nobody is claiming that these

15:37:31  1   plaintiffs are going to be the subject of some kind of

15:37:36  2   enforcement action.  The claim is that the defendants are

15:37:39  3   harming these plaintiffs by enforcing GA-38 to change school

15:37:44  4   district's behavior, and that effort is successful today.

15:37:48  5   They're having -- their actions are having the desired effect.

15:37:52  6           There's also no need for us to sue the school

15:37:57  7   districts.  They're not the ones who are harming the

15:38:00  8   plaintiffs.  Our plaintiffs are all from districts that want to

15:38:05  9   be able to respond to the pandemic and require masks, if

15:38:10  10  appropriate.  We can't gain anything by suing them.  In fact,

15:38:15  11  I'm not even sure we would have a controversy between us if we

15:38:19  12  tried to sue these school districts.  It wouldn't be a case or

15:38:22  13  controversy because we agree.  It's the enforcement by the

15:38:25  14  defendants that is standing in the way of these plaintiffs

15:38:31  15  getting what they need.

15:38:34  16          So, with all of that in mind, we think the standing

15:38:36  17  question is pretty straightforward.  Do our plaintiffs have a

15:38:42  18  concrete and particularized injury that is fairly traceable and

15:38:46  19  redressable?  And the answer is yes.  They are unable to have

15:38:50  20  meaningful equal access to education.  The reason they are

15:38:56  21  unable to have that is because of GA-38, which has stopped

15:39:01  22  their school districts from doing what they would have done

15:39:04  23  otherwise, which is have a mask mandate.

15:39:09  24          And the evidence shows that if this court were to

15:39:11  25  order the defendants to stop enforcing GA-38, these schools

15:39:18  1   would create conditions that would make it possible for our

15:39:22  2   clients to go to school.  That is more than enough for

15:39:25  3   standing.  Thank you.

15:39:27  4          THE COURT:  Thank you.

15:39:27  5          Mr. Kercher?

15:39:47  6          MR. KERCHER:  Let's take the case of a child in a

15:39:50  7   wheelchair denied access to school by stairs.  The child cannot

15:40:00  8   get up the stairs.  The stairs are the impediment to the child

15:40:03  9   accessing the building.  Why?  Because the wheelchair cannot go

15:40:10  10  up the stairs.  That's not this case.

15:40:17  11          Here Plaintiffs are alleging that the impediment, the

15:40:21  12  source of their injury, is a lack of mask mandates resulting

15:40:27  13  from GA-38.  Why does a lack of mask mandates keep the child

15:40:35  14  out of the building?  Counsel just told you.  It's fear.  I

15:40:46  15  don't mean that in a derogatory way.  We're all afraid of

15:40:51  16  COVID, some of us more than others.  But it is the fear of that

15:40:57  17  injury that keeps the child out of the building.

15:41:02  18          GA-38 does not deny anybody access to the school.  It

15:41:10  19  is striking, Your Honor, that this late in the proceedings --

15:41:17  20  and in fairness, it's been an accelerated process -- that the

15:41:20  21  plaintiffs still have not meaningfully engaged with *Clapper V.*

15:41:23  22  *Amnesty International*.  It's a Supreme Court case that dealt

15:41:28  23  with the government listening in to certain U.S. persons

15:41:34  24  abroad.  It's a FISA court case.

15:41:41  25          The plaintiffs in that case said we have

15:41:43  1  communications with the types of folks who get listened to, and

15:41:56  2  so we're injured because, if those conversations get listened

15:42:00  3  to, we would be injured, and we have taken certain measures to

15:42:04  4  stop having those conversations.  *Amnesty International* rejects

15:42:11  5  that theory, which it called an objectively reasonable

15:42:29  6  likelihood theory, where the plaintiffs argued they had an

15:42:32  7  objectively reasonable likelihood, an objectively reasonable

15:42:36  8  fear, of injury.

15:42:40  9        But that does not constitute an injury for standing

15:42:44  10  purposes.  Nor was it sufficient to constitute an injury for

15:42:47  11  standing purposes that these plaintiffs had taken measures not

15:42:54  12  to have these conversations, not to travel abroad to see the

15:42:58  13  folks with whom they would have otherwise had these

15:43:00  14  communications.

15:43:05  15        The fear of entering the building is not an injury

15:43:09  16  for purposes of standing, even if it is a reasonable fear.

15:43:15  17  That's why *Glass v. Paxton* does apply to this case.  There was

15:43:20  18  no certainty when that professor walked into the classroom

15:43:25  19  that, even if a student were carrying a concealed weapon and

15:43:28  20  did not like what she had to say, that violence would erupt.

15:43:32  21  That was not a sufficient injury for standing purposes.  Nor

15:43:36  22  was it a sufficient injury for standing purposes that that

15:43:40  23  professor, Professor Glass, had taken measures to chill her own

15:43:49  24  speech, that she said less, she made fewer statements.  She

15:43:52  25  talked about fewer things for fear that if she talked about a

15:43:57  1  broader range of things, an injury would occur.  The Fifth

15:44:00  2  Circuit, applying the same approach adopted by *Amnesty*

15:44:04  3  *International*, rejected that approach.  That's not good enough.

15:44:07  4      The plaintiffs would have the Court believe that this

15:44:15  5  is a case where they have proven that their fear is sufficient

15:44:19  6  to give rise to a -- to a cognizable injury for standing

15:44:25  7  purposes because they say they have shown that there is an

15:44:28  8  increased risk of harm.

15:44:29  9      But as *Shrimpers & Fishermen of RGV* makes clear, a

15:44:37  10  Fifth Circuit case, courts are weary about granting standing in

15:44:41  11  increased risk of harm cases.  They apply mostly in the

15:44:47  12  environmental tort context.  And even there the Fifth Circuit

15:44:51  13  said in *Shrimpers* that the plaintiffs must be able to quantify

15:44:57  14  the increased risk of harm.

15:45:02  15      Plaintiffs have not met that standard.  It's true

15:45:05  16  they brought you a bunch of articles and they brought you

15:45:09  17  experts and they brought you doctors that talk about the

15:45:15  18  efficacy of masks, that talk about an increased danger for some

15:45:19  19  children with some disabilities.  What they don't do is

15:45:23  20  quantify what that increase is.  And *Shrimpers* says that's what

15:45:29  21  you have to do in order to prove increased risk of harm.

15:45:38  22  That's not here in this case, Your Honor.

15:45:41  23      And it's important to remember that because the

15:45:42  24  Plaintiffs are asking for equitable relief, the standard that

15:45:46  25  they must show is that their harm is certainly impending.

15:45:56  1  That's not this case.  The plaintiffs cannot show that if they

15:45:58  2  walk into school, they will get sick.

15:46:02  3      Mr. Melsheimer said in his remarks at the beginning

15:46:05  4  of the day that the plaintiff is injured if they go to school,

15:46:09  5  and the plaintiff is injured if they stay home.  It is true

15:46:20  6  that there is good evidence to suggest that learning remotely

15:46:22  7  is not as good as learning in person.  That is a problem many

15:46:25  8  children face.  It is not the case that the plaintiffs can show

15:46:28  9  that, if they go to school, they will be harmed.

15:46:32  10      It is not even the case, Your Honor, that they --

15:46:35  11  that the plaintiffs could show that if a mask mandate were in

15:46:38  12  place, they could go to school and not be harmed.  And we know

15:46:43  13  that that's true, Your Honor, not merely as a matter of

15:46:47  14  conjecture or common sense, but because that's what the

15:46:50  15  individualized data at the school and ISD level in this case

15:46:54  16  show, that the schools and ISDs in this case that have mask

15:46:58  17  mandates in place do not have appreciably lower COVID-positive

15:47:02  18  rates than those schools and ISDs that do have mask mandates in

15:47:07  19  place.  The numbers are nearly identical.

15:47:27  20      When it come to redressability, the plaintiffs

15:47:31  21  suggest that all they need happen is that a mask mandate be put

15:47:35  22  in place.  First of all, I would point out, Your Honor, that

15:47:39  23  that goes back to some of your earlier questions about what it

15:47:42  24  is exactly that they're asking for.  Because, if they don't get

15:47:46  25  that, where are they?  How are they much improved?

15:47:49  1         Second of all, just because an elected official has

15:47:57  2   submitted an affidavit saying or a declaration saying that if

15:48:00  3   GA-38 goes away or becomes unenforceable by order of this Court

15:48:05  4   then there will be a mask mandate in place doesn't mean that

15:48:07  5   they will enforce it.  It doesn't mean that the students, or

15:48:12  6   teachers or faculty or staff will follow it.  And,

15:48:14  7   unfortunately, we know, Your Honor, that this is a hotly

15:48:15  8   contested issue and we see that people's decision making on

15:48:18  9   this issue is, at a minimum, diverse.

15:48:23  10         Amnesty International says that the Supreme Court has

15:48:26  11   been hesitant to grant standing that turned on the decisions of

15:48:31  12   third parties not before the court.  Simply because there may

15:48:37  13   be a mask mandate in place doesn't mean that children will be

15:48:40  14   universally masked, and they can't show that.

15:48:59  15         When it comes to the enforcement connection,

15:49:01  16   Your Honor, we spoke about this briefly earlier.  And it's not

15:49:07  17   that the defendants are conflating the sovereign immunity

15:49:15  18   standard and the standing standard.  It's that those analyses

15:49:18  19   overlap.  That's been recognized in several Fifth Circuit

15:49:24  20   courts, not the least of which *Air Evac*, a case cited I think

15:49:29  21   at least once by both parties.  When evaluating whether or not

15:49:33  22   a government official may be sued for purposes of standing, we

15:49:38  23   look at cases like *Fitts v. McGhee*, cases like *Ex parte Young*,

15:49:45  24   and the like to evaluate whether or not they have a sufficient

15:49:50  25   and particularized enforcement connection to the statute at

15:49:53  1  issue, which are the challenged provisions.

15:49:56  2       That's not true in this case, and here's how we know

15:49:59  3  that.  It's true that the attorney general has filed lawsuits

15:50:06  4  and sent out letters threatening legal action.  That's true.

15:50:10  5  Where does that authority come from?  It is not unique to the

15:50:19  6  attorney general by virtue of his position or because of some

15:50:22  7  statute granting him power.  It is the same kind of lawsuit

15:50:25  8  that citizens, parents, can and are bringing.

15:50:29  9       That has two ramifications.  First it shows that

15:50:37  10  General Paxton does not have a specific and particularized

15:50:41  11  connection to the statute at issue.  It's not the case that if

15:50:42  12  he is enforcing them, we don't have to worry about how that's

15:50:45  13  happening.  Of course that's the case.  That goes directly to

15:50:49  14  redressability, because if you enjoin General Paxton from

15:50:52  15  filing lawsuits under an *ultra vires* theory in state court that

15:50:57  16  enjoins no one else who can bring that same kind of lawsuit,

15:51:05  17  what good have we done and why have we done it for --

15:51:06  18       THE COURT:  So your argument is, and it comes back to

15:51:09  19  what I long felt, no matter how those plaintiffs are situated,

15:51:14  20  no matter how any plaintiff anywhere in the state is situated

15:51:21  21  there's nobody they can sue, there's no way they can get GA-38

15:51:34  22  tested for its legality.

15:51:36  23       MR. KERCHER:  No.  That's not my argument.

15:51:39  24       THE COURT:  Who do they sue?

15:51:39  25       MR. KERCHER:  Assuming they can sue, right, because

15:51:40  1  that question comes in *in medias res*.  It seems to assume they

15:51:43  2  are in fact injured, understanding that's where it starts.

15:51:46  3       THE COURT:  No.  I understand they may not.  Presume

15:51:50  4  that they have standing, who do they sue?

15:51:54  5       MR. KERCHER:  It depends on what they want.  It

15:51:57  6  depends on the relief that they are asking for.  If what

15:51:59  7  they're really asking for, Your Honor, is relief under the ADA

15:52:03  8  so that they can go through the process -- the interactive

15:52:09  9  process so they can see about getting an accommodation, then

15:52:11  10 the proper party to sue is the ISD.  And if the ISD throws up

15:52:16  11 its hands and says, Hey, the only reason we're not doing this

15:52:19  12 is because of GA-38, then the proper procedural remedy for that

15:52:23  13 is for the attorney general to intervene and to defend the

15:52:26  14 statute.  And that's it.

15:52:27  15      THE COURT:  Suppose the attorney general chooses not

15:52:29  16 to intervene?  What I think the State builds up is an elaborate

15:52:42  17 house to avoid people gaining access to the courts.

15:52:48  18      MR. KERCHER:  In fairness, Your Honor, the State is

15:52:50  19 not building anything up.  What we talked about in our phone

15:52:53  20 call yesterday, the Court expressed some frustration --

15:52:55  21      THE COURT:  Yeah.

15:52:56  22      MR. KERCHER:  -- in hearing from my office on

15:52:58  23 important cases like this.  And you said it seemed to be the

15:53:03  24 established policy of the attorney general to say that the

15:53:06  25 State could never be sued.

| | | |
|---|---|---|
| 15:53:07 | 1 | THE COURT:  Yes. |
| 15:53:08 | 2 | MR. KERCHER:  That's not right.  It's not an |
| 15:53:11 | 3 | established policy.  When the AG appears in court on behalf of |
| 15:53:16 | 4 | the State of Texas or its officers or its agencies, the State |
| 15:53:20 | 5 | of Texas is relying on the law.  We don't just get to walk in |
| 15:53:27 | 6 | here and say "You can't sue us."  If we say you can't sue us, |
| 15:53:31 | 7 | it's because the law says we can't be sued.  It is true, |
| 15:53:36 | 8 | Your Honor, that sometimes that creates some thorny problems |
| 15:53:40 | 9 | for purposes of redressability. |
| 15:53:41 | 10 | And even *Ex parte Young* lamented in, what, 1907 it |
| 15:53:46 | 11 | sure would be handy if the law in this country was simply that |
| 15:53:50 | 12 | somebody could just sue the governor whenever they didn't like |
| 15:53:53 | 13 | the law. |
| 15:53:53 | 14 | THE COURT:  No.  I don't think it's that complex.  I |
| 15:54:03 | 15 | just find it amazing that the position is that the plaintiffs |
| 15:54:04 | 16 | have to choose someone else to sue other than the person that |
| 15:54:08 | 17 | is enforcing the document, GA-38, that is creating the alleged |
| 15:54:15 | 18 | harm. |
| 15:54:24 | 19 | MR. KERCHER:  Let's carry that one step further, |
| 15:54:27 | 20 | Your Honor.  Could plaintiff -- let's say that one of the |
| 15:54:31 | 21 | participants who has brought a lawsuit against the ISD |
| 15:54:34 | 22 | insisting that the ISD comply with GA-38, are we saying that |
| 15:54:40 | 23 | the plaintiffs could sue those parents for the injury of |
| 15:54:43 | 24 | bringing a lawsuit in state court, because that's where that -- |
| 15:54:48 | 25 | that's the outcome of that. |

```
15:54:49   1              THE COURT:  No.  I disagree with you.  You are
15:54:52   2   positing that the plaintiffs engage in a futile act of suing a
15:54:58   3   school district that believes the way they believe -- maybe
15:55:04   4   it's one of these districts that's being sued by the attorney
15:55:07   5   general that's not enforcing -- I mean, that's enforcing what
15:55:11   6   the school district did -- and they have to sue someone who
15:55:15   7   agrees with the way they agree and then hope the attorney
15:55:20   8   general is going to come in to defend the statute, and that's
15:55:25   9   the way they get their day in court.
15:55:27  10              And I just find that -- and it may be the law, but I
15:55:35  11   find it just remarkable that you can't sue the entity that is
15:55:41  12   enforcing the law that you find repugnant.  It doesn't mean
15:55:48  13   you're going to win.  It just means, who do we sue and how do
15:55:53  14   we get in court?
15:55:54  15              MR. KERCHER:  Two points on that, Your Honor.  First,
15:55:57  16   what we're suggesting, though, in context is that a federal
15:56:02  17   court tell the attorney general for a sovereign state:  You
15:56:08  18   cannot bring *ultra vires* lawsuits in this -- in this case.
15:56:13  19   It's different than just saying, hey, this law is no good and
15:56:17  20   so you cannot enforce the law.  What you would have to --
15:56:20  21   because the attorney general is not enforcing because of the
15:56:24  22   law.  He's bringing *ultra vires* causes of action.
15:56:29  23              The other thing is, Your Honor, if -- well, let's
15:56:35  24   see.  In order to finish my original answer, if what the
15:56:39  25   plaintiffs really want is to -- is to ensure that GA-38 is not
```

15:56:47   1  being enforced, then they could sue the district attorney,

15:56:51   2  right?  And if the district attorney is not enforcing it, then

15:56:56   3  what suit would they have to bring?  There's a real problem --

15:57:00   4       THE COURT:  But the attorney general is enforcing it.

15:57:04   5  That's not theoretical.

15:57:07   6       MR. KERCHER:  No.  But that doesn't mean that what

15:57:09   7  will happen if that stops isn't theoretical, at least in part

15:57:13   8  because we know in places where the attorney general has not

15:57:16   9  filed suit, there are parents who have.  And so in order for

15:57:19   10 the plaintiffs to get what they want, that turns on the

15:57:21   11 decision making of parties who are not before the court,

15:57:23   12 parties who cannot be before the court.

15:57:25   13      It's also important to note, you know, in *Amnesty*

15:57:28   14 *International* the court noted that it's improper -- it would be

15:57:31   15 improper to find standing just because the plaintiffs might

15:57:37   16 otherwise be left without redress.

15:57:43   17      Not all problems, Your Honor, have a solution in a

15:57:45   18 court of law.  And, as the court noted at the beginning of this

15:57:51   19 hearing and the end of the last hearing at the TRO, there are

15:57:54   20 real policy issues in this case.  And it may be the case,

15:57:57   21 Your Honor, that the answer to the plaintiffs' problem is not a

15:58:00   22 judicial one, it's not a court order, but it is a political

15:58:04   23 answer.  And this Court cannot grant that kind of relief, as

15:58:08   24 you well know.

15:58:09   25      THE COURT:  Well, if it were a political answer, it

15:58:12  1  would be just the attack on the policy of whether or not it

15:58:16  2  makes good sense for the governor to have issued GA-38 in the

15:58:24  3  terms it is.  The issue here is not there.  The issue here is

15:58:34  4  whether or not GA-38 is violative of existent federal law.

15:58:43  5          MR. KERCHER:  And for the reasons that we've

15:58:44  6  discussed, Your Honor, GA-38 does not violate federal law.  It

15:58:49  7  does not exclude these students from their school.

15:58:53  8          THE COURT:  I know.  And that's the issue I would

15:58:55  9  like to get to.  But I don't get to get to that issue anytime

15:58:59  10  soon because the State's major argument is there's nobody out

15:59:04  11  there that can sue to do that.

15:59:08  12          MR. KERCHER:  I'm sorry.  I didn't follow that,

15:59:09  13  Your Honor.

15:59:10  14          THE COURT:  Well, I can't decide whether you're right

15:59:12  15  or wrong on whether GA-38 violates the ADA or 504 until I

15:59:19  16  determine whether these plaintiffs can bring an action to test

15:59:23  17  that.

15:59:23  18          MR. KERCHER:  Well, but in determining whether these

15:59:25  19  plaintiffs can bring an action to test that, we do have to

15:59:28  20  evaluate whether or not GA-38 is keeping these students out of

15:59:32  21  school, because that goes to the traceability argument.  That's

15:59:35  22  the traceability portion of standing.  They have to prove an

15:59:39  23  injury that is fairly traceable to the challenged provision.

15:59:42  24          THE COURT:  Well.  They say --

15:59:44  25          MR. KERCHER:  And they cannot show.

15:59:45  1          THE COURT:  Well, they say they have shown that with

15:59:48  2  these particular plaintiffs.

15:59:49  3          MR. KERCHER:  And you may remember the beginning of

15:59:52  4  my remarks I said they haven't.

15:59:54  5          THE COURT:  I understand.

15:59:55  6          MR. KERCHER:  And the reason that they haven't,

15:59:56  7  Your Honor, is because they are really bringing an increased

15:59:59  8  risk of harm injury.  They're saying it's because it's more

16:00:02  9  dangerous.  And if you listen closely to the remarks from

16:00:05  10  opposing counsel -- I'm not trying to do a "gotcha"; we've all

16:00:09  11  said a lot of words today -- but it's not an accident that we

16:00:10  12  have talked about the plaintiffs' plight in terms of their fear

16:00:14  13  of what's going on in that building and in terms of the choices

16:00:17  14  that they have made, right?  If they are making those

16:00:22  15  choices --

16:00:23  16          THE COURT:  Let me tell you, I'm very familiar with

16:00:26  17  the *Glass* case, of course, because it originated in this court.

16:00:30  18  I see a large difference between what somebody may have in

16:00:38  19  their mind which causes them to perhaps be a danger to a

16:00:47  20  teacher in a classrooms, as was presented in *Glass*, and a known

16:00:52  21  pandemic that is killing people randomly throughout the

16:00:55  22  country, whether they're children or whether they're not

16:00:58  23  children.  And I think this makes this case much different.

16:01:02  24          You know, we really haven't a pandemic case since

16:01:08  25  *Jacobson*.  You know, this is a pandemic case.  And I don't find

| | |
|---|---|
| 16:01:12 | 1 |
| 16:01:16 | 2 |

1  it easy to apply analogies to it, as I've said several times

2  today.

3          MR. KERCHER:  And I think one of the best analogies,

4  Your Honor, is an environmental tort case, where there's poison

5  in the ground.  And that's what the *Shrimpers & Fishermen of*

6  *RGV* case is about.  In that case we know that where there is a

7  known toxin, which is certainly analogous, Your Honor, to a

8  virus out there in the air.  But there are particularized

9  standards in order to show standing.  That's an increased risk

10  of harm standard.  *Amnesty International* says there is no

11  probabilistic standing if it's an increased risk of harm case,

12  which this one appears to be.

13          And you're right, those don't come along very often.

14  But, if they come along, it's not enough for a doctor to say

15  this person is at a higher risk.  That has to be quantified.

16  And that's part of the problems the Court noted with the

17  evidence that the plaintiffs have brought in this case, writ

18  large.  They have a lot of broad evidence.  But for all the

19  experts that they've hired in this case, they haven't had the

20  experts provide the Court with particularized data.

21          Those experts did not look at the ISD data.  Those

22  experts did not look at the particular school data.  Those

23  experts -- even the treating physicians for the individualized

24  plaintiffs did not tell the Court this person has this much

25  more probability of getting sick because of their disability.

16:02:40  1   And that's the standard under *Shrimpers & Fishermen of RGB*.

16:02:46  2          It is hard, and it is unusual.  But the -- there are

16:02:50  3   cases that give us guidance here, and they haven't responded to

16:02:53  4   the *Shrimpers* or to the *Amnesty International* case.  And the

16:02:59  5   *Amnesty International* case makes very clear that there are

16:03:02  6   really two kinds of harm where what's going on is you're afraid

16:03:07  7   of what's going to happen.  Either you're saying that it will

16:03:12  8   happen for sure, and that's not good enough, or you're saying

16:03:16  9   the measures I'm taking to avoid it are an injury for standing.

16:03:21  10          And *Amnesty International* says the measures I'm

16:03:24  11  taking to avoid a perceived or feared injury is not sufficient

16:03:29  12  for standing, at least in part because of the redressability

16:03:31  13  problem.  That comes from the person's choice.

16:03:48  14          And, Your Honor, as we have been talking about the

16:03:50  15  increased risk of harm injury, I think that goes back to a

16:03:52  16  question you asked Ms. Gifford earlier about how many slices of

16:04:01  17  cheese could be removed.  Some of that will depend upon the

16:04:05  18  individualized proof in order to show standing, how many pieces

16:04:07  19  of cheese could be removed in order to show a sufficiently

16:04:10  20  increased risk of harm.  That's going to be necessarily a

16:04:13  21  case-by-case basis in which the plaintiffs in each case will be

16:04:17  22  required to quantify the increase in risk.

16:04:30  23          Did that address your questions, Your Honor?

16:04:32  24          THE COURT:  Yes, you've addressed them.

16:04:43  25          MS. COBERLY:  Your Honor, counsel discussed earlier

| | |
|---|---|
| 16:04:47 | 1 |

this premise that we haven't shown GA-38 is the thing --

THE COURT:  Well, what I would like to hear right now is I would like you to specifically address the *Shrimpers* case and *Amnesty International* and the arguments that the defendants make as to why those cases effectively run the table here.

MS. COBERLY:  Absolutely.  So the *Shrimpers* case is a case about generalized injury, and it was, as counsel noted, about a toxic substance.  And the court did not require that the plaintiffs quantify the additional risk.  The word "quantify" doesn't appear in the opinion.

What the court said was, "Assuming petitioners' members did identify specific risks" -- and I'm quoting -- "there is no evidence of the extent to which those risks would be increased for those members by the expected emissions."

So the issue there was there was a generalized risk to the general population of harm from these emissions, and the question was whether these plaintiffs had alleged a particularized harm, one that was different from what the general population would experience.

And the court concluded that the petitioners had not presented any evidence that they in particular suffered a greater risk.  And to quote the decision, "Without actual evidence from the petitioners, we will not wade into the morass empirical questions."  Later, "Petitioners' claims to standing fail because they rest on mere allegations rather than concrete

16:06:33  1  evidence."

16:06:34  2       We have presented concrete evidence, Your Honor.  We

16:06:39  3  have presented extensive expert evidence about the increased

16:06:43  4  risk that these particular students face of getting COVID-19.

16:06:52  5  We've also presented evidence that their treating physicians

16:06:56  6  have discussed with their parents that the risk of COVID-19 to

16:07:01  7  these particular students -- not the general risk to the

16:07:05  8  general population, not the positivity rates in the classroom,

16:07:08  9  but the risk to these students -- is unacceptably high for them

16:07:16  10  to be in close proximity with other children without those

16:07:18  11  children wearing masks.  And that's why the *Shrimpers* case

16:07:22  12  doesn't apply.  All it does is require evidence.  We have

16:07:25  13  presented that evidence.

16:07:28  14       On *Amnesty International* that was, as counsel noted,

16:07:32  15  a FISA case.  And the claim was that certain U.S. citizens who

16:07:37  16  couldn't directly be the subject of surveillance were going to

16:07:42  17  end up with their conversations surveilled because they had

16:07:46  18  conversations with other people whom FISA might decide to

16:07:50  19  surveil.

16:07:51  20       There were several layers of speculation involved in

16:07:55  21  that claim.  So the idea was "I'm afraid of speaking because

16:08:01  22  it's possible that the person I'm speaking with might be the

16:08:05  23  subject of surveillance by the government."  And, of course,

16:08:09  24  there was no evidence presented in that case that it was likely

16:08:16  25  that these particular conversations were -- were going to be

16:08:20  1  surveilled.  It was no more likely that their conversations

16:08:23  2  were going to be surveilled than someone else's conversations.

16:08:27  3       Again, we have presented concrete evidence showing

16:08:31  4  that these plaintiffs are at an increased risk of contracting

16:08:38  5  COVID-19 and of suffering much more severe injury.

16:08:44  6       So, once again, the issue in *Amnesty* was there's

16:08:51  7  speculation, not evidence.  We have presented that evidence.

16:09:01  8  So to go to the -- to the factual question, the traceability

16:09:04  9  question that counsel started his remarks with, he suggested we

16:09:09  10 haven't shown that the injury suffered by these plaintiffs,

16:09:15  11 their inability to attend school, was caused by GA-38.

16:09:24  12      And the analogy he used was to a case involving

16:09:26  13 ramps.  Suppose you have a child in a wheelchair, there are

16:09:30  14 steps, the child can't go in, and the cause for him being

16:09:33  15 excluded from school is the stairs.

16:09:35  16      Well, suppose now that the school put in ramps

16:09:39  17 because ramps would be a reasonable accommodation.  Ramps would

16:09:44  18 protect that student, and the ramp would be what allows the

16:09:47  19 child to get into the school.  Now suppose the governor issued

16:09:51  20 an executive order saying no ramps.  That executive order would

16:09:57  21 be the very thing that would stop that child from coming into

16:10:01  22 school, and that's what we have here.

16:10:03  23      Take again the case of M.P.  M.P. attends school in

16:10:09  24 Fort Bend School District.  The Fort Bend School District

16:10:13  25 adopted a mask mandate.  That mask mandate created a level of

16:10:20   1   risk for M.P. that was acceptable for M.P. to attend school in

16:10:26   2   this current school year and for M.P.'s parents to make the

16:10:30   3   difficult decision to send their child to school knowing that

16:10:33   4   virtual school was not sufficient for her needs.

16:10:38   5          Fort Bend had that mask mandate but stopped enforcing

16:10:44   6   it in August of this year specifically because the attorney

16:10:48   7   general was enforcing GA-38.  That's the proof.  That's the

16:10:54   8   link that connects the dots directly from GA-38 to the attorney

16:11:00   9   general's enforcement to M.P. not being able to attend school

16:11:05  10   today.

16:11:08  11          If that is not standing, if that doesn't even enable

16:11:11  12   us to get into court to talk about the legality of GA-38, then

16:11:19  13   there would never be standing.  There would never be an ability

16:11:21  14   to come to court to challenge it.  And that does seem to be, as

16:11:26  15   the Court has noted, what the attorney general's goal is.

16:11:33  16          Their position again and again in this case is that

16:11:37  17   no one can be sued.  They've said, well, the parents can

16:11:40  18   enforce.  District attorneys maybe can enforce.  And the

16:11:46  19   argument doesn't seem to be, and so those parties are necessary

16:11:50  20   parties, so bring them into this case.  Their argument is the

16:11:53  21   parents can enforce so you can't sue anyone over this law.

16:11:58  22          That can't be the way the law works in federal court.

16:12:02  23   That can't be what Article III requires.  This executive order

16:12:10  24   may not specifically charge the attorney general in its actual

16:12:13  25   language with responsibility, but there's no doubt that the

16:12:17    1    attorney general does have the power to enforce and is actually

16:12:21    2    enforcing.

16:12:24    3              And I'd like to read for a moment from the deposition

16:12:26    4    of Mr. Kinghorn in the Office of the Attorney General.

16:12:35    5              Page 18 of the deposition.

16:12:43    6              "Question:  So I was just saying, as part of the

16:12:46    7    office of attorney general's duties, does that include seeking

16:12:50    8    injunctions to compel local officials to comply with state law?

16:12:57    9              "Answer:  It can sometimes extend to that, yes."

16:13:03   10              Then again on page 19:

16:13:06   11              "Question:  Okay.  And so you said sometimes.  Is

16:13:09   12    this an example of when the attorney general authority includes

16:13:15   13    seeking an injunction to get a declaration and enjoin what it

16:13:19   14    considers *ultra vires* acts?

16:13:22   15              "Answer:  Yes.

16:13:26   16              "Question:  And under the Texas Constitution, is it

16:13:30   17    the attorney general's responsibility to represent the State in

16:13:35   18    these actions?

16:13:36   19              "Answer:  Well, the Texas Constitution vests the

16:13:40   20    attorney general with broad authority to act on behalf of the

16:13:44   21    State.

16:13:55   22              "Question:  And then -- but it's within the attorney

16:13:57   23    general's, you know, general authority to enforce state law in

16:14:00   24    this manner, correct?

16:14:04   25              "Answer:  So 'in this manner,' you're referring to

16:14:06  1  what exactly?

16:14:07  2      "Question:  By seeking an injunction to prevent and

16:14:10  3  get a declaration that an act by a local official is invalid or

16:14:16  4  unlawful.

16:14:17  5      "Answer:  Yes.  I would agree to that."

16:14:24  6      MS. COBERLY:  The evidence shows, the law shows, and

16:14:26  7  the behavior of the attorney general shows that the attorney

16:14:30  8  general has the power to enforce GA-38.  The attorney general's

16:14:34  9  enforcement of GA-38 is what has kept M.P. home from school

16:14:41  10  this year.  There has to be a way for these plaintiffs to bring

16:14:47  11  a challenge in federal court.

16:14:52  12      Counsel asked, is this Court really -- a federal

16:14:54  13  court really going to enter an order against the Attorney

16:14:58  14  General of Texas to preclude him from bringing an *ultra vires*

16:15:03  15  action based on this law?  And the answer is yes, if that law

16:15:09  16  violates federal law, and we've made the case that it does.  So

16:15:12  17  that is exactly what we're asking for the Court to do, and that

16:15:18  18  is exactly what *Ex parte Young* permits this Court to do.

16:15:21  19      Thank you.

16:15:25  20      THE COURT:  All right.  Mr. Kercher, what are we down

16:15:27  21  to?  Sovereign immunity?

16:15:29  22      MR. KERCHER:  I think that's right, Your Honor.  And

16:15:31  23  I think the sovereign immunity arguments have largely been

16:15:35  24  covered in terms of the enforcement issue.  That's mostly the

16:15:39  25  way we've briefed them.  I'm not particularly interested in

| | |
|---|---|
| 16:15:41 | 1 |
| 16:15:44 | 2 |

filling that vacuum at this point.  I think we're

comfortable --

            THE COURT:  We've got at least 45 minutes.

            MR. KERCHER:  Well, if you want me to go, Judge.  Be

careful what you wish for.

            THE COURT:  No.  I'm playing with you here.

            MR. KERCHER:  Judge, I would respond to my learned

colleague and would commend opposing counsel.  They've

obviously done an excellent job today.  But I would respond to

her closing remarks regarding it cannot be the case that

there's no standing.

            I'll read from *Amnesty International*.  This is at

*U.S. Reporter* page 420.

            Quote, the assumption that --

            THE COURT:  There are a lot of volumes in the *U.S.*

*Reporter*.

            MR. KERCHER:  Well, but only one in which this case

appears.

            THE COURT:  I know, but what volume is that to go

with your page citation.

            MR. KERCHER:  It's 568 U.S. 398 at 420.

            It says:  "The assumption that if Respondents have no

standing to sue, no one would have standing, is not a reason to

find standing."

            And then there is a string cite, including to *Valley*

| | | |
|---|---|---|
| 16:16:52 | 1 | *Forge Christian College*, *Schlesinger*, *Richardson*, and *Raines*. |
| 16:16:57 | 2 | It's a complicated problem to be sure, not one solved |
| 16:17:01 | 3 | with platitudes rejected by the Supreme Court. |
| 16:17:10 | 4 | THE COURT:  Anything further from the plaintiffs? |
| 16:17:15 | 5 | MR. MELSHEIMER:  Briefly, Your Honor. |
| 16:17:23 | 6 | THE COURT:  Trying to quantify this, Mr. Melsheimer. |
| 16:17:26 | 7 | We've gone from ten minute to two minutes to now briefly.  Is |
| 16:17:30 | 8 | briefly less or greater? |
| 16:17:32 | 9 | MR. MELSHEIMER:  It's probably a little greater. |
| 16:17:34 | 10 | Your Honor, I should never say that in a district that once was |
| 16:17:38 | 11 | the home of the Honorable Lucius Bunton, who as you know would |
| 16:17:42 | 12 | take a pretty strong view of "I have one more question" or "I |
| 16:17:46 | 13 | have a few more questions." |
| 16:17:47 | 14 | THE COURT:  I'll assure you, though, that I do not |
| 16:17:49 | 15 | have a water pistol at the bench.  And, if I did, it would have |
| 16:17:53 | 16 | to be a very strong one so I could shoot over the clerks here |
| 16:17:57 | 17 | in front of me to reach the lawyers. |
| 16:17:59 | 18 | MR. MELSHEIMER:  I had that brandished against me, |
| 16:18:03 | 19 | Your Honor.  It was never actually fired. |
| 16:18:05 | 20 | THE COURT:  I was shot by it in front of a jury, I |
| 16:18:08 | 21 | will tell you. |
| 16:18:11 | 22 | MR. MELSHEIMER:  That was even before the open carry |
| 16:18:13 | 23 | laws, Your Honor. |
| 16:18:15 | 24 | Your Honor, we just want to end a couple of things, |
| 16:18:18 | 25 | first thanking the Court for its time.  I know your time is |

16:18:22  1  extremely valuable and limited and you have many demands on it,

16:18:26  2  and I appreciate you giving time to what I think everyone

16:18:30  3  agrees is an important case.

16:18:33  4  I just wanted to end by talking about the relief,

16:18:36  5  because I think it is part of our proof to argue why we need an

16:18:41  6  injunction and what we're asking for.  And we're asking for an

16:18:45  7  injunction to enjoin the defendants and their agents from

16:18:48  8  enforcing or giving any effect to the provisions of GA-38 and

16:18:53  9  prohibiting public schools or school districts from requiring

16:18:56  10  masks for their students.

16:18:57  11  That's it.  It's not an affirmative injunction.  It's

16:19:01  12  an injunction restraining them.  And I'll note that it's the

16:19:05  13  same kind of injunction that was issued in multiple cases that

16:19:09  14  come -- that precede you, the Iowa case, the South Carolina

16:19:14  15  case.  There was a suggestion made that there were other

16:19:17  16  parties in those cases, and that's certainly true, that there

16:19:20  17  were other parties.  But it is also true that in all of those

16:19:24  18  cases, save the DeSantis, so in five of the six cases where the

16:19:29  19  relief was granted, there was an injunction ordering or

16:19:32  20  prohibiting the effect of an anti-masking mandate or something

16:19:38  21  similar to that.

16:19:39  22  We believe that, as the Court must consider the

16:19:42  23  balance of harm, that the equities at issue and the public

16:19:47  24  interest weighs in favor of granting the injunction in this

16:19:51  25  case, after a full trial where both sides have been allowed to

16:19:55   1   present evidence.

16:19:57   2          The plaintiffs here, without a continued injunction,

16:20:00   3   face continued irreparable harm.  We've had some debate about

16:20:04   4   the quantification, Your Honor, but there's simply no doubt

16:20:07   5   that the plaintiffs' medical condition place them at an

16:20:10   6   increased risk of either getting COVID or experiencing severe

16:20:14   7   symptoms.

16:20:16   8          They didn't challenge that.  They didn't say, well,

16:20:18   9   that's exaggerated or here's some doctor that says otherwise.

16:20:21   10  We didn't put in evidence that said it was four times or ten

16:20:24   11  times or eight times, that's true.  We didn't have to do that

16:20:27   12  under the case law.  But it's plain that it's uncontradicted

16:20:31   13  that the risk is greater.

16:20:34   14         It's certainly true that Plaintiffs have lost and

16:20:36   15  will continue to lose the opportunity to attend and have

16:20:39   16  meaningful access to public school in person without an

16:20:42   17  injunction, because then without the injunction, Your Honor,

16:20:44   18  they're faced with this -- this choice of going to school where

16:20:48   19  there's risk to them, that's unique to them, and that's

16:20:52   20  depriving them of the benefits of their -- of their access to

16:20:58   21  education.  Or they have to stay at home where they are

16:21:01   22  suffering from sub -- from virtual learning that is simply not

16:21:08   23  as effective as in-person learning.  And there's been no -- no

16:21:12   24  dispute about that.

16:21:15   25         The courts presume that a violation of a civil rights

16:21:17   1   statute like the ADA is irreparable harm.  It's in the public

16:21:22   2   interest to do this, Your Honor.  There's no hardship to the

16:21:24   3   defendants.  Certainly sometimes the court has to look at the

16:21:29   4   hardship to the other side of a case, especially in a business

16:21:33   5   where you're maybe enjoining in a trade secret case or an

16:21:37   6   employment case where maybe the business is going to be harmed

16:21:39   7   in some way.

16:21:41   8        Complying with federal law is not a hardship to the

16:21:47   9   defendants.  They ought to comply with federal law, and so

16:21:49  10   there's really no hardship to them at all.  But, in fact, it is

16:21:53  11   certainly in the public interest to have the ADA and the

16:21:58  12   Rehabilitation Act enforced, to have federal law -- the

16:22:02  13   mandates of federal law not interfered with or impeded, as

16:22:06  14   we've argued in our preemption claim.

16:22:12  15        And, Your Honor, again, I'll simply say this:  You

16:22:14  16   know, it's become cliché to say that we're all in this

16:22:17  17   together, and that's certainly true.  I submit to you, though,

16:22:22  18   that GA-38 makes it impossible for us to be all in this

16:22:26  19   together, because what it requires and prohibits, it prohibits

16:22:31  20   our schools from making the decisions that the ADA and 504 and

16:22:37  21   ARPA require to consider all of the possible options for

16:22:44  22   mitigating the risk of this pandemic.

16:22:46  23        So the people who are not all in this together with

16:22:49  24   us are in fact the plaintiffs in this case, these disabled

16:22:55  25   children, who are forced to deal with the problems that we've

16:22:59  1  identified in the Hobson's choice that we've exposed.

16:23:03  2          So we all are in this together, Your Honor, and you

16:23:05  3  should enjoin the enforcement of GA-38 as we've pled and argued

16:23:11  4  today.  Thank you.

16:23:14  5          THE COURT:  Mr. Kercher, anything further?

16:23:16  6          MR. KERCHER:  It's important to note, Your Honor, the

16:23:18  7  scope of the injunction they're asking for.  They're asking the

16:23:23  8  Court to enjoin all enforcement of GA-38 as it relates to mask

16:23:29  9  mandates apparently across the entire state and forever.  I

16:23:32 10  don't think that they have proven that they are entitled to

16:23:33 11  that scope of relief.

16:23:35 12          Even assuming they've proven something, even assuming

16:23:38 13  they've made their case, is it true that there are -- is it

16:23:42 14  true that they are entitled to relief in school districts and

16:23:46 15  schools outside of their own?  I don't think they've shown

16:23:49 16  that.  And, as we've learned, part of this analysis turns on

16:23:54 17  localized data not before the Court.

16:23:56 18          It's also important to consider, Your Honor, how long

16:23:59 19  that relief goes.  Is it never the case that the governor under

16:24:06 20  the Texas Disaster Act can issue an order saying that mask

16:24:10 21  mandates are anathema by local governments?  Is there no point?

16:24:16 22  Is there no threshold?

16:24:18 23          THE COURT:  I don't think that is the logical

16:24:20 24  conclusion from this.  If the plaintiffs are correct, the

16:24:30 25  injunction would be tailored to where if the mask -- if the

| | | |
|---|---|---|
| 16:24:36 | 1 | mask provision violated the ADA and Section 504 and the Rescue |
| 16:24:43 | 2 | Act, I mean, it wouldn't be any broader than where the Court |
| 16:24:48 | 3 | were to find it was at odds with federal law.  So that's where |
| 16:24:55 | 4 | it would stop in a best-of-all-worlds situation for the |
| 16:24:58 | 5 | plaintiff. |
| 16:25:03 | 6 | MR. KERCHER:  That creates pretty considerable |
| 16:25:03 | 7 | interpretation problems down the line. |
| 16:25:05 | 8 | THE COURT:  Well, it does.  It does.  Because that's |
| 16:25:06 | 9 | what always happen, as we've spent the entire day on, when |
| 16:25:10 | 10 | you're comparing state action with federal law.  And how far it |
| 16:25:13 | 11 | goes and where it stops.  Nothing easy about it. |
| 16:25:18 | 12 | MR. KERCHER:  I would encourage the Court to further |
| 16:25:21 | 13 | consider how that could work as a function of time.  As we have |
| 16:25:27 | 14 | seen COVID numbers go down, is there no point at which |
| 16:25:30 | 15 | enforcement of GA-38 would not be violative, per se, of the ADA |
| 16:25:36 | 16 | or the Rehab Act? |
| 16:25:37 | 17 | THE COURT:  There might not be.  It just may be, if |
| 16:25:43 | 18 | the plaintiffs prevail, that that's just the way it is. |
| 16:25:48 | 19 | MR. KERCHER:  I'm sorry? |
| 16:25:48 | 20 | THE COURT:  That that's just the way it is.  Because |
| 16:25:51 | 21 | you read the statutes, particularly when you read the Rescue |
| 16:25:54 | 22 | Act, about relationship to what the CDC is saying and what have |
| 16:25:59 | 23 | you.  I don't know where it stops.  I'm just saying that.  I'm |
| 16:26:04 | 24 | not going to be in the mind set of projecting all the way into |
| 16:26:09 | 25 | the future.  I'm going to look at the case that we have now and |

16:26:13   1  make my decision on whether they've gotten there or not.  And

16:26:16   2  I'm going to -- if it is that they have, then I'm going to look

16:26:22   3  at the federal law as it exists at this moment.  Federal law

16:26:25   4  may later change.

16:26:26   5       But as it exists at this moment, if they are correct,

16:26:34   6  then, to go back to what we talked more about this morning,

16:26:38   7  taking masks off the table with regard to school children can't

16:26:44   8  be done.  That has to at least be something that local school

16:26:47   9  districts are allowed to consider.

16:26:52  10       MR. KERCHER:  And I take your point, Your Honor.  I

16:26:54  11  don't want to draw the discussion out unnecessarily.  I would

16:26:57  12  only suggest this:  That framing any injunction the Court might

16:27:01  13  enter in that way very likely runs afoul of the rule against

16:27:06  14  imposing an injunction that simply instructs the parties to

16:27:09  15  follow the law.  "Do not enforce GA-38 if it's not following

16:27:15  16  the law."  And, as the Court knows --

16:27:18  17       THE COURT:  No.  No.  Don't get me wrong.  That

16:27:19  18  wouldn't be the way it would be worded.  I would find that it

16:27:22  19  doesn't follow the law and, therefore, it's enjoined from

16:27:25  20  enforcement.

16:27:29  21       MR. KERCHER:  So the Court would find that in all

16:27:30  22  cases GA-38 does not follow the law?

16:27:33  23       THE COURT:  As it exists right now with regard to

16:27:35  24  independent school districts, and that's where it would stop.

16:27:38  25       The precise language in GA-38 is what the Court will

| | | |
|---|---|---|
| 16:27:44 | 1 | consider, and the precise language in 504 and the ADA and the |
| 16:27:53 | 2 | Rescue Act once I have determined whether there is a party here |
| 16:28:00 | 3 | who can -- can bring this lawsuit. |
| 16:28:05 | 4 | MR. KERCHER:  I take your point, Your Honor.  It's |
| 16:28:06 | 5 | difficult to argue about this in the abstract.  If and when the |
| 16:28:08 | 6 | Court has language, we may have to take that argument up at |
| 16:28:11 | 7 | some point with someone. |
| 16:28:12 | 8 | THE COURT:  That's why God invented the Fifth |
| 16:28:15 | 9 | Circuit.  That's why they're there. |
| 16:28:16 | 10 | MR. KERCHER:  They are indeed his gift. |
| 16:28:18 | 11 | THE COURT:  The "wise people in New Orleans," as we |
| 16:28:21 | 12 | refer to them. |
| 16:28:21 | 13 | MR. MELSHEIMER:  Your Honor, can I make one just |
| 16:28:22 | 14 | additional comment about that remark.  Of course in addition to |
| 16:28:26 | 15 | the injunction, we've also asked for a declaration -- a |
| 16:28:30 | 16 | declaratory judgment with respect to GA-38 that may well take |
| 16:28:34 | 17 | care of some of the timing issues. |
| 16:28:38 | 18 | THE COURT:  Well, if I were so inclined, I'm not sure |
| 16:28:38 | 19 | I could render an injunction without a declaration as to what |
| 16:28:41 | 20 | the infirmities of GA-38 are. |
| 16:28:44 | 21 | MR. MELSHEIMER:  Correct, Your Honor. |
| 16:28:46 | 22 | THE COURT:  That goes without saying. |
| 16:28:47 | 23 | MR. MELSHEIMER:  All right.  Thank you for your time. |
| 16:28:49 | 24 | THE COURT:  All right.  Mr. Melsheimer, do the |
| 16:28:51 | 25 | plaintiffs rest and close? |

16:28:52  1                MR. MELSHEIMER:  We do.

16:28:53  2                THE COURT:  Mr. Kercher?

16:28:55  3                MR. KERCHER:  We do.

16:28:56  4                THE COURT:  All right.  Then the case is under

16:28:58  5    advisement.  We are going to work on it with as much dispatch

16:29:02  6    as we can muster under the circumstances.  It will be one of my

16:29:07  7    priorities that we will attempt to get out as quickly as

16:29:11  8    possible.  So thank you-all.

16:29:14  9                Mr. Kercher?

16:29:15  10               MR. KERCHER:  Your Honor, are there are any issues on

16:29:17  11   which the Court needs additional briefing, any post-trial

16:29:21  12   briefing?

16:29:21  13               THE COURT:  Oh, Lord no.

16:29:25  14               MR. KERCHER:  Because we got loads of stuff we didn't

16:29:28  15   write down.

16:29:28  16               THE COURT:  Well, I'm going to tell you, I think the

16:29:32  17   cases that you-all have touched upon, the statements that were

16:29:36  18   made by the amici, and the position of the United States

16:29:40  19   Department of Justice pretty much gives me everything I need in

16:29:44  20   the way of the law.

16:29:46  21               But if before you get a decision out of me anybody

16:29:50  22   just stumbles on something that has a direct implication on

16:29:54  23   this, such as the cases we've talked about out of South

16:29:57  24   Carolina, Iowa, Tennessee, Florida, where something moves

16:30:02  25   beyond the temporary injunction or temporary restraining order

| | | |
|---|---|---|
| 16:30:06 | 1 | stage and we get a merits ruling, or if one of those circuits |
| 16:30:10 | 2 | takes the case up, then don't presume that we will find those |
| 16:30:15 | 3 | cases as quickly as you find them.  So I am available to accept |
| 16:30:20 | 4 | anything after the fact that comes out that is directly on |
| 16:30:24 | 5 | point in this case. |
| 16:30:24 | 6 | MR. MELSHEIMER:  And, Your Honor, should we just file |
| 16:30:27 | 7 | that as a notion -- a notice of supplemental authority? |
| 16:30:31 | 8 | THE COURT:  You can -- I'll tell you, it's however |
| 16:30:34 | 9 | you want to protect your record.  I don't care if it's filed. |
| 16:30:38 | 10 | You could e-mail it to Ms. Carmona.  You could use regular mail |
| 16:30:42 | 11 | and send it to me.  I just want knowledge of it.  Now, however |
| 16:30:46 | 12 | you want to structure that is up to you and your particular |
| 16:30:49 | 13 | adversarial positions here and how important you think it is to |
| 16:30:54 | 14 | put that in the record and protect the record.  I just want the |
| 16:30:57 | 15 | information. |
| 16:30:57 | 16 | MR. MELSHEIMER:  Thank you, Your Honor. |
| 16:30:58 | 17 | THE COURT:  I don't care how we do it. |
| 16:30:59 | 18 | MR. KERCHER:  Understood. |
| 16:31:00 | 19 | THE COURT:  All right. |
| 16:31:01 | 20 | MR. MELSHEIMER:  Thank you. |
| 16:31:01 | 21 | THE COURT:  I think this case was very well |
| 16:31:04 | 22 | presented.  It's a difficult case, as I may have mentioned to |
| 16:31:07 | 23 | you.  Or maybe it was in one of my other difficult cases |
| 16:31:10 | 24 | recently.  I am ready to have about a six-week run of nothing |
| 16:31:14 | 25 | but employment discrimination cases.  I'm not saying those |

16:31:17  1  cases aren't important, but the issues are a whole lot easier

16:31:21  2  to get your arms around.

16:31:23  3          MR. MELSHEIMER:  How about patent cases, Judge?

16:31:25  4          THE COURT:  It's easier to get your arms around a

16:31:27  5  patent cases.  The technology may be difficult, but the law's

16:31:31  6  not that hard.  So there we go.

16:31:36  7      (Discussion off the record)

16:31:53  8          THE COURT:  Thank you-all.  You did a great job.

16:31:56  9          Court's in recess.

16:31:57  10     (End of transcript)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   **UNITED STATES DISTRICT COURT      )**

2   **WESTERN DISTRICT OF TEXAS          )**

3        I, Arlinda Rodriguez, Official Court Reporter, United

4   States District Court, Western District of Texas, do certify

5   that the foregoing is a correct transcript from the record of

6   proceedings in the above-entitled matter.

7        I certify that the transcript fees and format comply with

8   those prescribed by the Court and Judicial Conference of the

9   United States.

10       WITNESS MY OFFICIAL HAND this the 10th day of

11  October 2021.

12

13                                  /S/ Arlinda Rodriguez
                                    Arlinda Rodriguez, Texas CSR 7753
14                                  Expiration Date:  10/31/2021
                                    Official Court Reporter
15                                  United States District Court
                                    Austin Division
16                                  501 West 5th Street, Suite 4152
                                    Austin, Texas 78701
17                                  (512) 391-8791

18

19

20

21

22

23

24

25

**Exhibit E: Final Judgment**

Case: 21-51083     Document: 16     Page: 273     Date Filed: 11/23/2021

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**FILED**

November 10, 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ **SO**

DEPUTY

| | |
|---|---|
| E.T., BY AND THROUGH HER PARENTS AND NEXT FRIENDS; D.D., BY AND THROUGH HER PARENTS AND NEXT FRIENDS; J.R., BY AND THROUGH HER PARENTS AND NEXT FRIENDS; H.M, BY AND THROUGH HER PARENTS AND NEXT FRIENDS; E.S., BY AND THROUGH HER PARENTS AND NEXT FRIENDS; M.P, BY AND THROUGH HER PARENTS AND NEXT FRIENDS; S.P., BY AND THROUGH HER PARENTS AND NEXT FRIENDS; AND A.M., BY AND THROUGH HER PARENTS AND NEXT FRIENDS, PLAINTIFFS, V. MIKE MORATH, IN HIS OFFICIAL CAPACITY AS THE COMMISSIONER OF THE TEXAS EDUCATION AGENCY; THE TEXAS EDUCATION AGENCY; AND ATTORNEY GENERAL KENNETH PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS, DEFENDANTS. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ CAUSE NO. 1:21-CV-717-LY<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

## **PERMANENT INJUNCTION AND FINAL JUDGMENT**

BE IT REMEMBERED that on October 6, 2021, the court called the above styled and

numbered cause for bench trial, all parties announced ready, and the trial proceeded and concluded.

On this date, by separate Memorandum Opinion Incorporating Findings of Fact and Conclusions of

Law and Order on Motion to Dismiss, the court dismissed without prejudice Plaintiffs' claims

against Defendants Mike Morath and the Texas Education Agency for lack of subject-matter

jurisdiction and determined that Governor Greg Abbott's Executive Order GA-38 violates federal law and is preempted by federal law.  Therefore,

**IT IS ORDERED** and the court **HEREBY DECLARES** that Paragraph 4 of Governor Greg Abbott's Executive Order GA-38 violates Title II of the Americans with Disabilities Act of 1990 ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and is preempted by the ADA, Section 504, and the American Rescue Plan Act of 2021, insofar as Paragraph 4 applies to school districts, as that term is used in Executive Order GA-38, in Texas.

**IT IS FURTHER ORDERED** that Defendant Kenneth Paxton, Attorney General of Texas as well as his employees, agents, servants, designees, and successors in office are **HEREBY ENJOINED** from imposing any fines, withholding state and federal educational funds, bringing any legal action to enforce or in any way attempting to enforce Paragraph 4 of Executive Order GA-38 insofar as Paragraph 4 applies to school districts, as that term is used in Executive Order GA-38, in Texas.

**IT IS FURTHER ORDERED** that Plaintiffs shall recover their costs of court from Defendant Attorney General Paxton.

Any claim for attorney's fees incurred in this action will be determined post judgment and pursuant to Rule CV-7(j), of the Local Rules of the United States District Court for the Western District of Texas.

As all disputes among the parties have been resolved, the court renders the following Final Judgment pursuant to Federal Rule of Civil Procedure 58.

**IT IS FINALLY ORDERED** that the case is hereby **CLOSED**.

SIGNED this ___*10th*___ day of November, 2021.

_____
LEE YEAKEL
UNITED STATES DISTRICT JUDGE

Case: 21-51083      Document: 16      Page: 275      Date Filed: 11/23/2021

**Exhibit F: Order Denying
Motion for Stay Pending Appeal**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**FILED**

**21 NOV 22 AM 9:44**

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

| | | |
|---|---|---|
| E.T., BY AND THROUGH HER PARENTS AND NEXT FRIENDS; D.D., BY AND THROUGH HER PARENTS AND NEXT FRIENDS; J.R., BY AND THROUGH HER PARENTS AND NEXT FRIENDS; H.M, BY AND THROUGH HER PARENTS AND NEXT FRIENDS; E.S., BY AND THROUGH HER PARENTS AND NEXT FRIENDS; M.P, BY AND THROUGH HER PARENTS AND NEXT FRIENDS; S.P., BY AND THROUGH HER PARENTS AND NEXT FRIENDS; AND A.M., BY AND THROUGH HER PARENTS AND NEXT FRIENDS, PLAINTIFFS, | § § § § § § § § § § § § § § § § § § § § | |
| V. | § § § | CAUSE NO. 1:21-CV-717-LY |
| MIKE MORATH, IN HIS OFFICIAL CAPACITY AS THE COMMISSIONER OF THE TEXAS EDUCATION AGENCY; THE TEXAS EDUCATION AGENCY; AND ATTORNEY GENERAL KENNETH PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF TEXAS, DEFENDANTS. | § § § § § § § § § § § | |

## <u>ORDER ON MOTION TO STAY PENDING APPEAL</u>

Before the court are Defendant's Motion for Stay Pending Appeal filed November 11, 2021

(Doc. #85) and Plaintiffs' Response to Defendant's Motion to Stay filed November 16, 2021

(Doc. #88). Following a bench trial on October 6, 2021, the court rendered an Memorandum

Opinion Incorporating Findings of Fact and Conclusions of Law and Order on Motion to Dismiss

(Doc. #82) and Permanent Injunction and Final Judgment (Doc. #83) on November 10, 2021,

dismissing Plaintiffs' claims against Defendants Mike Morath and the Texas Education Agency without prejudice for lack of subject-matter jurisdiction; declaring that Paragraph 4 of Governor Greg Abbott's Executive Order GA-38 violates Title II of the Americans with Disabilities Act of 1990 ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and is preempted by the ADA, Section 504, and the American Rescue Plan Act of 2021, insofar as Paragraph 4 applies to school districts, as that term is used in Executive Order GA-38, in Texas; and permanently enjoining Defendant Kenneth Paxton his employees, agents, servants, designees, and successors in office from imposing any fines, withholding state and federal educational funds, bringing any legal action to enforce or in any way attempting to enforce Paragraph 4 of Executive Order GA-38 insofar as Paragraph 4 applies to school districts, as that term is used in Executive Order GA-38, in Texas. Defendant Kenneth Paxton appealed to the United States Court of Appeals for the Fifth Circuit on November 11, 2021 (Doc. #84). The order on the motion to dismiss further concludes that Plaintiffs Paxton's enforcement of GA-38 overcomes any claim he may have to sovereign immunity.

Paxton seeks to stay this court's Memorandum Opinion Incorporating Findings of Fact and Conclusions of Law and Order on Motion to Dismiss (Doc. #82) and Permanent Injunction and Final Judgment (Doc. #83) until the appeal is concluded or, alternatively, seeks an order suspending the permanent injunction pending appeal. See FED. R. APP. P. 8(a)(1); FED. R. CIV. P. 62(d). A motion to stay a judgment under Rule 8 of the Federal Rules of Appellate Procedure or to suspend an injunction under Rule 62 of the Federal Rules of Civil Procedure ultimately seeks a delay the implementation of its decision until the Fifth Circuit has an opportunity to consider the validity of that ruling, thereby interrupting the ordinary process of judicial review and postponing relief for the prevailing party at trial. *See United States v. State of Texas*, 523 F. Supp. 703, 729 (E.D. Tex. 1981).

The United States Supreme Court established a four-factor test for suspending an injunction pending appeal: "(1) whether the [] applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a[n injunction]; (3) whether issuance of the [injunction] will substantially injure the other parties interest in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). *See also Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013). An injunction is not a matter of right, even if the applicant will suffer irreparable injury without it. 556 U.S. at 427. Having considered the motion and response, the court concludes that Paxton has failed to make a sufficient showing to warrant a stay pending appeal. Paxton argues that he "has raised a substantial case on the merits regarding the serious legal questions of standing and sovereign immunity" and has demonstrated a likelihood of success on the merits regarding Plaintiffs' ADA and Section 504 claims. Paxton asserts that given the novel nature of Plaintiffs' claims, the Fifth Circuit should haven an opportunity to consider these issues before an injunction is implemented.

The court concludes that Paxton has not presented a substantial case on the merits that would support a stay of the court's injunction. As the court has concluded, Paragraph 4 of GA-38 violates and is preempted by federal law. Paxton's contentions directly contradict federal law, and he fails to mount any challenge to Plaintiffs' evidence establishing the risks of COVID-19 to students with disabilities of the reasonableness of masking as an accommodation. Even if the Paxton had presented a substantial case on the merits, the balance of the equities heavily favors a denial of the requested stay.

Paxton asserts that immediately implementing the injunction will irreparably harm the State of Texas because Texas has an interest in enforcing its laws and thus enjoining Paxton—a state

3

official—from enforcing GA-38 imposes irreparable harm because it disturbs the *status quo*. The enforcement of GA-38 does not reflect the *status quo*, and Texas' interest in seeing its laws enforced does not, standing alone, outweigh the other factors the court must consider in determining whether to suspend an injunction. *Cf. Planned Parenthood*, 734 F.3d at 419 (staying injunction where government's interest was coupled with state's strong showing of likely success on merits). Because the court has found a violation of federal law, this factor only weighs weakly in Texas' favor.

On the other hand, the irreparable harm to Plaintiffs in being denied the benefits of in-person learning on an equal basis as their peers without disabilities weighs heavily against a stay. "As the [government entity] is the appealing party, its interest and harm merges with that of the public." *Id.* (citing *Nken*, 556 U.S. at 435). Texas has an interest in seeing its laws enforced, but because the court concludes that Paragraph 4 of GA-38 violates and is preempted by federal law, that interest can, at best, only weigh weakly in Texas' favor.

Moreover, Paxton's claim that the injunction is vague and overbroad is also without merit. The injunction bars Paxton from enforcing only the specific provisions of GA-38 prohibiting school districts from requiring masks, solely preventing Paxton from engaging in conduct that this court has concluded violates federal law.

Throughout this case Paxton has consistently and forcefully argued that he does not enforce GA-38 and Plaintiffs' asserted injuries will not be addressed by enjoining his actions. If Paxton is correct, in spite of the overwhelming evidence to the contrary that Paxton is enforcing GA-38, then Paxton has not shown that he or Texas is harmed by this court's injunction because its entry has no effect on either him or GA-38.

4

**IT IS THEREFORE ORDERED** that Defendant's Motion for Stay Pending Appeal filed

November 11, 2021 (Doc. #85) is **DENIED**.

SIGNED this _22nd_ day of November, 2021.

_____

LEE YEAKEL
UNITED STATES DISTRICT JUDGE